## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA; the | ) | **Case No.: 5:21-cv-00306-MTT** |
| States of ARKANSAS, CALIFORNIA, | ) | **JURY TRIAL DEMANDED** |
| COLORADO, CONNECTICUT | ) | |
| DELAWARE, FLORIDA, GEORGIA, | ) | |
| HAWAII, ILLINOIS, INDIANA, IOWA, | ) | |
| LOUISIANA, MASSACHUSETTS, | ) | |
| MICHIGAN, MINNESOTA, MISSOURI, | ) | |
| MONTANA, NEVADA, | ) | |
| NEW HAMPSHIRE, NEW JERSEY, | ) | |
| NEW MEXICO, NEW YORK | ) | |
| NORTH CAROLINA, OKLAHOMA, | ) | |
| RHODE ISLAND, TENNESSEE, TEXAS, | ) | |
| VERMONT, VIRGINIA, WASHINGTON, | ) | |
| WISCONSIN, THE DISTRICT OF | ) | |
| COLUMBIA, ex rel. JEFFREY | ) | |
| WILKERSON and LARRY JACKSON, | ) | |
| | ) | |
| Plaintiffs-Relators, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALLERGAN LIMITED f/k/a | ) | |
| ALLERGAN PLC and ALLERGAN USA, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT

1

# Table of Contents

STATEMENT OF THE CASE ...................................................................................................... 5

JURISDICTION AND VENUE ................................................................................................... 8

PARTIES ....................................................................................................................................... 8

APPLICABLE LAW ................................................................................................................... 13

    I.     The Federal and State Statutes Allergan Violated ................................................. 13

        A.    The False Claims Act (FCA) .................................................................................. 13

        B.    The Anti-Kickback Statute (AKS) ......................................................................... 14

        C.    The State False Claims Acts ................................................................................... 16

        D.    The California and Illinois Insurance Fraud Prevention Acts ................................. 17

    II.    The Federal and State Health Insurance Programs, Regulatory Frameworks, and
           Material Conditions of Payment That Defendant Violated ..................................... 18

        A.    The Medicare Program ........................................................................................... 18

        B.    The Medicaid Program ........................................................................................... 21

        C.    Other Federal Health Programs .............................................................................. 22

    III.   HHS-OIG Issued a Special Fraud Alert Related to Pharmaceutical Speaker Programs
           and Warned That Speaker Programs Have Inherent Fraud Risks ............................ 23

THE ALLERGAN GASTROINTESTINAL DRUGS AT ISSUE ............................................. 26

    I.     Linzess .................................................................................................................... 26

    II.    Viberzi ..................................................................................................................... 27

ALLERGAN'S FRAUDULENT SCHEME .............................................................................. 30

    I.     Allergan's Sales Strategy, Sales Personnel Compensation, and Speaker Program
           Background .............................................................................................................. 31

    II.    Allergan Dramatically Increased Its Speaker Spending to Induce Prescriptions of
           Viberzi and Linzess ................................................................................................ 34

    III.   Allergan selected and paid speaker-physicians based on Allergan's revenue from
           speaker-physicians' prescriptions ........................................................................... 35

    IV.   The Venue, Nature and Subject Matter of Allergan Speaker Events All Prove the
           Speaker Events Were a Means to Pay Kickbacks ................................................... 37

    V.    Allergan Specifically Conditioned the Payment of Speaker Fees on Prescriptions .. 40

        A.    Physicians Began Prescribing Significantly More Allergan GI Drugs When Allergan
             Started Paying Speaker Fees ................................................................................... 47

    VI.   Allergan Corporate Policies Facilitated Using Speaker Events to Pay Illegal
           Remuneration to Physicians to Prescribe Allergan Drugs ...................................... 48

        A.    Allergan's Policy of Requiring a Minimum Number of RSVPs for Events, Instead of
             Minimum Number of Actual Attendees, Incentivized Sales Representatives to
             Collect Tenuous RSVPs Whom Allergan Knew Would Not Show Up .................... 48

        B.    Allergan Paid Speaker-Physicians in Full for Sham Events ...................................... 50

ALLERGAN'S SCHEME HAS CAUSED THE SUBMISSION OF THOUSANDS OF FALSE CLAIMS AND COST THE FEDERAL AND STATE GOVERNMENT MILLIONS ............... 55

ALLERGAN'S UNLAWFUL RETALIATION AGAINST RELATOR JACKSON ................. 56

COUNT I: Federal FCA ............................................................................................ 61

COUNT II: Federal FCA ........................................................................................... 61

COUNT III: Federal FCA Conspiracy ...................................................................... 62

COUNT IV: Federal FCA .......................................................................................... 63

COUNT V: Arkansas State Medicaid Fraud False Claims Act ................................ 63

COUNT VI: California FCA ...................................................................................... 65

COUNT VII: Colorado Medicaid False Claims Act, ............................................... 66

COUNT VIII: Connecticut False Claims Act, .......................................................... 67

COUNT IX: Delaware False Claims & Reporting Act ............................................. 68

COUNT X: District of Columbia False Claims Act ................................................. 69

COUNT XI: Florida FCA .......................................................................................... 70

COUNT XII: Georgia State False Medicaid Claims Act .......................................... 71

COUNT XIII: Hawaii False Claims Act, .................................................................. 72

COUNT XIV: Illinois FCA ....................................................................................... 73

COUNT XV: Indiana Medicaid False Claims and Whistleblower Protection Act .................... 74

COUNT XVI: Iowa FCA ........................................................................................... 75

COUNT XVII: Louisiana Medical Assistance Programs Integrity Law .................. 75

COUNT XVIII: The Commonwealth of Massachusetts FCA ................................... 76

COUNT XIX: Michigan Medicaid FCA ................................................................... 77

COUNT XX: Minnesota False Claims Act, ............................................................. 79

COUNT XXI: Missouri Health Care Payment Fraud and Abuse Statute, ................ 80

COUNT XXII: Montana FCA .................................................................................... 81

COUNT XXIII: Nevada Submission of False Claims to State or Local Government Act ........... 82

COUNT XXIV: New Hampshire False Claims Act .................................................. 83

COUNT XXV: New Jersey False Claims Act ........................................................... 84

COUNT XXVI: New Mexico Medicaid FCA ........................................................... 85

COUNT XXVII: New York False Claims Act, ......................................................... 86

COUNT XXVIII: North Carolina False Claims Act ................................................. 87

COUNT XXIX: Oklahoma Medicaid FCA ............................................................... 88

COUNT XXX: Rhode Island FCA ............................................................................ 89

COUNT XXXI: Tennessee Medicaid FCA ............................................................... 90

COUNT XXXII: Texas Medicaid Fraud Prevention Act ......................................... 91

COUNT XXXIII: Vermont FCA ................................................................................ 92

COUNT XXXIV: Virginia Fraud Against Taxpayers Act ....................................... 93

COUNT XXXV: Washington State Medicaid Fraud FCA......................................... 94

COUNT XXXVI: Wisconsin False Claims for Medical Assistance Act, ................... 95

COUNT XXXVII: California Insurance Frauds Prevention Act................................. 96

COUNT XXXVIII: Illinois Insurance Frauds Prevention Act ................................... 98

COUNT XXXIX: Unlawful Retaliation ................................................................... 99

Relators Jeffrey Wilkerson ("Relator Wilkerson") and Larry Jackson ("Relator Jackson") on behalf of themselves, the United States of America and the States of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, and the District of Columbia (the named party States) allege and claim against Defendants Allergan Limited f/k/a Allergan PLC and Allergan USA, Inc. (collectively "Allergan"), as follows:

## STATEMENT OF THE CASE

1.      "The relationship between a patient and a physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest."[1]  This case is about a fraudulent Allergan scheme to bribe doctors to prescribe expensive, often unnecessary, and potentially dangerous Allergan drugs to boost Allergan's profits. Allergan's scheme corrupted thousands of patient-physician relationships by causing doctors to place their own financial interests over the interests of their patients.

2.      Allergan's scheme also violates the federal False Claims Act (FCA), the federal Anti-Kickback Statute (AKS), and a number of state False Claims Acts and has cost taxpayers millions of dollars in fraudulent claims for drug reimbursements under federal and state healthcare programs.

3.      Beginning in 2015, Allergan devised and implemented a nationwide scheme to provide doctors and their medical practices illegal kickbacks in the form of money, food, alcohol,

---

[1] American Medical Association, Code of Ethics: Patient Physician Relationships.

travel expenses, services, and other things of value, to induce them to prescribe—and to cause other physicians to prescribe—two expensive and potentially dangerous gastrointestinal drugs: (1) the newly-launched Viberzi, a Schedule IV opioid drug with addictive properties and (2) its lucrative counterpart, Linzess.

4.    Consistent with Allergan's history of violations of the anti-kickback laws summarized below, Allergan's kickback scheme demonstrates corruption of its sales and marketing, finance, and compliance functions.  Allergan's kickback scheme was a fundamental part of Allergan's comprehensive, coordinated sales and marketing plan for these two drugs.

5.    As part of this scheme, Allergan used its speaker program to pay doctors to prescribe these expensive and even dangerous Allergan drugs to patients.  Allergan concealed the "kickback" nature of its payments to physicians by calling the illegal payments "speaker fees" and by claiming it paid those "speaker fees" to physicians for conducting "educational events" with other healthcare professionals (HCPs).  The purpose of the speaker fees was not education, however; it was to encourage the speakers to increase their prescriptions of Linzess and Viberzi, and to cause other doctors to do the same.  The more Allergan paid doctors, the more it expected the doctor to increase his or her prescriptions.  Allergan also hoped that by bribing specialist doctors and their medical practices to vouch for its products, the specialists would cause many other doctors to prescribe the Allergan drugs as well.

6.    In addition to Allergan's kickbacks of money, food, alcohol, and travel expenses, Allergan also provided other inducements to physicians to prescribe Linzess and Viberzi, including free services and assistance to the prescribers and the prescribers' staff.  Those free services included: helping the practices to identify potential Viberzi and Linzess patients; performing administrative functions and medical reviews necessary to facilitate prescriptions and

reimbursement; helping with administrative communications and other functions relating to billing and reimbursement; and coordination with dispensing pharmacies including follow up services to facilitate continued prescriptions of these drugs. These inducements included the practice of "chasing scripts" to make sure prescriptions were filled, as described below.

7. All of Allergan's conduct described herein relating to its providing physicians money, food, alcohol, travel expenses, services, inducements, and other things of value were part of its unlawful kickback scheme and were acts in furtherance of a conspiracy to violate the AKS and the FCA involving Allergan and the doctors it bribed.

8. Relators worked for Allergan as sales representatives when Allergan devised and implemented its kickback scheme and witnessed first-hand Allergan's scheme in practice. Allergan instructed Relators to aggressively market Viberzi and Linzess, to downplay the risks of the drugs, and to do whatever was necessary to increase sales, including arranging for the payment of speaker fees for sham events. Relators saw first-hand that often the "educational events" for which doctors were paid thousands of dollars were nothing more than the doctor getting paid for drinking and dining with one of Allergan's sales reps at a high-priced restaurant. Allergan even paid doctors thousands of dollars in speaker fees for events that were cancelled.

9. Relators also saw first-hand that Allergan's scheme worked just as it intended. Doctors that Allergan paid thousands of dollars in speaker fee kickbacks greatly increased their prescriptions of Linzess and Viberzi. If a doctor failed to increase his or her prescriptions, Allergan removed them from the speaker program, cutting off the spigot of money.

10. Allergan specifically targeted doctors for its speaker program who had patients covered by federal and state healthcare programs. As a result, Allergan's army of kickback-paid physicians became substantial drivers of federal and state reimbursements for Viberzi and Linzess.

Each claim paid by the government for a prescription written by a doctor involved in Allergan's kickback scheme is a false claim under the federal and state FCAs. Allergan has caused the federal and state governments to pay millions of dollars for prescriptions written by doctors involved in Allergan's kickback scheme.

## JURISDICTION AND VENUE

11.     The action arises, in part, under the FCA, 31 U.S.C. §§ 3729-33. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper under 31 U.S.C. § 3732(a).

12.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a) because Allergan qualifies to do business in the state of Georgia, transacts substantial business in the state of Georgia, and can be found here. Additionally, venue lies in this judicial district because Allergan committed acts proscribed by 31 U.S.C. § 3729 here. Specifically, Allergan offered and provided illegal remuneration to induce physicians to prescribe pharmaceutical products that were paid for by government funded health care programs, in violation of 42 U.S.C. § 1320a-7b. Moreover, Allergan made and used false records material to false claims, conspired to submit false claims, and knowingly concealed and improperly avoided obligations to pay or transmit money or property to the United States in this district.

## PARTIES

13.     Allergan Limited is a multinational pharmaceutical company headquartered in Dublin, Ireland. Allergan USA, Inc. is a wholly owned subsidiary of Allergan Limited and is headquartered in Parsippany, New Jersey. Allergan sells billions of dollars of pharmaceutical products each year in the United States, including several brand-name gastrointestinal drugs, such as Linzess and Viberzi. On May 8, 2020, global pharmaceutical company Abbvie, Inc. completed

an acquisition of Allergan Limited.  Since then, Allergan has operated as a subsidiary of Abbvie, Inc.

14.     Allergan is a recidivist violator of the AKS and the FCA and has a long history of fraudulent marketing practices for its various drugs, including payments of illicit kickbacks to prescribing physicians.

15.     In 2010, Allergan pled guilty to crimes and paid $600 million in criminal fines and civil false claims settlements associated with its marketing of Botox.[2]  As part of the civil settlement, Allergan paid $225 million to resolve claims that Allergan caused false claims to be submitted to government health care programs because Allergan "provided inducements to doctors to inject more Botox."[3]  Allergan also entered into a Corporate Integrity Agreement (CIA) with the Department of Health and Human Services (HHS), Office of Inspector General (HHS-OIG).[4] The Allergan CIA was entered on August 30, 2010 and was operative for 5 years.[5]  The CIA required Allergan to implement a Compliance Program, Code of Conduct, and policies and procedures to address arrangements entered into with doctors, "including, but not limited to speaker programs, speaker training programs, [and] presentations…) … [and] to ensure that the arrangements and related events are used for legitimate and lawful purposes in accordance with applicable Federal health care program and FDA requirements."[6]  The Allergan CIA expired just

---

[2] Press Release, Dep't of Justice "Allergan Agrees to Plead Guilty and Pay $600 Million to Resolve Allegations of Off-Label Promotion of Botox." (Sept. 1, 2010); available at: https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox.
[3] *Id.*
[4] *Id.*
[5] Part I-II, Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Allergan, Inc. (August 30, 2010).
[6] *Id.* (emphasis added).

a few months before Allergan began implementing the unlawful scheme described in this Complaint.

16.     Similarly, on September 15, 2010, Forest Pharmaceuticals Inc., now an Allergan subsidiary,[7] agreed to pay $313 million to resolve criminal and civil allegations, including FCA allegations, that it caused false claims to be submitted to federal health care programs for the drugs Levothroid, Celexa, and Lexapro.[8]  The settlement resolved allegations that "Forest used illegal kickbacks to induce physicians and others to prescribe Celexa and Lexapro including cash payments disguised as grants or consulting fees, expensive meals and lavish entertainment, and thus caused false claims to be submitted to federal health care programs."  In connection with the $313 million settlement, Forest was also required to enter a CIA with HHS-OIG.[9]  The Forest CIA was entered on September 14, 2010 and was operative for 5 years.  The Forest CIA also required Forest to implement a Compliance Program, Code of Conduct, and policies and procedures to address financial arrangements entered into with doctors.[10]  The Forest CIA was still in effect when Allergan purchased Forest in 2015 and expired just a few months before Allergan began implementing the scheme described herein.

17.     In 2016, while owned by Allergan, Forest paid another $38 million to the United States and various state governments to resolve kickback allegations related to its marketing of

---

[7] As described further *infra,* Allergan acquired Forest Pharmaceuticals in March 2015 as part of Allergan's purchase of Actavis, Inc.

[8] Press Release: Dept. of Justice, "Drug Maker Forest Pleads Guilty; To Pay More Than $313 Million to Resolve Criminal Charges and False Claims Act Allegations." (Sep. 15, 2010), available at: https://www.justice.gov/opa/pr/drug-maker-forest-pleads-guilty-pay-more-313-million-resolve-criminal-charges-and-false.

[9] *Id.*

[10] Part III, Section B. Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Forest Laboratories, Inc. (September 14, 2010).

Bystolic, Savella, and Namenda. Mirroring the scheme described herein, the 2016 Forest settlement resolved allegations that Forest violated the FCA and AKS by "providing payments and meals to certain physicians in connection with **speaker programs** about Bystolic, Savella or Namenda … and the payment and meals were intended as improper inducements because Forest provided these benefits even when the programs were cancelled, when no licensed health care professionals attended the programs…or when the meals associated with the programs exceeded Forest's internal cost limitations."[11]

18. When Allergan purchased Forest in 2014, Allergan placed many former Forest sales employees in leadership positions with Allergan. Those former Forest employees included Allergan District Manager Alan Foust, Regional Manager James Martin, and Vice President of Sales Chris Sweeney. Those former Forest employees brought with them to Allergan the complete disregard for compliance that they learned as part of the corrupt culture at Forest.

19. In 2017, Allergan paid another $13 million to settle allegations that it paid kickbacks to eye doctors to prescribe Lumigan, Zymar, Restasis, and Acular and that it had disguised the illicit payments as "speaker fees."[12]

20. Relator Larry Jackson has over 20 years of experience as a pharmaceutical sales representative. Relator Jackson worked for Allergan, and its predecessor Actavis Pharma, Inc., as a Senior Professional Sales Specialist from 2013 to 2017. Relator Jackson worked in Allergan's Gastroenterology Group and promoted drugs, including Viberzi and Linzess. He

---

[11] Press Release, Dep't of Justice. "Forest Laboratories and Forest Pharmaceuticals to Pay $38 Million to Resolve Kickback Allegations Under the False Claims Act." (December 15, 2016), available at: https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations (emphasis added).
[12] *See United States of America ex rel. Herbert J. Nevyas, M.D. and Anita Nevyas-Wallace, M.D. v. Allergan, Inc.*, Civil Action No. 09-CV-00432 (E.D. Pa.).

was responsible for Allergan's Tulsa, Oklahoma, Northwest Arkansas, and Southwest Missouri territories. In this role, Relator Jackson learned first-hand that Allergan systematically provides illegal remuneration to physicians to induce those physicians to prescribe Allergan drugs in violation of the AKS. Through his knowledge of Allergan's nationwide operations, Relator Jackson also has knowledge that Allergan devised its AKS violations at the highest level of management, and management implemented Allergan's scheme nationwide. Ultimately, Allergan terminated Relator Jackson in violation 31 U.S.C. § 3730(h) for voicing concerns about Allergan's dangerous and illegal marketing tactics and for his efforts to prevent false claims from being submitted.

21.     Relator Jeffrey Wilkerson has over 12 years of experience as a pharmaceutical sales representative. Relator Wilkerson worked for Defendant Allergan, and its predecessor Actavis Pharma, Inc., as a Senior Professional Sales Specialist from 2013 to 2016. Relator Wilkerson worked in Allergan's Gastroenterology Group and promoted Gastroenterology drugs, including Viberzi and Linzess. He was responsible for Allergan's West Tennessee and North Mississippi territories. In this role, Relator Wilkerson learned firsthand that Allergan systematically provides illegal remuneration to physicians to induce those physicians to prescribe Allergan drugs in violation of the AKS. Through his knowledge of Allergan's nationwide operations, Relator Wilkerson also has knowledge that Allergan devised its AKS violations at the highest level of management and management implemented Allergan's scheme nationwide.

22.     Before filing this Complaint, Relators voluntarily disclosed to the United States the information upon which this case is based. Although Relators are aware of no public disclosure of the fraud described herein, if any public disclosure has taken place, as defined by 31 U.S.C. § 3730(e)(4)(A), Relators would qualify as the original source of the information for purposes of

that code section. Relators also have knowledge that is independent of and would materially add to any purported publicly disclosed allegations or transactions and voluntarily provided that information to the United States before filing their Complaint, as contemplated by 31 U.S.C. § 3730(e)(4)(B)(2).

## APPLICABLE LAW

### I. The Federal and State Statutes Allergan Violated

#### A. The False Claims Act (FCA)

23.     The FCA, 31 U.S.C. §§ 3729-3733, provides that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or (4) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

24.     Under the FCA, "the terms 'knowing' and 'knowingly' (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1).

25.     The FCA defines "claim" as "(A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or

property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

26.     The FCA defines the term "obligation" as an "established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

27.     The FCA also provides relief from retaliatory actions.  An employee is entitled to all relief necessary to make that employee whole if the employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the FCA or other efforts to stop one or more violations of the FCA." 31 U.S.C. § 3730(h).

**B.  The Anti-Kickback Statute (AKS)**

28.     Soon after the establishment of the Medicare system in 1965, it became apparent that unscrupulous physicians and medical entities were abusing taxpayers funding the national healthcare system through unethical and kickback-tainted referrals by unscrupulous physicians and medical entities.  In response, Congress enacted the federal AKS and made it a misdemeanor to provide "bribes and kickbacks" in exchange for referrals of Medicare-funded medical services. *See* Pub. L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972).  Congress amended the AKS in 1977 to extend its reach beyond strictly "bribes and kickbacks" to "any remuneration" and elevated

violation of the AKS from misdemeanor to felony status. *See* Medicare and Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977).

29.     The AKS provides that anyone who "knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person … to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or … to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, **shall be guilty of a felony and upon conviction thereof, shall be fined not more than \$25,000 or imprisoned for not more than five years, or both**." 42 U.S.C. § 1320a-7b(b) (emphasis added).

30.     The AKS does not specifically define "remuneration," but the word has been interpreted by the courts to mean "anything of value." *See, e.g., Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019) (analyzing whether doctors received "anything of value" in AKS case). *See also* OIG Compliance Program Guidance for Ambulance Suppliers, 68 FR 14245-02 ("Under the anti-kickback statute, 'remuneration' means virtually anything of value.").

31.     A payment violates the AKS if *one* purpose of the payment is to induce referral of items or services that may be paid for by federal health care programs. *United States v. Shah*, 981 F.3d 920, 926 (11th Cir. 2020), *citing U.S. v. Greber,* 760 F.2d 68, 69 (3rd Cir. 1985). It is no defense to the AKS that a payment was made, in part, for services actually rendered so long as the payor also sought to induce referrals. *Id.*

32.     A person need not have actual knowledge of the AKS or a specific intent to commit a violation of the AKS in order to be liable. 42 U.S.C. § 1320a-7b(h). A payee's motivation for

accepting kickbacks is similarly irrelevant. *United States v. Shah*, 981 F.3d 920, 926 (11th Cir. 2020). The AKS requires *no* proof of the recipient's motivation for accepting the illegal payment, if the recipient accepts the kickback knowingly and willfully. *Id.*

33.     The AKS expressly provides that "**a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]**." 42 U.S.C. §1320a-7b(g) (emphasis added).

34.     Compliance with the AKS is a material requirement to receive payment from government health care programs. As addressed *infra*, the certifications required to enroll as a Medicare Provider and the certifications required to receive payment for each Medicare Part D prescription require physicians to certify that they will not violate the AKS or other health care laws. A physician's misrepresentation that prescription drug claims submitted to federal healthcare programs are in compliance with the AKS when such claims are actually tainted by illegal remuneration is material to the government's payment decision and triggers FCA liability. *See Universal Health Services, Inc. v. U.S.*, 136 S. Ct. 1989, 2003 (2016).

### C. The State False Claims Acts

35.     Upon witnessing the effectiveness of the federal FCA in combatting fraud against government programs and health care fraud specifically, many states have enacted state laws similar to the federal FCA.

36.     Relators allege violations of the FCAs of a number of states in this Complaint, including the plaintiff states of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North

16

Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Wisconsin, Washington, and the District of Columbia.

37.     Claims tainted by illegal remuneration may not be paid under state regulatory regimes.  For instance, in the State of Georgia, it is unlawful to obtain or attempt to obtain benefits paid for by the Georgia Medicaid program by knowingly and willfully making a false statement or false representation; deliberate concealment of any material fact; or fraudulent scheme or device.  O.C.G.A. § 49-4-146.1(b).

38.     Further, the Georgia State False Medicaid Claims Act imposes liability on any person who: (1) knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid. O.C.G.A. § 49-4-168(a).

**D.  The California and Illinois Insurance Fraud Prevention Acts**

39.     The states of California and Illinois also have enacted Insurance Fraud Prevention Acts that permit relators to bring a *qui tam* action to recover fraudulent claims submitted to private insurance companies in those states.  Allergan's offer and provision of illegal remuneration to induce prescriptions of its drugs have caused the submission of false claims, tainted by bribes, to private insurance companies in California and Illinois.

40.     California state law prohibits providing kickbacks to physicians and medical care providers.  Specifically, California Business and Professional Code § 650(a) prohibits: "[T]he offer, delivery, receipt or acceptance by any person licensed under this division or the Chiropractic Initiative Act of any rebate, refund, commission, preference, patronage, dividend or discount, or

other consideration, whether in the form of money or otherwise as compensation or inducement for referring patients, clients or customers to any person." California Penal Code § 549 makes it illegal for a firm or corporation to "solicit, accept, or refer any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether" that individual or entity will present or cause to be presented any false or fraudulent claim for payment of a health care benefit.

41.     California Insurance Code § 1871.7(b) provides for civil recoveries against persons who violate the provision of Penal Code sections 549.

42.     The Illinois Insurance Claims Fraud Prevention Act, §5(b) provides that a person who violates any provision of the Act or Article 46 of the "Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance." 740 Ill. Comp. Stat. § 92/5(b). Illinois Criminal Code, Article 46, provides criminal penalties for any person who commits the offense of insurance fraud. 720 Ill. Com. Stat. § 5/46-1(a).

43.     The Illinois Insurance Claims Fraud Prevention Act § 15(a) provides for a *qui tam* action to create incentives for private individuals to prosecute fraud violations. 740 Ill. Comp. Stat. § 92/15(a).

## II.     The Federal and State Health Insurance Programs, Regulatory Frameworks, and Material Conditions of Payment That Defendant Violated

### A.  The Medicare Program

44.     Medicare is a federal healthcare program that provides federally subsidized health insurance for eligible citizens—primarily persons who are 65 or older and the disabled. 42 U.S.C. §§ 1395, *et seq*.

18

45.    The Medicare Program is segmented into four parts.  Medicare Part D was enacted as part of the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare beneficiaries.  All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D.  HHS through its sub-agency Centers for Medicare and Medicaid Services (CMS), contracts with private companies (or sponsors) authorized to sell Part D insurance coverage.  Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

46.    To be eligible to participate in the Medicare program and receive payment from the Medicare program, including to prescribe and have Medicare pay for prescriptions for pharmaceutical products, physicians must certify that they agree to comply with the AKS and other relevant health care laws.  Physicians make those certifications in Form CMS-855I.  Among other disclosures and certifications required, Form CMS-855I contains a "certification statement and signature" and requires the physician to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).**

Form CMS-855I (emphasis added).   Form CMS-855I also requires physicians to certify the following:

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

47.     Additionally, to enroll as a prescribing physician in the Medicare Part D program, a physician or other eligible provider must certify that they agree to comply with the AKS and other relevant health care laws.  Physicians make this certification in Form CMS-855O.   Among other disclosures and certifications required, Form CMS-855O contains a "certification statement," which requires:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 2A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).**

Form CMS 855-O (emphasis added).  Form CMS 855-O also requires physicians, or other eligible individuals, to certify the following:

> I will not knowingly order and/or certify an item and/or service or prescribe Part D drugs that allows a false or fraudulent claim to be presented for payment by Medicare.

48.     When the government pays for pharmaceutical products under Medicare Part D, Part D sponsors must certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste and abuse, including, but not limited to applicable provisions of federal criminal law, the FCA, and the AKS.  42 C.F.R. § 423.505(h)(1).

49.     CMS regulations also require that all subcontracts between Part D sponsors and pharmacies contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

**B. The Medicaid Program**

50.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  The FMAP is at least 50 percent and is as high as 83 percent.

51.     In all states, the Medicaid program pays for prescription drugs.  Most states award contracts to private companies to administer the state's Medicaid program and process claims for payment on behalf of Medicaid beneficiaries.  Typically, after processing the claims, these private companies generate funding requests to the state Medicaid programs.  Before the beginning of each calendar quarter, each state submits to CMS Form CMS-37 (Medicaid Program Report; Quarterly Distribution of Funding Requirements), which provides an estimate of its Medicaid federal funding according to the FMAP and expected Medicaid spending.  42 C.F.R. § 430.30.  Similarly, after each calendar quarter and in order to receive federal Medicaid funds, each state submits Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which provides an accounting of the state's actual recorded expenditures.  *Id.*

52.     Using this information, CMS then determines the amount of federal funding each state will be provided for the ensuing quarter and issues a grant to the state for that amount.  42 C.F.R. § 430.30.  Each state is then authorized to draw funds from the federal grant to pay for Medicaid expenditures, including prescription drugs.

53.     States require certifications by physicians as a condition of providing Medicaid reimbursement for prescription drugs paid for by the Medicaid program.  These

certifications include compliance with the AKS, among other federal laws. To participate in the Medicaid program, a physician must also sign an agreement with the state that certifies compliance with the state and federal Medicaid requirements, including the AKS.

54.      For example, to enroll as a provider under the Georgia Medicaid Program and receive funds from the Georgia Medicaid program, physicians must agree to "abide by all federal and state laws governing the Medicaid program."[13]   Accordingly, when physicians in Georgia prescribe Allergan drugs tainted by kickbacks, the existence of such kickbacks are a "material fact" that must be disclosed to the state. A physician's failure to disclose such a kickback is a false statement and any resulting payment from the state is a false claim. O.C.G.A. § 49-4-146.1(b).   Submitting claims to the Georgia Medicaid Program that are tainted by illegal kickbacks is a violation of the Georgia State False Medicaid Claims Act. O.C.G.A. § 49-4-168(a).

**C. Other Federal Health Programs**

55.      TRICARE is a managed health program established by the Department of Defense and provides health care benefits to eligible beneficiaries, which include active duty service members, retired service members, and their families. TRICARE provides prescription drug benefits to its beneficiaries. TRICARE requires physicians to certify compliance with the AKS, among other federal health care laws.

56.      The Federal Employee Health Benefits Program ("FEHBP") is a federally funded health care program established by Congress in 1959, pursuant to the Federal

---

[13] *See* GA DEPT OF COMMUNITY HEALTH DIVISION OF MEDICAL ASSISTANCE Provider Enrollment Application Instructions; available at https://www.gahsc.org/nm/pp/2006/ccs/Medicaid%20Provider%20Enrollment%20Appl.pdf.

Employees Health Benefits Act. 5 U.S.C. §§ 8901, *et seq*. The Office of Personnel Management ("OPM") administers the FEHBP program and contracts with various health insurance carriers to provide services to FEHBP members. *Id*. at §§ 8902, 8909(a). The funds used to pay for health care for FEHBP members are maintained in the Employees Benefit Treasury funds and are the source of all payments to the insurance carriers for health care rendered to FEHBP members—including payment for prescription drugs. *Id*. at § 8909.

57.     The U.S. Department of Veterans Affairs (VA) maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are purchased directly or indirectly by the VA and dispensed to VA beneficiaries. The VA also supports a mail service prescription program as part of the outpatient drug benefit. The system serves millions of veterans.

### III.     HHS-OIG Issued a Special Fraud Alert Related to Pharmaceutical Speaker Programs and Warned That Speaker Programs Have Inherent Fraud Risks

58.     HHS-OIG issues "fraud alerts" to identify fraudulent and abusive practices within the health care industry as well as address specific trends of health care fraud and certain practices of an industry-wide character.[14] These special fraud alerts are published in the Federal Register, on HHS' website, and "extensive[ly] distributed directly to the health care provider community."[15]

---

[14] Federal Register Volume 59, Issue 242 (December 19, 1994).
[15] *Id.*

59.     On November 16, 2020, HHS-OIG issued Special Fraud Alert: Speaker Programs ("Special Fraud Alert").[16]  This Special Fraud Alert highlighted "the fraud and abuse risks associated with offer, payment, solicitation or receipt of remuneration relating to speaker programs by pharmaceutical and medical device companies."[17]  Allergan's "speaker" programs described herein are precisely the type of speaker programs addressed and identified as "inherent fraud risks" in the Special Fraud Alert.[18]

60.     Generally, the speaker programs that caused HHS-OIG to issue the Special Fraud Alert are company-sponsored events like those described herein at which a pharmaceutical or device company pays a physician or other HCP to make a speech or presentation to other HCPs about a drug or device sold by the company.[19]  From 2017 to 2020, drug and device companies reported paying nearly **$2 billion** to HCPs for speaker-related services.[20]

61.     HHS-OIG's position is that **any** payment to HCPs for speaker events is inherently suspect.  Although drug companies claim that "HCPs 'participate in company-sponsored speaker programs in order to help educate and inform other health care professionals about the benefits, risks and appropriate uses of company medicines,'" HHS-OIG has made it clear that "OIG is skeptical about the educational value of such programs."[21]

---

[16] Special Fraud Alert: Speaker Programs.  Department of Health and Human Services, Office of Inspector General. (Nov. 16, 2020) available at:
https://oig.hhs.gov/fraud/docs/alertsandbulletins/2020/SpecialFraudAlertSpeakerPrograms.pdf.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

62.     Speaker programs, precisely like those funded by Allergan and alleged herein, "strongly suggest that one purpose of the remuneration to the HCP speaker and attendees is to induce or reward referrals."  As demonstrated in Relators' personal observations and allegations detailed herein, "studies have shown that HCPs who receive remuneration from a company are more likely to prescribe or order that company's products."[22]  "This remuneration to HCPs may skew their clinical decision making in favor of their own and the company's financial interests, rather than the patient's best interests."[23]

63.     HHS-OIG issued the Special Fraud Alert to highlight "some of the inherent fraud and abuse risks associated with the offer, payment, solicitation, or receipt of remuneration related to company-sponsored speaker programs."[24]  These inherent risks are exemplified in specific characteristics of speaker programs that HHS-OIG has determined violate the FCA and AKS.  These characteristics include when drug and device companies:

-       selected high-prescribing HCPs to be speakers and rewarded them with lucrative speaker deals (*e.g.*, some HCPs received hundreds of thousands of dollars for speaking);
-       conditioned speaker remuneration on sales targets (e.g., required speaker HCPs to write a minimum number of prescriptions in order to receive the speaker honoraria);
-       held programs at high-end restaurants where expensive meals and alcohol were served.[25]

64.     HHS-OIG also provided additional characteristics that indicate a speaker program arrangement could violate the AKS, including:

---

[22] *Id.* citing Amarnath Annapureddy et al., *Association Between Industry Payments to Physicians and Device Selection in ICD Implantation*, 324 JAMA 17, 2020, at 1759, 1762–63; William Fleischman et al., *Association between payments from manufacturers of pharmaceuticals to physicians and regional prescribing: cross sectional ecological study,* 354 BMJ i4189, 2016, at 1, 4–7; James P. Orlowski & Leon Wateska, *The effects of pharmaceutical firm enticements on physician prescribing patterns. There's no such thing as a free lunch*, 102 CHEST, 1992, 270.
[23] *Id.*
[24] *Id.*
[25] *Id.*

- The company sponsors speaker programs where little or no substantive information is actually presented;
- Alcohol is available or a meal exceeding modest value is provided to the attendees of the program (the concern is heightened when the alcohol is free);
- The program is held at a location not conducive to the exchange of educational information (*e.g.*, restaurants or entertainment or sports venues);
- The company sponsors a large number of programs on the same or substantially the same topic or product, especially in situations involving recent substantive change in relevant information;
- Attendees include individuals who don't have a legitimate business reason to attend the program, including, for example friends, significant others, or family members of the speaker or HCP attendees; employees or medical professional who are members of the speaker's own medical practice; staff of facilities for which the speaker is a medical director; and other individuals with no use for the information.
- The company's sales or marketing business units influence the selection of speakers or the company selects HCP speakers based on past or expected revenue that the speakers or attendees have or will generate by prescribing or ordering the company's products (e.g., a return on investment analysis is considered in identifying participants); and
- The company pays HCP speakers more than fair market value for the speaking service or pays compensation that takes into account the volume or value of past business generated or potential.

65.     Almost all of the characteristics of speaker's programs that HHS-OIG identified as fraudulent are present in the Allergan speaker scheme described in this Complaint and demonstrate Allergan has violated the FCA and AKS.

## THE ALLERGAN GASTROINTESTINAL DRUGS AT ISSUE

**I.          Linzess**

66.     Linzess (linaclotide) is a daily prescription medication used to treat two chronic constipation disorders: irritable bowel syndrome with constipation (IBS-C) and chronic idiopathic[26] constipation (CIC).

67.     Ironwood Pharmaceuticals, Inc. and Forest Laboratories, Inc. launched Linzess in the U.S. markets on December 17, 2012, as a "guanylate cyclase-C (GC-C) agonist"

---

[26] "Idiopathic" means a condition for which the cause is unknown.

– a drug that increases intestinal fluid secretion to help soften stools and stimulate bowel movements.

68.     In July 2014, Actavis, Inc. acquired Forest Laboratories, Inc.  In March 2015, Allergan acquired Actavis, Inc. and continued to aggressively marketing Linzess, including through paid speaker events.

69.     Linzess is similar to and in fact competes with non-prescription "over-the-counter" (OTC) constipation medications such as Miralax.  Many Medicare Part D plans and state Medicaid prescription drug plans require patients to try Miralax first as a preliminary "step therapy" to try to remedy the patient's constipation issues before covering the expensive cost of Linzess.

70.     In 2016, the average cost for a 30-day prescription of Linzess under Medicare Part D plans was $320.36.  In 2017, the average cost for a 30-day prescription of Linzess under Medicare Part D plans was $352.64 or over $11 per day.  Miralax—Linzess' OTC competitor— costs $18.99 for a 30-day supply of once-daily doses or less than 64 cents per day.

## II.        Viberzi

71.     Viberzi is an opioid-based Schedule IV controlled substance under the Controlled Substances Act that is used to treat patients with Irritable Bowel Syndrome with Diarrhea (IBS-D).  The active ingredient in Viberzi is an opiate called eluxadoline.

72.     Allergan acquired eluxadoline from Furiex Pharmaceuticals for over $1 billion in July 2014.  Allergan believed that it would recoup this investment by extending Allergan's current gastrointestinal (GI) business through the aggressive marketing and sale of eluxadoline as the brand name Viberzi.

73.     The FDA approved Viberzi on May 27, 2015, as an opioid for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

74.     Viberzi was launched, and became available for sale, in the United States on December 14, 2015.

75.     Viberzi is an extremely expensive medication.  In 2016, Medicare Part D plans paid an average of $889.21 for a 30-day prescription of Viberzi.  In 2017, Medicare Part D plans paid an average of $1004.79 for a 30-day prescription of Viberzi, or $33 per day.

76.     Imodium (active ingredient Loperamide HCL) is a non-prescription, OTC competitor to Viberzi that also treats IBS-D.   A 30 count package of Imodium costs roughly $12.50, or 41 cents per day.

77.     A primary component of Allergan's Viberzi sales strategy was to dramatically increase "speaker" program spending surrounding the launch of Viberzi.  Through its increase in "speaker" spending, Allergan added hundreds of "speaker-physicians" to its payroll to drive growth and increase prescriptions of its new product.

78.     Due to Viberzi's extreme cost and unproven effectiveness, Allergan knew, and specifically informed its sales representatives such as Relator Wilkerson, that securing "speaker-physicians" willing to prescribe Viberzi in exchange for "speaker" payments would be necessary to create the rapid growth required to meet Allergan's Viberzi sales goals.

79.     Viberzi, however, is not a drug to be taken lightly.  It can cause harmful side effects and is contraindicated for many people.

80.     For example, patients who don't have gallbladders—who often experience IBS-D symptoms and therefore were a large target market for Viberzi— have an increased risk of serious pancreatitis that can lead to hospitalization or death if they take Viberzi.  On March 15, 2017, the U.S. Food and Drug Administration (FDA) issued a warning that Viberzi should not be prescribed to patients who do not have a gall bladder because these patients have an increased risk of

developing pancreatitis. As of February 2017, the FDA had received 120 reports through the FDA Adverse Event Reporting System of serious cases of pancreatitis or death due to patients taking Viberzi. Seventy-six of these patients were hospitalized, and two patients died.

81. Viberzi endangers other patients as well. Patients who drink more than three alcoholic beverages per day —a much larger group than patients without gallbladders—also have increased risk of pancreatitis when taking Viberzi, which could result in severe illness or death. Those patients also are not readily identifiable because alcohol consumption can vary, and doctors rely on self-reporting by the patient to determine the amount of alcohol consumed every day.

82. In addition, because Viberzi is an opioid that affects the central nervous system creating a "high," Viberzi also has potential for dangerous recreational use and abuse.

83. The opioid epidemic has taken a devastating toll on Americans, and the path of addiction and death directly track prescription opioid prescribing levels. From 2000 to 2015, more than half a million Americans died from drug overdoses, and, in December 2016, opioid overdoses were killing Americans at a rate of 91 deaths per day.

84. Other drugs with similar chemical properties to eluxadoline include pentazocine, which is a known addictive opioid abused by opioid addicts, and has been known colloquially for decades as "poor man's heroin."

85. In human abuse studies, Viberzi produced a high rate of euphoria and exhibited similar "drug liking" responses to pentazocine. Roughly half the subjects in one study reported a pleasurable feeling or getting "high" from taking eluxadoline.

86. Despite Viberzi's dangers, Allergan management – including District Manager Alan Foust and Allergan Regional Manager James Martin (Foust's supervisor) – instructed sales staff, including Relators, to minimize, downplay, or deliberately fail to disclose to physicians

Viberzi's dangerous contraindications, its addictive opioid properties, and its status as a Scheduled Drug under the Controlled Substances Act. As described more fully below, Relator Jackson raised numerous concerns about Allergan's marketing instructions because he believed the deceptive messages were potentially harmful to patients. Relator Jackson was also concerned that Allergan was pushing doctors to prescribe Viberzi for patients who did not suffer from IBS-D but who simply had occasional diarrhea, which he viewed as illegal "off label" marketing. As alleged herein, Allergan fired Relator Jackson for raising these concerns and seeking to prevent the submission of false claims.

## **ALLERGAN'S FRAUDULENT SCHEME**

87. In connection with the launch of Viberzi at the end of 2015, Allergan devised a scheme to use speakers programs, and services and other illegal remuneration to doctors and their medical practices, to boost the sales of both Viberzi and Linzess. Allergan recruited an army of paid specialist speakers to sell Viberzi and Linzess to other HCPs at Allergan funded events.

88. The purpose and intent of Allergan's speaker program, known as the "Speaker Bureau," was to give physicians cash, food, alcohol, travel expenses, and other illegal remuneration to induce them to prescribe Allergan drugs, and to cause other physicians to prescribe those drugs. For instance,

- Allergan encouraged its sales personnel to select speaker-physicians based on the expectation that the speaker-physicians would increase their volume of prescriptions of Allergan's drugs.

- Allergan carefully monitored speaker-physicians' prescriptions of Allergan drugs and rewarded high-prescribing physicians with additional speaker events (and thus additional cash) and punished low-prescribing physicians by limiting their speaker events or removing them from the Speaker Bureau altogether.

- At many Allergan speaker events the speaker-physician did not present any educational materials but simply engaged in small-talk with attendees; yet Allergan still paid the

speaker-physician handsomely with the sole goal of inducing the speaker-physician to write prescriptions.

- Many Allergan speaker events were held at fine dining restaurants not conducive to the exchange of education information. At these events, Allergan spent thousands of dollars on food and alcohol for speakers and attendees (who were often not even HCPs), and Allergan routinely spent more on food and alcohol than its internal per-person cost limitations.

- Allergan knew that many of its speaker-events were complete shams, where no actual attendees showed up for an educational presentation. Instead, only the speaker-physician and Allergan sales representatives were present; yet Allergan still paid the speaker-physician handsomely, with the sole intent to induce the speaker-physician to write prescriptions.

- Allergan paid physicians speaker fees for events that were cancelled in advance.

- Even those speaker events where the required number of attendees were present were conducted, at least in part, to induce prescriptions of Allergan drugs by the speakers and the HCP attendees.

89. Allergan implemented its speaker scheme nationwide, and thus paid kickback payments to doctors across the country.

90. As a result of Allergan's nationwide fraudulent speaker scheme, the federal and state governments have paid thousands of false claims resulting in millions of dollars of losses to the state and federal taxpayers.

## I.    Allergan's Sales Strategy, Sales Personnel Compensation, and Speaker Program Background

91. Pursuant to Allergan's sales and marketing plan, Allergan sought to increase prescriptions for Linzess and Viberzi by any means necessary. Allergan recognized that the use of financial incentives was the most effective method to increase prescriptions. Allergan's tactics included highly rewarding its sales force based on the volume of prescriptions they generated.

92.     Allergan sales representatives' employment is strictly conditioned on meeting Allergan's aggressive prescription quotas.  If a sales representative does not meet Allergan's aggressive quotas, Allergan fires them.

93.     Allergan sales employee compensation, and bonuses, are based on prescription volume and not patient need.  For example, when Allergan launched Viberzi in December 2015, Allergan incentivized its sales representatives to push prescriptions of the high-priority drug by paying each representative a $107 bonus for every Viberzi prescription written in that sales representative's territory.

94.     Further, if a sales representative exceeded their sales quota throughout the year, they were selected to the "President's Club" and received an all-expenses vacation and thousands of dollars in stock options.  For instance, in 2014, Relator Wilkerson was selected to the "President's Club" and received an all-expenses paid trip to Hawaii for two and $25,000 in Allergan stock.

95.     Each Allergan sales representative was assigned a territory, or "call list," that included physicians within the sales representative's geographic area, with instructions to "call on" and persuade the physician, or their physicians' staff, to prescribe more of Allergan's drugs.

96.     To gain access to each physician, Allergan sales representatives typically are instructed to bring food, coffee, or other gifts to the physician and their staff.   Allergan ranked each physician on a scale of 1 to 10 based on the physician's prescribing pattern and expected revenue.  A physician who was a high-prescriber of Allergan drugs or who Allergan believed could be induced to prescribe more Allergan's drugs was ranked highly, likely at a "10" priority level. Allergan representatives visited such physicians' offices more often and provided them more snacks, food, and other gifts.

32

97.     Allergan's sales volume-based commissions and its push to sell Viberzi by any means necessary resulted in extreme high-pressure sales tactics, which were part of its fraudulent kickback scheme.  Prior to the launch of Viberzi, Allergan instructed its sales staff to visit GI specialists in their territory and request patient lists and patient records containing personally identifiable information related to patients who had been diagnosed with IBS-D, so that Allergan could identify and then try to convince the physicians that these specific patients should be prescribed Viberzi.  Allergan gave its sales representatives this directive at a nationwide conference in Orlando, Florida in October 2016.  Many Allergan sales representatives complied with this instruction and were very aggressive about soliciting HIPAA-protected patient lists and patient documentation, leading to a high volume of prescriptions when Viberzi was launched in December 2016.  Shockingly, Allergan sales representatives were often able to get this confidential information by simply bringing food, coffee and snacks to physicians and their staff, as part of its kickback scheme

98.     To further its kickback scheme, Allergan also arranged for its sales representative to be alerted through real-time prescription data whenever a physician wrote a prescription for Viberzi.  When that occurred, Allergan instructed the sales representative to immediately drive to the pharmacy where the prescription was to be filled to ensure that all prior authorizations, payment coupons, or free vouchers were used.  This practice called "chasing scripts" was mandated by Allergan management and resulted in the improper disclosure of patient protected health information to pharmaceutical sales representatives.  Allergan's "chasing scripts" in this fashion was part of the Allergan's kickback scheme described herein.  These illegal tactics demonstrate Allergan's desperation to market Viberzi and Linzess and explain Allergan's motive for paying health care professionals kickbacks to induce referrals.

33

## II.     Allergan Dramatically Increased Its Speaker Spending to Induce Prescriptions of Viberzi and Linzess

99.     Leading up to the launch of Viberzi in December 2015, Allergan developed a sales and marketing strategy to co-promote Linzess and Viberzi.   Central to the Linzess/Viberzi promotion strategy was a massive increase in Allergan's "Speaker Bureau."

100.     Allergan instructed its national and regional management to recruit hundreds of new speaker-physicians who would be paid thousands of dollars each to promote Linzess and Viberzi on behalf of Allergan.

101.     In 2015, Allergan paid for 639 GI speaker events.   480 of these events promoted Linzess.   159 co-promoted Viberzi and Linzess in December 2015 alone.   For these 2015 events, Allergan paid $991,550 to physicians who had been targeted as prescribers of Viberzi and Linzess.

102.     In 2016, Allergan paid for 4,435 GI speaker events—all co-promoting Viberzi and Linzess.   For these events, Allergan paid $7,078,000 in direct payments to physicians to induce prescriptions of Viberzi and Linzess.   The average payment to physicians in 2016 for little more than showing up to an all-expense-paid dinner party or physician's office was $1,595.

103.     In 2017 Allergan paid for 3,083 speaker events—all co-promoting Viberzi and Linzess.   Allergan paid $5,035,820 to speaker-physicians in 2017.   The average payment to physicians in 2017 for little more than showing up to an all-expense-paid dinner party or physician's office was $1,633.

104.     Although to Relators' knowledge Allergan decreased its speaker spending after 2017, it still maintained its "Speaker Bureau" and paid "speaker fees."   Allergan continued to pay proven high prescribers well and to drop low prescribers of the program.

### III. Allergan selected and paid speaker-physicians based on Allergan's revenue from speaker-physicians' prescriptions

105. Allergan allowed its sales managers and sales representatives to select physicians from each territory who would be included in the Speaker-Bureau. Allergan sales managers' and sales representatives' compensation is volume based and increases when the number of prescriptions increases. The sales managers and sales representatives are highly motivated to select physicians for the Speaker Bureau whom they believe will increase prescriptions when paid thousands of dollars by Allergan for speaker events.

106. Allergan also instructed its employees to select physicians they believe could be induced by speaker payments to increase their prescriptions of Viberzi or Linzess. Allergan communicated this corporate policy to Relator Jeffrey Wilkerson by its District Manager Alan Foust and Regional Manager James (Jimmy) Martin.

107. Allergan also considered whether a target physician had a patient population that was primarily insured by government health care programs, so that taxpayer-funded healthcare programs would cover much of the expensive price-tag for Allergan's brand-name drugs.

108. Each year, typically around September, employees at Allergan's U.S. headquarters – often Amy Hache (a member of Allergan's Viberzi and Linzess marketing team) – contacted the Regional Managers in each Allergan sales region to inquire about physicians who can be added or removed from the Speaker Bureau based upon propensity for prescribing Viberzi and Linzess. In turn, Regional Managers contacted District Managers who oversee Allergan sales representatives to learn which physicians will be most profitable to add or remove from the Speaker Bureau.

109. Specifically, Relators have knowledge that, in or around September 2015, District Sales Manager Jimmy Martin contacted Regional Sales Manager Alan Foust about recommendations for the addition of numerous physicians to the Speaker Bureau. Foust and

Allergan sales representatives strategically assessed which physicians within their District would be the best "Return on Investment" in terms of payment of speaker fees in exchange for prescriptions.

110. Relator Wilkerson was personally involved in these discussions and has personal knowledge that Allergan—through Mr. Martin and Mr. Foust—instructed sales representatives to select physicians for the Speaker Bureau based on projected revenue increases from prospective speaker-physicians, particularly whether the prospective speaker-physicians were amenable to Allergan's arrangement of paying speaker fees in exchange for prescriptions.

111. For example, upon considering solely revenue-focused factors, the District Sales Team led by Mr. Foust selected Dr. Paul Bierman, a Memphis, TN gastroenterologist as a speaker-physician in 2016. Mr. Foust informed Relator Wilkerson that Dr. Bierman would be a good speaker-candidate going into 2016 because Viberzi was just being launched and the Memphis area would need a high-prescriber who could be guaranteed to produce a high volume of Viberzi prescriptions.

112. Allergan gave sales employees—paid through incentive-based compensation—the ability to over-ride Allergan's corporate suggestions to remove speaker-physicians from the Speaker Bureau. Each year, prior to the final selection of speaker-physicians, Allergan sent all Regional Managers a list of speaker-physicians slated to be removed from the Speaker Bureau. This process was specifically designed to allow Allergan sales employees to retain, and keep paying, speakers who were high prescribers or who were otherwise agreeable to Allergan's paying speaker fees in exchange for prescriptions.

113. For example, on or around December 12, 2017, Allergan Senior Manager Itiel Katz sent an email to all Allergan Regional Managers providing a list of GI Speakers whom Allergan

had scheduled to be removed from the Speaker Bureau. Regional Manager Jimmy Martin then forwarded this email and list to District Manager Alan Foust to highlight one speaker in Mr. Foust's territory who was scheduled to be removed from the Speaker Bureau and seek Mr. Foust's opinion of removing this speaker.

114. Mr. Foust openly communicated to sales representatives in his territory that Allergan speaker payments must be contingent on the Speaker-Physician writing prescriptions. Accordingly, he and Allergan sales representative Stephen Pointer suggested the specific speaker for removal. Because of this discussion between two sales employees, Mr. Foust instructed Mr. Martin and Allergan to terminate the speaker from the Speaker Bureau.

## IV. The Venue, Nature and Subject Matter of Allergan Speaker Events All Prove the Speaker Events Were a Means to Pay Kickbacks

115. Allergan hosted two types of speaker events—"in-office speaker events" and "out-of-office" speaker events.

116. For "in-office" speaker events, the speaker-physician travels with the Allergan Sales Representative to another medical provider's office. The Sales Representative brings food and refreshments for the physician and their staff. Ostensibly, the speaker-physician was required to present a PowerPoint presentation created by Allergan about the benefits of Viberzi and Linzess.

117. In reality, and as witnessed first-hand by Relators, many in-office speaker events consist of the Allergan Sales Representative and the speaker-physician simply delivering food to a medical provider's office and briefly speaking with the provider or a provider's staff to encourage them to prescribe Viberzi and Linzess. Often, the physicians and staff were too busy seeing patients to sit through a PowerPoint or listen to a discussion of the efficacy of the drug. In these instances, when no actual presentation is made, the speaker-physician briefly talks to the provider or their staff about the need to prescribe Allergan's drugs, but sometimes does not speak to the

"hosting" physician at all. Nevertheless, Allergan still paid the speaker-physician between $1,000 and $2,500 for doing nothing more than visiting another physician's office and briefly talking with another physician or their staff to encourage them to prescribe Allergan drugs.

118.    As just one example, on January 14, 2016, Relator Wilkerson accompanied Allergan speaker-physician Dr. Paul Bierman to an "in-office speaker event" at Finn Medical Associates Office in Memphis, Tennessee. Dr. Bierman made no formal presentation and did not provide any educational information, but instead simply shook hands with Dr. Cary Finn and made small talk. Then, just before leaving, Dr. Bierman briefly stated that he thought Dr. Finn should prescribe Viberzi and Linzess. Allergan paid Dr. Bierman $1,200 for this visit. Relator Wilkerson discussed the cursory nature of Dr. Bierman's in-office speaker events with District Manager Alan Foust. Despite knowing Dr. Bierman routinely declined to present the Allergan PowerPoint and instead simply chatted with providers, Foust instructed Relator Wilkerson to falsify documents to state that Dr. Cary Finn and other staff and providers attended the presentation and to falsely state that all required information was presented.

119.    Other, even more transparent inducements occurred at Allergan dinner parties that were categorized as "out of office" speaker events. These "out-of-office" events were held at up-scale restaurants where speaker-physicians and guests ordered any alcohol or food items that they desired—all paid for by Allergan. Typical out-of-office speaker event venues were expensive restaurant chains Ruth's Chris Steakhouse and The Capital Grille. Often, non-medical attendees such as attendee and physician-speakers' spouses and dates attended Allergan "out-of-office" speaker events to enjoy an expensive meal and alcohol, all paid for by Allergan.

120.    Based on Relators' experience, the "educational" portion of the out-of-office speaker events was minimal or entirely absent. If provided at all, the purported education typically

38

lasted 15 minutes or less and consisted of the speaker flipping through a brief, generic, PowerPoint—parroting the same information provided in Allergan's written advertising and promotional materials that had already been distributed to physicians. These "out of office" events had little, if any, educational value and were, in truth, merely social occasions for potential prescribing physicians and their friends at expensive restaurants with all expenses paid by Allergan. While the attendees enjoyed free food and alcohol worth hundreds of dollars per person, Allergan paid the speakers as much as $3,500 just for showing up.

121.    Allergan's official internal policy was that each speaker event attendee could spend $150 on food and alcohol. However, Allergan routinely disregarded this internal limit and allowed speakers and attendees to order far more than $150 in food and drink. To evade these compliance-oriented per-person spending limits, Allergan instructed sales representatives to manipulate speaker event attendance records to make it appear that more people had attended the dinner parties than had actually been there. By fabricating attendees, Allergan could spend much more per person to influence the providers who were actually there, while seeming to spread the actual exorbitant cost of the opulent food and alcohol across the false roster of attendees. Using this strategy, which was acknowledged and encouraged by Allergan management including District Manager Richard Uhles, Allergan flouted its own purported "compliance" policies and spent far more than Allergan's stated $150 per person limit for "out of office" speaker events.

122.    Allergan used this strategy to provide even more extravagant illegal remuneration in the form of expensive meals and alcohol to attendee physicians at dinner parties, for the express purpose of inducing prescriptions of Viberzi and Linzess.

## V.      Allergan Specifically Conditioned the Payment of Speaker Fees on Prescriptions

123.    Allergan tracked speaker-physicians' prescriptions on a granular level and rewarded prescribers who increased their prescriptions with more speaker fees and withheld speaker fees from speaker-physicians who did not increase prescriptions.   The following paragraphs provide a representative example of Allergan's *quid pro quo* relationship with Dr. Paul Bierman.  The scheme was, however, nationwide.

124.    For example, in January 2016, Allergan District Manager Alan Foust was not satisfied with Dr. Paul Bierman's initial prescribing levels in his first weeks as a paid Allergan speaker-physician.   At this time, Allergan had recently launched Viberzi, and increasing prescriptions of Viberzi was a primary focus of Allergan's sales efforts and remuneration. Mr. Foust demanded of his sales team that all speaker-physicians needed to "get on board" with prescribing Viberzi to continue receiving speaker fee payments.

125.    Mr. Foust instructed Relator Wilkerson to inform Dr. Bierman that Allergan's payment of speaker fees was specifically conditioned upon Bierman increasing his prescription of Allergan drugs.  As instructed by Allergan management, Relator Wilkerson and fellow Allergan sales representative Frank Adcock visited Dr. Bierman at his office in January 2016 and delivered Allergan's message: if Dr. Bierman wanted to continue receiving thousands of dollars in speaker fees from Allergan, he had to prescribe more Viberzi.

126.    Dr. Bierman responded that he had been writing prescriptions of Viberzi, but he would increase his prescriptions to appease Allergan so that he could continue receiving speaker fees.

127.    Relator Wilkerson and Mr. Adcock explained that some of Dr. Bierman's prescriptions of Viberzi were being denied coverage because the required prior authorizations or

free vouchers were not being completed or used properly. At roughly $1,000 per month, few patients were willing to pay for Viberzi without significant coverage from insurers, primarily Medicare Part D and Medicaid plans.

128. Dr. Bierman walked together with Relator Wilkerson and Mr. Adcock back into his office to speak with his head nurse, Wendy. Together, they informed Wendy to assist Relator Wilkerson and Mr. Adcock with whatever they needed to ensure more Viberzi prescriptions were being written and "pulled-through" the pharmacy—meaning that Wendy needed to ensure that insurance coverage issues including the Medicaid and Medicare Part D prior authorizations for Viberzi were completed. Dr. Bierman instructed Wendy to text Relator Wilkerson and Mr. Adcock with each patient's name and pharmacy whenever Dr. Bierman wrote a prescription for Viberzi. Wilkerson and Adcock could then "chase the script" to the pharmacy and make sure each prescription was filled and paid for by the relevant federal or state payor. Allergan's "chasing scripts" in this fashion was part of the Allergan's kickback scheme described herein, as well as acts in furtherance of a conspiracy with the HCPs involved to violate the False Claims Act and anti-kickback laws.

129. In exchange for his promise to write more prescriptions, Allergan scheduled more speaker events for Dr. Bierman and paid him more speaker fees. Based on this arrangement and in patent violation of the AKS, Dr. Bierman's prescriptions of Linzess and Viberzi skyrocketed in tandem with his speaker fees.

130. Allergan's promotional partner Ironwood Pharmaceuticals[27] was acutely aware of the *quid pro quo* nature of the payments to prescribing physicians. Specifically, Ironwood Sales

---

[27] Ironwood Pharmaceuticals, Inc. is a gastroenterology-focused pharmaceutical company that developed Linaclotide, the active ingredient in Linzess. Ironwood Pharmaceuticals has co-promotion agreements with Allergan whereby both Ironwood and Allergan promote Viberzi and

Representative Holly Charnes, who co-promoted Viberzi and Linzess in the Memphis Area, remarked to Relator Wilkerson, "thankfully we have Dr. Bierman, because he keeps Viberzi going—he's basically the only person we can get to prescribe in any numbers."

131.    On or around March 17, 2017, Relator Wilkerson spoke with Allergan sales representative Will Fogelman, who informed him Allergan was elated that Dr. Bierman was the largest prescriber of Viberzi in the West Tennessee territory.  Mr. Fogelman candidly exclaimed that Dr. Bierman was prescribing so much Viberzi "because we [Allergan] are paying him."

132.    In or around September 2017, Allergan sales representative Frank Adcock stated that he was currently short of meeting his Viberzi sales goal and that, because the only thing that Dr. Bierman responds to is cash, Adcock needed Allergan to pay Dr. Bierman more speaker fees so Adcock could reach his sales quota.  Soon thereafter, Mr. Adcock arranged additional speaker events for Dr. Bierman.  In exchange, Dr. Bierman wrote additional Viberzi prescriptions, and Mr. Adcock met his sales quota—reaping bonuses and avoiding punishment from Allergan.

133.    Similarly, in or around February 2018, Mr. Adcock informed his manager Alan Foust that he had secured five more speaker events for Dr. Bierman in the coming weeks, which would pay Dr. Bierman thousands of dollars each.  In response, Foust reminded Adcock of Allergan's requirement that Dr. Bierman prescribe Allergan drugs in exchange for the speaker fees, stating that these five speaker engagements will be Dr. Bierman's "last five [speaker events] if [Dr. Bierman] does not write [prescriptions]."

---

Linzess.  Under the terms of these agreements, Ironwood's sales representative promote Viberzi and Linzess to health care practitioners.  *See* https://investor.ironwoodpharma.com/press-releases/press-release-details/2015/Ironwood-and-Allergan-Enter-Agreement-to-Co-Promote-VIBERZI-for-Irritable-Bowel-Syndrome-with-Diarrhea-IBS-D-in-the-US/default.aspx

134.    Dr. Bierman himself openly acknowledged that he knew Allergan speaker fees were paid in exchange for his prescribing Allergan drugs.   In April of 2018, Dr. Bierman requested more money from Allergan, explaining "I have to fly half my family to Israel for my son's wedding" and due to this personal expense, he needed more money from Allergan.   Allergan sales representative Frank Adcock confirmed that the *quid pro quo* was well understood between Allergan and Dr. Bierman, responding "I hear that, and I have to hit numbers, we are in good position!"

135.    Related to this interaction, Adcock openly discussed the bribes paid at Dr. Bierman's request, and that the bribes resulted in the desired outcome of inducing Dr. Bierman to increase prescriptions.  Specifically, Adcock informed other Allergan sales representatives that Dr. Bierman wrote the agreed upon additional prescriptions before the speaker programs but only "after he knew he would get paid."

136.    In 2015, prior to being added to Allergan Speaker Bureau and instructed by Allergan employees that speaker payments were contingent on prescriptions, Dr. Bierman prescribed 55 (30-day) prescriptions of Linzess.[28]

---

[28] The prescribing information described herein solely reflects prescriptions for Allergan drugs prescribed to Medicare Part D beneficiaries. All corresponding payment amounts reflect the amount paid by Medicare directly for these drugs and does not include any beneficiary co-pay obligations.  All quantitative data reflects "30-day prescriptions."  For example, while a physician could write one "prescription" for a 90-day supply of Linzess, this Medicare prescriber data would count that 90-day prescription as three (30-day) prescriptions of Linzess.  Further, roughly 70 percent of all Medicare beneficiaries are enrolled in Medicare Part D plans, and thus this data reflects the Viberzi and Linzess prescriptions made by speaker-physicians and paid for by the Medicare program for this group of Part D enrolled beneficiaries.  However, because not all Medicare beneficiaries are enrolled in Medicare Part D, and thus are not reflected in the Medicare Part D database, this data does not include every Medicare prescription written by these Speaker-Physicians for Allergan and Linzess.

137.    Allergan paid Dr. Bierman $1,500 for his first Viberzi/Linzess speaker event on December 11, 2015, along with two additional payments of $514.70 and $272.87 for "travel and lodging" associated with this speaker event.  Allergan also paid for Dr. Bierman's received food and alcohol at the dinner party.   By virtue of this illegal cash and remuneration, every prescription for Allergan drugs written by Dr. Biernman after December 11, 2015 was tainted by the illicit kickback arrangement and is a violation of the AKS and the FCA.

138.    In 2016, Allergan paid Dr. Bierman $59,000 in speaker fees, and his Linzess prescriptions doubled to 109 (30-day) prescriptions—for which Medicare paid $35,215.83. Additionally, Dr. Bierman wrote 25 prescriptions of Viberzi—for which Medicare paid $23,083.26.

139.    In 2017, Allergan paid Dr. Bierman $95,600 in speaker fees, making him one of the top five highest paid Allergan GI Speakers, and Dr. Bierman's prescriptions increased again. Dr. Bierman wrote 134 Linzess prescriptions—for which Medicare paid $50,560.15.   Dr. Bierman's Viberzi prescriptions roughly doubled to 47 (30-day) prescriptions—for which Medicare paid $48,127.63.

140.    In 2018, Allergan paid Dr. Bierman $23,420 in speakers fees and he wrote 160 Linzess prescriptions—for which Medicare paid $63,770.26 and 42 Viberzi prescriptions—for which Medicare paid $48,689.37.

141.    Thus, just as to one doctor in Memphis, Tennessee, Allergan caused the submission of *at least* 517 false claims for which Medicare paid over $266,944 in the three years after Viberzi's launch.

142.    Because of Allergan's success at inducing Dr. Bierman to prescribe hundreds of thousands of dollars of Allergan's drugs through payment of speaker fees, Allergan rewarded the

Allergan Sales Representatives responsible for Dr. Bierman's territory handsomely through Allergan's incentive-based compensation structure.

143.    Soon thereafter, Allergan Sales Representatives in the South Memphis Territory sought to increase their compensation by recruiting a physician-speaker based in South Memphis and achieving similar prescription growth through payment of speaker fees.  As another example, in 2018, Allergan added Nurse Practitioner Chantil Jeffreys to the Allergan Speaker Bureau and began paying N.P. Jeffries to prescribe Allergan drugs.  Allergan Sales Representative Will Fogelman told Relator Wilkerson that Allergan added Ms. Jeffreys to the Speaker Bureau based on Allergan's success in paying Dr. Bierman to write more prescriptions and its desire to expand its scheme to South Memphis.

144.    As background, in 2015 and 2016, Ms. Jeffreys had written 14 and 29 prescriptions of Linzess, respectively.  In 2017, her Linzess prescriptions increased—up to 47 prescriptions—for which Medicare paid $17,514.36.  This increase led Allergan to anticipate Ms. Jeffreys could be a valuable speaker-prescriber.  However, in 2018 after being added to the Speaker Bureau, Ms. Jeffreys' prescriptions remained relatively constant, at 43 prescriptions of Linzess. This prescription volume was not adequate for Allergan to continue paying Ms. Jeffreys speaker fees, so Allergan terminated Jeffreys from the Speaker Bureau in 2018.

145.    Allergan similarly paid Dr. Daniel Kayal, a physician based in Jackson, Tennessee, speaker fees in exchange for writing prescriptions of Allergan drugs.  Specifically, in or around January 2016, an Allergan sales representatives informed other Allergan sales representatives that Dr. Kayal "did great" at a recent speaker event; but, more importantly and showing the true intent behind the speaker fees paid to Dr. Kayal, was that following the event Dr. Kayal "had 10 patients start on Viberzi."

45

146. In 2015, prior to being added to Allergan's Speaker Bureau, Dr. Kayal prescribed 52 (30-day) prescriptions of Linzess to Medicare Part D beneficiaries.

147. Allergan paid Dr. Kayal $1,500 for his first Viberzi/Linzess speaker event on December 11, 2015, along with two separate payments of $614.20 and $234.87 for "travel and lodging" associated with this speaker event. By virtue of this illegal cash and remuneration, every prescription for Allergan drugs written by Dr. Kayal after December 11, 2015 was tainted by the illegal kickback arrangement and is a violation of the AKS and FCA.

148. In 2016, Allergan paid Dr. Kayal $20,600 in speaker fees and his Linzess prescriptions roughly doubled to 103 (30-day) prescriptions—for which Medicare paid $33,005.04. In 2017, Allergan paid Dr. Kayal $12,600 in speaker fees and he wrote 86 Linzess prescriptions—for which Medicare paid $31,109.50. Further, in 2018, Allergan paid Dr. Kayal $4,900 and he wrote 44 Linzess prescriptions—for which Medicare paid $17,582.28. During 2018, he also wrote 20 Viberzi prescriptions—for which Medicare paid $23,599.55.

149. Thus, just as to one more doctor in Jackson, Tennessee, Allergan caused the submission of at least 253 false claims, for which Medicare paid over $105,000.

150. In 2016 and 2017, Allergan paid 763 separate speaker-physicians as part of the GI Speaker Bureau.

151. Medicare Part D data demonstrates that speaker-physicians' prescription of Linzess correlates directly with Allergan's payment of speaker fees. In other words, the more Allergan paid the speaker-physicians, the more Linzess they prescribed.

152. For instance, of the 763 speakers paid by Allergan in 2016, Allergan decided to retain 493 Allergan speaker-physicians in the program for 2017. This sub-set of Allergan speaker-physicians prescribed a median volume of 46 (30-day) prescriptions of Linzess in 2016.

153. Similarly, there were 58 Allergan GI speaker-physicians who were slated for termination from the Speaker Bureau but instead retained by local Allergan sales manager "over-ride" because they were viewed favorably as prescribers by local sales employees who were paid for each prescription written. This sub-set of Allergan speaker-physicians prescribed a median volume of 45.5 (30-day) prescriptions of Linzess in 2016.

154. Conversely, there were 136 Allergan speaker-physicians terminated from the Speaker Bureau in 2016 because they were viewed unfavorably as low-prescribers by Allergan. This sub-set of Allergan speaker-physicians who were terminated prescribed only a median volume of 32 (30-day) prescriptions of Linzess in 2016—roughly 1/3 fewer prescriptions than their counterparts whom Allergan decided to keep paying.

A. **Physicians Began Prescribing Significantly More Allergan GI Drugs When Allergan Started Paying Speaker Fees**

155. Claims data also shows that doctors increased their prescriptions when Allergan selected them for the speaker program and started making kickback payments.

156. For example, during Allergan's 2016 speaker fee spending spree, Allergan added roughly 431 physician-speakers to the GI Speaker Bureau. In 2015, prior to Allergan paying those physicians speaker fees, these 431 physicians prescribed a median of 33 prescriptions of Linzess.

157. After Allergan added the physicians to the Speaker Bureau and started making kickback payments, these same 431 Speaker-Physicians prescribed a median of 47 prescriptions of Linzess in 2016—or roughly 1/3 more than they prescribed before Allergan started paying them kickbacks. 24%, or approximately 103, of these new speaker-physicians wrote at least twice as many Linzess prescriptions in 2016 as they wrote when Allergan was not paying them kickbacks in 2015. 16% of these new speaker-physicians prescribed more than three times the number of Linzess prescriptions in 2016 as they wrote when Allergan was not paying them kickbacks in 2015.

47

158.    The incontrovertible increase in prescriptions caused by Allergan paying physicians speaker fee kickbacks is evident in 2017 as well.  In 2017, Allergan added 32 new speaker-physicians to the GI Speaker Bureau.  These 32 speaker-physicians prescribed a median volume of 31 prescriptions of Linzess in 2016 before Allergan started paying them kickbacks.  In 2017, after Allergan began paying speaker fee kickbacks, these 32 speaker-physicians prescribed a median of 47 prescriptions of Linzess.  28% of these 32 new speaker-physician at least doubled their Linzess prescriptions in 2017 after Allergan started paying them kickbacks. 19% at least tripled their Linzess prescriptions after Allergan started paying them kickbacks.

## VI.    Allergan Corporate Policies Facilitated Using Speaker Events to Pay Illegal Remuneration to Physicians to Prescribe Allergan Drugs

159.    Despite Allergan's knowledge—as a recidivist violator of the AKS and FCA—that it must implement adequate controls to ensure its Speaker Bureau was compliant with the AKS and other health care laws, Allergan knowingly implemented corporate policies that directly facilitated and encouraged using the Speaker Bureau to provide kickbacks.  The money mattered more than the law.

### A.    Allergan's Policy of Requiring a Minimum Number of RSVPs for Events, Instead of Minimum Number of Actual Attendees, Incentivized Sales Representatives to Collect Tenuous RSVPs Whom Allergan Knew Would Not Show Up

160.    HHS-OIG's Special Fraud alert notes that the pharmaceutical industry dubiously claims that HCPs "participate in company-sponsored speaker programs in order to help educate and inform other health care professionals about the benefits, risks and appropriate uses of company medicines."[29]   Even if industry's self-serving statement is taken at face-value, it is

---

[29] *Code on Interactions with Health Care Professionals*, PhRMA, 7 (June 2020), available at  https://www.phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/A-C/Code-of-Interaction_FINAL21.pdf

obvious that for a speaker to educate and inform others, those others must be in attendance to hear the speaker.

161.    Allergan, however, knowingly structured its speaker program to pay speaker-physicians thousands of dollars for speaker events that never occurred, where no other HCPs (besides the speaker) attended, and where attendance was so low that it failed to meet the minimum levels required by Allergan's purported "compliance" policies.

162.    Under Allergan's policy, for a scheduled speaker event to go forward, the sales representative organizing the speaker event was required to collect a specific number of affirmative RSVPs from people who planned to attend the speaker event.

163.    For "in-office" speaker events, Allergan compliance policies required sales representatives to collect a minimum of two positive RSVPs – both must be prescribers (meaning a physician, physician assistant or nurse practitioner) or dispensers (pharmacist).  For "out-of-office" speaker events, Allergan compliance policies require sales representatives to collect a minimum of four positive RSVPs – three of which must be a prescriber or dispenser.  If sales representative obtained the required number of positive RSVPs from people who claimed they would attend the event, the event would proceed, even if the people later admitted that they would not attend or failed to show up.

164.     In Relators' direct experience, Allergan intentionally overlooked and did not care how many of the people who stated they would attend actually attended the event.  For instance, when sales representatives asked Allergan managers, such as District Manager Alan Foust, about the attendance requirements for speaker events, Mr. Foust quickly and emphatically informed the sales team that there were no attendance requirements, only RSVP requirements.  Moreover,

Allergan disciplined sales representatives who did not obtain the required RSVPs, but did not discipline sales representatives when people did not actually attend events.

165.    In practice, Allergan encouraged sales representatives to collect highly dubious RSVP "commitments" from providers, but knew many if not most would not actually attend. Relators have personal knowledge that it was commonplace for physicians—who were often busy seeing patients and would barely engage with sales representatives—to tell the sales representative: "yeah, I'll try to come to the event" or "I may come to the event."  In actuality, these physicians would rarely show up to the event.  Such non-committals were registered as positive RSVPs for the sham minimum requirements set by Allergan.

166.    Because the true purpose of the speaker event was to pay the speaker to prescribe Allergan's drugs, if no one showed up to the event, Allergan did not care and still paid the speaker-physician the full "honorarium," despite the lack of attendees that the physician was purportedly being paid to educate.  This is because "payment for prescriptions" was the purpose of the event, not education.

**B.  Allergan Paid Speaker-Physicians in Full for Sham Events**

167.    For example, Relators have knowledge that Richard Uhles, an Allergan Primary Care Manager—who oversaw Allergan primary care sales representatives charged with promoting Viberzi and Linzess in the North Tulsa and Oklahoma City, Oklahoma territory—instructed sales representatives to add false attendees to speaker program documentation, often after the event took place, so that Allergan could mask its payments to physicians for referrals as somehow part of an educational event.

168.    This post-hoc manipulation of speaker event attendance records was specifically intended to create the false impression that Allergan speaker events contained some education

provided to health care providers, when in fact few people, or often no one, attended these sham events which were merely conduits to pay bribes to the speaker-physician.

169.    On many other occasions, prior to sales management's instruction to manipulate event attendance, Allergan Sales Representatives reported through IntraMed—the Allergan program designed and used to record speaker event attendance—that only one or two people attended in-office speaker events, or even reported that no one except the speaker and the Allergan sales representative attended the event.  Nevertheless, despite Allergan's clear knowledge that its purportedly "educational" programs were not attended by anyone and that no education took place, Allergan paid the speaker-physicians thousands of dollars for doing nothing but writing prescriptions.

170.    For instance, in or around July 2015, Relator Jackson scheduled an "out-of-office" speaker event with Dr. Daniel Meline at Ruth's Chris Steakhouse in Tulsa, Oklahoma.  According to Allergan policies, Relator Jackson obtained the required number of positive RSVPs for the event.  However, at the time of the scheduled event, none of the physicians who tentatively informed Relator Jackson that they "may come" or "may try to come" to the event, showed up. Instead, Relator Jackson and Dr. Meline simply ate a very nice meal, and Allergan paid Dr. Meline $1,500 in speaker fees for an event where there were no attendees, no education, no PowerPoint presentation, and nothing occurred other than an Allergan sales representative delivering a check and buying dinner and drinks for a prescribing physician.

171.    Relator Jackson was frustrated that he had failed to assemble a legitimate event and considered it to be a failure. When he reported through the IntraMed software that no one attended this scheduled speaker event, he was surprised to find that Allergan did not care.  Because

Allergan's sole focus was on positive RSVPs, not actual attendees, Allergan did not discipline or criticize Relator Jackson.

172.    Due to Allergan's corporate policy of only focusing on positive RSVPs, not actual attendance, speaker events routinely went unattended or "under-attended."    Particularly during the explosion of speaker fees paid in 2016 and 2017, Allergan scheduled so many speaker events to funnel cash to physician-speakers that sales representatives had difficulty getting physicians to show up to the events and thus hundreds of events went unattended.

173.    For example, on or around July 27, 2016, Allergan GI Division Vice President of Sales Chris Sweeney—who was responsible for all GI sales managers and sales representatives in the Western United States—alerted all Regional and District Managers that Allergan sales reps were not meeting the positive RSVP requirements for upcoming speaker events.  Specifically, Mr. Sweeney informed the sales managers that there were **93** speaker events scheduled for the week of August 8, 2016 and only **6** of those speaker events met minimum RSVP requirements.  Sweeney then encouraged the sales managers to push their sales representative to obtain the required RSVPs to create an appearance of compliance.  Sweeney did not encourage or instruct the sales managers to ensure that the providers who were purportedly to be educated about Allergan's drugs actually attended the event.  Nor did Sweeney or Allergan mention withholding payment to the speakers based on low attendance, or cancelling or re-scheduling events where the minimum RSVPs had not been obtained.

174.    Unsurprisingly, 12 of these scheduled speaker events during the week of August 8, 2016 went totally unattended by anyone other than the speaker-physician and the Allergan sales representative, 17 of the scheduled speaker events were under-attended, and three scheduled speaker events were cancelled because the sales representative did not obtain the requisite RSVPs.

Yet, Allergan still paid the speaker-physicians the full honorarium, typically between $1,200 and $3,500, for each of these sham events, for simply showing up to a steakhouse and ordering all the food and drink desired, all paid for by Allergan. Allergan even paid the three speakers for the events that were completely cancelled.

175.     From 2015 to May 2018, Allergan paid physician speakers for at least 2,129 sham speaker events where no actual attendees were present, the actual attendees were fewer than the Allergan RSVP requirement, or the event was cancelled prior to the day of the event.

176.     In 2015, Allergan paid physician speakers $15,900 for 11 events where no attendees were present. Similarly, in 2015, Allergan paid speaker fees for 28 separate speaker events where the number of actual attendees did not meet the number of RSVPs required to host a speaker event. Allergan paid its speaker-physicians $45,050 in speaker fees for these 28 under-attended events.

177.     In 2016, during a surge of speaker fee spending surrounding the launch of Viberzi, Allergan paid speaker-physicians for 507 speaker events where no attendees were present. Every one of these 507 payments was a sham – it is not possible that any education took place. In connection with these 507 unattended events in 2016, Allergan paid speaker-physicians $797,600 in purported speaker fees for sham events where no one was even present to be educated.

178.     Additionally, in 2016, Allergan paid speaker fees for 494 separate speaker events where the number of actual attendees did not meet the number of positive RSVPs required to host a speaker event. Allergan paid its speaker-physicians $807,400 in speaker fees for these 494 under-attended or non-attended events.

179.     In 2017, Allergan paid speaker-physicians for 425 speaker programs that were not attended by anyone except the physician and the Allergan sales representative. In total, Allergan

spent $670,840 in "speaker fees" alone for these events that were complete shams and not attended by anyone.

180.    In 2018, Allergan paid its GI speaker-physicians for at least 37 "speaker events" where no one except the speaker-physicians and the Allergan sales representative attended.  In total, Allergan paid $62,370 for these unattended, sham, speaker events.  Additionally, in 2018, Allergan paid speaker fees for at least 28 separate speaker events where the number of actual attendees did not meet the number of RSVPs required to host a speaker event.  Allergan paid $49,700 in speaker fees for these 28 under-attended events.

181.    Allergan even paid physicians for events that were cancelled. If the Allergan sales representative could not obtain the requisite number of positive RSVPs for a speaker event (two physicians or prescribers for an in-office event and four attendees including at least three prescribers or dispensers for an out-of-office event), Allergan's policy required that the event be cancelled.  But even when an event was cancelled days ahead of time and the speaker-physician was not required to do anything, Allergan's corporate policy was still to pay the speaker-physician the full amount of speaker fees for doing nothing.  Plainly, the true purpose of this payment and Allergan's policy of paying physicians the full amount of speaker fees for cancelled events was to induce prescriptions.

182.    In 2015, Allergan paid GI speaker-physicians a total of $32,100 for 19 separate events that were cancelled before the day of the event. In 2016, Allergan paid GI speaker-physicians $151,550 for 93 events that were cancelled prior to the event. In 2017, Allergan paid GI speaker-physicians a total of $118,600 for 69 speaker events that were cancelled days prior to the event.  In 2018, Allergan paid its GI speaker physicians a total of $47,160 for 28 separate events that were cancelled prior to the event.

183.    Additional details about these sham events,  the doctors taking part therein, and the amount of claims paid by Medicare for prescriptions written by those doctors after Allergan began paying kickbacks are included in Addendum 1, attached hereto.

## ALLERGAN'S SCHEME HAS CAUSED THE SUBMISSION OF THOUSANDS OF FALSE CLAIMS AND COST THE FEDERAL AND STATE GOVERNMENT MILLIONS

184.    By no later than December 2015, Allergan had implemented its illegal kickback scheme described above related to the marketing of Viberzi and Linzess.

185.    Allergan's payments of cash and other remuneration given to speaker-physicians, other HCPs,  and their medical practices described herein violate the AKS because the payments and other remuneration were made for the purpose of inducing referrals – *e.g.* prescriptions for Viberzi and Linzess that were paid largely by federal and state health care programs.

186.    As soon as speaker-physicians accepted cash and other remuneration from Allergan, they were in a kickback relationship with Allergan, and every claim paid by federal and state healthcare programs for an Allergan drug prescribed by the speaker-physicians "resulted from a violation of the [AKS and therefore] **constitute a false or fraudulent claim for purposes of [the FCA]**."  42 U.S.C. §1320a-7b(g) (emphasis added).

187.    As alleged herein, Allergan entered into kickback relationships with hundreds of speaker-physicians in 2015 and thereafter.

188.    Those speaker-physicians wrote thousands of prescriptions for Viberzi and Linzess resulting in the payment of millions of dollars of claims by Medicare, Medicaid, and other federal health benefit programs such as Tricare, the FEHB, and the VA.

189.    Relators have provided herein and in the accompanying Addendum to this Complaint, incorporated herein, other examples of these kickbacks to speaker-physicians, and

specific examples of claim amounts paid by Medicare for prescriptions written by speaker-physicians after they entered into a kickback relationship with Allergan. *See supra* ¶¶ 133-146 and Addendum 1.

190.     In just 2016 and 2017, Allergan paid over $12,000,000 to speakers for events related to Viberzi and Linzess. During those years, the federal government paid over $39,000,000 for prescriptions of Viberzi and Linzess through the Medicare Part D program.

191.     Those representative payments represent only a fraction of the millions of dollars paid by Medicare, Medicaid, and other federal health benefit programs such as Tricare, the FEHB, and the VA. All of those fraudulent payments are recoverable under the FCA.

**ALLERGAN'S UNLAWFUL RETALIATION AGAINST RELATOR JACKSON**

192.     Before and after the launch of Viberzi in December 2015, Relator Jackson was concerned that Allergan was illegally promoting Viberzi and other drugs, including through the illegal solicitation of confidential patient information in violation of HIPAA. He worried that Allergan's sales and marketing strategy was not only unlawful but was resulting in harm to patients.

193.     As an experienced pharmaceutical sales professional who was employed by Allergan while it was under Corporate Integrity Agreements related to off-label marketing and AKS violations, Relator Jackson attended mandatory compliance training instructing against off-label marketing and AKS violations.

194.     While promoting and selling Viberzi, Relator Jackson's direct supervisor Alan Foust directed Relator Jackson not to raise the contraindications and potential dangers associated with Viberzi and to minimize the potential risks of the drug to particular patients. Through Relator Jackson's experience and training at regional and national sales meetings, Relator Jackson knows

56

that Mr. Foust's directives were consistent with Allergan's aggressive marketing and sales strategy nationwide.

195.    Mr. Foust and Allergan reprimanded Jackson because he described Viberzi and its properties truthfully, limited his marketing pitches to approved uses, and objected to making false representations to health care providers about the drugs' harmful properties.

196.    In January 2016, Mr. Foust came to Fort Smith, Arkansas to conduct a field-ride training session with Jackson.  During the training, Foust instructed Jackson (a) to recommend Viberzi for patients for whom Viberzi was dangerous, and (b) to disregard Viberzi's contraindications, addictive properties, and side effects.

197.    Mr. Foust reprimanded Jackson for discussing contraindications with medical staff at several health care providers' offices.  Mr. Foust went even further and advised Relator Jackson that he would be filling out a coaching report about Relator Jackson based upon Jackson's refusal to go along with Foust's directives to make false representations about Viberzi.  Foust warned Relator that the report would "sting."

198.    Through 2016, a pattern developed of Foust reprimanding Jackson for his refusal to disregard the appropriate patient profile warnings and precautions of Viberzi.  Mr. Foust wrote two negative performance reviews of Jackson in 2016 in addition to the negative coaching report in January 2016.  Foust's negative performance reviews of Jackson were nothing more than retaliation for Jackson's refusal to improperly promote and make false representations that downplayed the contraindications of Viberzi.

199.    Mr. Foust is an experienced pharmaceutical sales manager and veteran of Forest Laboratories, who is familiar with its FCA off-label settlements and the scrutiny of the prior Corporate Integrity Agreements.  While the Corporate Integrity Agreements were in effect, Foust

also attended government mandated compliance training regarding off-label marketing. Mr. Foust is well aware that off-label marketing, the practice of promoting drugs for uses other than what the Food and Drug Administrations has approved can result in a *qui tam* lawsuit and FCA liability. Mr. Foust also knows that retaliating against employees for raising concerns about off-label marketing can result in liability for retaliation under the FCA.

200.     Jackson informed other Allergan managers and the Human Resources Department that Foust was directing him to lie about the drug's potentially addictive opioid properties and the recommended profile of patients who should take Viberzi. He also informed management that he believed Foust was retaliating against him.

201.     In August 2016, Kristi Curleau, an Allergan's Human Resources employee sent Relator Jackson an email asking to arrange a confidential phone call. During the call, Ms. Curleau asked Jackson if he felt Foust was discriminating against him. Jackson replied that he did feel like he was being discriminated against and was being "singled out for not promoting products 'off-label.'" Jackson further informed the HR Department that off-label promotion of Viberzi was occurring in his territory and that he believed the representations about the drug that were being made by Allergan sales representatives were unlawful and potentially harmful to patients. Ms. Curleau responded that Allergan took Relator Jackson's allegations very seriously and that she was documenting his concerns.

202.     In September 2016, Relator Jackson called Allergan Regional Manager Jimmy Martin, who was Mr. Foust's supervisor. Relator Jackson told Mr. Martin that Mr. Foust was consistently encouraging sales representatives to promote Viberzi for off-label purposes and for patients who do not exhibit IBS-D symptoms. Promoting Viberzi to such patients is potentially dangerous because of the contra-indications of Viberzi, its addictive opioid properties, and because

it can result in the physician failing to properly identify the root cause of patient's symptoms if they are not suffering from IBS-D. In this conversation, Relator Jackson also informed Mr. Martin that Mr. Foust was retaliating against him for refusing to downplay the dangerous contraindications and other warnings and precautions associated with Viberzi and for refusing to promote Viberzi for off-label purposes in violation of the FCA. Despite receiving detailed information about the allegations of potential FCA violations in his territory, Mr. Martin ignored Relator Jackson's concerns.

203.    Mr. Martin is an experienced pharmaceutical sales manager and veteran of Forest Laboratories, who is familiar with its False Claims Act off-label settlements. During the period when the Forest CIAs were in effect, Mr. Martin also attended mandatory compliance training regarding off-label marketing and FCA compliance. Mr. Martin is well aware that off-label marketing can result in a *qui tam* lawsuit and FCA liability. Mr. Martin also knows that retaliating against employees for raising concerns about off-label marketing can result in liability for retaliation under the FCA.

204.    On January 19, 2017, Mr. Foust again reprimanded Relator Jackson for not describing Viberzi in a deceptive manner to prescribers. Foust stated "he felt we are back to square one." Foust then stated that "we are going to make some decisions tonight and will let you know something in the morning." The next day, January 20, 2017, Foust and Brian McKenna, an Allergan Human Resources employee, called and informed Mr. Jackson that he was being dismissed for "Not Meeting Expectations." The expectations that were not being met were clearly that Mr. Jackson would not be quiet about the apparent FCA violations.

205.    In fact, Allergan terminated Relator Jackson in retaliation for his efforts to stop violations of the FCA, his refusal to engage in fraudulent behavior, and his continuing to raise

concerns to Allergan managers and human resources employees regarding potential FCA liability and Allergan's discrimination for his refusal to participate in the illegal activity.

206.    Relator Jackson met and exceeded several performance-related measures that demonstrate he was a highly capable and productive sales representative, and Allergan did not fire him because of his ability to perform legitimate duties. For example, in early 2016 when Relator Jackson was raising off-label marketing concerns, Chris Sweeney, the Vice President of GI Sales, recognized Jackson as a "mover and shaker," an award bestowed upon top Allergan Sales Representatives whose performance was in the top 13 percent of sales nationally. Further demonstrating his productivity during the time Mr. Foust was his supervisor, Relator Jackson was in the top 50 percent in sales in the United States for the top three products in which he marketed and sold. He was in the top 15 percent of sales of Linzess and the top 42 percent in sales of Viberzi. Allergan also paid Relator Jackson his 2016 fourth quarter bonus **after** his termination. This bonus was earned during October through December of 2016, the time right before Allergan fired Jackson in January 2017. Under Allergan's bonus policy, employees must be in good standing and not on a performance plan to receive a quarterly bonus.

207.    As alleged, Jackson engaged in protected activity by his lawful acts to stop one or more violations of the FCA by: (a) refusing to cause the submission of false claims for payment to the government for drug reimbursement, and (b) informing individuals in Allergan's Human Resources Department and other sales and marketing managers of his belief that Defendant was unlawfully promoting and selling Viberzi, leading to inappropriate prescriptions being written for such patients, and to ongoing violations of the FCA. Allergan then terminated Jackson in direct retaliation for engaging in such protected activity.

208.    Relator Jackson is entitled to reinstatement, double back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, litigation costs, reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3730(h).

## COUNT I: Federal FCA
### (31 U.S.C. § 3729(a)(1)(A))

209.    The allegations in paragraphs 1-208 are incorporated by reference.

210.    By virtue of the kickbacks (in violation of the AKS), misrepresentations, and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly caused to be presented false or fraudulent claims for the improper payment or approval of drugs on behalf of federal and state health care program beneficiaries in violation of 31 U.S.C. § 3729(a)(1)(A).

211.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused to be submitted, paid for claims that otherwise would not have been paid.

212.    Because of these false or fraudulent claims, Defendants are liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the False Claims Act. As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT II: Federal FCA
### (31 U.S.C. § 3729(a)(1)(B))

213.    The allegations in paragraphs 1-208 are incorporated by reference.

214.    Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or false claim paid or approved by the United States, to wit: Defendants created or used false speaker event attendance records,

caused to be made or used false Medicare enrollment certifications, and false Medicare billing certifications, including those material certifications on Form CMS 855-I, Form CMS 855-O, Form CMS-64 and Form CMS-37.

215.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

216.    Because of these false or fraudulent claims, Defendants are liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.   As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT III: Federal FCA Conspiracy
### (31 U.S.C. § 3729(a)(1)(C))

217.    The allegations in paragraphs 1-208 are incorporated by reference.

218.    Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(C).

219.    By virtue of kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly conspired with HCPs including but not limited to Dr. Paul Bierman, Dr. Adam Levy, Dr. Asif Qadri, and other HCPs described above, to commit violations of the FCA and the AKS for the improper payment or approval of drugs on behalf of federal health care program beneficiaries.

220.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

221.    Because of these false or fraudulent claims, Defendants are liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each

violation of the Act. As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT IV: Federal FCA
### (31 U.S.C. § 3729(a)(1)(G))

222.    The allegations in paragraphs 1-208 are incorporated by reference.

223.    With knowledge of kickbacks provided and tainted claims submitted (in violation of the AKS), on a corporate-wide basis described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States in violation of 31 U.S.C. § 3729(a)(1)(G), to wit: knowingly submitted false claims to the United States and received funds based on false claims in violation of the FCA and Anti-Kickback Statute, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

224.    Because of these false or fraudulent claims, Defendants are liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act. As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT V: Arkansas State Medicaid Fraud False Claims Act
### (Ark. Code § 20-77-900, et seq.)

225.    The allegations in paragraphs 1-208 are incorporated by reference.

226.    Relators also bring this action on behalf of the State of Arkansas, against Defendants under the Arkansas State Medicaid Fraud False Claims Act ("FCA"), Ark. Code § 20-77-900 et seq.

227.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Arkansas FCA, Ark. Code § 20-77-902, which create liability for any person who:

> **(1)** Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;
>
> **(2)** At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;
>
> ***
>
> **(6)** Knowingly solicits or receives any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind:
>
> **(A)** In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or
>
> **(B)** In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program;
>
> **(7) (A)** Knowingly offers or pays any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce the person:
>
> **(i)** To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or
>
> **(ii)** To purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program.

228.    Defendants also violated the conspiracy provisions of the statute.

229.    Pursuant to the Arkansas FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to

64

the State for treble damages, civil penalties, and all other relief authorized by law. Ark. Code § 20-77-900 *et seq*.

230.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT VI: California FCA
### (Cal. Gov't Code § 12650, et seq.)

231.    The allegations in paragraphs 1-208 are incorporated by reference.

232.    Relators also bring this action on behalf of the State of California, against Defendants under the California False Claims Act ("FCA"), Cal. Gov't Code § 12652(c).

233.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provisions of the California FCA, Cal. Gov't Code § 12651(a)(1), (a)(2), and (a)(7), which create liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval.;" "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" and "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision." Defendants also violated the conspiracy provisions of the statute.

234.    Pursuant to the California FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Cal. Gov't Code § 12651(a)(1). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

**COUNT VII: Colorado Medicaid False Claims Act,**
**(Colo. Rev. Stat. § 25.5-4-303.5, et seq.)**

235.    The allegations in paragraphs 1-208 are incorporated by reference.

236.    Relators also bring this action in the name of the State of Colorado, against Defendants pursuant to the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306.

237.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(a), which creates liability for any person who "[k]nowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval."

238.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(b), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

239.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305)1)(f), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act,' or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act.'"

240.    Defendants also violated the conspiracy provisions of the statute.

241.     Pursuant to the Colorado FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law.  Colo. Rev. Stat. § 25.5-4-305(1).

### COUNT VIII: Connecticut False Claims Act,
**(Conn. Gen. Stat. § 4-274, et seq.)**

242.     The allegations in paragraphs 1-208 are incorporated by reference.

243.     Relators also bring this action in the name of the State of Connecticut, against Defendants pursuant to the Connecticut False Claims Act, Conn. Gen. Stat. § 4-277.

244.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(1), which provides that no person shall "[k]nowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program."

245.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(2), which provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program."

246.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provisions of the Connecticut FCA, Conn. Gen. Stat. § 4/275(a)(7), which provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program."

67

247.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(8), which provides that no person shall "[k]nowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program."

248.     Defendant also violated the conspiracy provisions of the statute.

249.     Pursuant to the Connecticut FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by the law.  Conn. Gen. Stat. § 4-275(b).

## COUNT IX: Delaware False Claims & Reporting Act
### (Del. Code Ann. Tit. 6 § 1201, et seq.)

250.     The allegations in paragraphs 1-208 are incorporated by reference.

251.     Relators also bring this action on behalf of the Government of the State of Delaware, against Defendants under the State of Delaware's False Claims and Reporting Act ("FCA"), Del. Code Ann. tit. 6, § 1203(b)(1).

252.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(1), (a)(2) and (a)(7), which create liability for any person who "[k]nowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;"  "[k]nowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;" and  "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government." Defendants also violated the conspiracy provisions of the statute.

253.     Pursuant to the Delaware FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Del. Code Ann. tit. 6, §1201(a). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT X: District of Columbia False Claims Act
### (D.C. Code Ann. § 2.381.01, et seq.)

254.     The allegations in paragraphs 1-208 are incorporated by reference.

255.     Relators also bring this action in the name of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.03(b)(1).

256.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

257.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

258.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(6), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit

69

money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District."

259.    Defendants also violated the conspiracy provisions of the statute.

260.    Pursuant to the D.C. FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Defendants are thus liable to the District for statutorily defined damages sustained because of the acts of Defendants and civil penalties. D.C. Code Ann. § 2-381.02(a).

## COUNT XI: Florida FCA
### (Fla. Stat. § 68.081, et seq.)

261.    The allegations in paragraphs 1-208 are incorporated by reference.

262.    Relators also bring this action on behalf of the State of Florida, against Defendants under the State of Florida's False Claims Act ("FCA"), Fla. Stat. § 68.083(2).

263.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(a), (b), and (g) which create liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval;" "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" and "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."  Defendants also violated the conspiracy provisions of the statute.

264.    Pursuant to the Florida FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to

the State for treble damages, civil penalties, and all other relief authorized by law. Fla. Stat. § 68.082(2). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XII: Georgia State False Medicaid Claims Act
### (O.C.G.A. § 49-4-168, et seq.)

265.   The allegations in paragraphs 1-208 are incorporated by reference.

266.   Relators also bring this action in the name of the State of Georgia, against Defendants pursuant to the Georgia State False Medicaid Claims Act ("SFMCA"), O.C.G.A. § 49-4-168 et seq.

267.   Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia SFMCA, O.C.G.A. § 49-4-168.1(a)(1), (a)(2), and (a)(7), which create liability for any person who "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;" "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" and "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program." Defendants also violated the conspiracy provisions of the statute.

268.   Pursuant to the Georgia SFMCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. O.C.G.A. § 49-4-168.1(a). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIII: Hawaii False Claims Act,
### (Haw. Rev. Stat. § 661-21, et seq.)

269.    The allegations in paragraphs 1-208 are incorporated by reference.

270.    Relators also bring this action on behalf of the State of Hawaii and its political

subdivisions, against Defendants under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-

25(a).

271.    Defendants, through their material misrepresentations, non-disclosures and other

wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw.

Rev. Stat. § 661-21(a)(l), which creates liability for any person who "[k]nowingly presents, or

causes to be presented, a false or fraudulent claim for payment or approval."

272.    Defendants, through their material misrepresentations, non-disclosures and other

wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw.

Rev. Stat. § 661-21(a)(2), which creates liability for any person who "[k]nowingly makes, uses,

or causes to be made or used, a false record or statement material to a false or fraudulent claim."

273.    Defendants, through their material misrepresentations, non-disclosures and other

wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw.

Rev. Stat. § 661-21(a)(6), which creates liability for any person who "[k]nowingly makes, uses,

or causes to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the State, or knowingly conceals, or knowingly and improperly

avoids or decreases an obligation to pay or transmit money or property to the State."

274.    Defendants also violated the conspiracy provisions of the statute.

275.    Pursuant to the Hawaii FCA, based on Defendants' material misrepresentations,

non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to

the State for treble damages, civil penalties, and all other relief authorized by law. Haw. Rev. Stat. § 661-21(a).

## COUNT XIV: Illinois FCA
### (740 Ill. Comp. Stat. 175/1, et seq.)

276.     The allegations in paragraphs 1-208 are incorporated by reference.

277.     Relators also bring this action on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act ("FCA"), 740 Ill. Comp. Stat. 175/4(b).

278.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(A), (B), and (G) which create liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" and "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."  Defendants also violated the conspiracy provisions of the statute.

279.     Pursuant to the Illinois FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. 740 Ill. Comp. Stat. 175/3(a).  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XV: Indiana Medicaid False Claims and Whistleblower Protection Act
### (Ind. Code § 5-11-5.7, et seq.)

280.    The allegations in paragraphs 1-208 are incorporated by reference.

281.    Relators also bring this action on behalf of the State of Indiana, against Defendants under the State of Indiana False Claims and Whistleblower Protection Act ("FCA"), Ind. Code § 5-11-5.7-4(a).

282.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(l) and (a)(2) which create liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" and "knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim."

283.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, also violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), which creates liability for any person who "(A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."  Defendants also violated the conspiracy provisions of the statute.

284.    Pursuant to the Indiana FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ind. Code § 5-11-5.5-2(b).  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

**COUNT XVI: Iowa FCA**
**(Iowa Code § 685.1, et seq.)**

285.     The allegations in paragraphs 1-208 are incorporated by reference.

286.     Relators also bring this action on behalf of the State of Iowa, against Defendants under the State of Iowa False Claims Act ("FCA"), Iowa Code § 685.3(2)a.

287.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code § 685.2(1).a, b., and g.  which create liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" and "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."  Defendants also violated the conspiracy provisions of the statute.

288.     Pursuant to the Iowa FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Iowa Code § 685.2(1).  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

**COUNT XVII: Louisiana Medical Assistance Programs Integrity Law**
**(La. Rev. Stat. Ann. § 46:437.1, et seq.)**

289.     The allegations in paragraphs 1-208 are incorporated by reference.

290.    Relators also bring this action on behalf of the State of Louisiana's medical assistance programs, against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law ("FCA"), La. Rev. Stat. Ann. § 46:439.1.A.

291.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.A, B, and C, which state that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim;" "[n]o person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;" and  "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs."  Defendants also violated the conspiracy provisions of the statute.

292.    Pursuant to the Louisiana FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. La. Rev. Stat. Ann. § 46:438.6.  As a result of Defendants' violations, the State of Louisiana has suffered damages in an amount to be determined at trial.

## COUNT XVIII: The Commonwealth of Massachusetts FCA
### (Mass. Ann. Laws Ch. 12, § 5A, et seq.)

293.    The allegations in paragraphs 1-208 are incorporated by reference.

294.    Relators also bring this action on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act ("FCA"), Mass. Ann. Laws ch. 12, § 5C(2).

295.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(1), B(2), and B(9), which create liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;" and "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof." Defendants also violated the conspiracy provisions of the statute.

296.    Pursuant to the Massachusetts FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mass. Ann. Laws ch. 12, § 5B(a).  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIX: Michigan Medicaid FCA
### (Mich. Comp. Laws Serv. § 400.601, et seq.)

297.    The allegations in paragraphs 1-208 are incorporated by reference.

298.    Relators also bring this action in the name of the State of Michigan, against Defendants under the State of Michigan Medicaid False Claims Act ("FCA"), Mich. Comp. Laws Serv. § 400.610a(l).

299.    Defendants, through the material illegal remuneration, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Michigan FCA, Mich. Comp. Laws Serv. § 400.603(1)-(3):

> (1)    A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.
>
> (2)    A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.
>
> (3)    A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled.

300.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(1) and (2), which state that "[a] person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false;" and "[a] person shall not knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act." Defendants also violated the conspiracy provisions of the statute.

301.    Pursuant to the Michigan FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mich. Comp.

Laws. Serv. § 400.612. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XX: Minnesota False Claims Act,
(Minn. Stat. § 15C.01, et seq.)

302.    The allegations in paragraphs 1-208 are incorporated by reference.

303.    Relators also bring this action on behalf of the State of Minnesota and its political subdivisions, against Defendants under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

304.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Minnesota FCA, Minn. Stat. § 15C.02(a), which create liability for any person who:

> (1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2)    knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> …
>
> (7)    knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

305.    Defendants also violated the conspiracy provisions of the statute.

306.    Pursuant to the Minnesota FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Minn. Stat. § 15C.02(a).

## COUNT XXI: Missouri Health Care Payment Fraud and Abuse Statute,
### (MO Rev. Code § 191.900, et seq.)

307.    The allegations in paragraphs 1-208 are incorporated by reference.

308.    Relators also bring this action on behalf of the State of Missouri, against Defendants under the Missouri Health Care Payment Fraud and Abuse Statute ("FCA"), MO Rev. Code § 191.900, *et seq.*

309.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Missouri FCA, MO Rev. Code § 191.905, which create liability for any person who:

> 91.905. 1. No health care provider shall knowingly make or cause to be made a false statement or false representation of a material fact in order to receive a health care payment, including but not limited to:
>
> (1) Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not;
>
> (2) Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment made by a health care payer for providing health care;
>
> (3) Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled;
>
> ***
>
> 2. No person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for:
>
> (1) Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or
>
> (2) Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

> 3. No person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

310.     Defendants also violated the conspiracy provisions of the statute.

311.     Pursuant to the Missouri FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. MO Rev. Code § 191.905.

312.     As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

**COUNT XXII: Montana FCA**
**(Mont. Code Ann. § 17-8-401, et seq.)**

313.     The allegations in paragraphs 1-208 are incorporated by reference.

314.     Relators also bring this action on behalf of the State of Montana, against Defendants under the State of Montana False Claims Act ("FCA"), Mont. Code Ann. § 17-8-406(1).

315.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Montana FCA, Mont. Code Ann. § 17-8-403(1), which create liability for any person who:

> (a)     knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
>
> (b)     knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]
>
>  …
>
> (g)     knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity.

316.    Defendants also violated the conspiracy provisions of the statute.

317.    Pursuant to the Montana FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mont. Code Ann. § 17-8-403(2).

318.    As a result of Defendant's violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XXIII: Nevada Submission of False Claims to State or Local Government Act
**(Nev. Rev. Stat. § 357.010, et seq.)**

319.    The allegations in paragraphs 1-208 are incorporated by reference.

320.    Relators also bring this action on behalf of the State of Nevada, against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act ("FCA"), Nev. Rev. Stat. § 357.080(1).

321.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Nevada FCA, Nev. Rev. Stat. § 357.040(l), which create liability for any person who:

> (a)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (b)    Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.
> …
>
> (f)    Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision; or

(g)    Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

322.    Defendants also violated the conspiracy provisions of the statute.

323.    Pursuant to the Nevada FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Nev. Rev. Stat. § 357.040(2).

324.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## <u>COUNT XXIV</u>: <u>New Hampshire False Claims Act</u>
### (N.H. Rev. Stat. Ann. § 167:61-B, et seq.)

325.    The allegations in paragraphs 1-208 are incorporated by reference.

326.    Relators also bring this action on behalf of the State of New Hampshire, against Defendants under the State of New Hampshire False Claims Act ("FCA"), N.H. Rev. Stat. Ann. § 167:61-b, et seq.

327.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of The New Hampshire FCA, N.H. Rev. Stat. Ann. § 167:61-b, which create liability for any person who:

(a)    Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.

(b)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.
…

(d)    Has possession, custody, or control of property or money used, or to be used, by the department and, intending to defraud the department or willfully to conceal the property, delivers, or causes to be delivered, less

83

property than the amount for which the person receives a certificate or receipt.

(e)     Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the department; or

(f)     Is a beneficiary of an inadvertent submission of a false claim to the department, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the department within a reasonable time after discovery of the false claim.

328.    Defendants also violated the conspiracy provisions of the statute.

329.    Pursuant to the New Hampshire FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.H. Rev. Stat. Ann. § 167:61-b, et seq.

330.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXV: New Jersey False Claims Act
### (N.J. Stat. Ann. § 2A:32C-1, et seq.)

331.    The allegations in paragraphs 1-208 are incorporated by reference.

332.    Relators also bring this action in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey False Claims Act ("FCA"), N.J. Stat. Ann. § 2A:32C-5.b.

333.    Defendants, through their illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3, which create liability for any person who:

a.     Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

84

b.      Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;
…
g.      Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

334.   Defendants also violated the conspiracy provisions of the statute.

335.   Pursuant to the New Jersey FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.J. Stat. Ann. § 2A:32C-3.

336.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XXVI: New Mexico Medicaid FCA
### (N.M. Stat. Ann. § 27-14-1, et seq.)

337.   The allegations in paragraphs 1-208 are incorporated by reference.

338.   Relators also bring this action on behalf of the State of New Mexico, against Defendants under the State of New Mexico Medicaid False Claims Act ("FCA"), N.M. Stat. Ann. § 27-14-7.B.

339.   Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New Mexico FCA, N.M. Stat. Ann. § 27-14-4, which create liability for any person who:

A.  presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

B.      presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

     C.     makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false; [or]
…
     E.     makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false.

340.    Defendants also violated the conspiracy provisions of the statute.

341.    Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

342.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXVII: New York False Claims Act,
### (N.Y. State Fin. Law § 187, et seq.)

343.    The allegations in paragraphs 1-208 are incorporated by reference.

344.    Relators also bring this action on behalf of the State of New York, against Defendants under the State of New York False Claims Act, N.Y. State Fin. Law § 190(2).

345.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New York FCA, N.Y. State Fin. Law § 189(1), which create liability for any person who:

     (a)     knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

     (b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
…
     (g)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

(h)    knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same….

346.    Defendants also violated the conspiracy provisions of the statute.

347.    Pursuant to the New York FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.Y. State Fin. Law § 189(1).

## COUNT XXVIII: North Carolina False Claims Act
### (N.C. Gen. Stat. § 1-605, et seq.)

348.    The allegations in paragraphs 1-208 are incorporated by reference.

349.    Relators also bring this action on behalf of the State of North Carolina, against Defendants under the State of North Carolina False Claims Act ("FCA"), N.C. Gen. Stat. § 1-608(b).

350.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the North Carolina FCA, N.C. Gen. Stat. § 1-607(a), which create liability for any person who:

(1)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
…
(7)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

351.    Defendants also violated the conspiracy provisions of the statute.

352.    Pursuant to the North Carolina FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.C. Gen. Stat. § 1-607(a). Defendant also violated the conspiracy provisions of the statute.

353.    As a result of Defendant's violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIX: Oklahoma Medicaid FCA
### (Okla. Stat. Tit. § 63-5053, et seq.)

354.    The allegations in paragraphs 1-208 are incorporated by reference.

355.    Relators also bring this action in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid False Claims Act ("FCA"), Okla. Stat. tit. § 63-5053.2(B).

356.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Oklahoma FCA, Okla. Stat. tit. § 63-053.1(B), which create liability for any person who:

> 1.    Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;
>
> 2.    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; … or
>
> 7.    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money         or         property         to         the         state.

357.    Defendants also violated the conspiracy provisions of the statute.

358.    Pursuant to the Oklahoma FCA, based on Defendants' material illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above,

Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law under Oklahoma FCA, Okla. Stat. tit. § 63-053.1(B).

359.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

<u>**COUNT XXX: Rhode Island FCA**</u>
**(R.I. Gen. Laws § 9-1.1-1, et seq.)**

360.    The allegations in paragraphs 1-208 are incorporated by reference.

361.    Relators also bring this action in the name of the State of Rhode Island, against Defendants pursuant to the State of Rhode Island False Claims Act ("FCA"), R.I. Gen. Laws § 9-1.1-4(b).

362.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a), which create liability for any person who:

> (1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (2)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> …
> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state….

363.    Defendants also violated the conspiracy provisions of the statute.

364.    Pursuant to the Rhode Island FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. R.I. Gen. Laws § 9-1.1-3(a).

365. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XXXI: Tennessee Medicaid FCA
### (Tenn. Code Ann. § 71-5-181, et seq.)

366. The allegations in paragraphs 1-208 are incorporated by reference.

367. Relators also bring this action in the name of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act ("FCA"), Tenn. Code Ann. § 71-5-183(b)(1).

368. Defendants, through the material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l), which create liability for any person who:

> (A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

> (B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program; [or]

> (C) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program.

369. Defendants also violated the conspiracy provisions of the statute.

370. Pursuant to the Tennessee FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tenn. Code Ann. § 71-5-182(a).

371.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXXII: Texas Medicaid Fraud Prevention Act
### (Tex. Hum. Res. Code § 36.001, et seq.)

372.    The allegations in paragraphs 1-208 are incorporated by reference.

373.    Relators also bring this action in the name of the State of Texas, against Defendants under the State of Texas Medicaid Fraud Prevention Act ("FCA"), Tex. Hum. Res. Code § 36.101(a).

374.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Texas FCA, Tex. Hum. Res. Code § 36.002, which create liability for any person who, *inter alia*:

> (1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

> (2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

> (3)    knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;
> …

> (12)    knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

> (13)    knowingly engages in conduct that constitutes a violation under Section 32.039(b).

375.    Defendants also violated the conspiracy provisions of the statute.

376.    Pursuant to the Texas FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for three times the payments or benefits provided under the Medicaid program directly or indirectly as a result of the Defendant's unlawful acts, civil penalties, and all other relief authorized by law.  Tex. Hum. Res. Code § 36.052.

## COUNT XXXIII: Vermont FCA
### (Vt. Stat. Tit. 32, 630, et seq.)

377.    The allegations in paragraphs 1-208 are incorporated by reference.

378.    Relators also bring this action in the name of the State of Vermont, against Defendants under the State of Vermont False Claims Act ("FCA"), Vt. Stat. Ann. tit. 32, § 632(b).

379.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Vermont FCA, Vt. Stat. Ann. tit. 32, § 631, which state that no person shall:

> (1)    knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;
>
> (2)    knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;
> …
> (8)    enter into a written agreement or contract with an official of the State or its agent knowing the information contained therein is false;
>
> (9)    knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State; [or]
>
> (10)    knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

380.    Defendants also violated the conspiracy provisions of the statute.

381.     Pursuant to the Vermont FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Vt. Stat. Ann. tit. 32, § 631(b).

382.     As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

<u>COUNT XXXIV</u>: <u>Virginia Fraud Against Taxpayers Act</u>
**(Va. Code Ann. § 8.01-216.1, et seq.)**

383.     The allegations in paragraphs 1-208 are incorporated by reference.

384.     Relators also bring this action on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act ("FCA"), Va. Code Ann. § 8.01-216.5(A).

385.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Virginia FCA, Va. Code Ann. § 8.01-216.3(A), which create liability for any person who:

> 1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> 2.     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> …
> 7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth.

386.     Defendants also violated the conspiracy provisions of the statute.

387.     Pursuant to the Virginia FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to

the State for treble damages, civil penalties, and all other relief authorized by law. Va. Code Ann. § 8.01-216.3(A).

388.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XXXV: Washington State Medicaid Fraud FCA
### (Wash. Rev. Code § 74.66.005, et seq.)

389.    The allegations in paragraphs 1-208 are incorporated by reference.

390.    Relators also bring this action on behalf of the State of Washington, against Defendants under the Washington State Medicaid Fraud False Claims Act ("FCA"), Wash. Rev. Code § 74.66.050(1).

391.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Washington FCA, Wash. Rev. Code § 74.66.020(1), which create liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> …
> (g)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

392.    Defendants also violated the conspiracy provisions of the statute.

393.    Pursuant to the Washington FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wash. Rev. Code § 74.66.020(1).

394.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XXXVI: Wisconsin False Claims for Medical Assistance Act,
### (Wis. Stat. § 20.931, et seq.)

395.    The allegations in paragraphs 1-208 are incorporated by reference.

396.    Relators also bring this action on behalf of the State of Wisconsin, against Defendants under the State of Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931(5)(a), for material misrepresentations, non-disclosures and other wrongful acts and omissions that occurred before the (non-retroactive) repeal of that law effective July 14, 2015.

397.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Wisconsin FCA, Wis. Stat. § 20.931(2), which created liability for any person who:

> (a)  Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.
>
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.
> ….
> (g)  Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program.

398.    Defendants also violated the conspiracy provisions of the statute.

399.    Pursuant to the Wisconsin FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wis. Stat. § 20.931(2).

## COUNT XXXVII: California Insurance Frauds Prevention Act
### (California Insurance Code § 1871.7(a) & (b))

400. The allegations in paragraphs 1-208 are incorporated by reference.

401. Relators also bring this action for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. § 1871.7, as amended ("CIFPA"). The CIFPA provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim, as may be amended. Cal. Ins. Code § 1871.7(b).

402. Subsection (e) of Cal. Ins. Code § 1871.7 provides for a *qui tam* civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. Cal. Ins. Code § 1871.7(e). The *qui tam* provision was patterned after the Federal False Claims Act, 31 U.S.C. §§ 3729-32, and the California False Claims Act, Cal. Gov't Code §§12650 et seq.

403. Subsection (b) of Cal Ins. Code § 1871.7 provides for civil recoveries against person who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits certain activities, including violations of 550(a)(5)-(6), (b)(1), (2), and (3).

404. Defendants caused to be presented, or knowingly assisted or conspired in presenting or causing to be presented, to the insurers in the State of California fraudulent claims that were induced by payments of kickbacks to physicians, in violation of Penal Code § 550 (b)(1), among other provisions.

405. Defendants also concealed and/or failed to disclose information that would have affected the rights of pharmacies to receive reimbursement for prescriptions, in violations of Penal Code § 550(a).

406.    Each claim for reimbursement that was inflated as a result of Defendants' illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

407.    Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

408.    The payment of the kickbacks alleged in this Complaint represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

409.    Moreover, the payment of these kickbacks violates the "runners and cappers" provision of § 1871.7(a), as Defendants' kickback scheme was to "procure clients or patients to obtain services or benefits under a contract of insurance." In the alternative, Defendants' payment of kickbacks violated the "runners and cappers" provision of § 1871.7(a), as Defendants' employment of sales representatives to provide kickbacks to physicians in order to generate prescriptions that would eventually be paid for by private insurance companies constitutes the unlawful and knowing employment of "runners, cappers, steerers, or other persons ... to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." The Relators know and believe that these practices continued beyond the time at which they were employed at Allergan, and upon information and belief, this pattern and practice continues to the present.

410.    The payment of the kickbacks alleged in this Complaint represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false

claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

411.    The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code § 1871.7.  Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged.

**COUNT XXXVIII: Illinois Insurance Frauds Prevention Act**
**(740 Ill. Comp. Stat § 92)**

412.    The allegations in paragraphs 1-208 are incorporated by reference.

413.    Relators also bring this action for treble damages and penalties under the Illinois Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92

414.    Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:  A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

415.    Article 46 of the Illinois Criminal Code, referenced in the above-quoted section, provides criminal penalties for any person who commits the offense of insurance fraud, defined in the statute as follows: (a) A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company…. 720 Ill. Comp. Stat. §5/46-1(a).

416.    Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a *qui tam* civil action in order to create incentives for private individuals to prosecute violations of the statute.  Subsection 15(a) provides: "An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois.  The action shall be brought in the name of the State."  740 Ill. Comp. Stat. §92/15(a).

417.    By virtue of the conduct described in this Complaint, Defendants committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Claims Fraud Prevention Act: knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat §5/46-1(a).

418.    As a result of such conduct, Defendants have received illegal profits to which they were not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

419.    The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by Defendants in violation of 740 Ill. Comp. Stat. § 92. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged in this Complaint.

## COUNT XXXIX: UNLAWFUL RETALIATION
### (31 U.S.C. § 3730(h))

420.    Relator Jackson adopts and incorporates paragraphs 1-208.

421.    Relator Jackson engaged in protected activity while employed by Allergan, to stop one or more violations of the FCA, including by refusing to promote Allergan drug Viberzi in a

deceptive, misleading and off-label manner. Based on compliance training and his extensive experience as a pharmaceutical sales representative, Relator Jackson reasonably believed that the off-label and deceptive messages Allergan instructed him to use were illegal under the Food, Drug and Cosmetic Act and the FCA, and thus resulted in false claims being submitted. Further, Relator Jackson reported these concerns to Allergan Human Resources employees. Relator Jackson engaged in this protected activity in an effort to prevent violations of the False Claims Act.

422. In violation of 31 U.S.C § 3730(h), Defendants retaliated against Relator Jackson because of his efforts to stop violations of the FCA and to prevent violations of the FCA. This retaliation included terminating Relator Jackson's employment with Allergan.

423. As a result of Defendants' retaliatory conduct, Relator Jackson has suffered damages of extended periods of lost pay, undue hardship forced upon Relator Jackson, and harm to his personal and professional reputation.

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves, the United States, and the States, pray:

(a) That the Court enter judgment against Defendants in favor of the United States and the Relators, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the Federal False Claims Act before November 2, 2015, and $11,000 to $21,563 for each violation after November 2, 2015;

(b) That the Court enter judgment against Defendants in favor of the States and the Relators in the amount of the damages or penalties sustained by the States, trebled as provided for in the State FCAs, plus civil penalties for each violation of each of the States' FCAs;

100

(c)     That Relators be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim.

(d)     That the Relators be awarded an amount from the proceeds of the action to the States as provided for in the *qui tam* provisions of each of the individual States' FCAs;

(e)     That the Relators be awarded an amount from the proceeds of the action to the States of California and Illinois as provided for in the *qui tam* provisions of each individual States' California Insurance Fraud Prevention Act and the Illinois Insurance Claims Fraud Prevention Act.

(f)     That the Court enter judgment against Defendants in favor of Relator Jackson, for all relief available under 31 U.S.C. § 3730(h), including reinstatement, double back pay, special damages, litigation costs and reasonable attorney's fees, because of Defendants' retaliation against Relator Jackson;

(g)     That judgment be entered against Defendants, in favor of Relators, the United States, and the States, in the amounts to be determined at trial;

(h)     That Relators be awarded all costs and expenses incurred, including reasonable attorneys' fees and costs; and

(i)     That the Court order such other relief as is appropriate.

## **RELATORS DEMAND A TRIAL BY JURY**

Respectfully submitted this 19th day of October, 2021.

s/ *James E. Butler, Jr.*

JAMES E. BUTLER, JR.
Georgia Bar No. 099625
jim@butlerwooten.com
BRANDON L. PEAK
Georgia Bar No. 141605
brandon@butlerwooten.com
ROBERT H. SNYDER
Georgia Bar No. 404522
rob@butlerwooten.com
JOSEPH M. COLWELL
Georgia Bar No. 531527
joseph@butlerwooten.com
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, GA 30324
T: (404) 321-1800    F: (404) 321-2962


JAMES J. BREEN
*(Petition for Admission Pending)*
Georgia Bar No. 079275
jbreen@breenlaw.com
THE BREEN LAW FIRM, PA
11720 Amber Park Drive
Suite 160
Alpharetta, GA 30009
T: (770) 740-0008    F: (678) 252-5545

MICHAEL SULLIVAN
Georgia Bar No. 691431
msullivan@finchmccranie.com
DAVID BROUCHARD
Georgia Bar No. 712859
david@finchmccranie.com
GARY T. THOMPSON
*(Petition for Admission Pending)*
Georgia Bar No. 722008
gthompson@finchmccranie.com
FINCH MCCRANIE, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, GA 30303
T: (404) 658-9070    F: (404) 688-0649


JAMES F. BARGER, JR.

Georgia Bar No. 304373
jim@frobar.com
BEN BUCY
Georgia Bar No. 526064
ben@frohsinbarger.com
FROHSIN BARGER & WALTHALL
100 Main Street
St. Simons Island, GA 31522
T:  (912) 809-3007

ATTORNEYS FOR PLAINTIFFS-RELATORS

## CERTIFICATE OF SERVICE

This is to certify that on October 21, 2021, I electronically filed Plaintiffs-Relators' THIRD AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Eva Gunasekera
Renee Brooker
Tycko & Zavareei
1828 L Street NW
Suite 1000
Washington, DC 20036
eva@tzlegal.com
reneebrooker@tzlegal.com

Christelle Klovers
US Department of Justice
PO Box 261, Ben Franklin Station
Washington, DC 20044
Christelle.Klovers@usdoj.gov

Michael D. Granston
US Department of Justice
PO Box 261
PHB 9141
Washington, DC 20044
michael.granston@usdoj.gov

Edward Crooke
US Department of Justice - DC
1100 L Street NW
Room 11204
Washington, DC 20005

Vanessa Ruth Waldref
US Department of Justice - ENRD
PO Box 7611
Washington, DC 20044

Daniel Hugo Fruchter
U S Attorney's Office - SPO
920 W Riverside Suite 300
P O Box 1494
Spokane, WA 99210-1494

Tyler Howard Louis Tornabene
U S Attorney's Office - SPO
920 W Riverside Suite 300
P O Box 1494
Spokane, WA 99210-1494

I certify I have served this document on the following via e-mail:

Katrina A. King
2425 Bristol Court SW
Suite 1st Floor
Olympia, WA 98502
katrina.king@atg.wa.gov

This 21st day of October, 2021.

s/ *James E. Butler, Jr.*

JAMES E. BUTLER, JR.
Georgia Bar No. 099625
jim@butlerwooten.com
BRANDON L. PEAK
Georgia Bar No. 141605
brandon@butlerwooten.com
ROBERT H. SNYDER
Georgia Bar No. 404522
rob@butlerwooten.com
JOSEPH M. COLWELL
Georgia Bar No. 531527
joseph@butlerwooten.com
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, GA 30324
T: (404) 321-1800    F: (404) 321-2962

# Addendum 1 to
# Relators' Third Amended Complaint

**Addendum 1 to Relators Third Amended Complaint**

**Additional examples of Allergan's "Speaker Bureau" payments for "sham," under-attended, and/or cancelled events and resulting False Claims**

1.      On September 9, 2015, Allergan paid speaker-physician Dr. Nikhil Karanth $1,750 in speaker fees for a purported speaker event at the Waterfront Grille in New Bedford, Massachusetts.  No one other than Dr. Karanth and Allergan sales representative Tim Harkin attended the event.  No education event occurred.  Instead, the two people enjoyed drinks and a meal at Allergan's expense, and Allergan gave the physician a check in exchange for writing prescriptions.

2.      During 2015, Dr. Nikhil Karanth was a major prescriber of Linzess, and wrote at least 110 prescriptions of Linzess for Medicare Part D patients, at a cost to the Medicare program of $31,382.18.  Throughout 2015, Allergan (through its predecessor entity Actavis) paid Dr. Karanth $5,000 in speaker fees.  Allergan paid at least $1,750 of these speaker fees for an event that was a complete sham.  The speaker fees paid to Dr. Karanth had no purpose other than to induce Dr. Karanth to prescribe Allergan drugs—specifically Linzess—which were paid for by the Medicare program in violation of the AKS.

3.      During 2015, Allergan paid Dr. Shirish Amin for two separate events that were under-attended because there were fewer actual attendees than were required to meet Allergan's minimum positive RSVP requirements.  Specifically, on October 7, 2015, Allergan paid Dr. Amin $1,400 for an "in-office" speaker event at the Office of Dr. Brian Foulk, a family practitioner in Northern Cambria, Pennsylvania. Only one person besides Dr. Amin and Allergan Sales Representative Haley Crider attended this event.  Later, on December 17, 2015 Allergan paid Dr. Shirish Amin $1,750 for a speaker event at Benjamin's—a fine dining restaurant in Indiana,

Pennsylvania.  Only two people besides Dr. Amin and Allergan Sales Representative Haley Crider attended this event.

4.      In 2015, Dr. Shirish Amin was a major prescriber of Linzess.  As Allergan increased his speaker fees over the next three years, Dr. Amin increased his prescriptions at a dramatic rate. In 2015, Allergan paid Dr. Shirish Amin $10,250 in speaker fees, and in response to these payments, Dr. Amin prescribed at least 109 prescriptions of Linzess for Medicare Part D patients— at a cost of $30,871.76 to the Medicare program.  In 2016, Allergan paid Dr. Amin $15,250 in speaker fees, and he prescribed at least 184 prescriptions of Linzess for Medicare Part D patients— at a cost of $55,914.10 to the Medicare program.  In 2017, Allergan paid Dr. Amin $15,851 in speaker fees and Dr. Amin prescribed at least 202 prescriptions of Linzess, costing the Medicare program $67,825.98.  Further, in 2017, Dr. Amin became one of the largest Medicare prescribers of Viberzi in the nation—writing at least 56 prescriptions at a cost of $59,254.43 to the taxpayer funded Medicare program.

5.      On February 22, 2016, Allergan paid Dr. Joseph Hathaway to purportedly perform an in-office speaker event at "Dublin Medical," in Dublin, Georgia.  However, there were no attendees at this supposed speaker event.  The only "event" that occurred was the payment from Allergan to Dr. Hathaway.  Allergan paid Dr. Joseph Hathaway $1,800 to do nothing and simply called it a speaker event.  The only person in attendance other than Dr. Hathaway was Allergan Sales Representative Lacy Allen, and all she did was deliver a check to Dr. Hathaway.  The true purpose of paying Dr. Hathaway was to induce prescriptions of Linzess.

6.      Upon becoming a paid Allergan Speaker-Physician in 2016, Dr. Hathaway's prescriptions increased dramatically.  In 2015, while not on the Allergan Speaker Bureau and thus not paid kickbacks by Allergan, Dr. Hathaway wrote 36 prescriptions of Linzess.  In 2016,

Allergan paid Dr. Hathaway $33,500 in speaker fees, and Dr. Hathaway's prescriptions of Linzess skyrocketed over 500% from his 2015 levels to 184 prescriptions of Linzess—costing the Medicare program $59,644.46. In 2017, Allergan paid Dr. Hathaway $35,000 in speaker fees and his Medicare Part D Linzess prescriptions more than doubled again from his 2016 prescribing level to 395 prescriptions—costing Medicare $140,292.75. In two years, upon receiving nearly $70,000 for purported speaker fees, including for sham speaker events where no one was in attendance, Dr. Hathaway's Medicare Part D prescriptions of Linzess increased roughly ten-fold and cost the Medicare program approximately $200,000. Dr. Hathaway did not change practices or locations but operated the same small practice in Statesboro, Georgia from 2015 to 2017. His patient pool did not increase, but his payments from Allergan and his prescriptions of Linzess increased dramatically.

7.    On June 17, 2016, Allergan paid Dr. Jose Lantin $1,500 to purportedly perform a speaker event at Enzo's Restaurant—an upscale Italian restaurant in Mamaroneck, New York. No one attended, and Dr. Lantin did not speak. All he did was eat and drink, yet Allergan still paid Dr. Lantin for this sham event. This payment by Allergan to Dr. Lantin was not for any legitimate purpose, but was paid in exchange for prescriptions of Linzess.

8.    In 2015, Allergan paid Dr. Lantin $3,000 in speaker fees, and he wrote 47 prescriptions of Linzess to Medicare Part D patients—costing the Medicare program $14,543.73. In 2016, Allergan paid Dr. Lantin $10,700 in speaker fees, including for speaker events that were complete shams such as the one on June 17, 2016, and Dr. Lantin's prescriptions of Linzess increased by over 400% – up to 262 prescriptions – for which Medicare paid $89,760.36. In 2017, Allergan paid Dr. Lantin $18,200 in speaker fees, and his prescriptions of Linzess nearly doubled again—up to 439 prescriptions of Linzess and costing $168,874.29 to the Medicare program.

3

9.     On October 11, 2016, Allergan paid Dr. Asif Qadri, a physician based in Athens, Georgia, $1,500 for purportedly performing a speaker event at Town 220 Bistro in Madison, Georgia.   However, there were only two attendees at this speaker event—two fewer than Allergan's four person RSVP requirement. Allergan knew that paying a physician $1,500 for alleged "education" provided to only two people was above fair market value, not reasonable or necessary, and therefore was a kickback under the AKS.  The true purpose of paying Dr. Qadri was to induce prescriptions of Linzess.

10.     Dr. Qadri was not a paid speaker-physician in the speaker bureau in 2015, and Dr. Qadri prescribed 59 prescriptions of Linzess in 2015. In 2016, Allergan paid Dr. Qadri $11,000 in speaker fees, and Dr. Qadri's Linzess prescriptions increased dramatically, nearly 250%, up to 144 prescriptions—for which Medicare paid $46,196.53.  In 2017, Allergan paid Dr. Qadri $13,100 in speaker fees and his Linzess prescriptions increased dramatically again, nearly 450% more than he prescribed before being paid Allergan's kickbacks—up to 256 prescriptions for which Medicare paid over $90,638.24.

11.     On March 9, 2017, Allergan paid Dr. Tung Thomas Tran, a gastroenterologist based in Denison, Texas, $2,000 to purportedly perform a speaker event at the office of Dr. Amanda Wilcox in Prattville, Alabama.   However, no one except Dr. Tran and the Allergan Sales Representative attended.  Nothing occurred except Allergan paid a $2,000 kickback to Dr. Tran.

12.     Dr. Tran was not a paid speaker in 2015—and he prescribed 109 prescriptions of Linzess.  In 2016, Allergan made Dr. Tran one of the highest paid Allergan GI speaker-physicians in the country— paying him $110,300 in speaker fees. As a direct result, his prescriptions increased dramatically, almost doubling to 211 prescriptions of Linzess—for which Medicare paid $65,074. In 2017, Allergan paid Dr. Tran $77,445 in speaker fees and his prescriptions increased again to

4

294 prescriptions of Linzess—for which Medicare paid $102,261.80. Additionally, in exchange for payment for speaker events that were typically sham events, Dr. Tran prescribed significant amounts of Viberzi—writing 23 prescriptions in 2016, for which Medicare paid $22,173.98 and 26 Viberzi Medicare Part D prescriptions in 2017—for which Medicare paid $26,313.84.

13.     Similarly, on May 10, 2017, Allergan paid Dr. Jack Braha $1,500 to purportedly give a speaker event presentation at T Fusion Steakhouse—"a unique and creative fine dining restaurant"—in Brooklyn, New York. However, no one except Dr. Braha and the Allergan Sales Representative attended. All that occurred was that Dr. Braha enjoyed food and drinks at Allergan's expense and received a $1,500 check.

14.     In 2015, Dr. Braha was not paid any speaker fees by Allergan, and he wrote 25 prescriptions of Linzess. In 2016, Allergan paid Dr. Braha $11,150 in speaker fees and his prescriptions increased over 400% to 137 prescriptions of Linzess—for which Medicare paid $43,936.11. In 2017, Allergan paid Dr. Braha $19,215—including for events that were complete shams such as on May 10, 2017—and Dr. Braha's prescriptions increased again to 158 prescriptions of Linzess, for which Medicare paid $56,343. Further, in 2018, while being paid another $10,900 in speaker fees throughout 2018, Dr. Braha continued to prescribe significant amount of Linzess—158 prescriptions that cost Medicare $59,531.86—six times the amount he prescribed when Allergan was not paying him kickbacks in 2015.

15.     Similarly, on June 27, 2017, Allergan paid Dr. Oscar Chien $1,250 to purportedly provide education to other physicians at an Allergan GI speaker event held at Icho Izakaya—an upscale sushi restaurant in Rosemead, California. In reality, however, Dr. Chien had dinner alone with the Allergan sales representative and received a check for $1,250 to induce prescriptions.

16.     In 2015, Dr. Chien was not paid speaker fees by Allergan, and he prescribed 230 prescriptions of Linzess.  Upon becoming a paid speaker-physician and receiving $6,900 in speaker fees from Allergan, Dr. Chien increased his prescriptions to 337 prescriptions of Linzess—for which Medicare paid $109,086.41.  In 2017, Allergan paid Dr. Chien $6,500 in speaker fees. Dr. Chien's prescriptions increased again to 416 prescriptions of Linzess—for which Medicare paid $148,114.84.  Dr. Chien also prescribed significant amounts of Viberzi to Medicare Part D patients in exchange for speaker fees—writing 15 prescriptions costing Medicare $11,725.83 in 2016 and 11 Viberzi prescriptions costing Medicare $11,753 in 2017.

17.     On April 5, 2017, Allergan paid Dr. Gene Chiao $1,500 for purportedly performing a speaker event at Wildfire Glenview—an upscale restaurant in Glenview, Illinois.  However, there were only two attendees at this speaker event, two fewer than Allergan's four person RSVP requirement.  Therefore, Allergan knew that paying a physician $1,500 for "education" provided to only two people was above fair market value, not reasonable or necessary, and a kickback under the AKS.  Allergan's true purpose of paying Dr. Chiao was to induce prescriptions of Linzess.

18.     Allergan made Dr. Chiao—a gastroenterologist based in Highland Park, Illinois— a paid speaker in 2016.  In 2015, prior to being paid by Allergan, Dr. Chiao prescribed 23 prescriptions of Linzess.  The next year, in 2016, Allergan paid Dr. Chiao $7,100 in speaker fees and Dr. Chiao's Linzess prescriptions nearly tripled, to 62 prescriptions, for which Medicare paid $23,645.11.  In 2017, Allergan paid Dr. Chiao $6,300 in speaker fees and his Linzess prescriptions increased again to 77 prescriptions.  At the same time, Dr. Chiao became a major prescriber of Viberzi—writing 34 prescriptions to Medicare beneficiaries for which Medicare paid $35,268.48. Moreover, in 2018—while still a paid Allergan speaker-physician, Dr. Chiao's Linzess prescriptions increased again up to 105 prescriptions for which Medicare paid $45,407.30, and Dr.

6

Chiao continued prescribing Viberzi—writing 15 prescriptions for which Medicare paid $18,350.65.

19.     On May 16, 2018, Allergan paid Dr. G.S. Ramesh $1,400 for purportedly giving an "educational" speaker event co-promoting Linzess and Viberzi at 1960 Family Practice P.A. in Houston, Texas.  Dr. Ramesh and the Allergan sales representative were the only attendees at this sham event, and no education occurred.  The actual purpose of Allergan's $1,400 payment was to induce Dr. Ramesh to continue prescribing Allergan's GI drugs.

20.     Dr. Ramesh is based in Houston, Texas.  Allergan added him to the Speaker Bureau in 2016.  In 2015, before Allergan started paying him kickbacks Dr. Ramesh prescribed 50 prescriptions of Linzess, at a cost to Medicare of $14,518.  In 2016, Allergan paid Dr. Ramesh $19,900 in speaker fees, and his prescriptions more than doubled—up to 120 prescriptions of Linzess, costing Medicare $38,128.96.  In 2017, Allergan paid Dr. Ramesh $13,050 in speaker fees and his prescriptions increased yet again to 126 prescriptions at a cost to Medicare of $44,553.67, while he also prescribed 16 prescriptions of Viberzi at a cost to Medicare of $15,046.85.

21.     On January 25, 2018, Allergan paid speaker-physician Dr. Andrew Boxer $1,750 for purportedly performing a paid event at Oceano's Restaurant in Fair Lawn, New Jersey.  However, there was only one attendee at this purportedly "educational" event.  Allergan knew that paying a physician $1,750 to have a dinner at fine-dining restaurant with one other person was above fair market value, not reasonable or necessary, and was a kickback under the AKS.

22.     Dr. Andrew Boxer is based in Clifton, New Jersey. Allergan added him to the Speaker Bureau in 2017.  Before Allergan started paying him kickbacks, Dr. Boxer prescribed a relatively consistent level of Linzess—18 prescriptions in 2015 and 27 prescriptions in 2016.  After

Allergan added him to the Speaker Bureau and paid him $4,750 in speaker fees in 2017, Dr. Boxer's Linzess Prescriptions increased over 300% to 111 prescriptions, costing Medicare $45,346. Similarly, in 2018, Allergan paid Dr. Boxer $12,100 in speaker fees—including for events that were under-attended and where the payment was above fair market value, not reasonable or necessary, and violated the AKS such as the event on January 25, 2018. During that time, Dr. Boxer's prescriptions increased again to 117 prescriptions, costing Medicare $47,707.

**Examples of Allergan payments for cancelled events and resulting False Claims**

23.     On February 24, 2015, Allergan paid speaker-physician Dr. Fred Fowler $1,000 for a cancelled in-office speaker event that was scheduled to promote Linzess at Southern Piedmont Primary Care in Monroe, North Carolina. This event was cancelled before February 24 and Dr. Fowler was not required to do anything for this $1,000 payment other than prescribe Linzess and Viberzi.

24.     In 2015, Allergan predecessor Actavis Pharma, Inc. paid Dr. Fowler, a physician based in Charlotte, North Carolina, $2,500 in speaker fees, and he prescribed 114 prescriptions of Linzess. In 2016, Allergan paid Dr. Fowler $10,100 in speaker fees, along with $3,375 in "consulting fees, $2,266 in travel and lodging," and 35 separate payments totaling $1,613 for food and beverages. After Allergan made those payments, Dr. Fowler's prescriptions increased dramatically to 205 prescriptions of Linzess. In 2017, Allergan paid Dr. Fowler $11,000 in speaker fees (as well as over $1,000 in food and beverages and over $2,000 in travel and lodging) and his Linzess prescriptions increased again to 260 prescriptions. Moreover, as a result of these payments, including for events that were cancelled and never occurred, Dr. Fowler was a major prescriber of Viberzi—writing 19 prescriptions for Viberzi in 2016—at a cost of $18,509 and 58 prescriptions of Viberzi in 2017—at a cost of $58,079 to Medicare.

8

25. On or around January 21, 2016, Allergan paid Dr. Jamal Qureshi $1,200 for a cancelled in-office speaker event. There was no legitimate purpose to pay Dr. Quareshi the full speaker event amount of $1,200 for an event that was cancelled days prior, where Dr. Quareshi never went to the event location, never made any sort of presentation, and never provided any "education." Instead, Allergan intended its payment of $1,200 to induce to Dr. Quareshi to write Linzess prescriptions.

26. Dr. Quareshi is a physician based in Milwaukee, Wisconsin. Allergan added him to its Speaker Bureau in 2016. In 2015, before Allergan started paying him kickbacks, Dr. Quareshi prescribed 107 prescriptions of Linzess. In 2016, Allergan paid Dr. Quareshi $19,400, including for purported events that never occurred such as the event on or around January 21, 2016. During that time, Dr. Quareshi's Linzess prescriptions more than doubled to 262 prescriptions—for which Medicare paid $84,743.32. In 2017, Allergan continued to pay Dr. Quareshi and his Linzess prescriptions increased again to 276 prescriptions—for which Medicare paid $98,202.60.

27. On or around February 10, 2017, Allergan paid Dr. Harsh Dalal $1,200 related to a purported in-office event that was cancelled. There was no legitimate purpose to pay Dr. Halal the $1,200. Dr. Halal never went to the event location, never made any sort of presentation, and performed no services for Allergan other than writing prescriptions for Linzess.

28. Dr. Harsh Dalal is a physician based in Merrillville, Indiana and has been a paid Allergan GI speaker-physician since at least 2015. In 2015, Allergan predecessor Actavis Pharma, Inc. paid Dr. Halal $4,850 to promote Linzess. In 2016, Allergan paid Dr. Halal $23,900 and his Linzess prescriptions increased significantly—to 142 prescriptions for which Medicare paid $45,297.72. In 2017, Allergan paid Dr. Halal $19,700 in speaker fees, including for sham events

that never occurred such as the event on or around February 10, 2017.  Dr. Halal's prescriptions effectively doubled to 282 prescriptions of Linzess, for which Medicare paid $101,127.05.  During that time Dr. Halal also wrote 11 prescriptions of Viberzi—for which Medicare paid 5,385.39.

29.  On August 9, 2017, Allergan paid Dr. Joseph Hathaway $2,100 for a speaker event that was cancelled.  This event was scheduled to take place at Ruth's Chris Steakhouse in Myrtle Beach, South Carolina—however, it was cancelled. Dr. Hathaway never went to the event location, never made any sort of presentation, and performed no services for Allergan other than writing prescriptions of Linzess.

30.  Dr. Hathaway's dramatic increase in prescribing Linzess upon being paid by Allergan is detailed at ¶ 6 of Addendum 1.  In 2017, Allergan paid Dr. Hathaway $35,000 in speaker fees—including for speaker events that were cancelled such as the event on or around August 9, 2017—and his Medicare Linzess prescriptions more than doubled again from his 2016 prescribing level to 395 prescriptions—for which Medicare paid $140,292.75.

31.  Moreover, in 2018, while still being paid by Allergan and after receiving tens of thousands of dollars in speaker fees—including for sham events that were cancelled—Dr. Hathaway's Linzess prescriptions increased again, up to 470 prescriptions for which Medicare paid $188,072.08.

32.  On or around January 17, 2018, Allergan paid Athens, Georgia based Dr. Asif Qadri (who is also mentioned above) $2,500 for a cancelled in-office speaker event. There was no legitimate purpose to pay Dr. Qadri $2,500 for an event that was cancelled days prior to the scheduled event.  Dr. Qadri never went to the event location, never made any sort of presentation, and performed no services for Allergan except prescribing Linzess.

10

33.    Dr. Qadri's dramatic increase in prescribing Linzess upon being paid by Allergan is detailed above at ¶ 10.  In 2018, Allergan paid Dr. Qadri $14,700—including for purported speaker events that were cancelled such as the event on or around January 17, 2018.  In exchange, Dr. Qadri was a large prescriber of Linzess, writing 267 prescriptions in 2018, for which Medicare paid $102,423.93.  These 267 prescriptions in 2018 amount to four times the prescriptions that Dr. Qadri wrote in 2015 before Allergan started paying him kickbacks.