## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JEFFREY WILKERSON AND LARRY JACKSON | |
| *Plaintiffs-Relators*, | |
| v. | Case No.: 1:22-CV-03013 |
| | Judge Sharon Coleman |
| ALLERGAN LIMITED f/k/a ALLERGAN PLC and ALLERGAN USA, INC. | ORAL ARGUMENT REQUESTED |
| *Defendants*. | |

## DEFENDANT ALLERGAN USA, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 5

BACKGROUND ........................................................................................................ 6

I.     Relators Fail to Identify a Link Between an Alleged Kickback and a Claim for Government Payment ...................................................................................... 10

II.    Relators Fail to Allege Companywide Fraud with Particularity (Count I). ..................... 11

      A.    Relators Do Not Plead with Particularity that Allergan Management Devised or Implemented the Alleged Top-Down, Nationwide Scheme............... 11

      B.    Relators Do Not Plead with Particularity Allergan's Allegedly Fraudulent Relationships with Speaker Physicians................................. 17

III.    Relators' Other FCA Claims Also Fail (Count II through IV). ........................................ 20

IV.    Relators' State Law Claims Should Be Dismissed for the Same Reason as Their Federal FCA Claims (Counts V to XXXVIII). ................................................................. 21

      A.    Relators Fail to Adequately Plead State FCA Claims (Counts V to XXXVI). ...................................................................................... 21

      B.    Relators Fail to Plead State Insurance Fraud (Counts XXXVII and XXXVIII)................................................................................... 22

V.     Relator Jackson Fails to Plausibly Allege That He Was Fired in Retaliation for Conduct Protected by the FCA (Count XXXIX). ............................................................ 22

CONCLUSION........................................................................................................ 24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*U.S.* ex rel. *Absher v. Momence Meadows Nursing Ctr., Inc.*,
764 F.3d 699 (7th Cir. 2014) ...................................................20

*Bell Atlantic Corp. v. Twombly*,
560 U.S. 544 (2007)................................................................11

*U.S.* ex rel. *v. Berkowitz*,
896 F.3d 834 (7th Cir. 2018) ....................................................5

*Borsellino v. Goldman Sachs Grp., Inc.*,
477 F.3d 502 (7th Cir. 2007) ................................................5, 8

*U.S.* ex rel. *Buth v. Walmart, Inc.*,
No. 18-cv-840, 2019 WL 380251 (E.D. Wis. Aug. 13, 2019)...............15

*U.S.* ex rel. *Camburn v. Novartis Pharms. Corp.*,
No. 13-CV-3700, 2020 WL 1436706 (S.D.N.Y. Mar. 24, 2020) ............6

*U.S.* ex rel. *Ceas v. Chrysler Grp. LLC*,
78 F. Supp. 3d 869 (N.D. Ill. 2015) ...........................................6

*Costar Realty Info. v. CIVIX-DDI, LLC*,
946 F. Supp. 2d 766 (N.D. Ill. 2013) ........................................14

*U.S.* ex rel. *Crews v. NCS Healthcare of Illinois, Inc.*,
460 F.3d 853 (7th Cir. 2006) ....................................................6

*Goldberg v. Rush Univ. Med. Ctr.*,
929 F. Supp. 2d 807 (N.D. Ill. 2013) ..........................................8

*U.S.* ex rel. *Grenadyor v. Ukrainian Vill. Pharm.*,
772 F.3d 1102 (7th Cir. 2014) ...................................... *passim*

*U.S.* ex rel. *Grenadyor v. Ukrainian Vill. Pharm.*,
No. 09 C 7891, 2013 WL 6009261 (N.D. Ill. Nov. 7, 2013).................18

*U.S.* ex rel. *Gross v. AIDS Rsch. All.-Chicago*,
415 F.3d 601 (7th Cir. 2005) ................................................5, 6

*Health Choice Grp. v. Bayer Corp.*,
No. 5:17-CV-126, 2018 WL 3630042 (E.D. Tex. July 31, 2018) ...........6

*Hopper v. Solvay Pharms., Inc.*,
 590 F. Supp. 2d 1352 (M.D. Fla. 2008) ......................................................................6

*U.S.* ex rel. *Integra Med Analytics v. Baylor Scott & White Health*,
 816 F. App'x 892 (5th Cir.) .................................................................................11, 15

*U.S.* ex rel. *Kalec v. NuWave Monitoring, LLC*,
 84 F. Supp. 3d 793 (N.D. Ill. 2015) .......................................................7, 13, 16, 18

*U.S.* ex rel. *Keeler v. Eisai, Inc.*,
 568 F. App'x 783 (11th Cir. 2014) .......................................................................5, 8

*U.S.* ex. rel. *Kelly v. Novartis Pharm. Corp.*,
 827 F.3d 5 (1st Cir. 2016) .........................................................................................5

*U.S.* ex rel. *Kennedy v. Aventis Pharm., Inc.*,
 512 F. Supp. 2d 1158 (N.D. Ill. 2007) ...................................................................20

*U.S.* ex rel. *Kroening v. Forest Pharm., Inc.*,
 155 F. Supp. 3d 882 (E.D. Wis. 2016) ...................................................................16

*U.S.* ex rel. *Lisitza v. Par Pharm. Cos.*,
 276 F. Supp. 3d 779 (N.D. Ill. 2017) .....................................................................17

*U.S.* ex rel. *McCarthy v. Marathon Techs., Inc.*,
 No. 11-cv-7071 (N.D. Ill. 2014) .............................................................................17

*McCauley v. City of Chicago*,
 671 F.3d 611 (7th Cir. 2011) ..................................................................................10

*U.S.* ex rel. *McGee v. IBM Corp.*,
 81 F. Supp. 3d 643 (N.D. Ill. 2015) .........................................................................6

*U.S.* ex rel. *Myers v. Am.'s Disabled Homebound, Inc.*,
 No. 14-8525 (N.D. Ill. 2018) ..................................................................................17

*U.S.* ex rel. *Palmieri v. Alpharma, Inc.*,
 928 F. Supp. 2d 840 (D. Md. 2013) ..........................................................................6

*Ritacca v. Storz Med., A.G.*,
 298 F.R.D. 566 (N.D. Ill. 2014) ................................................................................2

*Singer v. Progressive Care, SC*,
 202 F. Supp. 3d 815 (N.D. Ill. 2016) .....................................................................5, 6

*U.S.* ex rel. *Stop Ill. Mktg. Fraud, LLC v. Addus HomeCare Corp.*,
 No. 13 C 9050, 2018 WL 1411124 (N.D. Ill. Mar. 21, 2018) ..................................7

*U.S.* ex rel. *Suarez v. AbbVie Inc.*,
   No. 15 C 8928, 2019 WL 4749967 (N.D. Ill. Sept. 30, 2019)......................................5, 6, 7, 9

*Trupp v. Roche Diagnostics Corp.*,
   440 F. Supp. 3d 990 (S.D. Ind. 2020) ..................................................................................20

*United States v. Walgreen Co.*,
   417 F. Supp. 3d 1068 (N.D. Ill. 2019) .................................................................................18

*U.S.* ex rel. *Walner v. NorthShore Univ. Healthsystem*,
   660 F. Supp. 2d 891 (N.D. Ill. 2009) .....................................................................................6

**Statutes**

31 U.S.C. § 3729(a)(1)(A) .....................................................................................................7

31 U.S.C. § 3729(a)(1)(C) ...............................................................................................16, 17

31 U.S.C. § 3730(b) ................................................................................................................2

31 U.S.C. § 3730(h) ..............................................................................................................19

California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 ................................18

Illinois Insurance Frauds Prevention Act, 740 Ill. Comp. Stat § 92 ...................................18

**Other Authorities**

Department of Health and Human Services, Office of Inspector General, "Special
   Fraud Alert" , https://oig.hhs.gov/fraud/docs/alertsandbulletins/2020/Special
   FraudAlertSpeakerPrograms.pdf (Novemeber 2020) .............................................................3

Federal Rule of Civil Procedure 9(b)........................................................................ *passim*

Defendant Allergan USA, Inc. ("Allergan") respectfully submits this memorandum of law in support of its Motion to Dismiss the Third Amended Complaint with prejudice.[1]

## INTRODUCTION

Allergan is a pharmaceutical company that produces Linzess and Viberzi, two federally approved drugs for treating Irritable Bowel Syndrome ("IBS"). Between 2015 and 2018, Allergan held a series of programs at which physicians were paid to educate other health care providers ("HCPs") on the clinical benefits of these two medications. Peer-to-peer programs are a lawful and common method by which pharmaceutical manufacturers educate HCPs about their drugs.

According to Relators Jeffrey Wilkerson and Larry Jackson, however, the "true purpose" of Allergan's speaker program was not to educate physicians about Linzess and Viberzi, but to induce fraudulent prescriptions of those drugs from the paid speakers. The result, Relators urge, without any basis, is that *every* prescription for Linzess or Viberzi written by any of the over seven hundred physicians who gave an educational presentation on those drugs is a false claim in violation of the False Claims Act ("FCA") and related state laws.

To support this sweeping theory of top-down, nationwide fraud, Relators do not identify a single instance of alleged misconduct by any individual at Allergan with companywide decision-making authority. Nor do they identify any Allergan corporate policies that plausibly constitute fraud. Instead, Relators try to bootstrap their own actions and allegations concerning a handful of other local sales representatives, managers, and speaker physicians into a nationwide scheme.

The Federal Rules of Civil Procedure require more. Under Rule 9(b), allegations of fraud

---

[1] The Third Amended Complaint was ECF No. 65 in proceedings before the Middle District of Georgia, *see* 5:21-cv-00306-MTT. This motion is made on behalf of Allergan USA, Inc. Although Relators filed an Affidavit of Service on named co-defendant Allergan Limited, our understanding is that Allergan Limited has no evidence of receiving service.

must be pled with particularity. In the Seventh Circuit, this means that Relators must specify the who, what, when, where, and how of the alleged fraudulent scheme. Relators fail to do so. Relators also have fallen short of the heightened standards of Rule 9(b) by failing to establish the link between the alleged kickbacks and Medicare claims submitted for a specific patient. Separately, Relator Jackson fails to plausibly allege that he was fired in retaliation for engaging in unrelated protected conduct concerning the marketing of Viberzi. Allergan thus respectfully requests that the Court dismiss the Third Amended Complaint ("TAC") with prejudice.[2]

## BACKGROUND

In December 2017, Relators filed this case under seal pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b), as well as the false claims acts and related statutes of dozens of States (Dkt. No. 1). Following an investigation, the United States and Plaintiff States declined to intervene (Dkt. No. 44). On October 21, 2021, Relators filed the operative TAC (Dkt. No. 65).

Between 2013 and 2017, Relators were sales representatives at Allergan, with sales territories covering portions of Oklahoma, Arkansas, Missouri, Mississippi, and Tennessee. TAC ¶¶ 20-21 (hereinafter "¶ _"). Relators allege that, as employees, they uncovered a "systematic[]," "nationwide," ¶ 21, kickback scheme in the form of Allergan's speaker program for Linzess and Viberzi. They do not identify a single patient for whom a doctor allegedly prescribed these drugs in exchange for a kickback or that a claim was submitted to Medicare for such patient.

Linzess and Viberzi are FDA-approved drugs for treating IBS, introduced in U.S. markets in December 2012 and 2015, respectively. ¶¶ 66-67, 73-74. Between 2015 and 2018, Allergan held a series of programs at which speaker physicians educated other HCPs on these drugs' clinical

---

[2] Relators have been aware from the beginning that "fraud claims . . . must be pleaded with particularity according to Rule 9(b)," and "[h]aving fallen short of this standard" in their first four complaints, this suit would be "properly dismissed with prejudice." *Ritacca v. Storz Med., A.G.*, 298 F.R.D. 566, 570 (N.D. Ill. 2014).

benefits. ¶ 175. These programs were organized by local sales representatives, who selected the speakers. ¶¶ 105, 112. Consistent with industry practice, Allergan provided speakers with a company-approved PowerPoint presentation to present to the other HCPs in attendance. ¶¶ 116, 120. Some programs were held in doctors' offices, others in venues like restaurants. ¶¶ 116, 119. If food and drinks were provided, Allergan policy limited expenditures to $150 per person. ¶ 121. Such peer-to-peer educational programs are common in the pharmaceutical industry. ¶ 60.

Allergan maintained internal anti-kickback compliance policies requiring sales representatives to obtain at least two RSVPs from HCPs for an in-office speaker program and at least four RSVPs for an out-of-office program. ¶ 163. If a program was canceled for failure to satisfy the RSVP requirements in the days just prior to the program, Allergan's policy was to pay the scheduled speaker. ¶ 181. Accordingly, Allergan enforced its RSVP requirement, including by "disciplin[ing] sales representatives who did not obtain the required RSVPs." ¶ 164.

According to Relators, every payment for every Linzess or Viberzi speaker program between 2015–2018 was part of a "nationwide" kickback scheme, "devised . . . at the highest level of management." ¶¶ 3, 20. Although Relators do not (and cannot) claim that paid speaker events are *per se* illegal, they allege that Allergan's events were illegal because their "true purpose" was to induce prescriptions from speaker physicians. ¶ 166. Relators cite extensively, *see* ¶¶ 58-65, 160, to November 2020 guidance from the Department of Health and Human Services' Office of Inspector General ("OIG") ("OIG Special Fraud Alert"), https://oig.hhs.gov/fraud/docs/alertsand bulletins/2020/SpecialFraudAlertSpeakerPrograms.pdf, which postdates the alleged conduct by years. The OIG Special Fraud Alert discusses "increased scrutiny" of paid speaker programs, *id.* at 4, but "recognizes that the lawfulness of . . . speaker programs" under the federal Anti-Kickback Statute ("AKS") "depends on the facts and circumstances and intent of the parties," *id.* at 5.

In support of their allegations, Relators primarily point to Allergan's policies of (1) holding speaker events based on how many RSVPs it received for an event, rather than on how many HCPs ultimately attended; and (2) paying speakers even when an event was canceled shortly beforehand. *See* ¶¶ 181, 163. Relators do not identify any statute, regulation or guidance— including the OIG Special Fraud Alert—indicating that these types of policies present AKS risk, much less that they constitute evidence of *per se* illegality. According to Relators, Allergan also exceeded its own "internal limit[s]" on food and drink budgets at some speaker events, ¶ 121, hosted some speaker events where no educational materials were presented, ¶¶ 88, 117, 118, and falsified attendance records for speaker events, ¶¶ 167, 168. Relators also point to their personal experiences as sales representatives; in particular, Relator Wilkerson's alleged experience offering a kickback to a doctor in Tennessee. ¶¶ 124–129. Finally, in an Addendum to the TAC, Relators identify approximately a dozen speaker physicians who, consistent with Allergan's policies, were allegedly paid for events with a low number of attendees or that were canceled shortly before taking place.[3]

Finally, Relator Jackson alleges that he was fired in retaliation for unrelated conduct concerning the marketing of Viberzi to physicians. According to Relator Jackson, he disobeyed his supervisor's alleged instruction "not to raise the contraindications and potential dangers associated with Viberzi and to minimize the potential risks of the drug." ¶ 194. Further, Relator Jackson allegedly objected to Allergan's marketing strategy for Viberzi encompassing some

---

[3] Relators also allege that Allergan sales representatives engaged in certain other "aggressive" sales practices, including: providing "free services and assistance to the prescribers and the prescribers' staff," ¶ 6; "try[ing] to convince . . . physicians that . . . specific patients should be prescribed Viberzi," ¶ 97; "chasing scripts" by visiting pharmacies to ensure payments for individual prescriptions were approved, ¶ 98; and bringing "coffee" and "snacks" on sales visits, ¶ 96. Relators do not explain how these alleged sales practices relate to their broader allegations about Allergan's speaker program or render any specific claims for Linzess or Viberzi fraudulent.

patients whose stomach problems were not severe enough to qualify for an "IBS-D" diagnosis, which he "viewed as illegal 'off-label' marketing." ¶ 86.

## STANDARD

"The FCA is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *U.S.* ex rel. *Gross v. AIDS Rsch. All.-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). In an FCA case, "[t]he plaintiff must describe the who, what, when, where, and how of the fraud—the first paragraph of any newspaper story.'" *U.S.* ex rel. *Berkowitz*, 896 F.3d 834, 839 (7th Cir. 2018) (internal quotation marks omitted). "This heightened pleading requirement is a response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotation marks omitted).

"To survive a motion to dismiss, a complaint alleging an FCA retaliation claim must contain factual allegations that, if proven, would establish that (1) the plaintiff was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA, (2) the employer knew the plaintiff was engaged in protected conduct, and (3) the employer was motivated to take an adverse employment action against the plaintiff because of the protected conduct." *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 828 (N.D. Ill. 2016).

## ARGUMENT

Courts routinely dismiss FCA cases premised on violations of the AKS, including many cases involving speaker programs, for failure to plead with particularity under Rule 9(b).[4] That

---

[4] *See, e.g.*, *U.S.* ex rel. *Grenadyor v. Ukrainian Vill. Pharm.*, 772 F.3d 1102 (7th Cir. 2014); *U.S.* ex rel. *Suarez v. AbbVie Inc.*, No. 15 C 8928, 2019 WL 4749967 (N.D. Ill. Sept. 30, 2019); *U.S.* ex. rel. *Kelly v. Novartis Pharm. Corp.*, 827 F.3d 5 (1st Cir. 2016); *U.S.* ex rel. *Keeler v. Eisai, Inc.*, 568 F. App'x 783 (11th Cir. 2014); *U.S.* ex rel. *Camburn v. Novartis Pharms. Corp.*, No. 13-CV-3700, 2020 WL 1436706 (S.D.N.Y. Mar. 24, 2020); *Health Choice Grp. v. Bayer Corp.*, No. 5:17-CV-126, 2018 WL 3630042 (E.D. Tex. July 31, 2018); *U.S.* ex rel. *Palmieri v. Alpharma, Inc.*, (continued…)

result is warranted here. Relators make sweeping accusations against Allergan, characterizing the entirety of its educational program for Linzess and Viberzi as a kickback scheme. But Relators fail time and again to back up their sweeping claims with particularized allegations. Despite claiming that the alleged scheme operates companywide, Relators decline to explain who devised the scheme, where the scheme was orchestrated from, what role Allergan's management played in the scheme, and how Allergan's policies and practices, which, on their face, sought to ensure legal compliance, facilitated the scheme. Next, Relators tack on dozens of state law claims without any particularized allegations whatsoever about payment requests to state payors. Courts in the Seventh Circuit strictly enforce the requirement to plead FCA claims with particularity.[5] Relators' failure to do so—along with Relator Jackson's failure to plausibly allege that he was fired in retaliation for conduct protected by the FCA—requires dismissal of the TAC with prejudice.

## I.    Relators Fail to Identify a Link Between an Alleged Kickback and a Claim for Government Payment.

Where an "FCA claim depends on violations of the Anti-Kickback statute, the relator must identify a link between the alleged kickback and a claim for government payment." *Suarez*, 2019 WL 4749967 at *10 (citing *Grenadyor*, 772 F.3d at 1107). "[S]uch an allegation necessarily requires a relator to name 'a specific patient referred in exchange for a kickback, and allege that a claim was submitted to Medicare for that patient.'" *Id.* (quoting *U.S.* ex rel. *Stop Ill. Mktg. Fraud, LLC v. Addus HomeCare Corp.,* No. 13 C 9050, 2018 WL 1411124, at *4 (N.D. Ill. Mar. 21,

---

928 F. Supp. 2d 840 (D. Md. 2013); *Hopper v. Solvay Pharms., Inc*., 590 F. Supp. 2d 1352 (M.D. Fla. 2008), *aff'd*, 588 F.3d 1318 (11th Cir. 2009).

[5] *See, e.g.*, *Grenadyor*, 772 F.3d at 1106 (7th Cir. 2014) (dismissing FCA claims under Rule 9(b) for failure to plead "with particularity"); *U.S.* ex rel. *Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853, 856–57 (7th Cir. 2006) (same); *U.S.* ex rel. *Gross v. AIDS Rsch. All.-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (same); *U.S.* ex rel. *Ceas v. Chrysler Grp. LLC*, 78 F. Supp. 3d 869, 880–81 (N.D. Ill. 2015) (same); *U.S.* ex rel. *McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 663–64 (N.D. Ill. 2015) (same); *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 827 (N.D. Ill. 2016) (same); *U.S.* ex rel. *Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 898 (N.D. Ill. 2009) (same).

2018).  Because Relators "fail[ed] to identify a single patient that was referred by" a physician in exchange for alleged kickbacks, they "fail[ed] to specifically link the alleged kickback scheme to an actual claim that was submitted to Medicare."  *U.S.* ex rel. *Kalec v. NuWave Monitoring, LLC*, 84 F. Supp. 3d 793, 807 (N.D. Ill. 2015) (citing *Grenadyor*, 772 F.3d at 1107).

Relators have not identified a single patient who was referred by a physician in exchange for a kickback or alleged that a claim was submitted for that patient.  Thus, under clearly established precedent in this Circuit, they have not met the pleading requirements of Rule 9(b).

## II.   Relators Fail to Allege Companywide Fraud with Particularity (Count I).

Relators' case is predicated on their contention that Allergan's peer-to-peer educational program was a companywide kickback scheme to induce speaker physicians to prescribe more Linzess and Viberzi, ¶ 209, and that this scheme "cause[d] to be presented" thousands of false claims in violation of 31 U.S.C. § 3729(a)(1)(A).  Relators advance two sets of allegations in support of their theory.  First, that Allergan management "devised" and "implemented" the scheme, ¶ 20, which was "facilitated" by its "corporate policies," ¶ 159.  Second, that Allergan maintained allegedly fraudulent relationships with individual speaker physicians across multiple states.  Neither set of allegations is pled with the necessary particularity.

### A.   Relators Do Not Plead with Particularity that Allergan Management Devised or Implemented the Alleged Top-Down, Nationwide Scheme.

Although Relators allege that Allergan's national management "devised" and "implemented" the alleged kickback scheme, ¶ 20, they fail to answer basic questions about *who* devised the scheme, *where* this scheme was orchestrated from, *what* role national management played in the scheme, and *how* Allergan's policies and practices facilitated it.  *See, e.g.*, *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) ("A complaint alleging fraud must provide the who, what, when, where, and how.") (internal quotation marks and citation omitted).

11

*Who.*  Beyond a vague reference to "the highest level of management," ¶ 21, Relators never even try to explain who "devised" or "implemented" Allergan's alleged nationwide scheme. Relators do not allege that any of the Allergan employees named in the TAC or the Addendum— *i.e.*, Frank Adcock, Lacy Allen, Haley Crider, Kristi Curleau, Will Fogelman, Alan Foust, Amy Hache, Tim Harkin, Itiel Katz, James Martin, Brian McKenna, Stephen Pointer, Chris Sweeney, and Richard Uhles—possessed nationwide policymaking or management authority.  Nor would those individuals—*e.g.*, sales representatives, human resources workers, regional and district managers—plausibly have had such authority.[6]  *See, e.g.*, *U.S.* ex rel. *Keeler v. Eisai, Inc.*, 568 F. App'x 783, 794–95 (11th Cir. 2014) ("As to the fraud's 'who,' . . . Relator has not alleged which individuals . . . instructed him (or other sales representatives) to [act] fraudulently[.]"); *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 817 (N.D. Ill. 2013) ("Relators d[id] not identify any specific . . . officials [at defendant company] that committed fraud or ordered their employees to commit fraud, nor do they provide any details alleging how such fraud was committed.").[7]

*Where.*  Despite Relators' assertions that Allergan's scheme operated "nationwide," ¶¶ 3, 20, 21, 89, 90, 123, the TAC is almost entirely devoid of allegations concerning employees at Allergan's U.S. headquarters.  Only one employee named in the TAC—Amy Hache, a "member of Allergan's Viberzi and Linzess marketing team"—is even alleged to have worked at

---

[6] The highest ranking of these individuals are Mr. Sweeney (in charge of "GI sales managers and sales representatives in the Western United States," ¶ 173) and Mr. Katz (a "Senior Manager," ¶ 113).  Far from orchestrating a kickback scheme, Mr. Sweeney is alleged only to have "alerted all Regional and District Managers that Allergan sales reps were not meeting [Allergan's] positive RSVP requirements," ¶ 173, and to have given Relator Jackson an award, ¶ 206.  Mr. Katz is alleged only to have "sent an email to all Allergan Regional Managers providing a list of [physicians] whom Allergan had scheduled to be removed from the Speaker Bureau." ¶ 113.

[7] Relators cite repeatedly to the alleged misconduct of one individual in Tennessee, Alan Foust, who had the lowest level sales management position in the company—a district sales manager.  *See, e.g.*, ¶¶ 109-111, 118, 124, 164. Relators then assert, without basis, that these alleged acts by Mr. Foust should be attributed to a nationwide scheme directed by Allergan's management.  *Ibid.*

headquarters. ¶ 108. Instead, Relators focus on actions taken in Tennessee, *see, e.g.*, ¶¶ 124–149, and, to a lesser extent, Oklahoma, *see* ¶¶ 167, 170–172, States from which Allergan's national management did not operate and could not have orchestrated a nationwide scheme. *See, e.g.*, *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharm.*, 772 F.3d 1102, 1108 (7th Cir. 2014) (dismissing FCA claim that was "[m]issing . . . any allegation that indicate[d] how" the relator, who "work[ed] for just one of the defendant pharmacies, obtained . . . information about a large number of pharmacies scattered over a number of states"); *Suarez*, 2019 WL 4749967 at *13 ("Relator cannot 'ask[ ] the court to infer' that the fraud occurred nationwide based on allegations concerning only South Florida.").[8]

*What*. Relators also fail to explain what role national management played in the supposed scheme. According to the TAC, the scheduling of programs, the selection of speakers, and the choice of invitees were not made by individuals at headquarters, but by local sales personnel. *See* ¶¶ 105, 112, 132-33, 143, 162. Relators allege vaguely that "Allergan" either "encouraged" or "instructed" employees to select speakers the employees anticipated would increase their prescriptions of Viberzi or Linzess, ¶¶ 88, 105, but Relators do not identify anyone with nationwide authority who gave that instruction or what form that instruction took.[9] *See Grenadyor*, 772 F.3d at 1106 ("The complaint [alleging fraud] must state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.") (internal quotation marks and citations

---

[8] In an Addendum to the TAC, Relators also discuss Allergan's relationship with a dozen or so speaker physicians across the country, but, as discussed below, *infra*, Relators do not adequately allege that those relationships implicated fraudulent activity.

[9] Relying again on the alleged actions of Mr. Foust, Relators allege, without further detail, that Foust and a regional manager "communicated this corporate policy" to Relator Wilkerson. ¶ 106. Relators do not provide any support for their assertion that this alleged "communicat[ion]" amounted to a "corporate policy," rather than a tactic by Mr. Foust to increase sales in his district.

omitted). Instead, Relators merely speculate that unnamed sales representatives might have tried to boost their commissions by "select[ing] physicians for the Speaker Bureau whom they believe[d] w[ould] increase prescriptions."[10] ¶ 105. Even if that sort of speculative pleading satisfied Rule 9(b) (which it does not), the self-serving actions of unidentified sales representatives would not convert the entirety of Allergan's speaker program into a kickback scheme.[11]

*How*. Relators also fail to allege with particularity how Allergan's policies and practices facilitated the alleged nationwide scheme. Relators focus on two alleged policies: (1) that Allergan held events based on how many RSVPs it received, rather than on how many individuals ultimately attended, ¶ 163; and (2) that Allergan paid speakers even when an event had low attendance or was canceled in the days leading up to it, ¶ 181. Neither policy gives rise to an inference of fraud, because both are fully consistent with obvious non-fraudulent explanations. *See, e.g.*, *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("If the allegations give rise to an obvious alternative explanation, then the complaint may stop . . . short of the line between possibility and plausibility of entitle[ment] to relief.") (internal quotation marks and citations omitted).[12]

---

[10] Contrary to Relators' implication, it certainly was not *fraudulent* for Allergan to base its compensation for sales representative in part on sales performance, a practice common not only in the pharmaceutical industry, but in sales positions across the national economy.

[11] The same issue applies to Relators' vague allegations that "[i]f a doctor failed to increase his or her prescriptions, Allergan removed them from the speaker program," ¶ 9, and that Allergan "rewarded prescribers who increased their prescriptions with more speaker fees and withheld speaker fees from speaker-physicians who did not increase prescriptions," ¶ 123. Relators do not explain how *management* created, communicated, implemented, or enforced those policies. At most, Relators allege that individual (and largely unspecified) sales representatives and managers were swayed by personal financial gain in deciding whether to retain or terminate physicians. Even if true, that non-particularized allegation would not support the existence of a national scheme.

[12] To be clear, Allergan is not asking the Court to draw an inference in its favor that the alleged conduct was lawful. The point is instead that, for Relators to satisfy *their* pleading burden, they must allege that Allergan engaged in a course of conduct that does not have an obvious lawful explanation. *See, e.g.*, *U.S.* ex rel. *Integra Med Analytics v. Baylor Scott & White Health*, 816 F. App'x 892, 898–99 (5th Cir.), *cert. denied*, 141 S. Ct. 905 (2020) (Relator's allegations were not "sufficient to establish that [defendant] was engaging in a scheme to submit fraudulent claims to Medicare" because the "allegations [we]re also consistent with a legal and 'obvious alternative explanation.'") (quoting *Bell Atlantic Corp. v. Twombly*, 560 U.S. 544, 567 (2007)).

With respect to attendance at an educational event, Allergan only controls the number and identity of the invitees. Allergan cannot control either how many people RSVP or, critically, how many confirmed attendees actually end up attending. Indeed, Relators identify no practical alternative to holding a program based on the number of RSVPs received for it. The reality is that an RSVP-based policy does not suggest fraudulent intent, but a desire for events to serve an educational purpose and to comply with the AKS, and the TAC documents efforts by Allergan management to enforce this policy, including by "disciplin[ing] sales representatives who did not obtain the required RSVPs." ¶ 164. *See also* ¶ 173 ("Allergan . . . encouraged the sales managers to push their sales representative[s] to obtain the required RSVPs[.]"). Relators suggest that some sales representatives may have skirted this policy—*e.g.*, Relator Jackson describes his experience allowing a speaking program to go forward based on RSVPs from physicians who "tentatively informed" him they "may come or may try to come." ¶ 170. But the decision of Relator Jackson in one instance (and allegedly some other unspecified sales representatives in others) to circumvent Allergan's corporate policy does not somehow render the *policy* a management-orchestrated sham.

Relators likewise fail to explain why, when programs had low attendance or were canceled shortly before scheduled to take place, there would be anything unusual about Allergan paying the scheduled speaker. Relators do not even try to explain how Allergan could justify refusing to pay a physician for a program that was actually held solely because fewer individuals showed up than had sent in an RSVP. Even when a program is canceled, the scheduled speaker is still required to block off his or her schedule and forego other activities while also preparing for the presentation. And certainly, Relators point to no authority for the idea that a cancellation policy that provides for payment of scheduled speakers when a program is canceled mere days in advance is *fraudulent*.

Relators also object in cursory fashion to a few other alleged aspects of Allergan's speaker programs. First, Relators allege that Allergan hosted some speaker programs where little or no educational material was presented. ¶¶ 88, 117-20. As elsewhere, Relators offer nothing more than conclusory statements and accusations about one program: an in-office meeting with allegedly limited educational value that Relator Wilkerson participated in. ¶ 118. Relators provide no reason to believe such programs were either common or widespread. Relators also fail to explain how they could possibly know whether educational materials were presented at programs they did not personally attend, as well as why an in-office program should be considered fraudulent if, after a physician speaker arrived for a scheduled program, he or she learned that the planned attendees "were too busy seeing patients" for the full presentation. ¶ 117. Second, Relators allege that some sales representatives falsified attendance records for speaker events. ¶¶ 167, 168. But the only actual program where Relators allege this happened involved Relator Wilkerson *himself* falsifying records. ¶ 118. Third, Relators allege that "Allergan routinely disregarded" its "internal limit[s]" on food and drink budgets for speaker events. ¶ 121. But, again, Relators do not allege a single program at which this actually happened, pointing only to a manager in Oklahoma who allegedly "instructed" employees to exceed those limits. ¶ 167. That vague "instruct[ion]" does not amount to a particularized allegation that any program in fact exceeded Allergan's internal limits, much less that such a program amounted to a kickback to a particular doctor resulting in a false claim being submitted. *See, e.g.*, *Kalec*, 84 F. Supp. 3d at 807 ("Plaintiffs fail[ed] to specifically link the alleged kickback scheme to an actual claim that was submitted to Medicare.").[13] Fourth, Relators allege "non-medical attendees such as attendee and physician-

---

[13] Relators also object in passing to a few other alleged aspects of Allergan's practices for promoting Linzess and Viberzi. First, Relators allege that some sales representatives "chas[ed] scripts" by visiting pharmacies to ensure payments for prescriptions were approved. ¶ 98. But Relators do not explain how that practice, even if real, would
(continued...)

speakers' spouses and dates attended" certain programs, ¶ 119, but again do not identify an event where this actually happened.

In sum, Relators fail to plead with particularity the who, what, where, and how of Allergan's national management's involvement in the alleged kickback scheme.

### B. Relators Do Not Plead with Particularity Allergan's Allegedly Fraudulent Relationships with Speaker Physicians.

Relators next try to establish companywide fraud through examples of Allergan's allegedly fraudulent relationships with individual speaker physicians. While Relators have alleged that Allergan paid physicians to present on Viberzi and Linzess in different states, they fail entirely to show these payments were part of a *nationwide fraudulent kickback scheme*.

With the exception of a few physicians in Tennessee, *see* ¶¶ 123–149, all of Relators' examples come in an Addendum to the TAC. These examples follow the same template: (1) a doctor was paid for a program (often at a restaurant) that had fewer attendees than were required to RSVP or was canceled shortly before scheduled to take place; and (2) the doctor's prescriptions of Linzess and Viberzi increased between 2015 and 2018.[14] From these bare allegations, Relators purport to infer illegal kickbacks. The deficiencies of these allegations[15] are manifold:

- *First,* Relators do not allege that Allergan violated its own RSVP requirements for any program identified in the Addendum at which attendance turned out to be lower than the

---

render the requests for payment "false." Second, Relators allege that some employees "tr[ied] to convince . . . physicians that . . . specific patients should be prescribed Viberzi," ¶ 97. Again, Relators do not explain why any resulting prescriptions would be "false," as Relators do not allege that kickbacks were given in exchange for these prescriptions (nor do Relators identify or quantify the prescriptions resulting from this alleged practice). Third, while Relators allege that "Allergan sales representatives were often able to get" information about patients "by simply bringing food, coffee and snacks to physicians and their staff," ¶ 97, they do not allege that physicians prescribed Linzess and Viberzi in exchange for coffee and snacks, an allegation that would be implausible on its face.

[14] For one physician listed in the Addendum, Dr. Karanth, Relators do not even allege an increase in prescriptions following participation in the speaker program. *See* Add. ¶¶ 1–2.

[15] These same deficiencies exist with respect to Relators' allegations about Drs. Jeffreys and Kayal, *see* ¶¶ 143–149. Those examples are thus also not pled with particularity.

number of required RSVPs. And, as discussed, *supra*, Relators do not identify a reasonable alternative to an RSVP policy when determining whether to go forward with a program.

- *Second,* as also discussed, *supra*, Relators do not explain why it was commercially unreasonable—much less *unlawful*—for Allergan to pay physicians for performing their contracts by speaking at programs with fewer HCPs than had committed to attend or to pay physicians for programs canceled shortly before they were scheduled to take place.

- *Third*, Relators do not allege that the poorly attended or canceled programs in the Addendum comprised a meaningful share of even these particular physicians' overall programs, let alone the programs of all physicians in the Allergan peer-to-peer educational program. For each physician, Relators identify only one to two programs that were poorly attended or canceled out of the several events at which each physician presented. *Compare*, *e.g.*, Add. ¶ 17 ("On April 5, 2017, Allergan paid Dr. Gene Chiao $1,500 for purportedly performing a speaker event" at which "there were only two attendees"); *with id.* ¶ 18 (alleging Dr. Chiao was paid $13,400 for speaker events between 2016 and 2018).

- *Fourth,* although Relators emphasize that some programs were held at restaurants, that conduct is neither *per se* illegal nor suggestive of fraud. Even the OIG Special Fraud Alert—which was issued *after* all the programs in question were held—provides only that "location" is one of several "factors" that could "potentially indicate" a program is "suspect." Special Fraud Alert, at 5. Nor do Relators allege that Allergan's own $150 internal spending limit was improper or that it was exceeded at any of the programs discussed in the Addendum.

- *Fifth,* Relators do not allege that any of the physicians in the Addendum agreed—or even were asked—to increase prescriptions in exchange for speaker fees. Instead, Relators merely assert, repeatedly, that Allergan's "true purpose" was fraudulent. *See, e.g.*, Add. ¶¶ 5, 9, 17. Relators make no effort to identify the people who embody "Allergan" and who had this "true purpose." Relators cannot convert lawful activity into "fraud" through conclusory allegations of hidden motives. *See Costar Realty Info. v. CIVIX-DDI, LLC*, 946 F. Supp. 2d 766, 772 (N.D. Ill. 2013) ("Rule 9(b) allows [m]alice, intent, knowledge, and other conditions of a person's mind to be alleged generally, but the pleadings must allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind.") (internal quotation marks and citation omitted).

- *Sixth*, even if some speaker physicians increased their prescriptions for Linzess and Viberzi between 2015 and 2018, that does not suggest fraud. There are obvious non-fraudulent explanations for such an increase. *See, e.g.*, *Integra*, 816 F. App'x at 898 ("[S]tatistical data cannot meet th[e] pleading requirements [of Rule 9(b)] if, among other possible issues, it is also consistent with a legal and obvious alternative explanation."). Both Linzess and Viberzi were relatively new medications during the relevant time period, launched in 2012 and 2015, respectively. ¶¶ 67, 73-74. The most obvious explanation for an increase in prescriptions over time is that physicians became increasingly aware of these new products and their clinical benefits and thus prescribed them more frequently to appropriate patients.

18

In light of these myriad deficiencies, Relators fail to plead with particularity that the Addendum examples amount to individual instances of fraud, much less top-down, companywide fraud.

Relators allege one improper relationship with greater specificity, and it concerns Relator Wilkerson's own actions. According to Relator Wilkerson, he and another Allergan employee schemed with Dr. Paul Bierman, a gastroenterologist in Tennessee, to increase prescriptions for Linzess and Viberzi. Unlike the other allegations in the TAC, Relators allege a direct "*quid pro quo*" with Dr. Bierman, in which he "promise[d] to write more prescriptions" for speaker fees. ¶¶ 129, 130. *See also, e.g.*, ¶ 125 ("Relator Wilkerson . . . visited Dr. Bierman at his office in January 2016 and delivered Allergan's message: if Dr. Bierman wanted to continue receiving thousands of dollars in speaker fees from Allergan, he had to prescribe more Viberzi."). Also unlike their other allegations, Relators allege that Relator Wilkerson's documentation of a speaker program with Dr. Bierman was inaccurate. ¶ 118. But one alleged example of unlawful activity by one of the Relators with one doctor in one state comes nowhere close to an adequately pled top-down, nationwide scheme. *See U.S.* ex rel. *Buth v. Walmart, Inc.*, No. 18-cv-840, 2019 WL 380251, at *6–7 (E.D. Wis. Aug. 13, 2019) (dismissing claim of "nationwide scheme" in violation of the FCA where all "six examples" came "from one Wisconsin pharmacy," because "there must . . . be sufficient facts to support a reasonable inference that the fraud was, in fact, widespread.").

"Missing" from the TAC "is any allegation that indicates how" Relators "obtained . . . information about" kickbacks at "a large number of [offices] scattered over a number of states." *Grenadyor*, 772 F.3d at 1108. *See also U.S.* ex rel. *Kroening v. Forest Pharm., Inc.*, 155 F. Supp. 3d 882, 896 (E.D. Wis. 2016) (Relator's "assertion that he spoke with . . . sales representatives from 17 other states . . . [is] insufficient to satisfy . . . Rule 9(b)."). Indeed, the alleged examples of improper speaker programs in the Addendum occurred in States where Relators did not work.

19

Relators do not allege that they attended those programs or explain how they know, for example, that there was no educational discussion at them. Relators' effort to establish companywide fraud through examples of Allergan's relationships with individual speaker physicians thus fails.

## III. Relators' Other FCA Claims Also Fail (Count II through IV).

Relators also fail to plead with particularity their claims that the alleged kickback scheme violated other provisions of the FCA.

First, Relators allege (Count II) that Allergan "created or used false speaker event attendance records" and "caused to be made or used false" Medicare billing and enrollment certifications by speaker physicians. ¶ 214. 31 U.S.C. § 3729(a)(1)(C). These allegations fail because (1) with the exception of an event where Relator Wilkerson allegedly falsified records, ¶ 118, Relators do not identify any specific programs for which records were falsified; and (2) Relators fail to "specifically link" these allegations of false records "to an actual claim that was submitted to" the government. *Kalec*, 84 F. Supp. 3d at 807. Furthermore, because Relators' vague theory of the certifications' falsity appears to be that the physicians made these certifications despite their participation in the alleged kickback scheme, these claims also fail because, for the reasons set forth in Part II, *supra*, the alleged kickback scheme was not pled with particularity.

Second, Relators allege (Count III) that Allergan "conspired" with speaker physicians to violate the FCA. 31 U.S.C. § 3729(a)(1)(C). However, Relators nowhere allege—let alone with particularity—that any doctor other than Dr. Bierman had an express *quid pro quo* or other unlawful agreement with Allergan. Absent a meeting of the minds, there is no conspiracy. *See, e.g.*, *U.S.* ex rel. *Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779, 806 (N.D. Ill. 2017) ("[A]s with any conspiracy, the core burden [in an FCA conspiracy] is to prove an agreement or meeting of the minds."). And, of course, Allergan cannot conspire with its own employees. *See U.S.* ex rel. *McCarthy v. Marathon Techs., Inc.,* No. 11-cv-7071, at *5 (N.D. Ill. Sep. 30, 2014) ("It is settled

law that a corporation cannot conspire with its wholly-owned subsidiaries or employees."). Moreover, for the same reasons Relators have failed to plead the underlying fraud with particularity, they have also failed to plead with particularity conspiracy to commit that same fraud.

Third, Relators allege (Count IV) a violation of Section 3729(a)(1)(G), which proscribes "improperly avoid[ing] . . . an obligation to pay or transmit money or property to the Government." This "reverse" FCA claim fails because Relators identify no obligation for Allergan to pay the government. Relators' theory that Allergan incurred such an obligation by causing the submission of a false claim ignores the distinction between Sections 3729(a)(1)(A) and (G) by turning any false claim for payment *from* the government into avoidance of an obligation to make payment *to* the government. Courts have rejected such "redundant" FCA claims.[16] Moreover, as discussed, the false claims on which Relators predicate their "reverse" claims were not pled with particularity.

## IV. Relators' State Law Claims Should Be Dismissed for the Same Reason as Their Federal FCA Claims (Counts V to XXXVIII).

Finally, Relators allege violations of the False Claims Acts and insurance fraud statutes of several states. Relators fail to plead any of these state law claims with particularity.

### A. Relators Fail to Adequately Plead State FCA Claims (Counts V to XXXVI).

Relators do not make any allegations (much less particularized ones) in support of their state FCA claims beyond those put forth in support of their federal claims. Because "state [FCA] laws [are] similar to the federal FCA," ¶ 35-36, Relators' state FCA claims fail for the same reason their federal ones do. *See, e.g.*, *U.S.* ex rel. *Grenadyor v. Ukrainian Vill. Pharm.*, No. 09 C 7891, 2013 WL 6009261, at \*6 (N.D. Ill. Nov. 7, 2013) ("These state statutes are modeled after and

---

[16] *See, e.g.*, *U.S.* ex rel. *Myers v. Am.'s Disabled Homebound, Inc.*, No. 14-8525, 2018 WL 1427171 (N.D. Ill. Mar. 22, 2018).

interpreted consistent with the FCA. . . . [Relator's] state law statutory claims [therefore] fail for the same reasons[.]"), *aff'd in relevant part* 772 F.3d 1101 (7th Cir. 2014).

These claims also fail because the TAC lacks any "indicia of reliability . . . to support the allegation of an actual false claim for payment being made to" a state government. *Kalec*, 84 F. Supp. 3d at 803–04 (internal quotation marks omitted). Indeed, the TAC contains no allegations about speaker physicians in most States where Relators raise state FCA claims, no claims data, and no examples of specific claims submitted to *any* state government payors (*i.e.*, Medicaid). "Absent a single example of a specific claim for payment," these state FCA claims must be dismissed. *United States v. Walgreen Co.*, 417 F. Supp. 3d 1068, 1095 (N.D. Ill. 2019).

### B.   Relators Fail to Plead State Insurance Fraud (Counts XXXVII and XXXVIII).

Relators' claims under the California Insurance Frauds Prevention Act (Count XXXVII) and Illinois Insurance Frauds Prevention Act (Count XXXVIII) concern alleged false claims submitted to private insurance companies in those States. *See* ¶¶ 39, 409, 417. But Relators' only reference to claims submitted to private insurance companies in either State is wholly conclusory and thus fails to satisfy Rule 9(b). *See* ¶ 39 ("Allergan's offer and provision of illegal remuneration to induce prescriptions of its drugs have caused the submissions of false claims, tainted by bribes, to private insurance companies in California and Illinois."). These claims must also be dismissed.

### V.   Relator Jackson Fails to Plausibly Allege That He Was Fired in Retaliation for Conduct Protected by the FCA (Count XXXIX).

To make out a claim of retaliation under the FCA, a plaintiff must plausibly allege that the employee suffered an adverse employment action in response to one of two types of protected conduct—*i.e.*, "lawful acts done" either (1) "in furtherance of an [FCA] action" or (2) "to stop 1 or more [FCA] violations." 31 U.S.C. § 3730(h). Relator Jackson does not allege that he took any

actions prior to termination from Allergan "in furtherance" of an FCA action. Relator Jackson also fails to plausibly allege he took actions "to stop 1 or more FCA violations."

As the TAC makes clear, Relator Jackson's alleged non-compliance with Allergan's marketing strategy for Viberzi stemmed from concerns about patient safety and privacy, *not* the submission of false claims.[17] Indeed, Relator Jackson's retaliation allegations largely ignore the FCA altogether. When he does reference the FCA, it is either to assert that an Allergan employee received anti-fraud training, *see* ¶¶ 193, 199, 203, or to offer the conclusory statement that he was fired for FCA-protected conduct, *see, e.g.*, ¶¶ 205, 207, 422. While Relator Jackson alleges he raised concerns internally about "off-label" marketing, *see* ¶¶ 200–205, those concerns (by his own account) did not pertain to preventing the government from paying false claims for Viberzi.[18] *See, e.g.*, ¶ 201 ("Jackson further informed the HR Department that off-label promotion of Viberzi was occurring in his territory and that he believed the representations about the drug that were being made by Allergan sales representatives were unlawful and potentially harmful to patients."). Moreover, Relator Jackson does not allege that anyone to whom he allegedly expressed his concerns about "off-label" marketing played any role in his termination. ¶¶ 201–202. Courts in this Circuit have repeatedly rejected FCA retaliation claims in similar circumstances. *See, e.g.,*

---

[17] *See, e.g.,* ¶ 192 ("Relator Jackson was concerned that Allergan was illegally promoting Viberzi . . . through the illegal solicitation of confidential patient information."); ¶ 198 ("[A] pattern developed of Foust reprimanding Jackson for his refusal to disregard the appropriate patient profile warnings and precautions of Viberzi.").

[18] The closest the TAC gets to a concrete allegation that Relator Jackson was trying to stop false claims is when he alleges he "informed Mr. Martin that Mr. Foust was retaliating against him . . . for refusing to promote Viberzi for off-label purposes i*n violation of the FCA*." ¶ 202 (emphasis added). In context, however, this assertion does not allege that Relator Jackson actually *told* Mr. Martin the supposed off-label marketing violated the FCA, but instead that, simply by raising the specter of off-label marketing, Relator Jackson was (implicitly) raising the possibility of FCA liability. This reading is confirmed by the next paragraph, in which Relator Jackson alleges that Mr. Martin "attended mandatory compliance training regarding off-label marketing and FCA compliance," and so was "well aware that off-label marketing can result in a qui tam lawsuit and FCA liability," ¶ 203, allegations that would be unnecessary if Relator Jackson had actually told Mr. Martin he believed off-label marketing of Viberzi was causing the submission of false claims.

*U.S.* ex rel. *Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 715 (7th Cir. 2014) (dismissing FCA retaliation claim where plaintiff was "concern[ed] about the standard of care provided" to patients, but "there is nothing to suggest that [plaintiff] was trying to investigate or report suspected fraud on [defendant's] part").[19]

## CONCLUSION

For these reasons, the Court should dismiss the TAC with prejudice.

Dated: August 1, 2022

Matthew J. O'Connor*
Patrick M. Phelan*
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Email: moconnor@cov.com
          pphelan@cov.com

*Admitted Pro Hac Vice*

Respectfully submitted,

/s/ Sherri M. Arrigo
Sherri M. Arrigo
Timothy L. Hogan
**DONOHUE, BROWN, MATHEWSON & SMYTH LLC**
131 South Dearborn Street, Suite 1600
Chicago, IL 60603
Tel: (312) 422-0900
Email: arrigo@dbmslaw.com
          hogan@dbmslaw.com
***Attorneys for Defendant Allergan USA, Inc.***

---

[19] *See also Trupp v. Roche Diagnostics Corp.*, 440 F. Supp. 3d 990, 999 (S.D. Ind. 2020) (dismissing FCA retaliation claim where, "[p]rior to the filing of her complaint, [plaintiff] never expressed any concerns referencing Medicare/Medicaid billing practices as a consequence of the off-label use," and where plaintiff's "apparent concerns were more accurately categorized as concerns for patient safety and customer education"); *U.S.* ex rel. *Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158 (N.D. Ill. 2007) (dismissing FCA retaliation claim where, "[t]hough [the plaintiff] may have complained about off-label marketing, there is no indication in her complaint that she informed her employers that she suspected that [it] was defrauding the government or that she was pursuing or assisting in making an FCA claim").

## NOTICE OF FILING AND CERTIFICATE OF SERVICE

[X] I hereby certify that on August 1, 2022, I electronically filed the foregoing Memorandum In Support of Its Motion to Dismiss with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

[ ] I hereby certify that on August 1, 2022, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

/s/Sherri M. Arrigo
DONOHUE BROWN MATHEWSON &
 SMYTH LLC
Sherri M. Arrigo (ARDC No. 06236640)
Timothy L. Hogan (ARDC No. 06277672)
131 S. Dearborn Street
Suite 1600
Chicago, IL  60603
(312) 422-0900
service@dbmslaw.com
arrigo@dbmslaw.com
hogan@dbmslaw.com