IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* JEFFREY WILKERSON and LARRY JACKSON <br><br> Plaintiffs-Relators, <br><br> v. <br><br> ALLERGAN LIMITED f/k/a ALLERGAN PLC and ALLERGAN USA, INC., <br><br> Defendants. | No. 1:22-cv-03013 <br><br> Judge Lindsay C. Jenkins |

**RELATORS' RESPONSE IN OPPOSITION TO DEFENDANT
ALLERGAN USA, INC.'S MOTION FOR RECONSIDERATION**

The Court did not err in ruling that "Allergan concedes that Relators have plausibly alleged a conspiracy between it and Dr. Bierman" and, therefore, "waived its right to contest the sufficiency of Relators' allegation of conspiracy with Dr. Bierman at the pleading stage." Dkt. No. 164, Order at 47-48.

In fact, Allergan made a strategic decision to use to its advantage Dr. Bierman's agreement to the demands of Allergan District Manager (and Relator Wilkerson's supervisor) Alan Foust to write more prescriptions in exchange for more speaker fees, which the Court described as "an explicit *quid pro quo* arrangement."[1] As an important aside, the Anti-Kickback Statute and False Claims Act are intended in part to prevent the *corruption of the process* that

---

[1] As the Court's Order observed, "Foust also told Wilkerson to convey to Dr. Bierman that the 'payment of speaker fees was specifically conditioned upon Bierman increasing his prescription of Allergan drugs'; Wilkerson and fellow sales representative Frank Adcock delivered this message in January 2016. [*Id.* ¶ 125.] Dr. Bierman expressly acknowledged the *quid pro quo* and agreed to increase his prescriptions of Viberzi. [*Id.* ¶¶ 126, 128.]" Dkt. No. 164 at 7-8.

occurs when *any part or purpose* of the remuneration is to induce the writing of prescriptions,[2] and no "*quid pro quo*" is required to be alleged or proved. In this case, Allergan sought to benefit by contrasting the rarely available evidence of an explicit *quid pro quo*—which *Dr. Bierman essentially "confessed to" in text messages*—to distinguish Relators' more typical allegations that speaker-doctors who received Allergan's payments then wrote prescriptions for Linzess and Viberzi.

Remarkably, Allergan now attempts to deny the obvious—and contradict its affirmative concessions that these allegations about Dr. Bierman and Allergan supervisor Faust allege a conspiracy under the False Claims Act based on Anti-Kickback violations. Allergan also raises new arguments and cases it failed to cite previously, which is improper on a motion for reconsideration.

Important both to this motion and to any FCA case, Allergan also misstates the legal standards applicable to corporate liability generally and to conspiracies specifically. Under well-established law summarized below: (1) the acts of any "agent" of Allergan acting within the scope of their authority are sufficient to make Allergan liable, regardless of whether that "agent" is a "high-level" employee; (2) no "express agreement" is required to establish a conspiracy; and (3) the existence of a conspiracy may be inferred from circumstantial evidence. Nonetheless,

---

[2] The Court's Order recites this test at page 24, "as long as any part of the remuneration was paid to induce the speakers to write more prescriptions," and cites *United States v. Borrasi*, 639 F.3d 774, 780–82 (7th Cir. 2011) (rejecting the argument that the "primary motivation" of payment of remuneration must be to induce referrals and holding that "if part of the payment compensated past referrals or induced future referrals, that portion of the payment violates" the AKS). Dkt. No. 164 at 24. The AKS protects federal healthcare programs from "increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care, or necessity of services." *United States. v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) (quotation omitted). AKS violations occur when any "part or purpose" of the payments is to "induce referrals," *United States v. Nagelvoort*, 856 F.3d 1117, 1130 (7th Cir. 2017)—here, to induce doctors to write prescriptions.

Relators have alleged Allergan's high-level coordination and direction of the speaker program. Relator Wilkerson's supervisor Alan Faust was but one of the many Allergan managerial employees involved in this nationally coordinated speaker program to pay doctors to increase prescriptions, directed from Allergan's national sales office.[3]

For all of these reasons as discussed below, Allergan's motion should be denied.

## BACKGROUND

The procedural posture of Allergan's motion is important. In its March 22, 2024 Order, this Court ruled that Relators had adequately alleged that Allergan engaged in a companywide scheme to violate the Anti-Kickback Statute ("AKS"). Dkt. No. 164 at 32, 40 (Relators' "allegations, if true, strongly suggest that Allergan's speaker program operated at a companywide scale"); ("Relators have alleged facts with enough particularity to make plausible that Allergan's Speaker Bureau violated the AKS."). The Court also found that Allergan "conced[ed] that Relators have pleaded illegal *quid pro quo* relationships with a small number of physicians with the requisite particularity." *Id.* at 40.

To illustrate, when Allergan first moved to dismiss, it argued that "[*u*]*nlike the other allegations in the TAC*, Relators allege a direct 'quid pro quo' with Dr. Bierman." Dkt. No. 83-1 at 16 (emphasis added).[4] After the Georgia district court denied Allergan's first motion without prejudice and transferred the case here,[5] Allergan continued its strategy of using

---

[3] As at least two examples alleged in the Third Amended Complaint (TAC), see ¶¶ 107 (identifying roles of Allergan's District and Regional Managers in communicating Allergan's corporate policy to select speaker-event physicians who could be induced by speaker payments to increase their prescriptions of Viberzi or Linzess); and 110 (describing involvement of personnel at Allergan's U.S. headquarters).
[4] *See also id.* at 17 ("Relators nowhere allege—let alone with particularity—that **any doctor other than Dr. Bierman** had an express *quid pro quo* or other unlawful agreement with Allergan.") (emphasis added); Dkt. No. 95 at 2 ("[T]he TAC contains only a single allegation of an improper meeting of the minds—Relator Wilkerson's own alleged bribing of Dr. Paul Bierman, a gastroenterologist in Tennessee.").
[5] Dkt. No. 100 at 1.

3

Relators' Bierman allegations to negatively contrast Relators' other allegations. So, in its second motion to dismiss, Allergan argued "Relators nowhere allege – let alone with particularity – that ***any doctor other than Dr. Bierman*** had an express *quid pro quo* or other unlawful agreement with Allergan." Dkt No. 133 at 20 (emphasis added).

Allergan has not only consistently repeated these concessions/arguments, but has never before raised the arguments or authority relied on in this motion for reconsideration related to the alleged pleading standards for a FCA conspiracy. That is a textbook "waiver" of those arguments. The following passage from Allergan's briefing on its motion to dismiss is Allergan's *entire* argument about Relators' conspiracy claims:

> Relators allege (Count III) that Allergan "conspired" with speaker physicians to violate the FCA. 31 U.S.C. 3729(a)(1)(C). However, ***Relators nowhere allege – let alone with particularity – that any doctor other than Dr. Bierman had an express quid pro quo or other unlawful agreement with Allergan***. Absent a meeting of the minds, there is no conspiracy [citation omitted]. And of course, Allergan cannot conspire with its own employees. [citations omitted]. Moreover, for the same reasons Relators have failed to plead the underlying fraud with particularity, they have also failed to plead with particularity conspiracy to commit that same fraud.

Dkt No. 133 at 20 (emphasis added).

Allergan reiterated that concession in its reply brief when it argued that "an FCA conspiracy requires 'the existence of an agreement between the defendants,' and Relators potentially alleged, at most, ***only one such arrangement 'with particularity'*** (***i.e. the payment Relator Wilkerson alleges he offered Dr. Bierman, a Tennessee gastroenterologist.***)" Dkt. 141 at 13 n. 10 (emphasis added).

At this Court's hearing on the motion to dismiss, Allergan likewise continued with its strategic decision to use the Dr. Bierman allegations offensively against Relators' other allegations:

4

- "But with respect to the other allegations in the complaint, there's nowhere near this level of specificity as there is with Bierman." Jan. 31, 2024 Motion Hearing Trans., pp. 16:21-17:1.

- "So the court – clearly in Berkowitz they didn't have the level of information that they did at least with Dr. Bierman." *Id*., 17:23-25.

- "There's no specific patient in Bierman, of course, but there's no level of detail with respect to any of these other cases." *Id*., 18:16-18.

Strikingly, Allergan repeats its concession in its motion for reconsideration. Allergan argues again that the Relator has adequately alleged an "…agreement with Dr. Bierman to write prescriptions for Linzess and Viberzi in exchange for speaker fees--an arrangement that, if true, would implicate the Anti-Kickback Statute ("AKS")." (See Dkt No. 165 at 1). But now, Allergan seeks to contradict its concessions by introducing new arguments that it strategically decided not to make previously. Allergan's waiver of these new arguments and authorities cannot be clearer. And its motion shows no basis for relief, as it fails to satisfy the legal standards summarized in the next section.

## ARGUMENT AND CITATIONS OF AUTHORITY

1. **Allergan Cannot Base Its Motion For Reconsideration On New Arguments That It Previously Strategically Decided to Ignore, and Cannot Now Attempt to Assert the Opposite of What It Has Already Conceded.**

Motions for reconsideration are disfavored and "serve the limited function of correcting manifest errors of law or fact." *Chicago Reg'l Council of Carpenters Pension Fund v. Carlson Constructors Corp.*, No. 17-CV-04242, 2022 WL 3087938, at *1 (N.D. Ill. Apr. 13, 2022), quoting *Slick v. Portfolio Recovery Assocs., LLC*, 111 F. Supp. 3d 900, 902 (N.D. Ill. 2015). They "cannot be used to raise arguments which could, and should, have been made before the judgment issued," *FDIC v. Meyer,* 781 F.2d 1260, 1268 (7th Cir. 1986), and do not "serve as the occasion to tender new legal theories for the first time," *Rothwell Cotton Co. v.*

*Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987), quoting *Keene Corp. v. International Fidelity Insurance Co.*, 561 F. Supp. 656 (N.D.Ill.1982).

Allergan has shown no "manifest error," which is defined as "[1] wholesale disregard, [2] misapplication, or [3] failure to recognize controlling precedent." *Oto v. Metro Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quotation omitted and numbers added). The Court made no "manifest error" in accurately describing the arguments Allergan strategically chose to make. The Court's Order certainly did not result in any manifest error of law or fact, by wholly "disregard[ing], misapply[ying], or fail[ing] to recognize controlling precedent." *Oto*, 224 F.3d at 606.

In addition, Allergan's new argument—that Relators failed to state a FCA conspiracy claim but only alleged a conspiracy to violate the AKS—is inappropriate on a motion for reconsideration. *Meyer,* 781 F.2d at 1268. If Allergan believed that argument was helpful or relevant, it should have raised it before the Court's Order.

For these reasons alone, Allergan's motion should be denied.

**2.  Allergan's Motion Also Disregards Long-Established Legal Standards Applicable to Corporate Liability Generally, and to Seventh Circuit Conspiracy Law Principles.**

Allergan's motion also fails because it misstates the legal standards applicable to corporate liability generally, as well as long-established Seventh Circuit law conspiracy law principles.

**A. The Acts of Any "Agent" of Allergan Acting within the Scope of Their Authority Are Sufficient to Make Allergan Liable.**

Allergan's motion is inconsistent with well-established Supreme Court authority establishing that "respondeat superior" is the basis of corporate civil and criminal liability. Consequently, the acts of any Allergan "agent" acting within the scope of their authority are

6

sufficient to make Allergan liable, regardless of whether that "agent" is a "high-level" employee.[6] Although Relators in fact have alleged Allergan's high-level coordination and direction of the speaker program from Allergan's national sales office to pay doctors to increase prescriptions, such allegations are not essential to plead that Allergan is liable for the acts of its employees. Allergan is wrong to the extent it suggests that the acts of its agents such as District Manager Alan Foust (or any "agent" of Allergan acting within the scope of his authority) cannot bind Allergan as a party to a conspiracy.

In both civil and criminal cases, a corporation may be held liable for the acts of any of its agents and employees under principles of *respondeat superior*. Under the seminal U.S. Supreme Court decision *New York Central & Hudson River Railroad v. United States*:

> [W]e see no good reason why corporations may not be held responsible for and charged with the knowledge and purposes of their agents, acting within the authority conferred upon them. [Citations omitted] If it were not so, many offenses might go unpunished and acts be committed in violation of law where, as in the present case, the statute requires all persons, corporate or private, to refrain from certain practices, forbidden in the interest of public policy.

212 U.S. 481, 493–95 (1909).

Under *New York Cent. & H.R.R. Co.,* a corporation can even be held criminally liable if (1) its agent commits a criminal act (2) within the scope of his employment, and (3) with the intent to benefit the corporation, since the acts of the agent are imputed to his principal, here Allergan. *Id*. at 494; *see also Standard Oil Co. of Tex. v. U.S.*, 307 F.2d 120, 127 (5th Cir. 1962)("the law had long recognized that the corporation would have a civil responsibility for

---

[6] For example, Allergan's motion for reconsideration argues that "[w]hile Allergan did not contest at the motion-to-dismiss stage that liability for such an agreement by Relator could be *attributed to* Allergan, that is not the same thing as conceding that high-level employees *participated in* the alleged conspiracy." Dkt. No. 165, at 4-5 n.1 (emphasis original). Allergan further argues that its concessions of a *quid pro quo* arrangement with Dr. Bierman "should not be read as a concession that Relators have alleged that high-level employees of Allergan participated in the alleged *quid pro quo* arrangement." *Id*.

7

injuries or wrongs done by those acting in the course and scope of their employment")(citing *New York Cent. & H.R.R. Co.*, 212 U.S. at 494).

Contrary to what Allergan suggests, there is no requirement that some "high-level" agent or employee of Allergan be identified in an FCA complaint for the corporation to be liable for conspiring to violate the False Claims Act. Nor is there such a requirement for finding liability under the FCA. As the Seventh Circuit held in affirming a judgment for FCA liability:

> Appellants ask us to ignore the bogus-certificate frauds on the ground that CEO Munson did not know about their falsity. But the district judge found that Alfredo Busano, head of one of Anchor's branch offices, knew what was going on. Corporations such as Anchor "know" what their employees know, when the employees acquire knowledge within the scope of their employment and are in a position to do something about that knowledge. *See, e.g., Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375 (7th Cir.2010). Busano acquired this knowledge as part of his duties at Anchor, and he could have rejected any loan application that had false information about the down payment. Instead he certified to the federal agency that the information was true. **Busano's knowledge was Anchor's knowledge.**

*United States v. Anchor Mortg. Corp.*, 711 F.3d 745, 747–48 (7th Cir. 2013) (affirming FCA judgment)(emphasis added). Thus, to create liability under the FCA, there is no requirement that any "high-level" Allergan employee be involved—much less identified in an FCA complaint.

### B. Allergan's Motion Also Contradicts Established Seventh Circuit Conspiracy Law Principles.

Allergan's new arguments made for the first time in this motion rely on authority outside the Seventh Circuit to contradict long-established general principles of conspiracy law, which apply in FCA cases.

It is well-settled law that no "express agreement" is required to establish a conspiracy. Instead, as a leading Seventh Circuit decision has observed: "No formal agreement is necessary to constitute an unlawful conspiracy….The conspiracy may be found in a course of dealing or other circumstances as well as in an exchange of words." *United States v. Zuideveld*, 316 F.2d

873, 877–79 (7th Cir. 1963), quoting *American Tobacco Co. v. U.S.*, 328 U.S. 781, 809-810 (1946). Indeed, "[t]he common design is the essence of the conspiracy. This may be shown by proof of concert of action in the commission of an unlawful act from which a plan, common design or an agreement can be inferred." *Id.*[7]

As one of this District's and Circuit's leading FCA cases, *United States v. Rogan*, summarized: "'[G]eneral civil conspiracy principles apply' to FCA conspiracy claims under 31 U.S.C. § 3729(a)(3).... Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.... All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *United States v. Rogan*, No. 02 C 3310, 2006 WL 8427270, at *20–21 (N.D. Ill. Oct. 2, 2006), aff'd, 517 F.3d 449 (7th Cir. 2008), quoting *United States v. Murphy*, 937 F. 2d 1032, 1039 (6th Cir. 1991).[8]

Ignoring these established Seventh Circuit principles of conspiracy law, Allergan cites for the first time a case from another circuit, *United States ex rel Ibanez v. Bristol-Myers Squibb Company*, 874 F.3d 905 (6th Cir. 2017), for the proposition that Relator did not allege that "an agreement was made *in order to* violate the FCA." Dkt. No. 165 at 4 (emphasis in original). In

---

[7] As the Seventh Circuit further held in *Zuideveld*: "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and a collocation of circumstances." 316 F.2d 873, 877–79 (7th Cir. 1963), quotation omitted. And "[o]ften crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. The conspiracy may be found in a course of dealing or other circumstances as well as in an exchange of words. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, the conclusion that a conspiracy is established is justified.'" *Id.*, quoting *American Tobacco Co. v. U.S.*, 328 U.S. 781, 809-810 (1946). Finally, "proof of the requisite knowledge and intent on the part of the conspirators need not be made by direct evidence. Indeed, it is a rare case in which such evidence may be found. The conspiracy may be shown by circumstantial evidence or permissible inferences or deductions from the facts." *Id.*

[8] Likewise, this Court observed in its Order that "[g]eneral civil conspiracy principles apply to FCA conspiracy claims." Dkt. No. 164 at 46 (also quoting *United States ex rel. Durcholz v. KW, Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999) (citation omitted)).

9

addition to Allergan's waiver of these new arguments and authorities, this out-of-circuit opinion cannot overrule or control conspiracy law in the Seventh Circuit.

Moreover, *Ibanez* was not an AKS case, but instead dealt with off-label promotion of a drug. 874 F.3d at 917. As a result, there was not a clear linkage between federal health care programs and claims and the alleged off-label usage. *Id.* Here, the linkage is direct and obvious—the AKS by its very terms applies **only to "acts involving Federal health care programs."** 42 U.S.C. §1320a-7b (emphasis added). And any claim resulting from a violation of the AKS statute "constitutes a false or fraudulent claim." *Id.* (g).**[9]** The linkage between the conspiracy to violate the AKS and the conspiracy to violate the FCA flows directly from the statute itself. [10]

## 3. Allergan Has Shown No Other Basis for Relief.

Allergan's contention that the Relators waived any argument about Allergan's concessions is clearly erroneous. Allergan's affirmative argument to the effect that only the Bierman allegations were sufficient was itself the concession. The Court then properly considered

---

[9] In this regard, it is important to note that the Anti-Kickback Statute's prohibition against payment of remuneration to induce prescriptions is limited to those paid for by federally funded healthcare programs. 42 U.S.C. § 1320a-7b(b). The linkage of the AKS conspiracy to prescriptions that were actually written and paid for with federal funds is what the Court required more particularized allegations about. This is very different from Allergan's erroneous proposition that an agreement to violate the AKS by paying remuneration to induce physicians to write prescriptions that will be paid for by the government is somehow not an agreement to violate the False Claims Act. The AKS explicitly provides that federally funded prescriptions written in violation of the AKS constitute violations of the FCA because they are paid for by the government. *See* 42 U.S.C. § 1320a-7b(g). Accordingly, while one might pay illegal kickbacks that are not shown to be linked to actual federally funded prescriptions, the same cannot be said for a conspiracy to violate the AKS, since the ultimate purpose of such a conspiracy, is the submission of false claims as has been alleged with respect to Dr. Bierman.

[10] Also in contrast to *Ibanez* and thus further distinguishing it, Relators expressly have alleged: that "[b]y virtue of kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly conspired with HCPs including but not limited to Dr. Paul Bierman, Dr. Adam Levy, Dr. Asif Qadri, and other HCPs described above***, to commit violations of the FCA and the AKS for the improper payment or approval of drugs on behalf of federal health care program beneficiaries***." TAC, ¶ 219 (emphasis supplied). That allegation alone alleges a sufficient "agreement" to violate the FCA and states a FCA conspiracy claim.

Allergan's own argument—including its concessions—in arriving at its decision on Allergan's Motion to Dismiss. Allergan also has no basis to complain that the Court has somehow improperly crafted an argument for the Relators when it simply considered and applied Allergan's affirmative arguments and concessions. The flaw in Allergan's logic is further illuminated by its effort to raise new arguments for the first time through its Motion for Reconsideration, to which the Relators object as untimely.

## CONCLUSION

Allergan has twice had the opportunity to argue that Relators' conspiracy claim relating to Allergan's payments to Dr. Bierman did not state a FCA conspiracy claim. It did not do so and instead conceded that Relators' Dr. Bierman allegations were sufficient. A motion for reconsideration is not an opportunity to recant prior concessions or to make new arguments. Because Allergan has not met its burden of showing any manifest error in the Court's March 22, 2024 Order, Relators respectfully ask the Court to deny Allergan's partial motion for reconsideration so this case can proceed without any further delay.

Respectfully submitted this 1st day of May, 2024.

/s/ Michael A. Sullivan
MICHAEL A. SULLIVAN
Georgia Bar No. 691431
msullivan@finchmccranie.com
FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, GA 30303
Tel: (404) 658-9070
Admitted *pro hac vice*

GEORGE F. GALLAND JR.
Illinois Bar No. 0906646
ggalland@lawmbg.com
ROBERT S. LIBMAN
Illinois Bar No. 6282259

rlibman@lawmbg.com
MINER, BARNHILL & GALLAND, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
Tel: (312) 751-1170

JAMES J. BREEN
Georgia Bar No. 079275
jbreen@breenlaw.com
THE BREEN LAW FIRM, PA
11720 Amber Park Drive
Suite 160
Alpharetta, GA 30009
Tel: (770) 740-0008
Admitted *pro hac vice*

JAMES F. BARGER, JR.
Georgia Bar No. 304373
jim@frohsinbarger.com
BEN BUCY
Georgia Bar No. 526064
ben@frohsinbarger.com
FROHSIN BARGER & WALTHALL
100 Main Street
St. Simons Island, GA 31522
Tel: (912) 809-3007
Admitted *pro hac vice*

ROBERT H. SNYDER, JR.
Georgia Bar No. 404552
rob@cannellasnyder.com
CANNELLA SNYDER LLC
315 W. Ponce De Leon Ave
Suite 885
Decatur, GA 30030
Tel: (404) 800-4828
Admitted *pro hac vice*

*Attorneys for Plaintiffs/Relators*

# **CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2024, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Michael A. Sullivan
MICHAEL A. SULLIVAN
Georgia Bar No. 691431
msullivan@finchmccranie.com
FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, GA 30303
Tel: (404) 658-9070
*One of the Attorneys for Plaintiffs/Relators*
*Admitted pro hac vice*