## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA; the States of ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MINNESOTA, MISSOURI, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, WISCONSIN, THE DISTRICT OF COLUMBIA, ex rel. JEFFREY WILKERSON and LARRY JACKSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No.: 22CV3013** <br> **JURY TRIAL DEMANDED** |
| Plaintiffs-Relators, | ) ) | |
| v. | ) ) | |
| ALLERGAN LIMITED f/k/a ALLERGAN PLC and ALLERGAN USA, INC. | ) ) ) | |
| Defendants. | ) | |

## FOURTH AMENDED COMPLAINT

**Table of Contents**

SUMMARY OF ALLEGATIONS ................................................................................ 1

FACTUAL OVERVIEW ........................................................................................... 6

JURISDICTION AND VENUE ................................................................................ 10

PARTIES ................................................................................................................ 10

APPLICABLE LAW ................................................................................................ 18

   I.      The Federal and State Statutes Allergan Violated ................................. 18

     A.    The False Claims Act (FCA) ............................................................. 18

     B.    The Anti-Kickback Statute (AKS) .................................................... 19

       i.    The AKS Requires No Proof of any Effect on the Recipient of a Kickback. ..... 21

      ii.    The Two Separate and Independent Bases of FCA Liability Relating to AKS Violations. ................................................................................ 22

         1.   Legal Basis No. 1: The "false certification" of Compliance with the AKS is a Basis of FCA Liability. ................................................ 22

         2.   Legal Basis 2: Under The 2010 Amendments, When AKS Violations Result in a Claim Being False, the Claims are Deemed to be False and Fraudulent Claims and thus Violations of the FCA. ............... 28

     C.    The State False Claims Acts .............................................................. 29

     D.    The California and Illinois Insurance Fraud Prevention Acts ............ 30

   II.     The Federal and State Health Insurance Programs, Regulatory Frameworks, and Material Conditions of Payment That Defendant Violated ........................ 32

     A.    The Medicare Program ...................................................................... 32

     B.    The Medicaid Program ...................................................................... 33

     C.    Other Federal Health Programs ......................................................... 34

   III.    HHS-OIG Has Long Issued Warnings That Speaker Programs Have Inherent Fraud Risks ....................................................................................... 35

THE ALLERGAN GASTROINTESTINAL DRUGS AT ISSUE ............................... 40

   I.      Linzess ................................................................................................ 40

   II.     Viberzi ................................................................................................ 41

ALLERGAN'S FRAUDULENT SCHEME ............................................................... 44

   I.      Allergan's Sales Strategy, Sales Personnel Compensation, and Speaker Program Background ............................................................................... 45

   II.     Allergan Dramatically Increased Its Speaker Spending to Induce Prescriptions of Viberzi and Linzess ............................................................................. 47

   III.    Allergan Selected and Paid Speaker-Physicians Based on Allergan's Revenue from Speaker-Physicians' Prescriptions ................................................... 49

   IV.    The Venue, Nature and Subject Matter of Allergan Speaker Events All Prove

the Speaker Events Were a Means to Pay Kickbacks ........................................... 52
V.      Allergan Conditioned the Payment of Speaker Fees on Prescriptions and Saw
        Huge Growth in the Number of Prescriptions Written by Many Doctors who
        Accepted Speaker Fee Kickbacks ............................................................. 55
VI.     Allergan Corporate Policies Facilitated Using Speaker Events to Pay Illegal
        Remuneration to Physicians to Prescribe Allergan Drugs ................................ 74
   A.   Allergan's Policy of Requiring a Minimum Number of RSVPs for Events,
        Instead of Minimum Number of Actual Attendees, Incentivized Sales
        Representatives to Collect Tenuous RSVPs Whom Allergan Knew Would Not
        Show Up ........................................................................................ 74
   B.   Allergan Paid Speaker-Physicians in Full for Sham Events.............................. 80
ALLERGAN'S SCHEME HAS CAUSED THE SUBMISSION OF THOUSANDS OF
FALSE CLAIMS AND COST THE FEDERAL AND STATE GOVERNMENT
MILLIONS ................................................................................................ 85
ALLERGAN'S UNLAWFUL RETALIATION AGAINST RELATOR JACKSON ......... 97
COUNT I: Federal FCA .............................................................................. 103
COUNT II: Federal FCA ............................................................................. 104
COUNT III: Federal FCA Conspiracy ............................................................. 104
COUNT IV: Federal FCA ............................................................................ 105
COUNT V: Arkansas State Medicaid Fraud False Claims Act ............................... 106
COUNT VI: California FCA .......................................................................... 107
COUNT VII: Colorado Medicaid False Claims Act, ........................................... 108
COUNT VIII: Connecticut False Claims Act, .................................................... 109
COUNT IX: Delaware False Claims & Reporting Act .......................................... 111
COUNT X: District of Columbia False Claims Act ............................................. 112
COUNT XI: Florida FCA ............................................................................. 113
COUNT XII: Georgia State False Medicaid Claims Act ....................................... 113
COUNT XIII: Hawaii False Claims Act, .......................................................... 114
COUNT XIV: Illinois FCA ........................................................................... 115
COUNT XV: Indiana Medicaid False Claims and Whistleblower Protection Act ......... 116
COUNT XVI: Iowa FCA .............................................................................. 117
COUNT XVII: Louisiana Medical Assistance Programs Integrity Law .................... 118
COUNT XVIII: The Commonwealth of Massachusetts FCA .................................. 119
COUNT XIX: Michigan Medicaid FCA ........................................................... 120
COUNT XX: Minnesota False Claims Act, ....................................................... 121
COUNT XXI: Missouri Health Care Payment Fraud and Abuse Statute, .................. 122
COUNT XXII: Montana FCA ........................................................................ 123

**COUNT XXIII: Nevada Submission of False Claims to State or Local Government Act**. 124

**COUNT XXIV: New Hampshire False Claims Act** ............................................................. 125

**COUNT XXV: New Jersey False Claims Act** ..................................................................... 127

**COUNT XXVI: New Mexico Medicaid FCA** ..................................................................... 127

**COUNT XXVII: New York False Claims Act,** .................................................................... 128

**COUNT XXVIII: North Carolina False Claims Act** .......................................................... 129

**COUNT XXIX: Oklahoma Medicaid FCA** ........................................................................ 130

**COUNT XXX: Rhode Island FCA** ..................................................................................... 131

**COUNT XXXI: Tennessee Medicaid FCA** ......................................................................... 132

**COUNT XXXII: Texas Medicaid Fraud Prevention Act** .................................................... 133

**COUNT XXXIII: Vermont FCA** ......................................................................................... 135

**COUNT XXXIV: Virginia Fraud Against Taxpayers Act** ................................................... 136

**COUNT XXXV: Washington State Medicaid Fraud FCA** .................................................. 137

**COUNT XXXVI: Wisconsin False Claims for Medical Assistance Act,** ............................ 138

**COUNT XXXVII: California Insurance Frauds Prevention Act** ........................................ 138

**COUNT XXXVIII: Illinois Insurance Frauds Prevention Act** ............................................ 141

**COUNT XXXIX: UNLAWFUL RETALIATION** ................................................................ 142

Relators Jeffrey Wilkerson ("Relator Wilkerson") and Larry Jackson ("Relator Jackson") on behalf of themselves, the United States of America and the States of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, and the District of Columbia (the named party States) allege and claim against Defendants Allergan Limited f/k/a Allergan PLC and Allergan USA, Inc. (collectively "Allergan"), as follows:

## SUMMARY OF ALLEGATIONS

1.      This action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et. seq., alleges that Allergan violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320-a-7b, through a companywide program whereby it knowingly and willfully paid remuneration to physicians in the form of "speakers fees" to induce them to prescribe the expensive drugs Linzess and Viberzi. This Fourth Amended Complaint contains allegations addressing the concerns expressed by the Court in its Memorandum Opinion and Order entered on March 22, 2024. ECF No. 164.   The Court determined that the Relators had sufficiently alleged a companywide scheme in violation of the AKS, because at least one purpose of the remuneration was to induce physicians to prescribe Linzess and Viberzi to Medicare patients.[1] However, with the exception of the allegations regarding Dr. Paul Bierman and two others, the Court ruled that the Relators had not sufficiently pled the relationship between Allergan's payments of illegal kickbacks to physicians and the alleged false claims for Linzess and Viberzi paid for by Medicare or other federally funded health

---

[1] ECF No. 164 at 31-40.

1

programs.[2]  Accordingly, this Fourth Amended Complaint contains additional allegations setting forth Allergan's specific payments of unlawful remuneration to specific physicians to induce them to write prescriptions for Linzess and Viberzi, and the resulting payments by Medicare during the time that the payments of illegal remuneration could influence the physician's exercise of independent professional judgement as Allergan intended..

2.     This Fourth Amended Complaint also emphasizes the two separate and independent legal bases that Relators allege to establish the requisite relationship between violations of the AKS and the FCA.  As alleged herein, the first path is the long established and judicially accepted basis for FCA liability when a pharmaceutical manufacturer pays a kickback to a physician to induce the physician to prescribe a particular drug. FCA liability arises because the physician receiving the kickback and prescribing the drug, and the pharmacy dispensing it and seeking Medicare reimbursement, have expressly certified, or have been deemed to impliedly certify compliance with the AKS and, at all times material, Allergan knew that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) . . . ."[3]

3.     As further alleged herein, the second path is provided by the 2010 amendment to the AKS that was incorporated into the Affordable Care Act. 42 U.S.C. §1320-a-7b (g). This second path does not depend upon allegations of a violation of an express or implied certification

---

[2] *Id.* at 41-46.

[3] OIG Compliance Program for Individual and Small Group Physician Practices, 65 Fed. Reg. 59434 (Oct. 5, 2000), available at https://oig.hhs.gov/authorities/docs/physician.pdf. *See* certifications addressed below. Drug manufacturers, such as Allergan, know that physicians and pharmacies billing Medicare and treating Medicare patients certify compliance with the AKS and themselves, at least impliedly certify that they will not violate the AKS in selling their Medicare covered drugs.

by the manufacturer, the physician or the pharmacist. It simply provides that a claim for "items or services", such as prescribed medications, resulting from an AKS violation is a false or fraudulent claim under the FCA.

4.      While each path provides a basis for FCA liability, neither requires that the kickback cause the physician to prescribe the medication. Instead, each path follows the express language and settled judicial interpretation of the AKS that the payment of remuneration is prohibited if any purpose is to induce the physician to prescribe Linzess or Viberzi. The first path leads to FCA liability when the claim encompasses a false certification of AKS compliance because, as alleged herein, the purpose of the AKS is to prohibit payments where any purpose of the remuneration is to induce the physician to prescribe the medication, so that the physician's independent judgment cannot be influenced, and payment from federal programs requires an express certification that the claim is not related to any kickbacks.  As further alleged herein, 42 U.S.C. §1320-a-7b (g) provides a broader second path for AKS based FCA liability, by including all claims for items and services resulting from AKS violations, without the need for an express or implied certification of AKS compliance.

5.      In the case of Allergan's company-wide marketing scheme to pay doctors to induce them to prescribe Viberzi and Linzess, it is the violation of the AKS that causes the resulting claim for items and services to be false and fraudulent under the FCA. The relevant causation chain is that the AKS violation causes the Medicare claim submitted to be false, not that the AKS violation causes the underlying prescription to be written. Once Allergan pays the doctor, or even dangles possible payment, to induce the doctor to write a prescription for a Medicare covered specific drug, the AKS has been violated and the falsity of any claim for the drug so prescribed results from the AKS violation.  It is the AKS violation itself that causes the claim thereafter submitted to Medicare

or other state or federal payors to be false and fraudulent. Since there is no requirement that the unlawful inducement successfully cause the doctor to write the prescription for a claim for the prescribed drug to be unlawful—and thus false—under the AKS, there is no requirement that the Relator plead and prove that the doctor would not have written the prescription but for the kickback in order to allege a violation of the FCA. However, as alleged herein, the unlawful remuneration Allergan paid doctors through its company-wide speakers program for Linzess and Viberzi clearly had the intended causal effect of inducing substantial increases in the number of Linzess and Viberzi prescriptions written by the doctors who received the unlawful payments of remuneration, as well as other less handsomely remunerated doctors whom the speakers influenced to follow their lead. Accordingly, the facts alleged by Relators herein also establish that Allergan's payments of unlawful remuneration to induce physicians to prescribe more Linzess and Viberzi had the intended and hoped for effect of causing them to do so.

6.      Underlying both legal bases for Allergan's FCA liability is a fundamental legal principle.  For more than 50 years, our federal laws that prohibit kickbacks (enacted and amended since 1972) have **never required** proof that the kickback had ***any effect on the recipient***.

    a.  To illustrate, the Seventh Circuit Pattern Jury Instructions[4] contain no such element of "effect on the recipient" to prove violations of the AKS.

    b.  As this Court has found, it is enough to show that one purpose of the *kickback-payor* is to induce referrals/prescriptions.

    c.  Kickback recipients have no reason to admit that their decisions are influenced by their personal financial interests.  The language of the AKS is consistent with that reality.

---

[4] *See*  https://www.ca7.uscourts.gov/pattern-jury-instructions/Criminal_Jury_Instructions.pdf , at 1093-94.

7.      Turning to the FCA, the first--and well-settled--basis of FCA liability is based on *false certifications*.  For many years, when there have been false certifications (express or implied) of compliance with the AKS, False Claims Act liability has followed. [5]

    a.  Every recipient of Medicare payments—doctors, pharmacies, and even pharmaceutical manufacturers—executes certifications of compliance with all applicable laws, which include the AKS. Here, at a minimum, the prescribers and dispensing pharmacies made such certifications (alleged specifically below), which Allergan's kickback payments caused to be false.

    b.  That settled basis of FCA liability exists with **no showing that the kickback had any effect on the recipient**.[6]

8.      Second, the 2010 AKS amendments created a separate and independent basis of liability.

    a.  Subsection (g) simply states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31." 42 U.S.C.A. § 1320a-7b(g).

---

[5] *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 186, 136 S. Ct. 1989, 1999, 195 L. Ed. 2d 348 (2016) ("We first hold that the implied false certification theory can, at least in some circumstances, provide a basis for liability.).

[6] As the Supreme Court held in *Universal Health Servs., Inc.*: "Accordingly, we hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id*. at 190.

5

b. Nothing in the 2010 amendments suggests an intent by Congress to reject the long-settled principle that **no showing is required that the kickback had any effect on the recipient of the kickback**.

c. Again, since it is impracticable to require a showing **that the kickback had any effect on the recipient of the kickback**, Congress clearly intended that the term "resulting from a violation of this section" mean that the reason for disqualification of the claim from coverage by a federal healthcare program was the AKS violation.

9.      Allergan is liable under the FCA under each of these bases of liability. In sum, the allegations herein demonstrate that Allergan paid remuneration to doctors with the intent to induce them to write prescriptions for Linzess and Viberzi, and therefore violated the AKS. *See* 42 U.S.C. § 1320a–7b(b)(2).  Based on the reliable Medicare Part D data, the allegations herein establish that the federal government paid false and fraudulent claims for the Linzess and Viberzi prescriptions alleged herein and that those claims resulted from Allergan's AKS violations. Consequently, because Allergan's payments violated the AKS, Allergan caused the certifications of compliance with the AKS to be false in material ways, and thus engaged in violations of the FCA, under the false certification basis of liability. Separately, 42 U.S.C. §1320-a-7b(g) provides a broader second path for AKS based FCA liability, by including all claims for items and services resulting from AKS violations.

## FACTUAL OVERVIEW

10.     "The relationship between a patient and a physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-

6

interest."[7]  This case is about a fraudulent Allergan scheme to bribe doctors to prescribe expensive, often unnecessary, and potentially dangerous Allergan drugs to boost Allergan's profits.

11.     Allergan's scheme violates the federal FCA, the AKS, and a number of state False Claims Acts. Its scheme has cost taxpayers millions of dollars in fraudulent claims for drug reimbursements under federal and state healthcare programs.

12.     Beginning in 2015, Allergan devised and implemented a companywide and nationwide scheme to provide doctors and their medical practices illegal kickbacks in the form of money, food, alcohol, travel expenses, services, and other things of value, to induce them to prescribe—and to cause other physicians to prescribe—two expensive and potentially dangerous gastrointestinal drugs: (1) the newly-launched Viberzi, a Schedule IV opioid drug with addictive properties and (2) its lucrative counterpart, Linzess.

13.     Consistent with Allergan's history of violations of the anti-kickback laws summarized below—which demonstrates Allergan's knowledge of its wrongdoing under the FCA--Allergan's kickback scheme demonstrates corruption of its sales and marketing, finance, and compliance functions.  Allergan's kickback scheme was a fundamental part of Allergan's comprehensive, coordinated sales and marketing plan for these two drugs.

14.     As part of this scheme, Allergan used its speaker program to pay doctors to prescribe these expensive and even dangerous Allergan drugs to patients.  Allergan concealed the "kickback" nature of its payments to physicians by calling the illegal payments "speaker fees" and by claiming it paid those "speaker fees" to physicians for conducting "educational events" with other healthcare professionals ("HCPs").  A purpose of the speaker fees however was to induce the speakers to prescribe and continue to prescribe Linzess and Viberzi, and to influence the

---

[7] American Medical Association, Code of Ethics: Patient Physician Relationships.

exercise of medical judgment by other doctors receiving less remuneration from Allergan to do the same. The more Allergan paid doctors, the more it expected the doctor to increase his or her prescriptions. Allergan also hoped that by bribing specialist doctors and their medical practices to vouch for its products, the specialists would cause many other doctors to prescribe the Allergan drugs as well. And, by cutting off payments to certain doctors who were not prescribing enough Linzess and Viberzi, Allergan communicated by its conduct its expectations that the doctors must prescribe more to keep the payments flowing.

15. In addition to Allergan's kickbacks of money, food, alcohol, and travel expenses, Allergan also provided other inducements to physicians to prescribe Linzess and Viberzi, including free services and assistance to the prescribers and the prescribers' staff. Those free services included: helping the practices to identify potential Viberzi and Linzess patients; performing administrative functions and medical reviews necessary to facilitate prescriptions and reimbursement, specifically including reimbursement by Medicare and other state and federal government programs; helping with administrative communications and other functions relating to billing and reimbursement; and coordination with dispensing pharmacies including follow up services to facilitate continued prescriptions of these drugs. These inducements included the practice of "chasing scripts" to make sure prescriptions were filled, as described below.

16. All of Allergan's conduct described herein relating to its providing physicians money, food, alcohol, travel expenses, services, inducements, and other things of value were part of its unlawful kickback scheme and were acts in furtherance of a conspiracy to violate the AKS and the FCA involving Allergan and the doctors it bribed.

17. Relators worked for Allergan as sales representatives when Allergan devised and implemented its kickback scheme, and Relators witnessed first-hand Allergan's scheme in

8

practice. Allergan instructed Relators to aggressively market Viberzi and Linzess, to downplay the risks of the drugs, and to do whatever was necessary to increase sales, including arranging for the payment of speaker fees to induce physicians to prescribe the drugs. Relators saw first-hand that often the "educational events" for which doctors were paid thousands of dollars were nothing more than the doctor getting paid for drinking and dining with one of Allergan's sales reps at a high-priced restaurant. Allergan even paid doctors the full speaker fee—which amounted to thousands of dollars--for events that were cancelled. While pharmaceutical companies recognize that paying a lower fee for a cancelled event fairly compensates physicians for committing his or her time to the event, paying the full speaker fee for cancelled events is unreasonable, inconsistent with Relator's experience at other pharmaceutical companies, and demonstrates Allergan's intent to simply pay physicians for prescriptions, not education.

18.     Allergan's scheme worked exactly as it intended. Many doctors who accepted Allergan's kickbacks in the form of speaker's fees and other remuneration substantially increased their prescriptions of Linzess and Viberzi, disproportionately to doctors who had not accepted kickbacks. Many doctors who accepted Allergan's kickbacks in the form of speaker's fees and other remuneration also maintained high prescription volumes of those drugs while they were accepting Allergan's kickbacks. Further, as noted, Allergan stopped paying physicians who did not sufficiently increase prescriptions upon becoming paid speakers.

19.     Allergan knew that its illegal scheme would cause the submission of false claims to the government for the Linzess and Viberzi. Allergan specifically targeted doctors for its speaker program who had patients covered by federal and state healthcare programs, including Medicare. As a result, Allergan's army of kickback-paid physicians became substantial drivers of federal and state reimbursements for Viberzi and Linzess. Allergan knew that doctors who write

9

prescriptions for Linzess and Viberzi, as well as the dispensing pharmacies that submit claims to Medicare and other federal and state payors for the prescriptions, certify compliance with the AKS. Each claim paid by the government for a prescription written by a doctor while they were taking part in Allergan's kickback scheme is a false claim under the federal and state FCAs. As a result, Allergan has caused the federal and state governments to pay millions of dollars for prescriptions written by doctors involved in Allergan's kickback scheme.

## JURISDICTION AND VENUE

20.     The action arises, in part, under the FCA, 31 U.S.C. §§ 3729-33. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper under 31 U.S.C. § 3732(a).

21.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a) because Allergan qualifies to do business in the state of Illinois, transacts substantial business in the state of Illinois, and can be found here. Additionally, venue lies in this judicial district because Allergan committed acts proscribed by 31 U.S.C. § 3729 here. Specifically, Allergan offered and provided illegal remuneration to induce physicians to prescribe pharmaceutical products that were paid for by government funded health care programs, in violation of 42 U.S.C. § 1320a-7b. Moreover, Allergan made and used false records material to false claims, conspired to submit false claims, and knowingly concealed and improperly avoided obligations to pay or transmit money or property to the United States in this district.

## PARTIES

22.     Allergan Limited is a multinational pharmaceutical company headquartered in Dublin, Ireland. Allergan USA, Inc. is a wholly owned subsidiary of Allergan Limited and is headquartered in Parsippany, New Jersey. Allergan sells billions of dollars of pharmaceutical

products each year in the United States, including several brand-name gastrointestinal drugs, such as Linzess and Viberzi. On May 8, 2020, global pharmaceutical company Abbvie, Inc. completed an acquisition of Allergan Limited. Since then, Allergan has operated as a subsidiary of Abbvie, Inc.

23.     Relevant to Allergan's knowledge and intent, Allergan is a recidivist violator of the AKS and the FCA and has a long history of fraudulent marketing practices for its various drugs, including payments of illicit kickbacks to prescribing physicians.

24.     In 2010, Allergan pled guilty to crimes and paid $600 million in criminal fines and civil false claims settlements associated with its marketing of Botox.[8] As part of the civil settlement, Allergan paid $225 million to resolve claims that Allergan caused false claims to be submitted to government health care programs because Allergan "provided inducements to doctors to inject more Botox."[9] Allergan also entered into a Corporate Integrity Agreement (CIA) with the Department of Health and Human Services (HHS), Office of Inspector General (HHS-OIG).[10] The Allergan CIA was entered on August 30, 2010 and was operative for 5 years.[11] The CIA required Allergan to implement a Compliance Program, Code of Conduct, and policies and procedures to address arrangements entered into with doctors, "including, but not limited to speaker programs, speaker training programs, [and] presentations…) … [and] to ensure that the arrangements and related events are used for legitimate and lawful purposes in accordance with

---

[8] Press Release, Dep't of Justice "Allergan Agrees to Plead Guilty and Pay $600 Million to Resolve Allegations of Off-Label Promotion of Botox." (Sept. 1, 2010); available at: https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox.
[9] *Id.*
[10] *Id.*
[11] Part I-II, Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Allergan, Inc. (August 30, 2010).

applicable Federal health care program and FDA requirements."[12]  The Allergan CIA expired just a few months before Allergan began implementing the unlawful scheme described in this Complaint.

25.     Similarly, on September 15, 2010, Forest Pharmaceuticals Inc., now an Allergan subsidiary,[13] agreed to pay $313 million to resolve criminal and civil allegations, including FCA allegations, that it caused false claims to be submitted to federal health care programs for the drugs Levothroid, Celexa, and Lexapro.[14]  The settlement resolved allegations that "Forest used illegal kickbacks to induce physicians and others to prescribe Celexa and Lexapro including cash payments disguised as grants or consulting fees, expensive meals and lavish entertainment, and thus caused false claims to be submitted to federal health care programs."  In connection with the $313 million settlement, Forest was also required to enter a CIA with HHS-OIG.[15]  The Forest CIA was entered on September 14, 2010 and was operative for 5 years.  The Forest CIA also required Forest to implement a Compliance Program, Code of Conduct, and policies and procedures to address financial arrangements entered into with doctors.[16]  The Forest CIA was still in effect when Allergan purchased Forest in 2015 and expired just a few months before Allergan began implementing the scheme described herein.

---

[12] *Id.* (emphasis added).

[13] As described further *infra,* Allergan acquired Forest Pharmaceuticals in March 2015 as part of Allergan's purchase of Actavis, Inc.

[14] Press Release: Dept. of Justice, "Drug Maker Forest Pleads Guilty; To Pay More Than $313 Million to Resolve Criminal Charges and False Claims Act Allegations." (Sep. 15, 2010), available at:        https://www.justice.gov/opa/pr/drug-maker-forest-pleads-guilty-pay-more-313-million-resolve-criminal-charges-and-false.

[15] *Id.*

[16] Part III, Section B. Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Forest Laboratories, Inc. (September 14, 2010).

26.     In 2016, while owned by Allergan, Forest paid another $38 million to the United States and various state governments to resolve kickback allegations related to its marketing of Bystolic, Savella, and Namenda.  Mirroring the scheme described herein, the 2016 Forest settlement resolved allegations that Forest violated the FCA and AKS by "providing payments and meals to certain physicians in connection with **speaker programs** about Bystolic, Savella or Namenda … and the payment and meals were intended as improper inducements because Forest provided these benefits even when the programs were cancelled, when no licensed health care professionals attended the programs…or when the meals associated with the programs exceeded Forest's internal cost limitations."[17]

27.     When Allergan purchased Forest in 2014, Allergan placed many former Forest sales employees in leadership positions with Allergan. Those former Forest employees included Allergan District Manager Alan Foust, Regional Manager James Martin, and Vice President of Sales Chris Sweeney.  Those former Forest employees brought with them to Allergan the disregard for compliance that they learned as part of the corrupt culture at Forest.

28.     In 2017, Allergan paid another $13 million to settle allegations that it paid kickbacks to eye doctors to prescribe Lumigan, Zymar, Restasis, and Acular and that it had disguised the illicit payments as "speaker fees."[18]

29.     Relator Larry Jackson has over 20 years of experience as a pharmaceutical sales representative.   Relator Jackson worked for Allergan, and its predecessor Actavis Pharma,

---

[17] Press Release, Dep't of Justice. "Forest Laboratories and Forest Pharmaceuticals to Pay $38 Million to Resolve Kickback Allegations Under the False Claims Act." (December 15, 2016), available at: https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations (emphasis added).

[18] *See United States of America ex rel. Herbert J. Nevyas, M.D. and Anita Nevyas-Wallace, M.D. v. Allergan, Inc.*, Civil Action No. 09-CV-00432 (E.D. Pa.).

Inc., as a Senior Professional Sales Specialist from 2013 to 2017. Relator Jackson worked in Allergan's Gastroenterology Group and promoted drugs, including Viberzi and Linzess. He was responsible for Allergan's Tulsa, Oklahoma, Northwest Arkansas, and Southwest Missouri territories. In this role, Relator Jackson learned first-hand that Allergan systematically provided illegal remuneration to physicians to induce those physicians to prescribe Allergan drugs, Viberzi and Linzess, in violation of the AKS. Through his knowledge of Allergan's nationwide operations, Relator Jackson also has knowledge that Allergan devised its AKS violations at the highest level of management, and management implemented Allergan's scheme nationwide. Ultimately, Allergan terminated Relator Jackson in violation 31 U.S.C. § 3730(h) for voicing concerns about Allergan's dangerous and illegal marketing tactics and for his efforts to prevent false claims from being submitted. Relator Jackson observed first hand in the performance of his duties for Allergan that the speaker fees program described herein was created and directed from Allergan's nationwide headquarters and was a companywide program, including, but not limited to, based on the statements of his supervisor and Regional Director, the fact that the national headquarters approved all speaker events,[19] issued the checks for the payments, and provided lists of physicians to consider including and excluding along with their prescription histories. Relator Jackson further witnessed his sales counterparts from other districts around the nation discussing the speaker program and its application to induce prescriptions of Linzess and Viberzi.

30. Relator Jeffrey Wilkerson has over 15 years of experience as a pharmaceutical sales representative. Relator Wilkerson worked for Defendant Allergan, and its predecessor Actavis Pharma, Inc., as a Senior Professional Sales Specialist from 2013 to 2016. Relator Wilkerson

---

[19] One such approval issued by Tasha Ellis from Allergan's New York office for an event put together by Relator Jackson is attached as Exhibit A.

worked in Allergan's Gastroenterology Group and promoted Gastroenterology drugs, including Viberzi and Linzess. He was responsible for Allergan's West Tennessee and North Mississippi territories. In this role, Relator Wilkerson learned firsthand that Allergan systematically provided illegal remuneration to physicians to induce those physicians to prescribe Allergan drugs, Viberzi and Linzess, in violation of the AKS. Through his knowledge of Allergan's nationwide operations, Relator Wilkerson also has knowledge that Allergan devised its AKS violations at the highest level of management and that management implemented Allergan's scheme nationwide. Relator Wilkerson also observed first hand in the performance of his duties for Allergan that the "Speakers Fee Program" alleged herein was created and directed from Allergan's nationwide headquarters and was a companywide program, including, but not limited to, based on the statements of his supervisors District Manager Alan Foust and Regional Manager James (Jimmy) Martin, the fact that the national headquarters approved all speaker events, issued the checks for the payments and provided lists of physicians to consider including and excluding along with their prescription histories. Relator Wilkerson further witnessed his sales counterparts from other districts around the nation discussing the speakers program and its application to induce prescriptions of Linzess and Viberzi.

31. Before filing the original Complaint, Relators voluntarily disclosed to the United States the information upon which this case is based, including the Relators' knowledge of the nationwide scope of the scheme. Although Relators are aware of no public disclosure of the fraud described herein, if any public disclosure has taken place, as defined by 31 U.S.C. § 3730(e)(4)(A), Relators qualify as the original source of the information for purposes of that code section. Relators also have knowledge that is independent of and materially added to any purported

publicly disclosed allegations or transactions and voluntarily provided that information to the United States before filing their Complaint, as contemplated by 31 U.S.C. § 3730(e)(4)(B)(2).

32.     Relators' disclosures to the government and filing of this Complaint caused the government to begin an investigation of Allergan's nationwide speakers' fee kickback scheme. During that investigation, the DOJ served civil investigatory demands (CIDs) on Allergan seeking information about Allergan's nationwide speaker's program.

33.     In response to the DOJ's CIDs, Allergan produced many documents, including Allergan's own non-public business records from its Intramed database that tracked every speaker event, the name of the sales representative and the HCP involved, the location, the amount paid, the number of RSVPs collected, the number of attendees (if any), and whether the event went forward or was cancelled.

34.     As is common in FCA cases, in response to DOJ's request that Relators' counsel provide DOJ assistance, Relators and Relators' counsel were given access to information produced by Allergan to the DOJ in response to the DOJ's CIDs, including Allergan's own internal business records about speaker events described in the previous paragraph.

35.     Although unnecessary to state a claim for relief given Relators' direct, personal knowledge of Allergan's nationwide kickback scheme, Relators have described that additional evidence of speaker's events to supplement and add to their own personal knowledge of Allergan's scheme in both the Third Amended Complaint and in this Fourth Amended Complaint.

36.     Relators also have reviewed and analyzed claims submission and payment data published by the Centers for Medicare and Medicaid Services (CMS) for the Medicare Part D prescription drug program. Medicare Part D publishes data reflecting the prescriptions written and

paid for by each participating provider through the Medicare Part D Prescriber Look-up Tool.[20] Entering the drugs into the website produces a report with the providers' name, location, specialty, and NPI; the drugs prescribed; the number of claims; and the amount paid. That data is published annually and provides the number of claims submitted and paid for prescription drugs by provider.

37. The federal government also collects and reports claims for Linzess and Viberzi paid by the Medicaid program, available at Dataset Search (medicaid.gov), including quarterly information about the number of claims for each drug, the number of units paid for, and the amounts paid. Those Medicaid data show significant increases in prescriptions for Linzess and Viberzi during Allergan's scheme from 2016 to 2018. For example, the prescriptions/claims and amounts paid nationwide by the Medicaid program for Linzess increased from $29,494,768.44 for 90,859 claims in 2016, to $43,750,271.95 for 125,169 claims in 2017, and to $49,259,092.19 for 141,675 claims in 2018. The data also show significant increases nationwide for Viberzi prescriptions, which increased from $1,499,406.97 for 1,628 claims in 2016, to $4,134,611.70 for 4,251 claims in 2017, to $4,468,407.04 for 4,615 claims in 2018.

38. Relators also reviewed and analyzed data from the CMS Open Payments database.[21] That government published database collects and publishes information about financial relationships between drug and medical device companies and certain health care providers. The data collected and published by CMS in its Open Payments database is mandatorily provided by the companies making the payments, including Allergan.

---

[20] The claims data is available for download and viewing at https://data.cms.gov/tools/medicare-part-d-prescriber-look-up-tool.

[21] Open Payments data is available for download and viewing at https://openpaymentsdata.cms.gov/.

39.     Given that speaker event evidence was provided directly by Allergan from its own database to the DOJ and to CMS for the Open Payments website, and CMS is the agency that receives claims and makes payments for prescriptions, there is no reason to doubt *or even suspect* that such evidence is unreliable for purposes of evaluating this Complaint.  In fact, the sources of this information demonstrate that it is *per se* reliable. Thus, all allegations contained herein can and should be considered by the Court.

## APPLICABLE LAW

### I.     The Federal and State Statutes Allergan Violated

#### A.     The False Claims Act (FCA)

40.     The FCA, 31 U.S.C. §§ 3729-3733, provides that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or (4) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

41.     Under the FCA, "the terms 'knowing' and 'knowingly' (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1).

42.     The FCA defines "claim" as "(A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

43.     The FCA defines the term "obligation" as an "established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

44.     The FCA also provides relief from retaliatory actions.  An employee is entitled to all relief necessary to make that employee whole if the employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the FCA or other efforts to stop one or more violations of the FCA." 31 U.S.C. § 3730(h).

**B.     The Anti-Kickback Statute (AKS)**

45.     Soon after the establishment of the Medicare system in 1965, it became apparent that unscrupulous persons and entities were abusing taxpayers funding the national healthcare system through unethical and kickback-tainted referrals.  In response, Congress enacted the federal AKS and made it a misdemeanor to provide "bribes and kickbacks" in exchange for referrals of Medicare-funded medical services.  *See* Pub. L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972).

Congress amended the AKS in 1977 to extend its reach beyond strictly "bribes and kickbacks" to "any remuneration" and elevated violation of the AKS from misdemeanor to felony status. *See* Medicare and Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977).

46.     The AKS provides that anyone who "knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person … to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or … to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, **shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both**." 42 U.S.C. § 1320a-7b(b) (emphasis added).

47.     The AKS does not specifically define "remuneration," but the word has been interpreted by the courts to mean "anything of value." *See, e.g., Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019) (analyzing whether doctors received "anything of value" in AKS case). *See also* OIG Compliance Program Guidance for Ambulance Suppliers, 68 FR 14245-02 ("Under the anti-kickback statute, 'remuneration' means virtually anything of value.").

48.     A payment violates the AKS if *one* purpose of the payment is to induce referral of items or services that may be paid for by federal health care programs. *United States v. Shah*, 981 F.3d 920, 926 (11th Cir. 2020), *citing U.S. v. Greber,* 760 F.2d 68, 69 (3rd Cir. 1985).  It is no defense to the AKS that a payment was made, in part, for services actually rendered, so long as the payor also sought to induce referrals. *Id.*

**i. The AKS Requires No Proof of any Effect on the Recipient of a Kickback.**

49. The AKS requires no proof that a kickback had any effect on the recipient. Its express terms reflect no such requirement. To illustrate, shortly after Congress enacted the Anti-Kickback Statute in 1972, to prevent kickbacks affecting the Medicare system—the Seventh Circuit issued two seminal decisions, both of which recognized this principle:

A. In *United States v. Hancock*, 604 F.2d 999 (7th Cir. 1979), the Court adopted a broad interpretation of "kickback" in that version of the AKS. It noted that kickbacks create the "*potential* for increased cost to the Medicare-Medicaid system and misapplication of federal funds." Id. at 1001 (emphasis supplied).

B. The next year, in *United States v. Ruttenberg*, 625 F.2d 173 (7th Cir. 1980), the Court also addressed the AKS. It held that "[w]hether costs were directly and immediately increased by those particular payments, however, is irrelevant. The potential for increased costs if such 'fee' agreements become an established and accepted method of business is clearly an evil with which the court was concerned and one Congress sought to avoid in enacting [the AKS]." *Id*.at 177.

50. More recently, the Seventh Circuit has repeated that the AKS protects patients from doctors whose medical judgments "might be clouded" by improper financial considerations:

> The Anti–Kickback Statute is designed to prevent Medicare and Medicaid fraud. According to the Health Resources and Services Administration, the Statute was enacted to "protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services." Health Res. & Serv. Admin., Program Assistance Letter 1995–10, *Guidance on the Federal Anti–Kickback Law, available at* http://bphc.hrsa. gov/policiesregulations/policies/pal199510.html (last visited February 2, 2015); *see also United States v. Borrasi*, 639 F.3d 774, 781 (7th Cir.2011) (explaining that AKS was "designed to help combat health care fraud"). **The Statute has another purpose as well—to protect patients from doctors whose medical judgments**

> **might be clouded by improper financial considerations**. *See* Health Res. & Serv. Admin., *supra* ("The law seeks to ... preserve freedom of choice and preserve competition.").

*United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) (emphasis added).

51.    A person need not have actual knowledge of the AKS or a specific intent to commit a violation of the AKS to be liable.  42 U.S.C. § 1320a-7b(h).  A payee's motivation for accepting kickbacks is similarly irrelevant. *United States v. Shah*, 981 F.3d 920, 926 (11th Cir. 2020).  The AKS requires *no* proof of the recipient's motivation for accepting the illegal payment, if the recipient accepts the kickback knowingly and willfully.  *Id.*

### ii.    The Two Separate and Independent Bases of FCA Liability Relating to AKS Violations.

52.    There are two separate and independent legal bases establishing Allergan's liability under the FCA, relating to Allergan's violations of the AKS.  The first has been established for decades and is based on "false certification" (express or implied) of compliance with the AKS. The second is based on the 2010 AKS amendment, which states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act.]"  42 U.S.C. § 1320a-7b(g).

### 1.    Legal Basis No. 1: The "false certification" of Compliance with the AKS is a Basis of FCA Liability.

53.    To participate in Medicare and other federal healthcare programs, certifications of compliance with all applicable laws including the AKS are made by (a) prescribing physicians (both in their Provider Agreement and Form 1500 or its electronic equivalent); (b) dispensing pharmacies; and (c) Part D Plan Sponsors.  Pharmaceutical manufacturers also execute certifications of compliance with the AKS in connection with the Medicaid Rebate program.

54.     Physicians, hospitals, and pharmacies enter into Provider Agreements with CMS to establish their eligibility to seek reimbursement from the Medicare Program. As part of those agreements, without which physicians, hospitals and pharmacies may not seek reimbursement from Federal Health Care Programs, the providers must sign certifications of compliance with the AKS, among other things.

55.     To be eligible to participate in the Medicare program and receive payment from the Medicare program, including to prescribe and have Medicare pay for prescriptions for pharmaceutical products, physicians must certify that they agree to comply with the AKS and other relevant health care laws.  Physicians make those certifications in Form CMS-855I.  Among other disclosures and certifications required, Form CMS-855I contains a "certification statement and signature" and requires the physician to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. **I understand that payment of a claim by Medicare is conditioned upon *the claim and the underlying transaction* complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).**

Form CMS-855I (emphasis added).   Form CMS-855I also requires physicians to certify the following:

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

56.     Additionally, to enroll as a prescribing physician in the Medicare Part D program, a physician or other eligible provider must certify that they agree to comply with the AKS and other relevant health care laws.  Physicians make this certification in Form CMS-855O.  Among

other disclosures and certifications required, Form CMS-855O contains a "certification statement," which requires:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 2A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).**

Form CMS 855-O (emphasis added). Form CMS 855-O also requires physicians, or other eligible individuals, to certify the following:

> I will not knowingly order and/or certify an item and/or service or prescribe Part D drugs that allows a false or fraudulent claim to be presented for payment by Medicare.

Every physician who prescribed the Linzess and Viberzi for Medicare patients alleged herein must have executed these required certifications in order to receive payment from Medicare for providing physician services to these Medicare patients.

57. In addition, each physician providing services under Medicare certifies compliance with the AKS on Form 1500 (or its electronic version):

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) <u>this claim</u>, whether submitted by me or on my behalf by my designated billing company, ***<u>complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment</u> including but not limited to the Federal anti-kickback statute*** and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary

24

individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills. (Emphasis added).

58.     When the government pays for pharmaceutical products under Medicare Part D, Part D sponsors must certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste and abuse, including, but not limited to applicable provisions of federal criminal law, the FCA, and the AKS.  42 C.F.R. § 423.505(h)(1).

59.     Pharmacies that dispense prescriptions also make certifications of compliance as well:

> Medicare Part B … required participating pharmacies (the "providers" or "suppliers") to enter into provider agreements on the Centers for Medicare and Medicaid Services ("CMS") Form 855S. These agreements contained the following certifications:
>
> > I agree to abide by the Social Security Act and *all applicable Medicare laws, regulations and program instructions* that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that *payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with* such laws, regulations, and program instructions (including, but not limited to, the *Federal anti-kickback statute* and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

*U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 41 F. Supp. 3d 323, 336 (S.D.N.Y. 2014)(emphasis added).  As that court held:

> The language in CMS Form 855S is clearly sufficient to constitute an express certification of compliance with the AKS. The certification not only states that the provider must comply with "all applicable Medicare laws, regulations and program instructions," but also explicitly mentions that the "Federal anti-kickback statute" is one of these laws. *Id.* The form also reminds providers that compliance with the AKS is "condition" of claim reimbursement under Medicare. *Id.*

60.     Further, dispensing pharmacies also make certifications of compliance with the AKS, including those described below:

CMS regulations also require that all subcontracts between Part D sponsors and pharmacies contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv). Pursuant to CMS regulations, Part D plan sponsors must agree to comply with "Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et seq.), and the *anti-kickback statute* (section 1128B(b) of the Act)." 42 C.F.R. § 423.505(h)(1) (emphasis added). Further, 42 C.F.R. § 423.505(i)(4)(iv) states: "Each and every contract must specify that the related entity, contractor, or subcontractor must comply with all applicable Federal laws, regulations, and CMS instructions."

The AKS is unquestionably one of the "applicable Federal laws" governing Medicare Part D that is cited in the contractor certification. CMS regulations specifically identify the AKS as one of the "Federal laws and regulations designed to prevent fraud, waste, and abuse" that apply to Medicare Part D. 42 C.F.R. § 423.505(h)(1). Moreover, the AKS itself states that it applies to any "Federal health care program," which includes Medicare Part D. 42 U.S.C. § 1320a–7b(f).

Accordingly, downstream entities who certify compliance "with all applicable Federal laws, regulations, and CMS instructions" certify compliance with the AKS. 42 C.F.R. § 423.505(i)(4)(iv).

*United States v. TEVA Pharms. USA, Inc.*, No. 13 CIV. 3702 (CM), 2016 WL 750720, at *6–7 (S.D.N.Y. Feb. 22, 2016)

61. Compliance with the AKS is a material requirement to receive payment from government health care programs. *See. e.g*., *United States ex rel. Nevyas v. Allergan, Inc.,* No. 2:09-cv-0043-MAK, 2015 WL 3429381, at *2 (E.D. Pa. May 26, 2015) (denying motion to dismiss Relator's FCA claim in case where Relator alleged Allergan caused to be presented claims associated with scheme to induce physicians to write prescriptions for Allergan products by providing them illegal remuneration).

62. As addressed *above*, the certifications required to enroll as a Medicare Provider and the certifications required for Medicare Part D to pay for each prescription require physicians to certify that they will not violate the AKS or other health care laws. A physician's misrepresentation that prescription drug claims submitted to federal healthcare programs comply

26

the AKS when such claims are related to illegal remuneration is material to the government's payment decision and triggers FCA liability. *See Universal Health Services, Inc. v. U.S.*, 136 S. Ct. 1989, 2003 (2016).

63.     When the government agrees to reimburse medical claims through these programs, it bargains for more than just a particular product or medical service. These claims must also be medically necessary and appropriate, and the government relies on providers' professional judgment to inform this analysis. When a kickback calls into question that judgment, the government does not get the benefit of its bargain.

64.     Defendants knew or should have known that these programs required physicians and pharmacies to certify compliance with federal laws, such as the Anti-Kickback Statute.

65.     Thus, claims that are related to a kickback scheme are *per se* false because the Anti-Kickback Statute prohibits the government from paying for such services or pharmaceuticals. No further express or implied false statement is required to render such infected claims false, and none can wash the claim clean.

66.     Moreover, as a prerequisite to participating in the various state Medicaid programs, providers must certify (expressly or, through their participation in the state-funded health care program, impliedly) their understanding of and compliance with both the federal Anti-Kickback Statute and applicable state anti-kickback laws.

67.     Even in the absence of an express certification of Compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment, i.e., that it is properly payable.

68.     Moreover, all claims for payment for the Linzess and Viberzi prescriptions written at least while the prescribing doctors were receiving kickbacks from Allergan were false claims

27

under the FCA. Each claim (a) "made specific representations about the goods or services provided"—that is, that the prescribing doctor had prescribed Linzess or Viberzi in a specified quantity for that Medicare patient—but (b) "fail[ed] to disclose noncompliance with material statutory, regulatory, or contractual requirements [that] makes those representations misleading half-truths"—that is, that the doctor was receiving kickbacks from Allergan. *Universal Health Servs., Inc.,* 579 U.S. at 190. Consequently, if a party pays a kickback to induce the prescribing of a particular drug, it renders false the submitter's implied or express certification of compliance that the resulting claim complies with the requirements of the Anti-kickback Statute.

> **2.     Legal Basis 2: Under The 2010 Amendments, When AKS Violations Result in a Claim Being False, the Claims are Deemed to be False and Fraudulent Claims and thus Violations of the FCA.**

69.     Since the 2010 amendments, the AKS expressly provides that "**a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]**." 42 U.S.C. §1320a-7b(g) (emphasis added).

70.     As one court has observed:

> The legislative history of Section 1320a–7b(g) makes it completely clear that Congress only intended that provision to correct *Thomas's* strict interpretation of the false certification theory. The *Thomas* court had, in effect, allowed the submission of a kickback-tainted claim by an innocent party to "launder[ ][it] into a 'clean' claim." *335 Id.* By enacting Section 1320a–7b(g), Congress made clear that the fact that the **certifications were made by an innocent party submitting a claim without knowledge of an AKS violation did not remove the taint of falsity from the certifications**; any claim connected in any way to an AKS violation was ineligible for reimbursement, even if the party that submitted the claim had no knowledge of the AKS violation.
>
> The new provision did nothing to alter the false certification theory of claim "falsity" articulated in *Mikes* and its progeny. Since the enactment of the PPACA, courts have continued to employ this framework in FCA cases predicated on AKS violations. *See U.S. ex rel. Williams v. Health Management Assocs., Inc.,* No. 09 Civ. 130, 2014 WL 2866250, at *16–18 (M.D.Ga. June 24, 2014); *U.S. ex rel. Ruscher v. Omnicare, Inc.,* No. 08 Civ. 3396, 2014 WL 2618158, at *7 (S.D.Tex.

June 12, 2014); *Parikh,* 977 F.Supp.2d at 663–64; *Osheroff,* 2013 WL 1289260, at *3–7; *U.S. ex rel. Yarberry v. Sears Holdings Corp.,* No. 09 Civ. 588, 2013 WL 1287058, at *3 (S.D.Ill. Mar. 28, 2013).

*U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 41 F. Supp. 3d 323, 334–35 (S.D.N.Y. 2014) (discussing *United States ex rel. Thomas v. Bailey,* No. 06 Civ. 465, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008)(emphasis added)).

71.     As described more fully below, Allergan paid kickbacks to doctors in the form of disguised "speaker fees." While those doctors were actively accepting kickbacks from Allergan, they were also writing prescriptions for Allergan drugs. In many cases, doctors who began accepting payments greatly increased their prescription of Allergan drugs. And across the board, doctors who accepted payments from Allergan prescribed more Allergan drugs than those who had not accepted payments.

72.     All claims paid by Medicare for prescriptions written by Allergan "speakers" while those "speakers" were actively accepting kickbacks from Allergan are connected to the kickbacks and are thus false claims.

C.     **The State False Claims Acts**

73.     Upon witnessing the effectiveness of the federal FCA in combatting fraud against government programs and health care fraud specifically, many states have enacted state laws like the federal FCA.

74.     Relators allege violations of the FCAs of a number of states in this Complaint, including the plaintiff states of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North

Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Wisconsin, Washington, and the District of Columbia.

75.     Claims associated with illegal remuneration may not be paid under state regulatory regimes.  For instance, in the State of Georgia, it is unlawful to obtain or attempt to obtain benefits paid for by the Georgia Medicaid program by knowingly and willfully making a false statement or false representation; deliberate concealment of any material fact; or fraudulent scheme or device.  O.C.G.A. § 49-4-146.1(b). The State FCAs recognize both legal bases of FCA liability alleged here.

76.     Further, the Georgia State False Medicaid Claims Act imposes liability on any person who: (1) knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid. O.C.G.A. § 49-4-168(a).

**D.      The California and Illinois Insurance Fraud Prevention Acts**

77.     The states of California and Illinois also have enacted Insurance Fraud Prevention Acts that permit relators to bring a *qui tam* action to recover fraudulent claims submitted to private insurance companies in those states.  Allergan's offer and provision of illegal remuneration to induce prescriptions of its drugs have caused the submission of false claims to private insurance companies in California and Illinois.

78.     California state law prohibits providing kickbacks to physicians and medical care providers.  Specifically, California Business and Professional Code § 650(a) prohibits: "[T]he offer, delivery, receipt or acceptance by any person licensed under this division or the Chiropractic

Initiative Act of any rebate, refund, commission, preference, patronage, dividend or discount, or other consideration, whether in the form of money or otherwise as compensation or inducement for referring patients, clients or customers to any person."   California Penal Code § 549 makes it illegal for a firm or corporation to "solicit, accept, or refer any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether" that individual or entity will present or cause to be presented any false or fraudulent claim for payment of a health care benefit.

79.     California Insurance Code § 1871.7(b) provides for civil recoveries against persons who violate the provision of Penal Code sections 549.

80.     The Illinois Insurance Claims Fraud Prevention Act, §5(b) provides that a person who violates any provision of the Act or Article 46 of the "Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance."  740 Ill. Comp. Stat. § 92/5(b). Illinois Criminal Code, Article 46, provides criminal penalties for any person who commits the offense of insurance fraud.  720 Ill. Com. Stat. § 5/46-1(a).

81.     The Illinois Insurance Claims Fraud Prevention Act § 15(a) provides for a *qui tam* action to create incentives for private individuals to prosecute fraud violations.  740 Ill. Comp. Stat. § 92/15(a).

II. **The Federal and State Health Insurance Programs, Regulatory Frameworks, and Material Conditions of Payment That Defendant Violated**

    A. **The Medicare Program**

82.    Medicare is a federal healthcare program that provides federally subsidized health insurance for eligible citizens—primarily persons who are 65 or older and the disabled. 42 U.S.C. §§ 1395, *et seq.*

83.    The Medicare Program is segmented into four parts. Medicare Part D was enacted as part of the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare beneficiaries. All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. HHS through its sub-agency Centers for Medicare and Medicaid Services (CMS), contracts with private companies (or sponsors) authorized to sell Part D insurance coverage. Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

84.    As described above, to be eligible to participate in the Medicare program and receive payment from the Medicare program, including to prescribe and have Medicare pay for prescriptions for pharmaceutical products, physicians must certify that they agree to comply with the AKS and other relevant health care laws. Physicians make those certifications in Form CMS-855I.

85.    As described above, to enroll as a prescribing physician in the Medicare Part D program, a physician or other eligible provider must certify that they agree to comply with the AKS and other relevant health care laws. Physicians make this certification in Form CMS-855O.

### B. The Medicaid Program

86.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  The FMAP is at least 50 percent and is as high as 83 percent.

87.     In all states, the Medicaid program pays for prescription drugs.  Most states award contracts to private companies to administer the state's Medicaid program and process claims for payment on behalf of Medicaid beneficiaries.  Typically, after processing the claims, these private companies generate funding requests to the state Medicaid programs.  Before the beginning of each calendar quarter, each state submits to CMS Form CMS-37 (Medicaid Program Report; Quarterly Distribution of Funding Requirements), which provides an estimate of its Medicaid federal funding according to the FMAP and expected Medicaid spending.  42 C.F.R. § 430.30.  Similarly, after each calendar quarter and in order to receive federal Medicaid funds, each state submits Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which provides an accounting of the state's actual recorded expenditures.  *Id.*

88.     Using this information, CMS then determines the amount of federal funding each state will be provided for the ensuing quarter and issues a grant to the state for that amount.  42 C.F.R. § 430.30.  Each state is then authorized to draw funds from the federal grant to pay for Medicaid expenditures, including prescription drugs.

89.     States require certifications by physicians as a condition of providing Medicaid reimbursement for prescription drugs paid for by the Medicaid program.  These certifications include compliance with the AKS, among other federal laws.  To participate in the Medicaid

33

program, a physician must also sign an agreement with the state that certifies compliance with the state and federal Medicaid requirements, including the AKS.

90.     For example, to enroll as a provider under the Georgia Medicaid Program and receive funds from the Georgia Medicaid program, physicians must agree to "abide by all federal and state laws governing the Medicaid program."[22]   Accordingly, when physicians in Georgia prescribe Allergan drugs associated with kickbacks, the existence of such kickbacks are a "material fact" that must be disclosed to the state.  A physician's failure to disclose such a kickback is a false statement and any resulting payment from the state is a false claim. O.C.G.A. § 49-4-146.1(b). Submitting such claims to the Georgia Medicaid Program is a violation of the Georgia State False Medicaid Claims Act.  O.C.G.A. § 49-4-168(a).

**C.     Other Federal Health Programs**

91.     TRICARE is a managed health program established by the Department of Defense and provides health care benefits to eligible beneficiaries, which include active duty service members, retired service members, and their families. TRICARE provides prescription drug benefits to its beneficiaries. TRICARE requires physicians to certify compliance with the AKS, among other federal health care laws.

92.     The Federal Employee Health Benefits Program ("FEHBP") is a federally funded health care program established by Congress in 1959, pursuant to the Federal Employees Health Benefits Act.  5 U.S.C. §§ 8901, *et seq*.  The Office of Personnel Management ("OPM") administers the FEHBP program and contracts with various health insurance carriers to provide

---

[22] *See* GA DEPT OF COMMUNITY HEALTH DIVISION OF MEDICAL ASSISTANCE Provider Enrollment Application Instructions; available at https://www.gahsc.org/nm/pp/2006/ccs/Medicaid%20Provider%20Enrollment%20Appl.pdf.

services to FEHBP members. *Id*. at §§ 8902, 8909(a). The funds used to pay for health care for FEHBP members are maintained in the Employees Benefit Treasury funds and are the source of all payments to the insurance carriers for health care rendered to FEHBP members—including payment for prescription drugs. *Id*. at § 8909.

93.     The U.S. Department of Veterans Affairs (VA) maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are purchased directly or indirectly by the VA and dispensed to VA beneficiaries. The VA also supports a mail service prescription program as part of the outpatient drug benefit. The system serves millions of veterans.

## III.    HHS-OIG Has Long Issued Warnings That Speaker Programs Have Inherent Fraud Risks

94.     For years, HHS-OIG has warned doctors and pharmaceutical companies about the inherent fraud risks associated with drug and device companies providing anything of value to healthcare providers in a position to make or influence referrals to those companies' products.

95.     As far back as 2000, HHS-OIG has told physicians that payment "arrangements with … pharmaceutical manufacturers and vendors are areas of potential concern," when it comes to conduct violating the AKS, and should always be reviewed by legal counsel familiar with the AKS. Particular areas of concerns also included any "financial arrangement with outside entities to whom the practice may refer Federal health care program business."[23]

96.     In its 2003 OIG Compliance Program Guidance for Pharmaceutical Manufacturers, HHS-OIG again identified manufacturer compensation relationships with physicians connected to marketing and sales activities, including speaking activities, as an area of risk under the AKS.

---

[23] OIG Compliance Program for Individual and Small Group Physician Practices, 65 Fed. Reg. 59434 (Oct. 5, 2000), available at https://oig.hhs.gov/authorities/docs/physician.pdf.

HHS-OIG noted that when a drug or device company engages in "entertainment, recreation, travel, meals or other benefits in association with information or marketing presentations," such arrangements may potentially implicate the anti-kickback statute.[24]

97.    Similarly in 2010, OIG warned physicians that a speaking arrangement with a drug company could be an improper inducement "to prescribe or use [company] products on the basis of . . . loyalty to the company or to get more money from the company, rather than because it is the best treatment for the patient."[25]  HHS-OIG specifically advised physicians to avoid any such arrangement with a pharmaceutical company if part of the basis for the physician's compensation is his or her "ability to prescribe a drug."  Such arrangements, per HHS-OIG "could violate fraud and abuse laws."[26]

98.    HHS-OIG also issues "fraud alerts" to identify fraudulent and abusive practices within the health care industry as well as address specific trends of health care fraud and certain practices of an industry-wide character.[27]  These special fraud alerts are published in the Federal Register, on HHS' website, and "extensive[ly] distributed directly to the health care provider community."[28]

99.    On November 16, 2020, HHS-OIG issued Special Fraud Alert: Speaker Programs ("Special Fraud Alert") which reminded drug manufacturers and others of the OIG's numerous prior notifications warning physicians and manufacturers that payment of remuneration –

---

[24] OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003), available at https://oig.hhs.gov/authorities/docs/03/050503FRCPGPharmac.pdf.
[25] A Roadmap for New Physicians, Avoiding Medicare and Medicaid Fraud and Abuse, HHS-OIG,  22  (Nov.  2010),  available  at  https://oig.hhs.gov/compliance/physician-education/roadmap_web_version.pdf.
[26] *Id.* at 23.
[27] Federal Register Volume 59, Issue 242 (December 19, 1994).
[28] *Id.*

including speaker fees- to induce physicians to prescribe the manufacturer's drug violates the AKS.[29]  This Special Fraud Alert highlighted "the fraud and abuse risks associated with offer, payment, solicitation or receipt of remuneration relating to speaker programs by pharmaceutical and medical device companies."[30]  Allergan's "speaker" programs described herein are precisely the type of speaker programs addressed and identified as "inherent fraud risks" in the Special Fraud Alert.[31]

100.    HHS-OIG stated in its 2020 Special Fraud Alert that it, and the DOJ, had "investigated and resolved numerous fraud cases involving allegations that remuneration offered and paid in connection with speaker programs violated the anti-kickback statute."  HHS-OIG further noted that it "has long expressed concerns over the practice of drug and device companies providing anything of value to HCPs in a position to make or influence referrals to such companies' products."[32]

101.    Generally, the speaker programs that caused HHS-OIG to issue the Special Fraud Alert are company-sponsored events like those described herein at which a pharmaceutical or device company pays a physician or other HCP to make a speech or presentation to other HCPs about a drug or device sold by the company.[33]  From 2017 to 2020, drug and device companies reported paying nearly **$2 billion** to HCPs for speaker-related services.[34]

---

[29] Special Fraud Alert: Speaker Programs.  Department of Health and Human Services, Office of Inspector General. (Nov. 16, 2020) available at:
https://oig.hhs.gov/fraud/docs/alertsandbulletins/2020/SpecialFraudAlertSpeakerPrograms.pdf.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

102.     HHS-OIG's position is that **any** payment to HCPs for speaker events is inherently suspect.  Although drug companies claim that "HCPs 'participate in company-sponsored speaker programs in order to help educate and inform other health care professionals about the benefits, risks and appropriate uses of company medicines,'" HHS-OIG has made it clear that "OIG is skeptical about the educational value of such programs."[35]

103.     Speaker programs, precisely like those funded by Allergan and alleged herein, "strongly suggest that one purpose of the remuneration to the HCP speaker and attendees is to induce or reward referrals."  As demonstrated in Relators' personal observations and allegations detailed herein, "studies have shown that HCPs who receive remuneration from a company are more likely to prescribe or order that company's products."[36]  "This remuneration to HCPs may skew their clinical decision making in favor of their own and the company's financial interests, rather than the patient's best interests."[37]

104.     HHS-OIG issued the Special Fraud Alert to highlight "some of the inherent fraud and abuse risks associated with the offer, payment, solicitation, or receipt of remuneration related to company-sponsored speaker programs."[38]  These inherent risks are exemplified in specific characteristics of speaker programs that HHS-OIG has determined violate the FCA and AKS. These characteristics include when drug and device companies:

---

[35] *Id.*

[36] *Id.* citing Amarnath Annapureddy et al., *Association Between Industry Payments to Physicians and Device Selection in ICD Implantation*, 324 JAMA 17, 2020, at 1759, 1762–63; William Fleischman et al., *Association between payments from manufacturers of pharmaceuticals to physicians and regional prescribing: cross sectional ecological study,* 354 BMJ i4189, 2016, at 1, 4–7; James P. Orlowski & Leon Wateska, *The effects of pharmaceutical firm enticements on physician prescribing patterns. There's no such thing as a free lunch*, 102 CHEST, 1992, 270.

[37] *Id.*

[38] *Id.*

- selected high-prescribing HCPs to be speakers and rewarded them with lucrative speaker deals (*e.g.*, some HCPs received hundreds of thousands of dollars for speaking);
- conditioned speaker remuneration on sales targets (e.g., required speaker HCPs to write a minimum number of prescriptions in order to receive the speaker honoraria);
- held programs at high-end restaurants where expensive meals and alcohol were served.[39]

105.    HHS-OIG also provided additional characteristics that indicate a speaker program arrangement could violate the AKS, including:

- The company sponsors speaker programs where little or no substantive information is actually presented—this characteristic is present in Allergan's GI speaker scheme
- Alcohol is available or a meal exceeding modest value is provided to the attendees of the program (the concern is heightened when the alcohol is free)—this characteristic is present in Allergan's GI speaker scheme;
- The program is held at a location not conducive to the exchange of educational information (*e.g.*, restaurants or entertainment or sports venues)—this characteristic is present in Allergan's GI speaker scheme;
- The company sponsors a large number of programs on the same or substantially the same topic or product, especially in situations involving recent substantive change in relevant information—this characteristic is present in Allergan's GI speaker scheme;
- Attendees include individuals who don't have a legitimate business reason to attend the program, including, for example friends, significant others, or family members of the speaker or HCP attendees; employees or medical professional who are members of the speaker's own medical practice; staff of facilities for which the speaker is a medical director; and other individuals with no use for the information—this characteristic is present in Allergan's GI speaker scheme;
- The company's sales or marketing business units influence the selection of speakers or the company selects HCP speakers based on past or expected revenue that the speakers or attendees have or will generate by prescribing or ordering the company's products (e.g., a return on investment analysis is considered in identifying participants)—this characteristic is present in Allergan's GI speaker scheme; and
  The company pays HCP speakers more than fair market value for the speaking service or pays compensation that takes into account the volume or value of past business generated or potential—this characteristic is present in Allergan's GI speaker scheme.

---

[39] *Id.*

106.    While HHS-OIG issued the Special Fraud alert after DOJ issued its CIDs in this matter, which effectively curtailed Allergan's GI speaker program, Allergan has knowledge through its numerous prior speaker program settlements and federal guidance issued before the Special Fraud alert, that the speaker program characteristics identified in the Special Fraud Alert implicate AKS and FCA liability and demonstrate an intent to induce physicians to write, and continue to write, prescriptions for drugs such as Linzess and Viberzi, by paying the physicians speaker fees.

## THE ALLERGAN GASTROINTESTINAL DRUGS AT ISSUE

I.    **Linzess**

107.    Linzess (linaclotide) is a daily prescription medication used to treat two chronic constipation disorders: irritable bowel syndrome with constipation (IBS-C) and chronic idiopathic[40] constipation (CIC).

108.    Ironwood Pharmaceuticals, Inc. and Forest Laboratories, Inc. launched Linzess in the U.S. markets on December 17, 2012, as a "guanylate cyclase-C (GC-C) agonist" – a drug that increases intestinal fluid secretion to help soften stools and stimulate bowel movements.

109.    In July 2014, Actavis, Inc. acquired Forest Laboratories, Inc.  In March 2015, Allergan acquired Actavis, Inc. and continued to aggressively marketing Linzess, including through paid speaker events.

110.    Linzess is similar to and in fact competes with non-prescription "over-the-counter" (OTC) constipation medications such as Miralax.  Many Medicare Part D plans and state Medicaid prescription drug plans require patients to try Miralax first as a preliminary "step therapy" to try to remedy the patient's constipation issues before covering the expensive cost of Linzess.

---

[40] "Idiopathic" means a condition for which the cause is unknown.

111.     In 2016, the average cost for a 30-day prescription of Linzess under Medicare Part D plans was $320.36.  In 2017, the average cost for a 30-day prescription of Linzess under Medicare Part D plans was $352.64 or over $11 per day.  Miralax—Linzess' OTC competitor—costs $18.99 for a 30-day supply of once-daily doses or less than 64 cents per day.

## II.     Viberzi

112.     Viberzi is an opioid-based Schedule IV controlled substance under the Controlled Substances Act that is used to treat patients with Irritable Bowel Syndrome with Diarrhea (IBS-D).  The active ingredient in Viberzi is an opiate called eluxadoline.

113.     Allergan acquired eluxadoline from Furiex Pharmaceuticals for over $1 billion in July 2014.  Allergan believed that it would recoup this investment by extending Allergan's current gastrointestinal (GI) business through the aggressive marketing and sale of eluxadoline as the brand name Viberzi.

114.     The FDA approved Viberzi on May 27, 2015, as an opioid for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

115.     Viberzi was launched, and became available for sale, in the United States on December 14, 2015.

116.     Viberzi is an extremely expensive medication.  In 2016, Medicare Part D plans paid an average of $889.21 for a 30-day prescription of Viberzi.  In 2017, Medicare Part D plans paid an average of $1004.79 for a 30-day prescription of Viberzi, or $33 per day.

117.     Imodium (active ingredient Loperamide HCL) is a non-prescription, OTC competitor to Viberzi that also treats IBS-D.   A 30-count package of Imodium costs roughly $12.50, or 41 cents per day.

118.    A primary component of Allergan's Viberzi sales strategy was to dramatically increase "speaker" program spending surrounding the launch of Viberzi. Through its increase in "speaker" spending, Allergan added hundreds of "speaker-physicians" to its payroll to drive growth and increase prescriptions of its new product as well as its related existing product, Linzess.

119.    Due to Viberzi's extreme cost and unproven effectiveness, Allergan knew, and specifically informed its sales representatives such as Relator Wilkerson, that securing "speaker-physicians" willing to prescribe Viberzi in exchange for "speaker" payments would be necessary to create the rapid growth required to meet Allergan's Viberzi sales goals while helping to increase sales of the related exiting drug, Linzess.

120.    Viberzi, however, is not a drug to be taken lightly.  It can cause harmful side effects and is contraindicated for many people.

121.    For example, patients who don't have gallbladders—who often experience IBS-D symptoms and therefore were a large target market for Viberzi— have an increased risk of serious pancreatitis that can lead to hospitalization or death if they take Viberzi.  On March 15, 2017, the U.S. Food and Drug Administration (FDA) issued a warning that Viberzi should not be prescribed to patients who do not have a gall bladder because these patients have an increased risk of developing pancreatitis.  As of February 2017, the FDA had received 120 reports through the FDA Adverse Event Reporting System of serious cases of pancreatitis or death due to patients taking Viberzi.  Seventy-six of these patients were hospitalized, and two patients died.

122.    Viberzi endangers other patients as well.  Patients who drink more than three alcoholic beverages per day —a much larger group than patients without gallbladders—also have increased risk of pancreatitis when taking Viberzi, which could result in severe illness or death.

Those patients also are not readily identifiable because alcohol consumption can vary, and doctors rely on self-reporting by the patient to determine the amount of alcohol consumed every day.

123.    In addition, because Viberzi is an opioid that affects the central nervous system creating a "high," Viberzi also has potential for dangerous recreational use and abuse.

124.    The opioid epidemic has taken a devastating toll on Americans, and the path of addiction and death directly track prescription opioid prescribing levels.  From 2000 to 2015, more than half a million Americans died from drug overdoses, and, in December 2016, opioid overdoses were killing Americans at a rate of 91 deaths per day.

125.    Other drugs with similar chemical properties to eluxadoline include pentazocine, which is a known addictive opioid abused by opioid addicts and has been known colloquially for decades as "poor man's heroin."

126.    In human abuse studies, Viberzi produced a high rate of euphoria and exhibited similar "drug liking" responses to pentazocine.  Roughly half the subjects in one study reported a pleasurable feeling or getting "high" from taking eluxadoline.

127.    Despite Viberzi's dangers, Allergan management – including District Manager Alan Foust and Allergan Regional Manager James Martin (Foust's supervisor) – instructed sales staff, including Relators, to minimize, downplay, or deliberately fail to disclose to physicians Viberzi's dangerous contraindications, its addictive opioid properties, and its status as a Scheduled Drug under the Controlled Substances Act.  As described more fully below, Relator Jackson raised numerous concerns about Allergan's marketing instructions because he believed the deceptive messages constituted "off-label" marketing, which involves seeking promoting drugs for purposes that have not been approved by the FDA and can implicate FCA liability.  *See United States v. King-Vassel*, 728 F.3d 707, 709-710 (7th Cir. 2013). Relator Jackson was also concerned that

Allergan was pushing doctors to prescribe Viberzi for patients who did not suffer from IBS-D but who simply had occasional diarrhea, which he viewed as illegal "off label" marketing. As alleged herein, Allergan fired Relator Jackson for raising these concerns and seeking to prevent the submission of false claims.

## ALLERGAN'S FRAUDULENT SCHEME

128. In connection with the launch of Viberzi at the end of 2015, Allergan devised a scheme to use speakers programs, and services and other illegal remuneration to doctors and their medical practices, to boost the sales of both Viberzi and Linzess. Allergan recruited an army of highly paid specialist speakers to sell Viberzi and Linzess to other HCPs at Allergan funded events.

129. The purpose and intent of Allergan's speaker program, known as the "Speaker Bureau," was to give physicians cash, food, alcohol, travel expenses, and other illegal remuneration to induce them to prescribe Allergan drugs, and to cause other physicians to prescribe those drugs. For instance:

- Allergan encouraged its sales personnel to select and highly compensate speaker-physicians based on the expectation that the speaker-physicians would increase their volume of prescriptions of Allergan's drugs.

- Allergan carefully monitored speaker-physicians' prescriptions of Allergan drugs and rewarded high-prescribing physicians with additional speaker events (and thus additional cash) and punished low-prescribing physicians by limiting their speaker events or removing them from the Speaker Bureau altogether.

- At many Allergan speaker events the speaker-physician did not present any educational materials but simply engaged in small-talk with attendees; yet Allergan still paid the speaker-physician handsomely with the sole goal of inducing the speaker-physician to write prescriptions.

- Many Allergan speaker events were held at fine dining restaurants not conducive to the exchange of education information. At these events, Allergan spent thousands of dollars on food and alcohol for speakers and attendees (who were often not even HCPs), and Allergan routinely spent more on food and alcohol than its internal per-person cost limitations.

- Allergan knew that many of its speaker-events were complete shams, where no actual attendees showed up for an educational presentation. Instead, only the speaker-physician and Allergan sales representatives were present; yet Allergan still paid the speaker-physician handsomely, with the sole intent to induce the speaker-physician to write prescriptions.

- Allergan paid physicians speaker fees for events that were cancelled in advance, which contrary to pharmaceutical industry standards.

- Even those speaker events where the required number of attendees were present were conducted, at least in part, to induce prescriptions of Allergan drugs by the speakers and the HCP attendees.

- At least one purpose, if not the primary purpose, of all speaker payments and related remuneration for food, drink, travel and entertainment was to induce speakers and attending physicians to increase their prescriptions of Linzess and Viberzi.

130. Allergan implemented its speaker scheme nationwide, and thus paid kickback payments to doctors across the country.

131. As a result of Allergan's nationwide fraudulent speaker scheme, the federal and state governments have paid thousands of false claims resulting in millions of dollars of losses to the state and federal taxpayers.

## I. Allergan's Sales Strategy, Sales Personnel Compensation, and Speaker Program Background

132. Pursuant to Allergan's sales and marketing plan, Allergan sought to increase prescriptions for Linzess and Viberzi by any means necessary. Allergan recognized that the use of financial incentives was the most effective method to increase prescriptions. Allergan's tactics included highly rewarding its sales force based on the volume of prescriptions they generated.

133. Allergan sales representatives' employment is strictly conditioned on meeting Allergan's aggressive prescription quotas. If a sales representative does not meet Allergan's aggressive quotas, Allergan fires them.

134.    Allergan sales employee compensation, and bonuses, are based on prescription volume and not patient need.  For example, when Allergan launched Viberzi in December 2015, Allergan incentivized its sales representatives to push prescriptions of the high-priority drug by paying each representative a $107 bonus for every Viberzi prescription written in that sales representative's territory.

135.    Further, if a sales representative exceeded their sales quota throughout the year, they were selected to the "President's Club" and received an all-expenses vacation and thousands of dollars in stock options.  For instance, in 2014, Relator Wilkerson was selected to the "President's Club" and received an all-expenses paid trip to Hawaii for two and $25,000 in Allergan stock.

136.    Each Allergan sales representative was assigned a territory, or "call list," that included physicians within the sales representative's geographic area, with instructions to "call on" and persuade the physician, or their physicians' staff, to prescribe more of Allergan's drugs.

137.    To gain access to each physician, Allergan sales representatives typically are instructed to bring food, coffee, or other gifts to the physician and their staff.   Allergan ranked each physician on a scale of 1 to 10 based on the physician's prescribing pattern and expected revenue.  A physician who was a high prescriber of Allergan drugs or who Allergan believed could be induced to prescribe more Allergan's drugs was ranked highly, likely at a "10" priority level. Allergan representatives visited such physicians' offices more often and provided them more snacks, food, and other gifts.

138.    Allergan's sales volume-based commissions and its push to sell Viberzi by any means necessary resulted in extreme high-pressure sales tactics, which were part of its fraudulent kickback scheme.  Prior to the launch of Viberzi, Allergan instructed its sales staff to visit GI

specialists in their territory and request patient lists and patient records containing personally identifiable information related to patients who had been diagnosed with IBS-D, so that Allergan could identify and then try to convince the physicians that these specific patients should be prescribed Viberzi. Allergan gave its sales representatives this directive at a nationwide conference in Orlando, Florida in October 2016. Many Allergan sales representatives complied with this instruction and were very aggressive about soliciting HIPAA-protected patient lists and patient documentation, leading to a high volume of prescriptions when Viberzi was launched in December 2016.

139. To further its kickback scheme, Allergan also arranged for its sales representative to be alerted through real-time prescription data whenever a physician wrote a prescription for Viberzi. When that occurred, Allergan instructed the sales representative to immediately drive to the pharmacy where the prescription was to be filled to ensure that all prior authorizations, payment coupons, or free vouchers were used. This practice called "chasing scripts" was mandated by Allergan management and resulted in the improper disclosure of patient protected health information to pharmaceutical sales representatives. Allergan's "chasing scripts" in this fashion was part of the Allergan's kickback scheme described herein. These illegal tactics demonstrate Allergan's desperation to market Viberzi and Linzess and explain Allergan's motive for paying health care professionals kickbacks to induce referrals.

## II. Allergan Dramatically Increased Its Speaker Spending to Induce Prescriptions of Viberzi and Linzess

140. Leading up to the launch of Viberzi in December 2015, Allergan developed a sales and marketing strategy to co-promote Linzess and Viberzi. Central to the Linzess/Viberzi promotion strategy was a massive increase in Allergan's "Speaker Bureau."

141.    Allergan instructed its national and regional management to recruit hundreds of new speaker-physicians who would be paid thousands of dollars each to promote Linzess and Viberzi on behalf of Allergan.  As told to Relator Wilkerson by Allergan regional management, including Alan Foust, speaker-physicians should be selected specifically on the basis that Allergan's sales personnel believed those physicians would write prescriptions for Viberzi and Linzess as a result of becoming paid speaker-physicians.

142.    In 2015, Allergan paid for 639 GI speaker events.  480 of these events promoted Linzess.   159 co-promoted Viberzi and Linzess in December 2015 alone.  For these 2015 events, Allergan paid $991,550 to physicians who had been targeted as prescribers of Viberzi and Linzess.

143.    In 2016, Allergan paid for 4,435 GI speaker events—all co-promoting Viberzi and Linzess.  For these events, Allergan paid $7,078,000 in direct payments to physicians to induce prescriptions of Viberzi and Linzess.  The average payment to physicians in 2016 for little more than showing up to an all-expense-paid dinner party or physician's office was $1,595.

144.    In 2017 Allergan paid for 3,083 speaker events—all co-promoting Viberzi and Linzess.   Allergan paid $5,035,820 to speaker-physicians in 2017.   T average payment to physicians in 2017 for little more than showing up to an all-expense-paid dinner party or physician's office was $1,633.

145.    Although to Relators' knowledge is that Allergan decreased its speaker spending after 2017, it still maintained its "Speaker Bureau" and paid "speaker fees" to induce physicians to prescribe Viberzi and Linzess through 2020, with payments made at least up to 12/22/20. Allergan continued to pay proven high prescribers well and to drop low prescribers of the program.

### III. Allergan Selected and Paid Speaker-Physicians Based on Allergan's Revenue from Speaker-Physicians' Prescriptions

146. Allergan allowed its sales managers and sales representatives to select physicians from each territory who would be included in the Speaker-Bureau and Allergan management directed the Relators to comply with this inducement oriented selection process. Allergan sales managers' and sales representatives' compensation is volume based and increases when the number of prescriptions increases. The sales managers and sales representatives are highly motivated to select physicians for the Speaker Bureau whom they believe will increase prescriptions when paid thousands of dollars by Allergan for speaker events.

147. Allergan also instructed its employees, including the Relators, to select physicians they believe could be induced by speaker payments to increase their prescriptions of Viberzi or Linzess. Allergan communicated this corporate policy to Relator Jeffrey Wilkerson by its District Manager Alan Foust and Regional Manager James (Jimmy) Martin.

148. Allergan also considered whether a target physician had a patient population that was primarily insured by government health care programs such as Medicare, so that taxpayer-funded healthcare programs would cover much of the expensive price-tag for Allergan's brand-name drugs. For example, the Relators were instructed to assist physicians' offices and pharmacies as necessary in securing Medicare and other government funded reimbursement for Linzess and Viberzi.

149. Each year, typically around September, employees at Allergan's U.S. headquarters – often Amy Hache (a member of Allergan's Viberzi and Linzess marketing team) – contacted the Regional Managers in each Allergan sales region to inquire about physicians who can be added or removed from the Speaker Bureau based upon propensity for prescribing Viberzi and Linzess. In turn, Regional Managers contacted District Managers who oversee Allergan sales representatives

49

to learn which physicians will be most profitable to add or remove from the Speaker Bureau. The Relators learned this information through direct interface and communications with and observations of their District and Regional Sales Managers as well as headquarters personnel such as Amy Hache.

150.    Specifically, Relators have knowledge that, in or around September 2015, District Sales Manager Jimmy Martin contacted Regional Sales Manager Alan Foust about recommendations for the addition of numerous physicians to the Speaker Bureau.  Foust and Allergan sales representatives strategically assessed which physicians within their District would be the best "Return on Investment" in terms of payment of speaker fees in exchange for prescriptions.

151.    Relator Wilkerson was personally involved in these discussions and has personal knowledge that Allergan—through Mr. Martin and Mr. Foust—instructed sales representatives to select physicians for the Speaker Bureau based on projected revenue increases from prospective speaker-physicians, particularly whether the prospective speaker-physicians were amenable to Allergan's arrangement of paying speaker fees in exchange for prescriptions.

152.    For example, upon considering solely revenue-focused factors, the District Sales Team led by Mr. Foust selected Dr. Paul Bierman, a Memphis, TN gastroenterologist as a speaker-physician in 2016.  Mr. Foust informed Relator Wilkerson that Dr. Bierman would be a good speaker-candidate going into 2016 because Viberzi was just being launched and the Memphis area would need a high-prescriber who could be guaranteed to produce a high volume of Viberzi prescriptions.

153.    Allergan's corporate policies were designed to select speaker-physicians based on those speaker's prescription volume.  Allergan gave sales employees—paid through incentive-

based compensation—the ability to over-ride Allergan's corporate suggestions to remove speaker-physicians from the Speaker Bureau. Each year, prior to the final selection of speaker-physicians, Allergan sent all Regional Managers a list of speaker-physicians slated to be removed from the Speaker Bureau. This process was specifically designed to allow Allergan sales employees to retain, and keep paying, speakers who were high prescribers or who were otherwise agreeable to Allergan's paying speaker fees in exchange for prescriptions.

154.    For example, on or around December 12, 2017, Allergan Senior Manager Itiel Katz sent an email to all Allergan Regional Managers providing a list of GI Speakers whom Allergan had scheduled to be removed from the Speaker Bureau. Regional Manager Jimmy Martin then forwarded this email and list to District Manager Alan Foust to highlight one speaker in Mr. Foust's territory who was scheduled to be removed from the Speaker Bureau and seek Mr. Foust's opinion of removing this speaker.

155.    Mr. Foust openly communicated to sales representatives in his territory that Allergan speaker payments must be contingent on the Speaker-Physician writing prescriptions. Accordingly, because the speaker was not prescribing at Foust's desired levels, he and Allergan sales representative Stephen Pointer suggested the specific speaker for removal. Because of this discussion between two sales employees, Mr. Foust instructed Mr. Martin and Allergan to terminate the speaker from the Speaker Bureau.

156.    The same pattern of terminating underperforming speakers is also evident in nationwide data provided by Allergan. In 2016 and 2017, Allergan paid 763 separate speaker-physicians as part of the GI Speaker Bureau.

51

157.    Medicare Part D data demonstrates that speaker-physicians' prescription of Linzess correlates directly with Allergan's payment of speaker fees.  In other words, the more Allergan paid the speaker-physicians, the more Linzess they prescribed.

158.    For instance, of the 763 speakers paid by Allergan in 2016, Allergan decided to retain 493 Allergan speaker-physicians in the program for 2017.  This sub-set of Allergan speaker-physicians prescribed a median volume of 46 (30-day) prescriptions of Linzess in 2016.

159.    Similarly, there were 58 Allergan GI speaker-physicians who were slated for termination from the Speaker Bureau but instead retained by local Allergan sales manager "override" because they were viewed favorably as prescribers by local sales employees who were paid for each prescription written.  This sub-set of Allergan speaker-physicians prescribed a median volume of 45.5 (30-day) prescriptions of Linzess in 2016.

160.    Conversely, there were 136 Allergan speaker-physicians terminated from the Speaker Bureau in 2016 because they were viewed unfavorably as low-prescribers by Allergan. This sub-set of Allergan speaker-physicians who were terminated prescribed only a median volume of 32 (30-day) prescriptions of Linzess in 2016—roughly 1/3 fewer prescriptions than their counterparts whom Allergan decided to keep paying.

## IV.    The Venue, Nature and Subject Matter of Allergan Speaker Events All Prove the Speaker Events Were a Means to Pay Kickbacks

161.    Allergan hosted two types of speaker events—"in-office speaker events" and "out-of-office" speaker events.

162.    For "in-office" speaker events, the speaker-physician travels with an Allergan Sales Representative to another medical provider's office.  The Sales Representative brings food and refreshments for the physician and their staff.  Ostensibly, the speaker-physician was required to present a PowerPoint presentation created by Allergan about the benefits of Viberzi and Linzess.

52

163.    In reality, and as witnessed first-hand by Relators, many in-office speaker events consist of the Allergan Sales Representative and the speaker-physician simply delivering food to a medical provider's office and briefly speaking with the provider or a provider's staff to encourage them to prescribe Viberzi and Linzess.  Often, the physicians and staff were too busy seeing patients to sit through a PowerPoint or listen to a discussion of the efficacy of the drug.  In these instances, when no actual presentation is made, the speaker-physician briefly talks to the provider or their staff about the need to prescribe Allergan's drugs, but sometimes does not speak to the "hosting" physician at all.  Nevertheless, Allergan still paid the speaker-physician between $1,000 and $2,500 for doing nothing more than visiting another physician's office and briefly talking with another physician or their staff to encourage them to prescribe Allergan drugs.

164.    As just one example, on January 14, 2016, Relator Wilkerson accompanied Allergan speaker-physician Dr. Paul Bierman to an "in-office speaker event" at Finn Medical Associates Office in Memphis, Tennessee.  Dr. Bierman made no formal presentation and did not provide any educational information, but instead simply shook hands with Dr. Cary Finn and made small talk.  Then, just before leaving, Dr. Bierman briefly stated that he thought Dr. Finn should prescribe Viberzi and Linzess.  Allergan paid Dr. Bierman $1,200 for this visit.  Relator Wilkerson discussed the cursory nature of Dr. Bierman's in-office speaker events with District Manager Alan Foust.  Despite knowing Dr. Bierman routinely declined to present the Allergan PowerPoint and instead simply chatted with providers, Foust instructed Relator Wilkerson to falsify documents to state that Dr. Cary Finn and other staff and providers attended the presentation and to falsely state that all required information was presented.

165.    Other, even more transparent inducements occurred at Allergan dinner parties that were categorized as "out of office" speaker events.   These "out-of-office" events were held at up-

scale restaurants where speaker-physicians and guests ordered any alcohol or food items that they desired—all paid for by Allergan. Typical out-of-office speaker event venues were expensive restaurant chains Ruth's Chris Steakhouse and The Capital Grille. Often, non-medical attendees such as attendee and physician-speakers' spouses and dates attended Allergan "out-of-office" speaker events to enjoy an expensive meal and alcohol, all paid for by Allergan.

166. Based on Relators' experience, the "educational" portion of the out-of-office speaker events was minimal or entirely absent. If provided at all, the purported education typically lasted 15 minutes or less and consisted of the speaker flipping through a brief, generic, PowerPoint—parroting the same information provided in Allergan's written advertising and promotional materials that had already been distributed to physicians. These "out of office" events had little, if any, educational value and were, in truth, merely social occasions for potential prescribing physicians and their friends at expensive restaurants with all expenses paid by Allergan. While the attendees enjoyed free food and alcohol worth hundreds of dollars per person, Allergan paid the speakers as much as $3,500 just for showing up.

167. Allergan's official internal policy was that each speaker event attendee could spend $150 on food and alcohol. However, Allergan routinely disregarded this internal limit and allowed speakers and attendees to order far more than $150 in food and drink. To evade these compliance-oriented per-person spending limits, Allergan instructed sales representatives to manipulate speaker event attendance records to make it appear that more people had attended the dinner parties than had been there. By fabricating attendees, Allergan could spend much more per person to influence the providers who were there, while seeming to spread the actual exorbitant cost of the opulent food and alcohol across the false roster of attendees. Using this strategy, which was acknowledged and encouraged by Allergan management including District Manager Richard

54

Uhles, Allergan flouted its own purported "compliance" policies and spent far more than Allergan's stated $150 per person limit for "out of office" speaker events.

168.     Allergan used this strategy to provide even more extravagant illegal remuneration in the form of expensive meals and alcohol to attendee physicians at dinner parties, for the express purpose of inducing prescriptions of Viberzi and Linzess.

## V.     Allergan Conditioned the Payment of Speaker Fees on Prescriptions and Saw Huge Growth in the Number of Prescriptions Written by Many Doctors who Accepted Speaker Fee Kickbacks

169.     Allergan tracked speaker-physicians' prescriptions on a granular level and rewarded prescribers who increased their prescriptions with more speaker fees and withheld speaker fees from speaker-physicians who did not increase prescriptions.  The following paragraphs provide a representative example of Allergan's kickback *relationship* with Dr. Paul Bierman.  The scheme was, however, nationwide.

170.     For example, in January 2016, Allergan District Manager Alan Foust was not satisfied with Dr. Paul Bierman's initial prescribing levels in his first weeks as a paid Allergan speaker-physician.   At this time, Allergan had recently launched Viberzi, and increasing prescriptions of Viberzi was a primary focus of Allergan's sales efforts and remuneration. Mr. Foust demanded of his sales team that all speaker-physicians needed to "get on board" with prescribing Viberzi to continue receiving speaker fee payments.

171.     Mr. Foust instructed Relator Wilkerson to inform Dr. Bierman that Allergan's payment of speaker fees was specifically conditioned upon Bierman increasing his prescription of Allergan drugs.  As instructed by Allergan management, Relator Wilkerson and fellow Allergan sales representative Frank Adcock visited Dr. Bierman at his office in January 2016 and delivered

Allergan's message: if Dr. Bierman wanted to continue receiving thousands of dollars in speaker fees from Allergan, he had to prescribe more Viberzi.

172.     Dr. Bierman responded that he had been writing prescriptions of Viberzi, but he would increase his prescriptions to appease Allergan so that he could continue receiving speaker fees.

173.     Relator Wilkerson and Mr. Adcock explained that some of Dr. Bierman's prescriptions of Viberzi were being denied coverage because the required prior authorizations or free vouchers were not being completed or used properly.  At roughly $1,000 per month, few patients were willing to pay for Viberzi without significant coverage from insurers, primarily Medicare Part D and Medicaid plans.

174.     Dr. Bierman walked together with Relator Wilkerson and Mr. Adcock back into his office to speak with his head nurse, Wendy.  Together, they informed Wendy to assist Relator Wilkerson and Mr. Adcock with whatever they needed to ensure more Viberzi prescriptions were being written and "pulled-through" the pharmacy—meaning that Wendy needed to ensure that insurance coverage issues including the Medicaid and Medicare Part D prior authorizations for Viberzi were completed.  Dr. Bierman instructed Wendy to text Relator Wilkerson and Mr. Adcock with each patient's name and pharmacy whenever Dr. Bierman wrote a prescription for Viberzi. Wilkerson and Adcock could then "chase the script" to the pharmacy and make sure each prescription was filled and paid for by the relevant federal or state payor.  Allergan's "chasing scripts" in this fashion was part of the Allergan's kickback scheme described herein, as well as acts in furtherance of a conspiracy with the HCPs involved to violate the False Claims Act and anti-kickback laws.

175.    In exchange for his promise to write more prescriptions, Allergan scheduled more speaker events for Dr. Bierman and paid him more speaker fees.  Based on this arrangement and in patent violation of the AKS, Dr. Bierman's prescriptions of Linzess and Viberzi skyrocketed in tandem with his speaker fees.

176.    Allergan's promotional partner Ironwood Pharmaceuticals[41] was acutely aware of the *quid pro quo* nature of the payments to prescribing physicians.  Specifically, Ironwood Sales Representative Holly Charnes, who co-promoted Viberzi and Linzess in the Memphis Area, remarked to Relator Wilkerson, "thankfully we have Dr. Bierman, because he keeps Viberzi going—he's basically the only person we can get to prescribe in any numbers."

177.    On or around March 17, 2017, Relator Wilkerson spoke with Allergan sales representative Will Fogelman, who informed him Allergan was elated that Dr. Bierman was the largest prescriber of Viberzi in the West Tennessee territory.  Mr. Fogelman candidly exclaimed that Dr. Bierman was prescribing so much Viberzi "because we [Allergan] are paying him."

178.    In or around September 2017, Allergan sales representative Frank Adcock stated that he was currently short of meeting his Viberzi sales goal and that, because the only thing that Dr. Bierman responds to is cash, Adcock needed Allergan to pay Dr. Bierman more speaker fees so Adcock could reach his sales quota.  Soon thereafter, Mr. Adcock arranged additional speaker events for Dr. Bierman.  In exchange, Dr. Bierman wrote additional Viberzi prescriptions, and Mr. Adcock met his sales quota—reaping bonuses and avoiding punishment from Allergan.

---

[41] Ironwood Pharmaceuticals, Inc. is a gastroenterology-focused pharmaceutical company that developed Linaclotide, the active ingredient in Linzess.  Ironwood Pharmaceuticals has co-promotion agreements with Allergan whereby both Ironwood and Allergan promote Viberzi and Linzess.  Under the terms of these agreements, Ironwood's sales representative promote Viberzi and Linzess to health care practitioners. *See* https://investor.ironwoodpharma.com/press-releases/press-release-details/2015/Ironwood-and-Allergan-Enter-Agreement-to-Co-Promote-VIBERZI-for-Irritable-Bowel-Syndrome-with-Diarrhea-IBS-D-in-the-US/default.aspx

179. Similarly, in or around February 2018, Mr. Adcock informed his manager Alan Foust that he had secured five more speaker events for Dr. Bierman in the coming weeks, which would pay Dr. Bierman thousands of dollars each. In response, Foust reminded Adcock of Allergan's requirement that Dr. Bierman prescribe Allergan drugs in exchange for the speaker fees, stating that these five speaker engagements will be Dr. Bierman's "last five [speaker events] if [Dr. Bierman] does not write [prescriptions]."

180. Dr. Bierman himself openly acknowledged that he knew Allergan speaker fees were paid in exchange for his prescribing Allergan drugs. In April of 2018, Dr. Bierman requested more money from Allergan, explaining "I have to fly half my family to Israel for my son's wedding" and due to this personal expense, he needed more money from Allergan. Allergan sales representative Frank Adcock confirmed that the *quid pro quo* was well understood between Allergan and Dr. Bierman, responding "I hear that, and I have to hit numbers, we are in good position!"

181. Related to this interaction, Adcock openly discussed the bribes paid at Dr. Bierman's request, and that the bribes resulted in the desired outcome of inducing Dr. Bierman to increase prescriptions. Specifically, Adcock informed other Allergan sales representatives that Dr. Bierman wrote the agreed upon additional prescriptions before the speaker programs but only "after he knew he would get paid."

182. Allergan paid Dr. Bierman $1,500 for his first Viberzi/Linzess speaker event on December 11, 2015, along with two additional payments of $514.70 and $272.87 for "travel, and lodging" associated with this speaker event. Allergan also paid for Dr. Bierman's food and alcohol at the dinner party. In 2015, prior to being added to Allergan Speaker Bureau and instructed by

Allergan employees that speaker payments were contingent on prescriptions, Dr. Bierman prescribed 55 (30-day) prescriptions of Linzess.[42]

183.    In 2016, Allergan paid Dr. Bierman $59,000 in speaker fees for 41 separate events held throughout the year.  While accepting those payments, Dr. Bierman's Linzess prescriptions doubled to 109 (30-day) prescriptions—for which Medicare paid $35,215.83 and he wrote 25 prescriptions of Viberzi—for which Medicare paid $23,083.26.

184.    In 2017, Allergan paid Dr. Bierman $95,600 in speaker fees for 38 events throughout the year, making him one of the top five highest paid Allergan GI Speakers.  While accepting those payments, Dr. Bierman's prescriptions increased again.  Dr. Bierman wrote 134 Linzess prescriptions—for which Medicare paid $50,560.15.  Dr. Bierman's Viberzi prescriptions roughly doubled to 47 (30-day) prescriptions—for which Medicare paid $48,127.63.

185.    The amount paid by Allergan to Dr. Bierman in 2017 was massive when compared to the average payment amounts to other doctors during that year.  The average amount paid to doctors by all manufacturers in the United States in 2017 was $3,452.22.  Dr. Bierman's total

---

[42] The prescribing information described herein solely reflects prescriptions for Allergan drugs prescribed to Medicare Part D beneficiaries. However, because the Medicare Part D database identifies the prescriptions written by each physician who writes more than ten 30-day prescriptions of a certain drug over a calendar year, the volume of prescriptions and amount paid by Medicare for the identified speaker physicians' prescriptions of Viberzi and Linzess is confirmed and demonstrates that claims were in fact submitted to the Medicare Part D program for payment. All corresponding payment amounts reflect the amount paid by Medicare directly for these drugs and does not include any beneficiary co-pay obligations. All quantitative data reflects "30-day prescriptions." For example, while a physician could write one "prescription" for a 90-day supply of Linzess, this Medicare prescriber data would count that 90-day prescription as three (30-day) prescriptions of Linzess. Further, roughly 70 percent of all Medicare beneficiaries are enrolled in Medicare Part D plans, and thus this data reflects the Viberzi and Linzess prescriptions made by speaker-physicians and paid for by the Medicare program for this group of Part D enrolled beneficiaries. However, because not all Medicare beneficiaries are enrolled in Medicare Part D, and thus are not reflected in the Medicare Part D database, this data does not include every Medicare prescription written by these Speaker-Physicians for Allergan and Linzess.

payments from Allergan including speakers' fees, food, and travel, was $109,442.21 or 3169% of the average.

186. In 2018, Allergan paid Dr. Bierman $23,420 in speakers fees for 16 events throughout the year. While accepting those payments, he wrote 160 Linzess prescriptions—for which Medicare paid $63,770.26 and 42 Viberzi prescriptions—for which Medicare paid $48,689.37.

187. As described above, Allergan made at least 98 payments to Dr. Bierman from December 2015 and continuing through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Bierman because of his participation in the companywide Speaker Bureau and a purpose of each of the payments was to induce Dr. Bierman to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Bierman remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond). Each one of the approximate 517 Linzess and Viberzi prescriptions Dr. Bierman wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Bierman's exercise of independent medical judgment.

188. As Allergan knew would occur, Dr. Bierman's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $269,446.50. Allergan's payments of remuneration to induce Dr. Bierman to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by

Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

189.    Because of Allergan's success at inducing Dr. Bierman to prescribe hundreds of thousands of dollars of Allergan's drugs through payment of speaker fees, Allergan rewarded the Allergan Sales Representatives responsible for Dr. Bierman's territory handsomely through Allergan's incentive-based compensation structure.

190.    Soon thereafter, Allergan Sales Representatives in the South Memphis Territory sought to increase their compensation by recruiting a physician-speaker based in South Memphis and achieving similar prescription growth through payment of speaker fees.  As another example, in 2018, Allergan added Nurse Practitioner Chantil Jeffreys to the Allergan Speaker Bureau and began paying N.P. Jeffries to prescribe Allergan drugs.  Allergan Sales Representative Will Fogelman told Relator Wilkerson that Allergan added Ms. Jeffreys to the Speaker Bureau based on Allergan's success in paying Dr. Bierman to write more prescriptions and its desire to expand its scheme to South Memphis.

191.    As background, in 2015 and 2016, Ms. Jeffreys had written 14 and 29 prescriptions of Linzess, respectively.  In 2017, her Linzess prescriptions increased—up to 47 prescriptions— for which Medicare paid $17,514.36.  This increase led Allergan to anticipate Ms. Jeffreys could be a valuable speaker-prescriber.  However, in 2018 after being added to the Speaker Bureau, Ms. Jeffreys' prescriptions remained relatively constant, at 43 prescriptions of Linzess. The lack of growth in Ms. Jeffreys' prescription volume was not adequate for Allergan to continue paying Ms. Jeffreys speaker fees, so Allergan terminated Jeffreys from the Speaker Bureau in 2018.

192.    Allergan similarly paid Dr. Daniel Kayal, a physician based in Jackson, Tennessee, speaker fees in exchange for writing prescriptions of Allergan drugs.  Specifically, in or around

61

January 2016, an Allergan sales representatives informed other Allergan sales representatives that Dr. Kayal "did great" at a recent speaker event; but, more importantly and showing the true intent behind the speaker fees paid to Dr. Kayal, was that following the event Dr. Kayal "had 10 patients start on Viberzi."

193.    In 2015, prior to being added to Allergan's Speaker Bureau, Dr. Kayal prescribed 52 prescriptions of Linzess to Medicare Part D beneficiaries.

194.    Allergan paid Dr. Kayal $1,500 for his first Viberzi/Linzess speaker event on December 11, 2015, along with two separate payments of $614.20 and $234.87 for "travel and lodging" associated with this speaker event. Every prescription for Allergan drugs written by Dr. Kayal after December 11, 2015 while he was still actively accepting Allergan speaker payments were written during the time that Dr. Kayal was receiving remuneration to induce him to prescribe the drugs in violation of the AKS and FCA.

195.    In 2016, Allergan paid Dr. Kayal $20,600 in speaker fees for 13 events. While accepting those payments, his Linzess prescriptions roughly doubled to 103 prescriptions—for which Medicare paid $33,005.04. In 2017, Allergan paid Dr. Kayal $12,600 in speaker fees for 9 events. While accepting those payments, he wrote another 86 Linzess prescriptions—for which Medicare paid $31,109.50. In 2018, Allergan paid Dr. Kayal $4,900 for 5 events. While accepting those payments, he wrote 44 Linzess prescriptions—for which Medicare paid $17,582.28. During 2018, he also wrote 20 Viberzi prescriptions—for which Medicare paid $23,599.55.

196.    As described above, Allergan made at least 27 payments to Dr. Kayal from December 2015 through the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Kayal because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr.

Kayal to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Kayal remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond). Each one of the approximate 253 Linzess and Viberzi prescriptions Dr. Kayal wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Kayal's exercise of independent medical judgment.

197. As Allergan intended and hoped, Dr. Kayal's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication that were submitted to the Medicare Program causing it to pay approximately $105,296.37. Allergan's payments of remuneration to induce Dr. Kayal to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

198. The same pattern that Relators directly observed of Allergan paid speakers Bierman and Kayal increasing their Linzess prescriptions after accepting Allergan's illegal payments was repeated all over the country. As noted, Linzess was not a new drug in 2015 when Allergan began its massive push to use speaker's fees as an illegal incentive to increase prescriptions. Instead, it had been on the market for three years when Allergan began its scheme in late 2015. Allergan's company-wide scheme to pay speaker fees to induce physician payees to increase Linzess and Viberzi prescriptions is demonstrated by overall increases in Medicare claims and payments as well as examples of individual physician payees from around the country.

199. While CMS published Medicare Part D claims data does not reveal kickbacks, it does reflect the success of Allergan's kickback scheme that was observed first hand by the Relators

63

and the resultant damage to Medicare. Medicare Part D Claims data shows that the overall number of claims paid by Medicare for Linzess prescriptions increased from 918,741 in 2015 to 1,307,006 in 2016 reflecting an overall increase of 42.27%.

200. Data from CMS and speaker evidence from Allergan demonstrate that many doctors who began accepting speaker's payments from Allergan in 2016 increased their Linzess prescriptions at a rate much higher than the overall growth rate for the drug after entering the speaker program.

201. For example, Dr. Joseph Hathaway of Statesboro, Georgia was not part of the Allergan speaker's program in 2015 when he wrote a total of wrote 36 Linzess prescriptions for Medicare Part D beneficiaries. On January 23, 2016, Allergan paid Dr. Hathaway $1,500.00 for his first Viberzi/Linzess speaker event, plus additional amounts for travel and food. In total in 2016, Allegan paid him more than $33,500 in speaker fees for 24 events in 10 out of 12 months. While accepting those payments, Dr. Hathaway's prescriptions of Linzess skyrocketed over 500%—more than 10 times the overall growth rate—to 184 prescriptions of Linzess—costing the Medicare program $59,644.46. In 2017, Allergan paid Dr. Hathaway $35,000 in speaker fees for 27 events and his Medicare Part D Linzess prescriptions more than doubled again from his 2016 prescribing level to 395 prescriptions—costing Medicare $140,292.75. In 2018, Allergan paid Dr. Hathaway $14,600 for 14 speaker events and prescriptions of Linzess increased again to 470 prescriptions for which Medicare paid $188,0762.10. From 2016 to 2018 while he was accepting Allergan's kickbacks, Dr. Hathaway's Linzess prescriptions increased more than 1200% over the amount he was prescribing before entering the speaker's bureau. Dr. Hathaway's prescription growth was more than 10 times the overall growth rate for Linzess during the same time period.

202.    As described above, Allergan made at least 65 payments to Dr. Hathaway from January 23, 2016 and continuing through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess.  Allergan made each of those ongoing payments to Dr. Hathaway because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Hathaway to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Hathaway remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond).  Each one of the approximate 1,084 Linzess and Viberzi prescriptions Dr. Hathaway wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Hathaway's exercise of independent medical judgment.

203.    As Allergan intended and hoped would occur, Dr. Hathaway's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $388,009.29. Allergan's payments of remuneration to induce Dr. Hathaway to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

204.    Another example:  Dr. Jack Braha of Brooklyn, New York was not part of the Allergan speaker's program in 2015 when he wrote a total of wrote 23 Linzess prescriptions for Medicare Part D beneficiaries.  On February 6, 2016, Allergan paid Dr. Braha $1500 for his first Viberzi/Linzess speaker event, plus additional amounts for travel and food.  In total in 2016, Allergan paid him more than $11,000 in speaker's fees for 9 events during five out of 12 months

of the year. While accepting those payments, his prescription volume of Linzess jumped over 495% to 137 prescriptions. Thus, Dr. Braha's prescription growth was more than 10 times the overall growth of Linzess prescriptions in the year he began accepting Allergan's kickbacks. Medicare paid $43,936.11 for those 2016 claims.

205. Dr. Braha's prescription volume continued to grow in 2017 and 2018 while he continued to accept Allergan's payments. In 2017, Allergan paid Dr. Braha $19,215 for 11 events in nine out of 12 months. While accepting those payments, Dr. Braha's prescriptions increased again to 158 prescriptions of Linzess, for which Medicare paid $56,343. In 2018, Allergan paid Dr. Braha another $10,900 in speaker fees for 9 events in 7 out of 12 months of the year. While accepting those payments, Dr. Braha maintained the same high number of Linzess prescriptions— 158 prescriptions that cost Medicare $59,531.86—six times the amount he prescribed when Allergan was not paying him kickbacks in 2015.

206. As described above, Allergan made at least 29 payments to Dr. Braha from February 2016 and continuing through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Braha because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Braha to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Braha remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond). Each one of the approximately 453 Linzess and Viberzi prescriptions Dr. Braha wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Braha's exercise of independent medical judgment.

207.     As Allergan intended and hoped would occur, Dr. Braha's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $158,810.97. Allergan's payments of remuneration to induce Dr. Braha to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

208.     Another example: Dr. Asif Qadri of Athens, Georgia was not part of the Allergan speaker's program in 2015 when he wrote a total of 59 Linzess prescriptions for Medicare Part D beneficiaries.  On March 1, 2016, Allergan paid him $1200.00 for his first speaker event.  In total in 2016, Allergan paid him $11,000 in speaker's fees for 9 events during 6 out of 12 months of the year.  While accepting those payments, Dr. Qadri's Medicare Part D Linzess prescriptions increased 244%, up to 144 prescriptions, more than five times the overall growth rate.  Medicare paid $46,196.53 for those 144 prescriptions.  In 2017, Allergan paid Dr. Qadri $13,100 for 8 events during 7 out of 12 months.  While accepting those 2017 payments, Dr. Qadri's Linzess prescriptions increased another 177% to 256 prescriptions for which Medicare paid over $90,638.24.  Overall, in 2016 and 2017, Dr. Qadri's Linzess prescriptions increased more than 433% after he began taking Allergan kickbacks—more than five times the overall Linzess growth rate during that same time.  In 2018, Allergan paid Dr. Qadri $14,800 for 11 speaker events.  In exchange, Dr. Qadri remained a large prescriber of Linzess, writing 267 prescriptions for which Medicare paid $102,423.93.  These 267 prescriptions in 2018 are four times the number of prescriptions that Dr. Qadri wrote in 2015 before Allergan started paying him kickbacks.

209.     As described above, Allergan made at least 29 payments to Dr. Qadri from March 1, 2016 and continuing through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess.  Allergan made each of those ongoing payments to Dr. Qadri because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Qadri to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Qadri remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond).  Each one of the approximate 567 Linzess and Viberzi prescriptions Dr. Qadri wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Qadri's exercise of independent medical judgment.

210.     As Allergan intended and hoped would occur, Dr. Qadri's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $239,258.70. Allergan's payments of remuneration to induce Dr. Qadri to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

211.     Another example: Dr. Nikhil Agarwal of San Franscisco, California, was not part of the Allergan speaker's program in 2015 when he wrote a total of 18 Linzess prescriptions for Medicare beneficiaries.  In 2016, Allergan paid him $23,880.75 for 12 speaker events. While accepting those payments, Dr. Agrawal's Linzess prescriptions increased 228%, up to 59 prescriptions, more than five times the overall growth rate for Linzess prescriptions.  Medicare

paid a total of $18,520.41 for those prescriptions. In 2017, Allergan paid Dr. Agrawal speaker fees for five events. While accepting those payments, his prescriptions again jumped up massively, this time growing 192% to 172.5 total prescriptions for which Medicare paid $64,585.50. Overall, in the two years after Dr. Agrawal entered the speaker's program his Linzess prescriptions increased by more than 850%—more than ten times the overall Linzess growth rate during that same time.

212. As described above, Allergan made at least 17 payments to Dr. Agarwal in 2016 and 2017 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Agarwal because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Agarwal to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Agarwal remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016 and 2017. Each one of the approximately 231 Linzess prescriptions Dr. Agarwal wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Agarwal's exercise of independent medical judgment.

213. As Allergan intended and hoped would occur, Dr. Agarwal's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $83,105.91. Allergan's payments of remuneration to induce Dr. Agarwal to write Linzess and Viberzi prescriptions for his Medicare patients during 2016 and 2017, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

214. Another example: Dr. Jamal Qureshi of Milwaukee, Wisconsin, was not part of the Allergan speaker's program in 2015 when he wrote a total of 107 Linzess prescriptions. On January 21, 2016, Allergan paid him $1200.00 for his first speaker event. In 2016 in total, Allergan paid him more than $20,000 for 16 speaker events during nine out of 12 months of the year. While accepting those payments, Dr. Qureshi's Linzess prescriptions increased 144.86%, up to 262 prescriptions—more than three and half times the overall growth during that same time. Medicare paid $84,743.32 for those prescriptions. In 2017, Allergan paid Dr. Qureshi $5,900 for four speaker events and his prescriptions increased again to 276 for which Medicare paid $98,202.60.

215. As described above, Allergan made at least 20 payments to Dr. Qureshi from January 21, 2016 and continuing through at least the end of 2017 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Qureshi because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Qureshi to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Qureshi remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016 and 2017 (and beyond). Each one of the approximate 538 Linzess and Viberzi prescriptions Dr. Qureshi wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Qureshi's exercise of independent medical judgment.

216. As Allergan intended and hoped would occur, Dr. Qureshi's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $182,945.92. Allergan's payments of remuneration to induce Dr. Qureshi to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based

claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

217. Another example: Dr. Thomas Tran of Dennison, Texas was not part of the Allergan speaker's program in 2015 when he wrote a total of 109 Linzess prescriptions. On January 23, 2016, Allergan paid him $1500.00 for his first Viberzi/Linzess speaker event. In total in 2016, Allergan paid him more than $118,000 for 43 events held during 10 out of 12 months of the year. While accepting those payments, Dr. Tran's Linzess prescriptions increased 114.86%, up to 234 prescriptions—more than twice the overall growth of Linzess prescriptions during that same time. Medicare paid $87,248.00 for those claims. In 2017, Allergan paid Dr. Tran $77,445.08 for 29 events during 10 out of 12 months. While accepting those payments, his prescriptions increased to 320, a growth of 36.75% that again outpaced the overall growth in Linzess sales, and that cost Medicare $128,575.00. In 2018, Allergan paid Dr. Tran $54,900 for 36 speakers events. While his Linzess prescription volume decreased to 229, that was still one of the highest prescription volumes in the country and Medicare paid $89,029.17 for those claims.

218. As described above, Allergan made at least 108 payments to Dr. Tran from January 23, 2016 and continuing through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Tran because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Tran to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Tran remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond). Each one of the approximate 783 Linzess prescriptions Dr. Tran wrote for his Medicare patients during that period were written at a time

71

when Allergan knew that the remuneration it was paying could influence Dr. Tran's exercise of independent medical judgment.

219.    As Allergan intended and hoped would occur, Dr. Tran's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $304,851.79. Allergan's payments of remuneration to induce Dr. Tran to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

220.    Thus, all throughout the nation, as evidenced by examples in Tennessee, California, New York, Georgia, Texas, and Wisconsin, the same pattern directly observed by Relators was repeated—doctors who began to accept remuneration payments from Allergan increased their prescription volume of Linzess and did so disproportionately to the overall prescription growth nationwide.  And as those doctors stayed in the program and continued to accept payments from Allergan, their prescription volume stayed high and usually grew faster than the average.

221.    A study performed by investigative journalists at ProPublica in 2019, after the Relators filed their complaint, reached the same conclusion, finding that "doctors who receive money from drugmakers related to a specific drug prescribe that drug more heavily than doctors without such financial ties."[43] That study analyzed Open Payments data and CMS claims while

---

[43] Doctors Prescribe More of a Drug If They Receive Money from a Pharma Company Tied to It, Freques, Hannah, ProPublica, Dec. 20, 2019, available at
https://www.propublica.org/article/doctors-prescribe-more-of-a-drug-if-they-receive-money-from-a-pharma-company-tied-to-it.

looking specifically at Allergan's speaker fee payments for Linzess. The study found, just as Relators observed and other data show, that doctors who received payments related to Linzess in 2016 wrote 45% more prescriptions for the drug, on average, than doctors who received no payments. The study was not limited to just providers who were in the speaker's program, but instead considered doctors who received any payment, the majority of which only accepted a free meal. The study found that the average number of Linzess prescriptions for Medicare beneficiaries submitted by doctors who took no money at all from Allergan was 26. For doctors who took *any* remuneration at all from Allergan, including just eating a meal, that number jumps to 49.

222. As shown in Allergan documents and CMA claims data, physicians who began accepting Allergan speaker payments (instead of just accepting free food and drink) averaged 69.56 prescriptions in 2016 or 167% the number of prescriptions written by doctors who received no remuneration from Allergan at all during that same year.

223. The direct correlation between a doctor accepting Allergan kickbacks and responding by increasing prescriptions of Allergan drugs is no surprise. There are dozens of scholarly articles concluding that prescriptions tend to increase when providers accept payments from the pharmaceutical company making the drug. A recent meta-study published in the Annals of Internal Medicine found that "the association between industry payments and physician prescribing was consistent across *all* studies that have evaluated this association."[44] That same study also looked specifically at the temporal association between receipt of a payment and an increase in prescriptions and concluded that the published studies strongly suggest, unsurprisingly, that a causal relationship exists between receipt of a payment and an increase in prescriptions.

---

[44] Are Financial Payments from the Pharmaceutical Industry Associated with Physician Prescribing? A Systematic Review, Ann. Internal Med. 2021, Mar., Mitchell, et al., available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8315858/#.

However, such studies and other reports in the literature do not establish that a particular drug company paid a particular physician a kickback to induce a prescription that would result in a Medicare claim. The Relators' first hand observation of Allergan's design and implementation of its "Speakers' Program", company-wide, to induce individual physicians to write more prescriptions for Linzess and Viberzi is the essential information necessary to disclose the AKS and FCA violations at issue.

224.    In summary, Allergan's speakers' fee payments worked just as Allergan intended and hoped by causing an increase in prescriptions from doctors who accepted payments which in turn caused an increase in claims submitted to and paid by Medicare for those prescriptions.

## VI.    Allergan Corporate Policies Facilitated Using Speaker Events to Pay Illegal Remuneration to Physicians to Prescribe Allergan Drugs

225.    Despite Allergan's knowledge—as a recidivist violator of the AKS and FCA—that it must implement adequate controls to ensure its Speaker Bureau was compliant with the AKS and other health care laws, the Relators directly observed that Allergan knowingly implemented corporate policies that facilitated and encouraged using the Speaker Bureau to provide kickbacks. The money mattered more than the law.

### A.    Allergan's Policy of Requiring a Minimum Number of RSVPs for Events, Instead of Minimum Number of Actual Attendees, Incentivized Sales Representatives to Collect Tenuous RSVPs Whom Allergan Knew Would Not Show Up

226.    HHS-OIG's Special Fraud alert notes that the pharmaceutical industry dubiously claims that HCPs "participate in company-sponsored speaker programs in order to help educate and inform other health care professionals about the benefits, risks and appropriate uses of

company medicines."[45]  Even if industry's self-serving statement is taken at face-value, it is obvious that for a speaker to educate and inform others, those others must be in attendance to hear the speaker.

227.  Allergan, however, knowingly structured its speaker program to pay speaker-physicians thousands of dollars for speaker events that never occurred, where no other HCPs (besides the speaker) attended, and where attendance was so low that it failed to meet the minimum levels required by Allergan's purported "compliance" policies.

228.  Under Allergan's policy, for a scheduled speaker event to go forward, the sales representative organizing the speaker event was required to collect a specific number of affirmative RSVPs from people who planned to attend the speaker event.

229.  For "in-office" speaker events, Allergan compliance policies required sales representatives to collect a minimum of two positive RSVPs – both must be prescribers (meaning a physician, physician assistant or nurse practitioner) or dispensers (pharmacist).  For "out-of-office" speaker events, Allergan compliance policies require sales representatives to collect a minimum of four positive RSVPs – three of which must be a prescriber or dispenser.  If sales representative obtained the required number of positive RSVPs from people who claimed they would attend the event, the event would proceed, even if the people later admitted that they would not attend or failed to show up.

230.  In Relators' direct experience, Allergan intentionally overlooked and did not care how many of the people who stated they would attend actually attended the event.  For instance,

---

[45] *Code on Interactions with Health Care Professionals*, PhRMA, 7 (June 2020), available at https://www.phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/A-C/Code-of-Interaction_FINAL21.pdf

when sales representatives asked Allergan managers, such as District Manager Alan Foust, about the attendance requirements for speaker events, Mr. Foust quickly and emphatically informed the sales team that there were no attendance requirements, only RSVP requirements. Moreover, Allergan disciplined sales representatives who did not obtain the required RSVPs, but did not discipline sales representatives when people did not actually attend events.

231. In practice, Allergan encouraged sales representatives to collect highly dubious RSVP "commitments" from providers but knew many if not most would not actually attend. Relators have personal knowledge that it was commonplace for physicians—who were often busy seeing patients and would barely engage with sales representatives—to tell the sales representative: "yeah, I'll try to come to the event" or "I may come to the event." In actuality, these physicians would rarely show up to the event. Such non-committals were registered as positive RSVPs for the sham minimum requirements set by Allergan.

232. Because the true purpose of the speaker event was to pay the speaker to prescribe Allergan's drugs, if no one showed up to the event, Allergan did not care and still paid the speaker-physician the full "honorarium," despite the lack of attendees that the physician was purportedly being paid to educate. This is because "payment for prescriptions" was the purpose of the event, not education.

233. Additional specific examples of this policy in effect include the following:

a. On September 9, 2015, Allergan paid speaker-physician Dr. Karanth $1,750 in speaker fees for a purported speaker event at the Waterfront Grille in New Bedford, Massachusetts. No one other than Dr. Karanth and Allergan sales representative Tim Harkin attended the event. No education event occurred. Instead, the two people

enjoyed drinks and a meal at Allergan's expense, and Allergan gave the physician a check in exchange for writing prescriptions.

b. During 2015, Allergan paid Dr. Shirish Amin for two separate events that were under-attended because there were fewer actual attendees than were required to meet Allergan's minimum positive RSVP requirements. Specifically, on October 7, 2015, Allergan paid Dr. Amin $1,400 for an "in-office" speaker event at the Office of Dr. Brian Foulk, a family practitioner in Northern Cambria, Pennsylvania. Only one person besides Dr. Amin and Allergan Sales Representative Haley Crider attended this event. Later, on December 17, 2015 Allergan paid Dr. Shirish Amin $1,750 for a speaker event at Benjamin's—a fine dining restaurant in Indiana, Pennsylvania. Only two people besides Dr. Amin and Allergan Sales Representative Haley Crider attended this event.

c. On February 22, 2016, Allergan paid Dr. Hathaway to purportedly perform an in-office speaker event at "Dublin Medical," in Dublin, Georgia. However, there were no attendees at this supposed speaker event. The only "event" that occurred was the payment from Allergan to Dr. Hathaway. Allergan paid Dr. Joseph Hathaway $1,800 to do nothing and simply called it a speaker event. The only person in attendance other than Dr. Hathaway was Allergan Sales Representative Lacy Allen, and all she did was deliver a check to Dr. Hathaway. The true purpose of paying Dr. Hathaway was to induce prescriptions of Linzess.

d. On June 17, 2016, Allergan paid Dr. Lantin $1,500 to purportedly perform a speaker event at Enzo's Restaurant—an upscale Italian restaurant in Mamaroneck, New York. No one attended, and Dr. Lantin did not speak. All he did was eat and drink, yet

77

Allergan still paid Dr. Lantin for this sham event. This payment by Allergan to Dr. Lantin was not for any legitimate purpose but was paid in exchange for prescriptions of Linzess.

e. On October 11, 2016, Allergan paid Dr. Qadri $1,500 for purportedly performing a speaker event at Town 220 Bistro in Madison, Georgia. However, there were only two attendees at this speaker event—two fewer than Allergan's four person RSVP requirement. Allergan knew that paying a physician $1,500 for alleged "education" provided to only two people was above fair market value, not reasonable or necessary, and therefore was a kickback under the AKS. The true purpose of paying Dr. Qadri was to induce prescriptions of Linzess.

f. On March 9, 2017, Allergan paid Dr. Tran $2,000 to purportedly perform a speaker event at the office of Dr. Amanda Wilcox in Prattville, Alabama. However, no one except Dr. Tran and the Allergan Sales Representative attended. Nothing occurred except Allergan paid a $2,000 kickback to Dr. Tran.

g. Similarly, on May 10, 2017, Allergan paid Dr. Braha $1,500 to purportedly give a speaker event presentation at T Fusion Steakhouse—"a unique and creative fine dining restaurant"—in Brooklyn, New York. However, no one except Dr. Braha and the Allergan Sales Representative attended. All that occurred was that Dr. Braha enjoyed food and drinks at Allergan's expense and received a $1,500 check.

h. Similarly, on June 27, 2017, Allergan paid Dr. Oscar Chien $1,250 to purportedly provide education to other physicians at an Allergan GI speaker event held at Icho Izakaya—an upscale sushi restaurant in Rosemead, California. In reality, however, Dr.

Chien had dinner alone with the Allergan sales representative and received a check for $1,250 to induce prescriptions.

i. On April 5, 2017, Allergan paid Dr. Gene Chiao $1,500 for purportedly performing a speaker event at Wildfire Glenview—an upscale restaurant in Glenview, Illinois. However, there were only two attendees at this speaker event, two fewer than Allergan's four person RSVP requirement. Therefore, Allergan knew that paying a physician $1,500 for "education" provided to only two people was above fair market value, not reasonable or necessary, and a kickback under the AKS. Allergan's true purpose of paying Dr. Chiao was to induce prescriptions of Linzess.

j. On May 16, 2018, Allergan paid Dr. G.S. Ramesh $1,400 for purportedly giving an "educational" speaker event co-promoting Linzess and Viberzi at 1960 Family Practice P.A. in Houston, Texas. Dr. Ramesh and the Allergan sales representative were the only attendees at this sham event, and no education occurred. The actual purpose of Allergan's $1,400 payment was to induce Dr. Ramesh to continue prescribing Allergan's GI drugs.

k. On January 25, 2018, Allergan paid speaker-physician Dr. Andrew Boxer $1,750 for purportedly performing a paid event at Oceano's Restaurant in Fair Lawn, New Jersey. However, there was only one attendee at this purportedly "educational" event. Allergan knew that paying a physician $1,750 to have a dinner at fine-dining restaurant with one other person was above fair market value, not reasonable or necessary, and was a kickback under the AKS.

**B. Allergan Paid Speaker-Physicians in Full for Sham Events**

234.    For example, Relators have knowledge that Richard Uhles, an Allergan Primary Care Manager—who oversaw Allergan primary care sales representatives charged with promoting Viberzi and Linzess in the North Tulsa and Oklahoma City, Oklahoma territory—instructed sales representatives to add false attendees to speaker program documentation, often after the event took place, so that Allergan could mask its payments to physicians for referrals as somehow part of an educational event.

235.    This post-hoc manipulation of speaker event attendance records was specifically intended to create the false impression that Allergan speaker events contained some education provided to health care providers, when in fact few people, or often no one, attended these sham events which were merely conduits to pay bribes to the speaker-physician.

236.    On many other occasions, prior to sales management's instruction to manipulate event attendance, Allergan Sales Representatives reported through IntraMed—the Allergan program designed and used to record speaker event attendance—that only one or two people attended in-office speaker events, or even reported that no one except the speaker and the Allergan sales representative attended the event.  Nevertheless, despite Allergan's clear knowledge that its purportedly "educational" programs were not attended by anyone and that no education took place, Allergan paid the speaker-physicians thousands of dollars for doing nothing but writing prescriptions.

237.    For instance, in or around July 2015, Relator Jackson scheduled an "out-of-office" speaker event with Dr. Daniel Meline at Ruth's Chris Steakhouse in Tulsa, Oklahoma.  According to Allergan policies, Relator Jackson obtained the required number of positive RSVPs for the event.  However, at the time of the scheduled event, none of the physicians who tentatively

informed Relator Jackson that they "may come" or "may try to come" to the event, showed up. Instead, Relator Jackson and Dr. Meline simply ate a very nice meal, and Allergan paid Dr. Meline $1,500 in speaker fees for an event where there were no attendees, no education, no PowerPoint presentation, and nothing occurred other than an Allergan sales representative delivering a check and buying dinner and drinks for a prescribing physician.

238. Relator Jackson was frustrated that he had failed to assemble a legitimate event and considered it to be a failure. When he reported through the IntraMed software that no one attended this scheduled speaker event, he was surprised to find that Allergan did not care. Because Allergan's sole focus was on positive RSVPs, not actual attendees, Allergan did not discipline or criticize Relator Jackson.

239. Due to Allergan's corporate policy of only focusing on positive RSVPs, not actual attendance, speaker events routinely went unattended or "under-attended." Particularly during the explosion of speaker fees paid in 2016 and 2017, Allergan scheduled so many speaker events to funnel cash to physician-speakers that sales representatives had difficulty getting physicians to show up to the events and thus hundreds of events went unattended.

240. For example, on or around July 27, 2016, Allergan GI Division Vice President of Sales Chris Sweeney—who was responsible for all GI sales managers and sales representatives in the Western United States—alerted all Regional and District Managers that Allergan sales reps were not meeting the positive RSVP requirements for upcoming speaker events. Specifically, Mr. Sweeney informed the sales managers that there were **93** speaker events scheduled for the week of August 8, 2016 and only **6** of those speaker events met minimum RSVP requirements. Sweeney then encouraged the sales managers to push their sales representative to obtain the required RSVPs to create an appearance of compliance. Sweeney did not encourage or instruct the sales managers

81

to ensure that the providers who were purportedly to be educated about Allergan's drugs actually attended the event. Nor did Sweeney or Allergan mention withholding payment to the speakers based on low attendance or cancelling or re-scheduling events where the minimum RSVPs had not been obtained.

241. Unsurprisingly, 12 of these scheduled speaker events during the week of August 8, 2016 went totally unattended by anyone other than the speaker-physician and the Allergan sales representative, 17 of the scheduled speaker events were under-attended, and three scheduled speaker events were cancelled because the sales representative did not obtain the requisite RSVPs. Yet, Allergan still paid the speaker-physicians the full honorarium, typically between $1,200 and $3,500, for each of these sham events, for simply showing up to a steakhouse and ordering all the food and drink desired, all paid for by Allergan. Allergan even paid the three speakers for the events that were completely cancelled.

242. From 2015 to May 2018, Allergan paid physician speakers for at least 2,129 sham speaker events where no actual attendees were present, the actual attendees were fewer than the Allergan RSVP requirement, or the event was cancelled prior to the day of the event.

243. In 2015, Allergan paid physician speakers $15,900 for 11 events where no attendees were present. Similarly, in 2015, Allergan paid speaker fees for 28 separate speaker events where the number of actual attendees did not meet the number of RSVPs required to host a speaker event. Allergan paid its speaker-physicians $45,050 in speaker fees for these 28 under-attended events.

244. In 2016, during a surge of speaker fee spending surrounding the launch of Viberzi, Allergan paid speaker-physicians for 507 speaker events where no attendees were present. Every one of these 507 payments was a sham – it is not possible that any education took place. In

82

connection with these 507 unattended events in 2016, Allergan paid speaker-physicians $797,600 in purported speaker fees for sham events where no one was even present to be educated.

245.    Additionally, in 2016, Allergan paid speaker fees for 494 separate speaker events where the number of actual attendees did not meet the number of positive RSVPs required to host a speaker event.  Allergan paid its speaker-physicians $807,400 in speaker fees for these 494 under-attended or non-attended events.

246.    In 2017, Allergan paid speaker-physicians for 425 speaker programs that were not attended by anyone except the physician and the Allergan sales representative.  In total, Allergan spent $670,840 in "speaker fees" alone for these events that were complete shams and not attended by anyone.

247.    In 2018, Allergan paid its GI speaker-physicians for at least 37 "speaker events" where no one except the speaker-physicians and the Allergan sales representative attended.  In total, Allergan paid $62,370 for these unattended, sham, speaker events.  Additionally, in 2018, Allergan paid speaker fees for at least 28 separate speaker events where the number of actual attendees did not meet the number of RSVPs required to host a speaker event.  Allergan paid $49,700 in speaker fees for these 28 under-attended events.

248.    Allergan even paid physicians for events that were cancelled. If the Allergan sales representative could not obtain the requisite number of positive RSVPs for a speaker event (two physicians or prescribers for an in-office event and four attendees including at least three prescribers or dispensers for an out-of-office event), Allergan's policy required that the event be cancelled.  But even when an event was cancelled days ahead of time and the speaker-physician was not required to do anything, Allergan's corporate policy was still to pay the speaker-physician the full amount of speaker fees for doing nothing.  Plainly, the true purpose of this payment and

Allergan's policy of paying physicians the full amount of speaker fees for cancelled events was to induce prescriptions.

249.    In 2015, Allergan paid GI speaker-physicians a total of $32,100 for 19 separate events that were cancelled before the day of the event. In 2016, Allergan paid GI speaker-physicians $151,550 for 93 events that were cancelled prior to the event. In 2017, Allergan paid GI speaker-physicians a total of $118,600 for 69 speaker events that were cancelled days prior to the event.  In 2018, Allergan paid its GI speaker physicians a total of $47,160 for 28 separate events that were cancelled prior to the event.  Some specific examples include:

a.  On February 24, 2015, Allergan paid speaker-physician Dr. Fred Fowler $1,000 for a cancelled in-office speaker event that was scheduled to promote Linzess at Southern Piedmont Primary Care in Monroe, North Carolina.  This event was cancelled before February 24 and Dr. Fowler was not required to do anything for this $1,000 payment other than prescribe Linzess and Viberzi.

b.  On or around January 21, 2016, Allergan paid Dr. Qureshi $1,200 for a cancelled in-office speaker event.  There was no legitimate purpose to pay Dr. Quareshi the full speaker event amount of $1,200 for an event that was cancelled days prior, where Dr. Quareshi never went to the event location, never made any sort of presentation, and never provided any "education."  Instead, Allergan intended its payment of $1,200 to induce to Dr. Quareshi to write Linzess prescriptions.

c.  On or around February 10, 2017, Allergan paid Dr. Harsh Dalal $1,200 related to a purported in-office event that was cancelled.  There was no legitimate purpose to pay Dr. Halal the $1,200.  Dr. Halal never went to the event location, never made any sort

of presentation, and performed no services for Allergan other than writing prescriptions for Linzess.

d.  On August 9, 2017, Allergan paid Dr. Hathaway $2,100 for a speaker event that was cancelled.  This event was scheduled to take place at Ruth's Chris Steakhouse in Myrtle Beach, South Carolina—however, it was cancelled. Dr. Hathaway never went to the event location, never made any sort of presentation, and performed no services for Allergan other than writing prescriptions of Linzess.

e.  On or around January 17, 2018, Allergan paid Dr. Qadri $2,500 for a cancelled in-office speaker event. There was no legitimate purpose to pay Dr. Qadri $2,500 for an event that was cancelled days prior to the scheduled event.  Dr. Qadri never went to the event location, never made any sort of presentation, and performed no services for Allergan except prescribing Linzess.

## ALLERGAN'S SCHEME HAS CAUSED THE SUBMISSION OF THOUSANDS OF FALSE CLAIMS AND COST THE FEDERAL AND STATE GOVERNMENT MILLIONS

250.    By no later than December 1, 2015, Allergan had implemented the illegal kickback scheme described above related to the marketing of Viberzi and Linzess.

251.    Allergan's payments of cash and other remuneration given to speaker-physicians, other HCPs, and their medical practices described herein violate the AKS because the payments and other remuneration were made for the purpose of inducing referrals – *e.g.* prescriptions for Viberzi and Linzess that were paid largely by federal and state health care programs.

252.    On each of the two separate and independent bases described above, Allergan violated the False Claims Act.

253.    First, in the false certification (express or implied) basis of FCA liability, Allergan's illegal remuneration to the speaker doctors it paid made false the various certifications of compliance with the AKS described above.

254.    All claims for payment for the Linzess and Viberzi prescriptions written at least while the prescribing doctors were receiving kickbacks from Allergan were false claims under the FCA. Each claim (a) "made specific representations about the goods or services provided"—that is, that the prescribing doctor had prescribed Linzess or Viberzi in a specified quantity for that Medicare patient—but (b) "fail[ed] to disclose noncompliance with material statutory, regulatory, or contractual requirements [that] makes those representations misleading half-truths"—that is, that the doctor was receiving kickbacks from Allergan. *Universal Health Servs., Inc.,* 579 U.S. at 190.

255.    The second separate and independent basis of FCA liability is the 2010 amendment to the AKS. Based on Allergan's intent to induce the writing of prescriptions for Linzess and Viberzi, as soon as speaker-physicians accepted cash and other remuneration from Allergan, they were in a kickback relationship with Allergan, and every claim paid by federal and state healthcare programs for an Allergan drug prescribed by the speaker-physicians that "resulted from a violation of the [AKS] **constituted a false or fraudulent claim for purposes of [the FCA]**." 42 U.S.C. §1320a-7b(g) (emphasis added).

256.    As alleged herein, Allergan entered into kickback relationships with hundreds of speaker-physicians in 2015 and thereafter resulting in the submission and payment of thousands of claims by federal and state payors. As described above, once Allergan paid the doctors to induce the doctor them to write a prescription for a Medicare covered specific drug, it had violated the and the falsity of any claim for the drug so prescribed results from the AKS violation. It is the

AKS violation itself that causes the claim thereafter submitted to Medicare or other state or federal payors to be false and fraudulent under the FCA.

257.    If additional causation evidence is required, Relators provided above many specific examples of the unlawful remuneration Allergan paid to doctors having the intended causal effect of inducing substantial increases in the number of Linzess and Viberzi prescriptions written by the doctors who received the unlawful payments of remuneration. There are many more.

258.    For example, in 2015, Dr. Shirish Amin of Indiana, PA was a major prescriber of Linzess. As Allergan increased his speaker fees over the next three years, Dr. Amin increased his prescriptions at a dramatic rate. In 2015, Allergan paid Dr. Shirish Amin $10,250 in speaker fees for seven events and Dr. Amin prescribed at least 109 prescriptions of Linzess for Medicare Part D patients—at a cost of $30,871.76 to the Medicare program. In 2016, Allergan paid Dr. Amin $15,250 in speaker fees for 11 events, and he prescribed at least 184 prescriptions of Linzess for Medicare Part D patients—at a cost of $55,914.10 to the Medicare program. In 2017, Allergan paid Dr. Amin $15,851 in speaker fees for seven events and Dr. Amin prescribed at least 202 prescriptions of Linzess, costing the Medicare program $67,825.98. Further, in 2017, Dr. Amin became one of the largest Medicare prescribers of Viberzi in the nation—writing at least 56 prescriptions at a cost of $59,254.43 to the taxpayer funded Medicare program.

259.    Allergan made at least 25 payments to Dr. Amin from 2015 and continuing through at least 2017, specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Amin because of his participation in the companywide Speakers Bureau. and a purpose of each of the payments was to induce Dr. Amin to write prescriptions for Linzess and/or Viberzi for his Medicare patients. Allergan thus paid Dr. Amin remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2015, 2016 and

2017 (and beyond). Each one of the approximately 551 Linzess and Viberzi prescriptions Dr. Amin wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Amin's exercise of independent medical judgment.

260. As Allergan intended and hoped would occur, Dr. Amin's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $193,245.51. Allergan's payments of remuneration to induce Dr. Amin to write Linzess and Viberzi prescriptions for his Medicare patients during 2015, 2016, and 2017, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

261. Another example: Dr. Andrew Boxer is based in Clifton, New Jersey. Allergan added him to the Speaker Bureau in 2017. Before Allergan started paying him kickbacks, Dr. Boxer prescribed a relatively consistent level of Linzess—18 prescriptions in 2015 and 27 prescriptions in 2016. After Allergan added him to the Speaker Bureau and paid him $4,750 in speaker fees for three events in 2017, Dr. Boxer's Linzess Prescriptions increased over 300% to 111 prescriptions, costing Medicare $45,346. Similarly, in 2018, Allergan paid Dr. Boxer $12,100 in speaker fees for nine events. During that time, Dr. Boxer's prescriptions increased again to 117 prescriptions, costing Medicare $47,707.

262. As described above, Allergan made at least 12 payments to Dr. Boxer from 2017 and continuing through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Boxer because of his

participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Boxer to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Boxer remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond).  Each one of the approximate 228 Linzess and Viberzi prescriptions Dr. Boxer wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Boxer's exercise of independent medical judgment.

263.    As Allergan intended and hoped would occur, Dr. Boxer's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $93,053.00. Allergan's payments of remuneration to induce Dr. Boxer to write Linzess and Viberzi prescriptions for his Medicare patients during 2017 and 2018 caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

264.    Allergan made Dr. Gene Chiao—a gastroenterologist based in Highland Park, Illinois—a paid speaker in 2016.  In 2015, prior to being paid by Allergan, Dr. Chiao prescribed 23 prescriptions of Linzess.  Allergan made its first Linzess/Viberzi speaker payment of $1,200 to Dr. Chiao on February 2, 2016. In total in 2016, Allergan paid Dr. Chiao $7,100 in speaker fees for six events and Dr. Chiao's Linzess prescriptions nearly tripled, to 62 prescriptions, for which Medicare paid $23,645.11.  In 2017, Allergan paid Dr. Chiao $6,300 in speaker fees for five events and his Linzess prescriptions increased again to 77 prescriptions.  At the same time, Dr. Chiao became a major prescriber of Viberzi—writing 34 prescriptions to Medicare beneficiaries for which Medicare paid $35,268.48.  Moreover, in 2018—while still a paid Allergan speaker-

physician, Dr. Chiao's Linzess prescriptions increased again up to 105 prescriptions for which Medicare paid $45,407.30, and Dr. Chiao continued prescribing Viberzi—writing 15 prescriptions for which Medicare paid $18,350.65.

265.    As described above, Allergan made at least 12 payments to Dr. Chiao from February 2, 2016 and continuing through the middle of 2018 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Chiao because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Chiao to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Chiao remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond). Each one of the approximate 293 Linzess and Viberzi prescriptions Dr. Chiao wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Chiao's exercise of independent medical judgment.

266.    As Allergan intended and hoped would occur, Dr. Chiao's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $168,078.84. Allergan's payments of remuneration to induce Dr. Chiao to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

267.    Another example: in 2015, Allergan did not pay speaker fees to Dr. Oscar Chien of San Gabriel, California and he prescribed 230 prescriptions of Linzess. After becoming a paid

90

speaker-physician in 2016, Allergan paid him $6,900 in speaker fees for seven events. Dr. Chien increased his prescriptions to 337 prescriptions of Linzess—for which Medicare paid $109,086.41. In 2017, Allergan paid Dr. Chien $6,500 in speaker fees for six events. Dr. Chien's prescriptions increased again to 416 prescriptions of Linzess—for which Medicare paid $148,114.84. Dr. Chien also prescribed significant amounts of Viberzi to Medicare Part D patients in exchange for speaker fees—writing 15 prescriptions costing Medicare $11,725.83 in 2016 and 11 prescriptions costing Medicare $11,753 in 2017.

268.    As described above, Allergan made at least 13 payments to Dr. Chien in 2016 and 2017 and continued through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess. Allergan made each of those ongoing payments to Dr. Chien because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Chien to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Chien remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond). Each one of the approximate 779 Linzess and Viberzi prescriptions Dr. Chien wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Chien's exercise of independent medical judgment.

269.    As Allergan intended and hoped would occur, Dr. Chien's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $280,680.08. Allergan's payments of remuneration to induce Dr. Chien to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by

91

Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

270.    Another example: Dr. Harsh Dalal is a physician based in Merrillville, Indiana and has been a paid Allergan GI speaker-physician since at least 2015.  In 2015, Allergan predecessor Actavis Pharma, Inc. paid Dr. Halal $4,850 to promote Linzess.  In 2016, Allergan paid Dr. Halal $23,900 for 15 speaker events and his Linzess prescriptions increased significantly—to 142 prescriptions for which Medicare paid $45,297.72.  In 2017, Allergan paid Dr. Halal $19,700 in speaker fees for 13 events.  Dr. Halal's prescriptions effectively doubled to 282 prescriptions of Linzess, for which Medicare paid $101,127.05.   During that time Dr. Halal also wrote 11 prescriptions of Viberzi—for which Medicare paid 5,385.39.

271.    As described above, Allergan made at least 28 payments to Dr. Dalal in 2016 and 2017 specifically relating to the prescribing of Viberzi and/or Linzess.  Allergan made each of those ongoing payments to Dr. Halal because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Dalal to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Dalal remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond). Each one of the approximate 435 Linzess and Viberzi prescriptions Dr. Dalal wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Dalal's exercise of independent medical judgment.

272.    As Allergan intended and hoped would occur, Dr. Dalal's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $152,260.16. Allergan's payments of remuneration to induce Dr. Dalal to write Linzess and Viberzi prescriptions for his

Medicare patients during 2016 and 2017 caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

273.    Another example: in 2015, Allergan predecessor Actavis Pharma, Inc. paid Dr. Fred Fowler, a physician based in Charlotte, North Carolina, $2,500 in speaker fees, and he prescribed 114 prescriptions of Linzess.  In 2016, Allergan paid Dr. Fowler $10,100 in speaker fees for eight events.  After Allergan made those payments, Dr. Fowler's prescriptions increased dramatically to 205 prescriptions of Linzess for which Medicare paid $64,857.90.  In 2017, Allergan paid Dr. Fowler $11,000 in speaker fees for five events and his Linzess prescriptions increased again to 260 prescriptions.  Dr. Fowler also was a major prescriber of Viberzi during this time—writing 19 prescriptions for Viberzi in 2016—at a cost of $18,509 and 58 prescriptions of Viberzi in 2017—at a cost of $58,079 to Medicare.

274.    As described above, Allergan made at least 13 payments to Dr. Fowler in 2016 and 2017 specifically relating to the prescribing of Viberzi and/or Linzess.  Allergan made each of those ongoing payments to Dr. Fowler because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Fowler to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Dr. Fowler remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016 and 2107 (and beyond). Each one of the approximate 542 Linzess and Viberzi prescriptions Dr. Fowler wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Fowler's exercise of independent medical judgment.

275.    As Allergan intended and hoped would occur, Dr. Fowler's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $236,710.17. Allergan's payments of remuneration to induce Dr. Fowler to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

276.    Another example: Allergan paid Dr. Jose Lantin of Yonkers, New York, $1500.00 in speaker fees for his first Linzess/Viberzi event on November 6, 2015.  In 2016, Allergan paid Dr. Lantin $10,700 in speaker fees for eight events, and Dr. Lantin's prescriptions of Linzess increased by over 400% – up to 262 prescriptions – for which Medicare paid $89,760.36.  In 2017, Allergan paid Dr. Lantin $18,200 in speaker fees for 13 events, and his prescriptions of Linzess nearly doubled again—up to 439 prescriptions of Linzess and costing $168,874.29 to the Medicare program.  In 2018, Allergan paid him $13,900 for nine speaker events.  Again, Dr. Lantin's Linzess prescriptions skyrocketed—this time to 748 prescriptions for which Medicare paid $293,071.71.

277.    As described above, Allergan made at least 31 payments to Dr. Lantin from November 16, 2015 and continuing through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess.  Allergan made each of those ongoing payments to Dr. Lantin because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Lantin to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Lantin remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond).  Each one of the approximate

1449 Linzess and Viberzi prescriptions Dr. Lantin wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Lantin's exercise of independent medical judgment.

278.    As Allergan intended and hoped would occur, Dr. Lantin's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $551,706.34. Allergan's payments of remuneration to induce Dr. Lantin to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

279.    Another example: Dr. G.S. Ramesh is based in Houston, Texas.  In 2015, before Allergan started paying him kickbacks Dr. Ramesh prescribed 50 prescriptions of Linzess.  On January 20, 2016, Allergan paid him $1,400 for his first Linzess/Viberzi speaker event.  In total in 2016, Allergan paid Dr. Ramesh $19,900 in speaker fees for 13 events, and his prescriptions more than doubled up to 120 prescriptions of Linzess, costing Medicare $38,128.96.  In 2017, Allergan paid Dr. Ramesh $13,050 in speaker fees for seven events and his prescriptions increased yet again to 126 prescriptions at a cost to Medicare of $44,553.67, while he also prescribed 16 prescriptions of Viberzi at a cost to Medicare of $15,046.85.  In 2018, Allergan paid him $15,450 for 12 events. Dr. Ramesh's Linzess prescriptions again increased to 160, costing Medicare $62,436.03.

280.    As described above, Allergan made at least 32 payments to Dr. Ramesh from January 20, 2016 and continuing through at least the end of 2018 specifically relating to the prescribing of Viberzi and/or Linzess.  Allergan made each of those ongoing payments to Dr.

Ramesh because of his participation in the companywide Speakers Bureau and a purpose of each of the payments was to induce Dr. Ramesh to write prescriptions for Linzess and Viberzi for his Medicare patients. Allergan thus paid Dr. Ramesh remuneration to induce him to write Linzess and Viberzi prescriptions throughout 2016, 2017 and 2018 (and beyond). Each one of the approximate 422 Linzess and Viberzi prescriptions Dr. Ramesh wrote for his Medicare patients during that period were written at a time when Allergan knew that the remuneration it was paying could influence Dr. Ramesh's exercise of independent medical judgment.

281.    As Allergan intended and hoped would occur, Dr. Ramesh's prescriptions for Viberzi and Linzess were presented to pharmacies that filled them and claims for the medication were submitted to the Medicare Program causing it to pay approximately $160,165.54. Allergan's payments of remuneration to induce Dr. Ramesh to write Linzess and Viberzi prescriptions for his Medicare patients during 2016, 2017 and 2018, caused each of the resulting prescription based claims to be false because of Allergan's AKS violations and caused each of the claims paid by Medicare to be false and fraudulent claims in violation of the FCA and the comparable state statutes.

282.    In total, Allergan's speaker-physicians wrote thousands of prescriptions for Viberzi and Linzess while they were actively taking kickbacks from Allergan resulting in the payment of many millions of dollars of claims by Medicare, Medicaid, and other federal health benefit programs such as Tricare, the FEHB, and the VA.

283.    Relators have provided herein many examples of these kickbacks to speaker-physicians, and specific examples of claim amounts paid by Medicare for prescriptions written by speaker-physicians after they entered a kickback relationship with Allergan.

284.     In just 2016 and 2017, Allergan paid over $12,000,000 to speakers for events related to Viberzi and Linzess.  During those years, the federal government paid over $39,000,000 through the Medicare Part D program for prescriptions of Viberzi and Linzess written by physicians receiving these kickbacks.

285.     Those representative claims described herein represent only a fraction of the millions of dollars paid by Medicare, Medicaid, and other federal health benefit programs such as Tricare, the FEHB, and the VA.  All those fraudulent payments are recoverable under the FCA.

**ALLERGAN'S UNLAWFUL RETALIATION AGAINST RELATOR JACKSON**

286.     Before and after the launch of Viberzi in December 2015, Relator Jackson was concerned that Allergan was illegally promoting Viberzi and other drugs, including through the illegal solicitation of confidential patient information in violation of HIPAA.  He worried that Allergan's sales and marketing strategy was not only unlawful but was resulting in harm to patients.

287.     As noted above, Relators were instructed to promote Viberzi beyond its target patient group of IBS-D. After initial sales numbers were below expectations, Allergan management instructed its sales force, including Relators, to straightaway and aggressively promote Viberzi off-label to patients who had loose, runny or watery stools, and belly pain or who simply wanted to "eat whatever they wanted without fear of diarrhea."

288.     Relator viewed such marketing as illegal "off label" marketing.

289.     Relator Jackson had personal knowledge that other sales personnel and supervisors responded to the company's directive to market the drug "off-label" for non-IBS-D patients.  That personal knowledge includes: (1) knowledge that representative were obtaining patient lists from gastroenterology practices in their territories to search for all patients with unspecified types of

diarrhea; (2) text messages with other sales representatives complaining about difficulties in using patient lists to identify off-label patients with diarrhea but no IBS-D diagnosis; (3) coaching from his supervisor Foust to promote the drug to non-IBS-D patients and to downplaying potential counterindications of the drug; and (4) direct observation of Foust in a meeting with a HCP downplaying the risk to patients who drank more than three alcoholic beverages a day by saying "don't worry about it, some people can hold their liquor better than others, I take Viberzi myself and I can go to the lake and throw down a 12 pack of beer and it has never affected me."

290.     Relators personally knew Allergan primary care sales representatives who did not know that Viberzi was a Schedule IV opioid, could not be taken by a patient who drank three or more alcoholic beverages a day, and had potential severe and life-threatening consequences for patients who did not have a gallbladder.

291.     Yet, those same primary care sales representatives were aggressively marketing this new drug to primary care physicians and their practice groups, leaving samples and vouchers or copay cards behind for patients to start taking Viberzi immediately without any forewarning or knowledge of its addictive opioid characteristics and significant contraindications or side effects

292.     Defendants' targeting of primary care providers was successful.  Primary care providers have been Viberzi's largest prescribers despite that Viberzi is intended to treat chronic GI disease that primarily affects patients of GI specialists.

293.     Although Relators Jackson refused to take part in what he viewed as illegal off-label marketing, he personally saw the growth in Viberzi prescriptions once other sales representatives, at Allergan's urging, aggressively marketed the drug to doctors to treat patients who were not suffering from IBS-D.  The sale of Viberzi multiplied by a hundred-fold in the first few months of the launch, totaling 64,000 prescriptions by the sixth month of the drug's launch.

98

294.    As an experienced pharmaceutical sales professional who was employed by Allergan while it was under Corporate Integrity Agreements related to off-label marketing and AKS violations, Relator Jackson attended mandatory compliance training instructing against off-label marketing and AKS violations.

295.    While promoting and selling Viberzi, Relator Jackson's direct supervisor Alan Foust directed Relator Jackson not to raise the contraindications and potential dangers associated with Viberzi and to minimize the potential risks of the drug to particular patients. Through Relator Jackson's experience and training at regional and national sales meetings, Relator Jackson knows that Mr. Foust's directives were consistent with Allergan's aggressive marketing and sales strategy nationwide.

296.    Mr. Foust and Allergan reprimanded Jackson because he described Viberzi and its properties truthfully, limited his marketing pitches to approved uses, and objected to making false representations to health care providers about the drugs' harmful properties.

297.    In January 2016, Mr. Foust came to Fort Smith, Arkansas to conduct a field-ride training session with Jackson. During the training, Foust instructed Jackson (a) to recommend Viberzi for patients for whom Viberzi was dangerous, and (b) to disregard Viberzi's contraindications, addictive properties, and side effects.

298.    Mr. Foust reprimanded Jackson for discussing contraindications with medical staff at several health care providers' offices. Mr. Foust went even further and advised Relator Jackson that he would be filling out a coaching report about Relator Jackson based upon Jackson's refusal to go along with Foust's directives to make false representations about Viberzi. Foust warned Relator that the report would "sting."

99

299.     Through 2016, a pattern developed of Foust reprimanding Jackson for his refusal to disregard the appropriate patient profile warnings and precautions of Viberzi.  Mr. Foust wrote two negative performance reviews of Jackson in 2016 in addition to the negative coaching report in January 2016.   Foust's negative performance reviews of Jackson were nothing more than retaliation for Jackson's refusal to improperly promote and make false representations that downplayed the contraindications of Viberzi.

300.     Mr. Foust is an experienced pharmaceutical sales manager and veteran of Forest Laboratories, who is familiar with its FCA off-label settlements and the scrutiny of the prior Corporate Integrity Agreements.  While the Corporate Integrity Agreements were in effect, Foust also attended government mandated compliance training regarding off-label marketing.  Mr. Foust is well aware that off-label marketing, the practice of promoting drugs for uses other than what the Food and Drug Administrations has approved can result in a *qui tam* lawsuit and FCA liability. Mr. Foust also knows that retaliating against employees for raising concerns about off-label marketing can result in liability for retaliation under the FCA.

301.     Jackson informed other Allergan managers and the Human Resources Department that Foust was directing him to lie about the drug's potentially addictive opioid properties and the recommended profile of patients who should take Viberzi.  He also informed management that he believed Foust was retaliating against him.

302.     In August 2016, Kristi Curleau, an Allergan's Human Resources employee sent Relator Jackson an email asking to arrange a confidential phone call.  During the call, Ms. Curleau asked Jackson if he felt Foust was discriminating against him.  Jackson replied that he did feel like he was being discriminated against and was being "singled out for not promoting products 'off-label.'"  Jackson further informed the HR Department that off-label promotion of Viberzi was

100

occurring in his territory and that he believed the representations about the drug that were being made by Allergan sales representatives were unlawful and constituted off-label marketing. Ms. Curleau responded that Allergan took Relator Jackson's allegations very seriously and that she was documenting his concerns.

303. In September 2016, Relator Jackson called Allergan Regional Manager Jimmy Martin, who was Mr. Foust's supervisor. Relator Jackson told Mr. Martin that Mr. Foust was consistently encouraging sales representatives to promote Viberzi for off-label purposes and for patients who do not exhibit IBS-D symptoms.

304. In this conversation, Relator Jackson also informed Mr. Martin that Mr. Foust was retaliating against him for refusing to downplay the dangerous contraindications and other warnings and precautions associated with Viberzi and for refusing to promote Viberzi for off-label purposes in violation of the FCA. Despite receiving detailed information about the allegations of potential FCA violations in his territory, Mr. Martin ignored Relator Jackson's concerns.

305. When this meeting occurred, Foust and Martin of course knew that they and other at Allergan had been directing the sales force to promote Viberzi for off label purposes and that other members of the sales fore had done as instructed resulting in increased sales numbers.

306. Mr. Martin is an experienced pharmaceutical sales manager and veteran of Forest Laboratories, who is familiar with its False Claims Act off-label settlements. During the period when the Forest CIAs were in effect, Mr. Martin also attended mandatory compliance training regarding off-label marketing and FCA compliance. Mr. Martin is well aware that off-label marketing can result in a *qui tam* lawsuit and FCA liability. Mr. Martin also knows that retaliating against employees for raising concerns about off-label marketing can result in liability for retaliation under the FCA.

307.    On January 19, 2017, Mr. Foust again reprimanded Relator Jackson for not describing Viberzi in a deceptive manner to prescribers.  Foust stated "he felt we are back to square one."  Foust then stated that "we are going to make some decisions tonight and will let you know something in the morning."   The next day, January 20, 2017, Foust and Brian McKenna, an Allergan Human Resources employee, called and informed Mr. Jackson that he was being dismissed for "Not Meeting Expectations."  The expectations that were not being met were clearly that Mr. Jackson would not be quiet about Foust's off-label marketing strategies and the apparent FCA violations.

308.    In fact, Allergan terminated Relator Jackson in retaliation for his efforts to stop violations of the FCA, his refusal to engage in fraudulent behavior, and his continued concerns to Allergan managers and human resources employees regarding potential FCA liability and Allergan's discrimination for his refusal to participate in the illegal activity.

309.    Relator Jackson met and exceeded several performance-related measures that demonstrate he was a highly capable and productive sales representative, and Allergan did not fire him because of his ability to perform legitimate duties.  For example, in early 2016 when Relator Jackson was raising off-label marketing concerns, Chris Sweeney, the Vice President of GI Sales, recognized Jackson as a "mover and shaker," an award bestowed upon top Allergan Sales Representatives whose performance was in the top 13 percent of sales nationally.   Further demonstrating his productivity during the time Mr. Foust was his supervisor, Relator Jackson was in the top 50 percent in sales in the United States for the top three products in which he marketed and sold.  He was in the top 15 percent of sales of Linzess and the top 42 percent in sales of Viberzi. Allergan also paid Relator Jackson his 2016 fourth quarter bonus **after** his termination.  This bonus was earned during October through December of 2016, the time right before Allergan fired Jackson

in January 2017. Under Allergan's bonus policy, employees must be in good standing and not on a performance plan to receive a quarterly bonus.

310. As alleged, Jackson engaged in protected activity by his lawful acts to stop one or more violations of the FCA by: (a) refusing to cause the submission of false claims for payment to the government for drug reimbursement, and (b) informing individuals in Allergan's Human Resources Department and other sales and marketing managers of his belief that Defendant was unlawfully promoting and selling Viberzi, leading to inappropriate prescriptions being written for such patients, and to ongoing violations of the FCA. Allergan then terminated Jackson in direct retaliation for engaging in such protected activity.

311. Relator Jackson is entitled to reinstatement, double back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, litigation costs, reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3730(h).

## COUNT I: Federal FCA
### (31 U.S.C. § 3729(a)(1)(A))

312. The allegations in paragraphs 1-301 are incorporated by reference.

313. By virtue of the kickbacks (in violation of the AKS), false certifications (express and implied), misrepresentations, and causing the submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly caused to be presented false or fraudulent claims for the improper payment or approval of drugs on behalf of federal and state health care program beneficiaries in violation of 31 U.S.C. § 3729(a)(1)(A).

314. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused to be submitted, paid for claims that otherwise would not have been paid.

315.     Because of these false or fraudulent claims, Defendants are liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the False Claims Act.  As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

### COUNT II: Federal FCA
### (31 U.S.C. § 3729(a)(1)(B))

316.     The allegations in paragraphs 1-301 are incorporated by reference.

317.     Defendants knowingly made, used, or caused to be made or used, the false certifications described above, and false records or statements material to a false or fraudulent claim or to get a false or false claim paid or approved by the United States, to wit: Defendants created or used false speaker event attendance records, caused to be made or used false Medicare enrollment certifications, and false Medicare billing certifications, including but not limited to those material certifications on Form CMS 855-I, Form CMS 855-O, Form CMS-64 and Form CMS-37.

318.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

319.     Because of these false or fraudulent claims, Defendants are liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.  As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

### COUNT III: Federal FCA Conspiracy
### (31 U.S.C. § 3729(a)(1)(C))

320.     The allegations in paragraphs 1-208 are incorporated by reference.

321.     Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(C).

322.     By virtue of kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), the false certifications (express and implied) described above, and misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly conspired with HCPs including but not limited to Dr. Paul Bierman, Dr. Adam Levy, Dr. Asif Qadri, and other HCPs  described above, to commit violations of the FCA and the AKS for the improper payment or approval of drugs on behalf of federal health care program beneficiaries.

323.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

324.     Because of these false or fraudulent claims, Defendants are liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.  As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## <u>COUNT IV: Federal FCA</u>
### <u>(31 U.S.C. § 3729(a)(1)(G))</u>

325.     The allegations in paragraphs 1-301 are incorporated by reference.

326.     With knowledge of kickbacks provided and the associated claims submitted (in violation of the AKS), on a corporate-wide basis described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States in violation of 31 U.S.C. § 3729(a)(1)(G), to wit: knowingly submitted false claims to the United States and received funds

based on false claims in violation of the FCA and Anti-Kickback Statute, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

327.    Because of these false or fraudulent claims, Defendants are liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.   As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT V: Arkansas State Medicaid Fraud False Claims Act
### (Ark. Code § 20-77-900, et seq.)

328.    The allegations in paragraphs 1-208 are incorporated by reference.

329.    Relators also bring this action on behalf of the State of Arkansas, against Defendants under the Arkansas State Medicaid Fraud False Claims Act ("FCA"), Ark. Code § 20-77-900 et seq.

330.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Arkansas FCA, Ark. Code § 20-77-902, which create liability for any person who:

> (1) Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;
>
> (2) At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;
>
> ***
>
> (6) Knowingly solicits or receives any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind:

**(A)** In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or

**(B)** In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program;

**(7) (A)** Knowingly offers or pays any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce the person:

**(i)** To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or

**(ii)** To purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program.

331.    Defendants also violated the conspiracy provisions of the statute.

332.    Pursuant to the Arkansas FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ark. Code § 20-77-900 *et seq.*

333.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT VI: California FCA
### (Cal. Gov't Code § 12650, et seq.)

334.    The allegations in paragraphs 1-208 are incorporated by reference.

335.    Relators also bring this action on behalf of the State of California, against Defendants under the California False Claims Act ("FCA"), Cal. Gov't Code § 12652(c).

336.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provisions of the California FCA, Cal. Gov't Code § 12651(a)(1), (a)(2), and (a)(7), which create liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval.;" "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" and "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision." Defendants also violated the conspiracy provisions of the statute.

337.     Pursuant to the California FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Cal. Gov't Code § 12651(a)(1). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT VII: Colorado Medicaid False Claims Act,
#### (Colo. Rev. Stat. § 25.5-4-303.5, et seq.)

338.     The allegations in paragraphs 1-208 are incorporated by reference.

339.     Relators also bring this action in the name of the State of Colorado, against Defendants pursuant to the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306.

340.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(a), which creates liability for any person who "[k]nowingly presents,

108

or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval."

341.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(b), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

342.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305)1)(f), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act,' or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act.'"

343.     Defendants also violated the conspiracy provisions of the statute.

344.     Pursuant to the Colorado FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law.  Colo. Rev. Stat. § 25.5-4-305(1).

### COUNT VIII: Connecticut False Claims Act,
(Conn. Gen. Stat. § 4-274, et seq.)

345.     The allegations in paragraphs 1-208 are incorporated by reference.

346.     Relators also bring this action in the name of the State of Connecticut, against Defendants pursuant to the Connecticut False Claims Act, Conn. Gen. Stat. § 4-277.

109

347. Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(1), which provides that no person shall "[k]nowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program."

348. Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(2), which provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program."

349. Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provisions of the Connecticut FCA, Conn. Gen. Stat. § 4/275(a)(7), which provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program."

350. Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(8), which provides that no person shall "[k]nowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program."

351. Defendant also violated the conspiracy provisions of the statute.

352. Pursuant to the Connecticut FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above,

Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by the law.  Conn. Gen. Stat. § 4-275(b).

## COUNT IX: Delaware False Claims & Reporting Act
### (Del. Code Ann. Tit. 6 § 1201, et seq.)

353.    The allegations in paragraphs 1-208 are incorporated by reference.

354.    Relators also bring this action on behalf of the Government of the State of Delaware, against Defendants under the State of Delaware's False Claims and Reporting Act ("FCA"), Del. Code Ann. tit. 6, § 1203(b)(1).

355.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(1), (a)(2) and (a)(7), which create liability for any person who "[k]nowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;"  "[k]nowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;" and  "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  Defendants also violated the conspiracy provisions of the statute.

356.    Pursuant to the Delaware FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Del. Code Ann. tit. 6, §1201(a). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT X: District of Columbia False Claims Act
### (D.C. Code Ann. § 2.381.01, et seq.)

357.     The allegations in paragraphs 1-208 are incorporated by reference.

358.     Relators also bring this action in the name of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.03(b)(1).

359.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

360.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

361.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(6), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District."

362.     Defendants also violated the conspiracy provisions of the statute.

363.     Pursuant to the D.C. FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Defendants are thus

liable to the District for statutorily defined damages sustained because of the acts of Defendants and civil penalties. D.C. Code Ann. § 2-381.02(a).

### COUNT XI: Florida FCA
### (Fla. Stat. § 68.081, et seq.)

364. The allegations in paragraphs 1-208 are incorporated by reference.

365. Relators also bring this action on behalf of the State of Florida, against Defendants under the State of Florida's False Claims Act ("FCA"), Fla. Stat. § 68.083(2).

366. Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(a), (b), and (g) which create liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval;" "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" and "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state." Defendants also violated the conspiracy provisions of the statute.

367. Pursuant to the Florida FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Fla. Stat. § 68.082(2). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XII: Georgia State False Medicaid Claims Act
### (O.C.G.A. § 49-4-168, et seq.)

368. The allegations in paragraphs 1-208 are incorporated by reference.

369.     Relators also bring this action in the name of the State of Georgia, against Defendants pursuant to the Georgia State False Medicaid Claims Act ("SFMCA"), O.C.G.A. § 49-4-168 et seq.

370.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia SFMCA, O.C.G.A. § 49-4-168.1(a)(1), (a)(2), and (a)(7), which create liability for any person who "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;" "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" and "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program." Defendants also violated the conspiracy provisions of the statute.

371.     Pursuant to the Georgia SFMCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. O.C.G.A. § 49-4-168.1(a). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XIII: Hawaii False Claims Act,
**(Haw. Rev. Stat. § 661-21, et seq.)**

372.     The allegations in paragraphs 1-208 are incorporated by reference.

373.     Relators also bring this action on behalf of the State of Hawaii and its political subdivisions, against Defendants under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-25(a).

374.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(l), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

375.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

376.     Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(6), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

377.     Defendants also violated the conspiracy provisions of the statute.

378.     Pursuant to the Hawaii FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Haw. Rev. Stat. § 661-21(a).

## **COUNT XIV**: Illinois FCA
### (740 Ill. Comp. Stat. 175/1, et seq.)

379.     The allegations in paragraphs 1-208 are incorporated by reference.

380.     Relators also bring this action on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act ("FCA"), 740 Ill. Comp. Stat. 175/4(b).

381.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(A), (B), and (G) which create liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" and "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State." Defendants also violated the conspiracy provisions of the statute.

382.    Pursuant to the Illinois FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. 740 Ill. Comp. Stat. 175/3(a). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XV: Indiana Medicaid False Claims and Whistleblower Protection Act
### (Ind. Code § 5-11-5.7, et seq.)

383.    The allegations in paragraphs 1-208 are incorporated by reference.

384.    Relators also bring this action on behalf of the State of Indiana, against Defendants under the State of Indiana False Claims and Whistleblower Protection Act ("FCA"), Ind. Code § 5-11-5.7-4(a).

385.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(l) and (a)(2) which create liability for any person who "knowingly presents, or

116

causes to be presented, a false or fraudulent claim for payment or approval" and "knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim."

386.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, also violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), which creates liability for any person who "(A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."  Defendants also violated the conspiracy provisions of the statute.

387.    Pursuant to the Indiana FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ind. Code § 5-11-5.5-2(b).  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XVI: Iowa FCA
### (Iowa Code § 685.1, et seq.)

388.    The allegations in paragraphs 1-208 are incorporated by reference.

389.    Relators also bring this action on behalf of the State of Iowa, against Defendants under the State of Iowa False Claims Act ("FCA"), Iowa Code § 685.3(2)a.

390.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code § 685.2(1).a, b., and g.  which create liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "[k]nowingly makes, uses,

117

or causes to be made or used, a false record or statement material to a false or fraudulent claim" and "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state." Defendants also violated the conspiracy provisions of the statute.

391.    Pursuant to the Iowa FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Iowa Code § 685.2(1). As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

### COUNT XVII: Louisiana Medical Assistance Programs Integrity Law
**(La. Rev. Stat. Ann. § 46:437.1, et seq.)**

392.    The allegations in paragraphs 1-208 are incorporated by reference.

393.    Relators also bring this action on behalf of the State of Louisiana's medical assistance programs, against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law ("FCA"), La. Rev. Stat. Ann. § 46:439.1.A.

394.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.A, B, and C, which state that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim;" "[n]o person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;" and  "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to

118

pay or transmit money or property to the medical assistance programs." Defendants also violated the conspiracy provisions of the statute.

395.    Pursuant to the Louisiana FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. La. Rev. Stat. Ann. § 46:438.6. As a result of Defendants' violations, the State of Louisiana has suffered damages in an amount to be determined at trial.

### COUNT XVIII: The Commonwealth of Massachusetts FCA
### (Mass. Ann. Laws Ch. 12, § 5A, et seq.)

396.    The allegations in paragraphs 1-208 are incorporated by reference.

397.    Relators also bring this action on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act ("FCA"), Mass. Ann. Laws ch. 12, § 5C(2).

398.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(1), B(2), and B(9), which create liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;" and "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof." Defendants also violated the conspiracy provisions of the statute.

119

399.    Pursuant to the Massachusetts FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mass. Ann. Laws ch. 12, § 5B(a).  As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIX: Michigan Medicaid FCA
### (Mich. Comp. Laws Serv. § 400.601, et seq.)

400.    The allegations in paragraphs 1-208 are incorporated by reference.

401.    Relators also bring this action in the name of the State of Michigan, against Defendants under the State of Michigan Medicaid False Claims Act ("FCA"), Mich. Comp. Laws Serv. § 400.610a(l).

402.    Defendants, through the material illegal remuneration, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Michigan FCA, Mich. Comp. Laws Serv. § 400.603(1)-(3):

> (1)    A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.

> (2)    A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.

> (3)    A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled.

403.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Michigan FCA, Mich.

120

Comp. Laws Serv. § 400.607(1) and (2), which state that "[a] person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false;" and "[a] person shall not knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act." Defendants also violated the conspiracy provisions of the statute.

404.    Pursuant to the Michigan FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mich. Comp. Laws. Serv. § 400.612. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XX: Minnesota False Claims Act,
### (Minn. Stat. § 15C.01, et seq.)

405.    The allegations in paragraphs 1-208 are incorporated by reference.

406.    Relators also bring this action on behalf of the State of Minnesota and its political subdivisions, against Defendants under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

407.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Minnesota FCA, Minn. Stat. § 15C.02(a), which create liability for any person who:

>    (1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

>    (2)    knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

(7)    knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

408.    Defendants also violated the conspiracy provisions of the statute.

409.    Pursuant to the Minnesota FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Minn. Stat. § 15C.02(a).

### COUNT XXI: Missouri Health Care Payment Fraud and Abuse Statute, (MO Rev. Code § 191.900, et seq.)

410.    The allegations in paragraphs 1-208 are incorporated by reference.

411.    Relators also bring this action on behalf of the State of Missouri, against Defendants under the Missouri Health Care Payment Fraud and Abuse Statute ("FCA"), MO Rev. Code § 191.900, *et seq.*

412.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Missouri FCA, MO Rev. Code § 191.905, which create liability for any person who:

91.905. 1. No health care provider shall knowingly make or cause to be made a false statement or false representation of a material fact in order to receive a health care payment, including but not limited to:

(1) Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not;

(2) Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment made by a health care payer for providing health care;

122

(3) Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled;

***

2. No person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for:

(1) Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

(2) Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

3. No person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

413.    Defendants also violated the conspiracy provisions of the statute.

414.    Pursuant to the Missouri FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. MO Rev. Code § 191.905.

415.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXII: Montana FCA
### (Mont. Code Ann. § 17-8-401, et seq.)

416.    The allegations in paragraphs 1-208 are incorporated by reference.

417.    Relators also bring this action on behalf of the State of Montana, against Defendants under the State of Montana False Claims Act ("FCA"), Mont. Code Ann. § 17-8-406(1).

123

418.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Montana FCA, Mont. Code Ann. § 17-8-403(1), which create liability for any person who:

>     (a)     knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
>
>     (b)     knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]
>
>      …
>
>     (g)     knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity.

419.     Defendants also violated the conspiracy provisions of the statute.

420.     Pursuant to the Montana FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mont. Code Ann. § 17-8-403(2).

421.     As a result of Defendant's violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIII: Nevada Submission of False Claims to State or Local Government Act
### (Nev. Rev. Stat. § 357.010, et seq.)

422.     The allegations in paragraphs 1-208 are incorporated by reference.

423.     Relators also bring this action on behalf of the State of Nevada, against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act ("FCA"), Nev. Rev. Stat. § 357.080(1).

424.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Nevada FCA, Nev. Rev. Stat. § 357.040(l), which create liability for any person who:

>        (a)      Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
>        (b)      Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.
>        …
>
>        (f)      Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision; or
>
>        (g)      Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

425.     Defendants also violated the conspiracy provisions of the statute.

426.     Pursuant to the Nevada FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Nev. Rev. Stat. § 357.040(2).

427.     As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIV: New Hampshire False Claims Act
### (N.H. Rev. Stat. Ann. § 167:61-B, et seq.)

428.     The allegations in paragraphs 1-208 are incorporated by reference.

429.     Relators also bring this action on behalf of the State of New Hampshire, against Defendants under the State of New Hampshire False Claims Act ("FCA"), N.H. Rev. Stat. Ann. § 167:61-b, et seq.

430.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of The New Hampshire FCA, N.H. Rev. Stat. Ann. § 167:61-b, which create liability for any person who:

      (a)    Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.

      (b)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.
…

      (d)    Has possession, custody, or control of property or money used, or to be used, by the department and, intending to defraud the department or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt.

      (e)    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the department; or

      (f)    Is a beneficiary of an inadvertent submission of a false claim to the department, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the department within a reasonable time after discovery of the false claim.

431.    Defendants also violated the conspiracy provisions of the statute.

432.    Pursuant to the New Hampshire FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.H. Rev. Stat. Ann. § 167:61-b, et seq.

433.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXV: New Jersey False Claims Act
### (N.J. Stat. Ann. § 2A:32C-1, et seq.)

434.     The allegations in paragraphs 1-208 are incorporated by reference.

435.     Relators also bring this action in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey False Claims Act ("FCA"), N.J. Stat. Ann. § 2A:32C-5.b.

436.     Defendants, through their illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3, which create liability for any person who:

> a.     Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;
>
> b.     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;
> …
> g.     Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

437.     Defendants also violated the conspiracy provisions of the statute.

438.     Pursuant to the New Jersey FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.J. Stat. Ann. § 2A:32C-3.

439.     As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXVI: New Mexico Medicaid FCA
### (N.M. Stat. Ann. § 27-14-1, et seq.)

440.     The allegations in paragraphs 1-208 are incorporated by reference.

441.    Relators also bring this action on behalf of the State of New Mexico, against Defendants under the State of New Mexico Medicaid False Claims Act ("FCA"), N.M. Stat. Ann. § 27-14-7.B.

442.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New Mexico FCA, N.M. Stat. Ann. § 27-14-4, which create liability for any person who:

> A.  presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;
>
> B.     presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;
>
> C.     makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false; [or]
> …
> E.     makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false.

443.    Defendants also violated the conspiracy provisions of the statute.

444.    Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

445.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

**COUNT XXVII: New York False Claims Act,**
**(N.Y. State Fin. Law § 187, et seq.)**

446.    The allegations in paragraphs 1-208 are incorporated by reference.

128

447.    Relators also bring this action on behalf of the State of New York, against Defendants under the State of New York False Claims Act, N.Y. State Fin. Law § 190(2).

448.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New York FCA, N.Y. State Fin. Law § 189(1), which create liability for any person who:

> (a)    knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (b)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> …
> (g)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or
>
> (h)    knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same….

449.    Defendants also violated the conspiracy provisions of the statute.

450.    Pursuant to the New York FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.Y. State Fin. Law § 189(1).

## COUNT XXVIII: North Carolina False Claims Act
### (N.C. Gen. Stat. § 1-605, et seq.)

451.    The allegations in paragraphs 1-208 are incorporated by reference.

452.    Relators also bring this action on behalf of the State of North Carolina, against Defendants under the State of North Carolina False Claims Act ("FCA"), N.C. Gen. Stat. § 1-608(b).

453. Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the North Carolina FCA, N.C. Gen. Stat. § 1-607(a), which create liability for any person who:

> (1)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (2)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
> …
> (7)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

454. Defendants also violated the conspiracy provisions of the statute.

455. Pursuant to the North Carolina FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.C. Gen. Stat. § 1-607(a). Defendant also violated the conspiracy provisions of the statute.

456. As a result of Defendant's violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIX: Oklahoma Medicaid FCA
### (Okla. Stat. Tit. § 63-5053, et seq.)

457. The allegations in paragraphs 1-208 are incorporated by reference.

458. Relators also bring this action in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid False Claims Act ("FCA"), Okla. Stat. tit. § 63-5053.2(B).

459.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Oklahoma FCA, Okla. Stat. tit. § 63-053.1(B), which create liability for any person who:

>    1.    Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;
>
>    2.    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;
>    … or
>
>    7.    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state.

460.    Defendants also violated the conspiracy provisions of the statute.

461.    Pursuant to the Oklahoma FCA, based on Defendants' material illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law under Oklahoma FCA, Okla. Stat. tit. § 63-053.1(B).

462.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXX: Rhode Island FCA
### (R.I. Gen. Laws § 9-1.1-1, et seq.)

463.    The allegations in paragraphs 1-208 are incorporated by reference.

464.    Relators also bring this action in the name of the State of Rhode Island, against Defendants pursuant to the State of Rhode Island False Claims Act ("FCA"), R.I. Gen. Laws § 9-1.1-4(b).

465.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a), which create liability for any person who:

> (1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (2)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> …
> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state….

466.    Defendants also violated the conspiracy provisions of the statute.

467.    Pursuant to the Rhode Island FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. R.I. Gen. Laws § 9-1.1-3(a).

468.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXXI: Tennessee Medicaid FCA
### (Tenn. Code Ann. § 71-5-181, et seq.)

469.    The allegations in paragraphs 1-208 are incorporated by reference.

470.    Relators also bring this action in the name of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act ("FCA"), Tenn. Code Ann. § 71-5-183(b)(1).

471.    Defendants, through the material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l), which create liability for any person who:

> (A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;
>
> (B)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program; [or]
>
> (C)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program.

472.    Defendants also violated the conspiracy provisions of the statute.

473.    Pursuant to the Tennessee FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tenn. Code Ann. § 71-5-182(a).

474.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXXII: Texas Medicaid Fraud Prevention Act
### (Tex. Hum. Res. Code § 36.001, et seq.)

475.    The allegations in paragraphs 1-208 are incorporated by reference.

476.    Relators also bring this action in the name of the State of Texas, against Defendants under the State of Texas Medicaid Fraud Prevention Act ("FCA"), Tex. Hum. Res. Code § 36.101(a).

477.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Texas FCA, Tex. Hum. Res. Code § 36.002, which create liability for any person who, *inter alia*:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3)    knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;
…

(12)    knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13)    knowingly engages in conduct that constitutes a violation under Section 32.039(b).

478.    Defendants also violated the conspiracy provisions of the statute.

479.    Pursuant to the Texas FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for three times the payments or benefits provided under the Medicaid program directly or indirectly as a result of the Defendant's unlawful acts, civil penalties, and all other relief authorized by law.  Tex. Hum. Res. Code § 36.052.

## COUNT XXXIII: Vermont FCA
### (Vt. Stat. Tit. 32, 630, et seq.)

480. The allegations in paragraphs 1-208 are incorporated by reference.

481. Relators also bring this action in the name of the State of Vermont, against Defendants under the State of Vermont False Claims Act ("FCA"), Vt. Stat. Ann. tit. 32, § 632(b).

482. Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Vermont FCA, Vt. Stat. Ann. tit. 32, § 631, which state that no person shall:

> (1)     knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;
>
> (2)     knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;
> …
> (8)     enter into a written agreement or contract with an official of the State or its agent knowing the information contained therein is false;
>
> (9)     knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State; [or]
>
> (10)     knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

483. Defendants also violated the conspiracy provisions of the statute.

484. Pursuant to the Vermont FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Vt. Stat. Ann. tit. 32, § 631(b).

485. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXXIV: Virginia Fraud Against Taxpayers Act
### (Va. Code Ann. § 8.01-216.1, et seq.)

486.    The allegations in paragraphs 1-208 are incorporated by reference.

487.    Relators also bring this action on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act ("FCA"), Va. Code Ann. § 8.01-216.5(A).

488.    Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Virginia FCA, Va. Code Ann. § 8.01-216.3(A), which create liability for any person who:

> 1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> 2.    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> …
> 7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth.

489.    Defendants also violated the conspiracy provisions of the statute.

490.    Pursuant to the Virginia FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Va. Code Ann. § 8.01-216.3(A).

491.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXXV: Washington State Medicaid Fraud FCA
### (Wash. Rev. Code § 74.66.005, et seq.)

492.     The allegations in paragraphs 1-208 are incorporated by reference.

493.     Relators also bring this action on behalf of the State of Washington, against Defendants under the Washington State Medicaid Fraud False Claims Act ("FCA"), Wash. Rev. Code § 74.66.050(1).

494.     Defendants, through the illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Washington FCA, Wash. Rev. Code § 74.66.020(1), which create liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> …
> (g)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

495.     Defendants also violated the conspiracy provisions of the statute.

496.     Pursuant to the Washington FCA, based on Defendants' illegal remuneration, material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wash. Rev. Code § 74.66.020(1).

497.     As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXXVI: Wisconsin False Claims for Medical Assistance Act,
### (Wis. Stat. § 20.931, et seq.)

498.    The allegations in paragraphs 1-208 are incorporated by reference.

499.    Relators also bring this action on behalf of the State of Wisconsin, against Defendants under the State of Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931(5)(a), for material misrepresentations, non-disclosures and other wrongful acts and omissions that occurred before the (non-retroactive) repeal of that law effective July 14, 2015.

500.    Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Wisconsin FCA, Wis. Stat. § 20.931(2), which created liability for any person who:

> (a)  Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.
>
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.
> ….
> (g)  Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program.

501.    Defendants also violated the conspiracy provisions of the statute.

502.    Pursuant to the Wisconsin FCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wis. Stat. § 20.931(2).

## COUNT XXXVII: California Insurance Frauds Prevention Act
### (California Insurance Code § 1871.7(a) & (b))

503.    The allegations in paragraphs 1-208 are incorporated by reference.

138

504.     Relators also bring this action for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. § 1871.7, as amended ("CIFPA"). The CIFPA provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim, as may be amended. Cal. Ins. Code § 1871.7(b).

505.     Subsection (e) of Cal. Ins. Code § 1871.7 provides for a *qui tam* civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. Cal. Ins. Code § 1871.7(e). The *qui tam* provision was patterned after the Federal False Claims Act, 31 U.S.C. §§ 3729-32, and the California False Claims Act, Cal. Gov't Code §§12650 et seq.

506.     Subsection (b) of Cal Ins. Code § 1871.7 provides for civil recoveries against person who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits certain activities, including violations of 550(a)(5)-(6), (b)(1), (2), and (3).

507.     Defendants caused to be presented, or knowingly assisted or conspired in presenting or causing to be presented, to the insurers in the State of California fraudulent claims that were induced by payments of kickbacks to physicians, in violation of Penal Code § 550 (b)(1), among other provisions.

508.     Defendants also concealed and/or failed to disclose information that would have affected the rights of pharmacies to receive reimbursement for prescriptions, in violations of Penal Code § 550(a).

509. Each claim for reimbursement that was inflated as a result of Defendants' illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

510. Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

511. The payment of the kickbacks alleged in this Complaint represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

512. Moreover, the payment of these kickbacks violates the "runners and cappers" provision of § 1871.7(a), as Defendants' kickback scheme was to "procure clients or patients to obtain services or benefits under a contract of insurance." In the alternative, Defendants' payment of kickbacks violated the "runners and cappers" provision of § 1871.7(a), as Defendants' employment of sales representatives to provide kickbacks to physicians in order to generate prescriptions that would eventually be paid for by private insurance companies constitutes the unlawful and knowing employment of "runners, cappers, steerers, or other persons ... to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." The Relators know and believe that these practices continued beyond the time at which they were employed at Allergan, and upon information and belief, this pattern and practice continues to the present.

513. The payment of the kickbacks alleged in this Complaint represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false

claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

514.    The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code § 1871.7.  Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged.

## COUNT XXXVIII: Illinois Insurance Frauds Prevention Act
### (740 Ill. Comp. Stat § 92)

515.    The allegations in paragraphs 1-208 are incorporated by reference.

516.    Relators also bring this action for treble damages and penalties under the Illinois Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92

517.    Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:  A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

518.    Article 46 of the Illinois Criminal Code, referenced in the above-quoted section, provides criminal penalties for any person who commits the offense of insurance fraud, defined in the statute as follows: (a) A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company…. 720 Ill. Comp. Stat. §5/46-1(a).

141

519.     Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a *qui tam* civil action in order to create incentives for private individuals to prosecute violations of the statute.  Subsection 15(a) provides: "An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois.  The action shall be brought in the name of the State."  740 Ill. Comp. Stat. §92/15(a).

520.     By virtue of the conduct described in this Complaint, Defendants committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Claims Fraud Prevention Act: knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat §5/46-1(a).

521.     As a result of such conduct, Defendants have received illegal profits to which they were not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

522.     The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by Defendants in violation of 740 Ill. Comp. Stat. § 92. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged in this Complaint.

## COUNT XXXIX: UNLAWFUL RETALIATION
### (31 U.S.C. § 3730(h))

523.     Relator Jackson adopts and incorporates paragraphs 1-208.

524.     Relator Jackson engaged in protected activity while employed by Allergan, to stop one or more violations of the FCA, including by refusing to promote Allergan drug Viberzi in a

deceptive, misleading and off-label manner. Based on compliance training and his extensive experience as a pharmaceutical sales representative, Relator Jackson reasonably believed that the off-label and deceptive messages Allergan instructed him to use were illegal under the Food, Drug and Cosmetic Act and the FCA, and thus resulted in false claims being submitted. Further, Relator Jackson reported these concerns to Allergan Human Resources employees. Relator Jackson engaged in this protected activity in an effort to prevent violations of the False Claims Act.

525.    In violation of 31 U.S.C § 3730(h), Defendants retaliated against Relator Jackson because of his efforts to stop violations of the FCA and to prevent violations of the FCA. This retaliation included terminating Relator Jackson's employment with Allergan.

526.    As a result of Defendants' retaliatory conduct, Relator Jackson has suffered damages of extended periods of lost pay, undue hardship forced upon Relator Jackson, and harm to his personal and professional reputation.

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves, the United States, and the States, pray:

(a)    That the Court enter judgment against Defendants in favor of the United States and the Relators, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the Federal False Claims Act before November 2, 2015, and $11,000 to $21,563 for each violation after November 2, 2015;

(b)    That the Court enter judgment against Defendants in favor of the States and the Relators in the amount of the damages or penalties sustained by the States, trebled as provided for in the State FCAs, plus civil penalties for each violation of each of the States' FCAs;

143

(c)     That Relators be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim.

(d)     That the Relators be awarded an amount from the proceeds of the action to the States as provided for in the *qui tam* provisions of each of the individual States' FCAs;

(e)     That the Relators be awarded an amount from the proceeds of the action to the States of California and Illinois as provided for in the *qui tam* provisions of each individual States' California Insurance Fraud Prevention Act and the Illinois Insurance Claims Fraud Prevention Act.

(f)     That the Court enter judgment against Defendants in favor of Relator Jackson, for all relief available under 31 U.S.C. § 3730(h), including reinstatement, double back pay, special damages, litigation costs and reasonable attorney's fees, because of Defendants' retaliation against Relator Jackson;

(g)     That judgment be entered against Defendants, in favor of Relators, the United States, and the States, in the amounts to be determined at trial;

(h)     That Relators be awarded all costs and expenses incurred, including reasonable attorneys' fees and costs; and

(i)     That the Court order such other relief as is appropriate.

## <u>RELATORS DEMAND A TRIAL BY JURY</u>

Respectfully submitted this 26th day of July, 2024.

/s/ Michael A. Sullivan
MICHAEL A. SULLIVAN
Georgia Bar No. 691431
msullivan@finchmccranie.com
FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, GA 30303
Tel: (404) 658-9070
Admitted *pro hac vice*

GEORGE F. GALLAND JR.
Illinois Bar No. 0906646
ggalland@lawmbg.com
ROBERT S. LIBMAN
Illinois Bar No. 6282259
rlibman@lawmbg.com
MINER, BARNHILL & GALLAND, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
Tel: (312) 751-1170

JAMES J. BREEN
Georgia Bar No. 079275
jbreen@breenlaw.com
THE BREEN LAW FIRM, PA
11720 Amber Park Drive
Suite 160
Alpharetta, GA 30009
Tel: (770) 740-0008
Admitted *pro hac vice*

JAMES F. BARGER, JR.
Georgia Bar No. 304373
jim@frohsinbarger.com
BEN BUCY
Georgia Bar No. 526064
ben@frohsinbarger.com
FROHSIN BARGER & WALTHALL
100 Main Street
St. Simons Island, GA 31522
Tel: (912) 809-3007
Admitted *pro hac vice*

145

ROBERT H. SNYDER, JR.
Georgia Bar No. 404552
rob@cannellasnyder.com
CANNELLA SNYDER LLC
315 W. Ponce De Leon Ave
Suite 885
Decatur, GA 30030
Tel: (404) 800-4828
Admitted *pro hac vice*

*Attorneys for Plaintiffs/Relators*

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2024, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Michael A. Sullivan</u>
MICHAEL A. SULLIVAN
Georgia Bar No. 691431
msullivan@finchmccranie.com
FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, GA 30303
Tel: (404) 658-9070
*One of the Attorneys for Plaintiffs/Relators*
*Admitted pro hac vice*

146